UNITED STATES DISTRICT **COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal Case No.** |
| | **:** | |
| **KENNETH JOSEPH OWEN THOMAS,** | **:** | **1:21-cr-00552 (CRC)** |
| | **:** | |
| **Defendant** | **:** | |
| | **:** | |

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF KENNETH JOSEPH OWEN THOMAS'**</u>
<u>**MOTION TO SUPPRESS OUT OF COURT IDENTIFICATION**</u>

Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas"), through the undersigned

counsel, John L. Pierce, Esq. presents this Motion and Memorandum of Law and hereby moves

the Court and presents this Memorandum of Law in support of his motion for this Court to

suppress the Government's erroneous mis-identification of Defendant Thomas in out-of-court

video evidence.  Note that the caption of this case tracks the indictment and is not a prejudgment

of whether the Government has mistaken his identity, having originally identified the Defendants

"Joseph Thomas" in the Statement of Fact at Dkt. # 1-1.

## I.    INTRODUCTION AND OVERVIEW

The Acting Chief of Police of the U.S. Capitol Police estimated that there were

"thousands" and in one place described the crowd as 10,000 demonstrators [1] (hundreds of whom

---

[1]      In a statement by Acting Chief of the U.S. Capitol Police, found at **https://twit-ter.com/MikevWUSA/status/1354104955553067010/photo/1** , Yogananda D. Pittman documents during a topic otherwise <u>not</u> relevant to this motion nor adopted by the Accused that the U.S. Capitol Police estimated that "tens of thousands" of demonstrators were at the U.S. Capitol. Elsewhere Pittman estimates the crowd at 10,000.

transgressed into violent acts and are frequently called rioters)[2] who were present at, around, and in many cases inside the U.S. Capitol building on the early afternoon of January 6, 2021.  Of the roughly 1,000 persons charged, many of them for minor charges of basically trespassing, less than 10% of the 10,000 demonstrators present at the U.S. Capitol building on January 6, 2021, transgressed from First Amendment demonstrating to unlawful rioting.

In a crowd of 10,000 people, the likelihood is very high that more than one person will appear on low-quality video (made so by the large number of people included in each scene) to look alike, even though on closer examination they are not the same person.

Given the low quality of video recordings (even with high quality equipment viewing hundreds of people at once, jammed in together and jostling, so that an individual's greatly-magnified face on the screen may be difficult to discern) and the large quantity of people, the presence of COVID-inspired masks, and a propensity for attendees to often wear similar clothes suitable to the cold January day, informal styles, often from certain regions or cultures concentrating certain kinds of clothing, active review and analysis of thousands of hours of video actually shows in reality, not just in possibility, seeing many people who appear at first glance to be the same person but on closer examination they are actually different people.

## II.      FACTUAL CONTEXT:  DEFECTIVE PROCESS OF IDENTIFICATION

The problem with the Government's claims about what Thomas did on January 6, 2021, are not questions of disputed facts to be deferred to the jury.  The problem is a defective process. The procedure is for Government staff who do not know Kenneth Thomas to look at poor-quality

---

[2]      Note that this refers to people actually at or around the U.S. Capitol.  There are (as always with mass demonstrations in D.C.) disputes about the total number of demonstrators at the Ellipse and on the Washington Mall near the White House, etc. in the hundreds of thousands.

video and guess that someone they see on a video – with many wearing masks, wearing similar clothing, or jammed into small spaces – might be someone **_whom they don't actually know in the first place_**.  The Government was not having someone **_who knows Thomas_** viewing videos, but in effect "the blind leading the blind" by scouring thousands of hours of videos.  Here, the original starting point is a social media post for which there is no solid identification.

This is unlike any traditional identification of an accused, which would involve a person who is an eyewitness who actually saw a person live, in person, picking a person whom they know out of photographs.

This is also unlike the Defendant picking himself out in videos or recognizing people around him or passing through the scene or remembering where he was and where he walked. The Defendant is quite confident of what the videos show because Thomas knows who he is and he knows what he did or did not do that do.

The operative Second Superseding Indictment  ("SSI") in this case, filed on December 14, 2022, at Dkt. No. 49, contains no allegations of fact whatsoever.  We must look if at all to the Statement of Facts filed at Dkt. # 1-1.

That is, it is not a question of whether the allegations are adequate, but there are none at all.  The indictment merely states the law allegedly violated under each Count, and nothing else.

However, Defendant, by counsel, suspects that the Government is confusing the actions of two different people.

## III.    GOVERNING LAW:

The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See

id.; see also *Patterson v. New York*, 432 U.S. 197, 215 (1977).

The test to be applied[3] in determining whether an identification procedure is impermissibly suggestive is whether it is "so unnecessarily suggestive and *conducive to irreparable mistaken identification as to violate the accused's due process rights." United States v. Foster*, 394 U.S. at 442 & n.2. "[I]n some cases the procedures leading to an eyewitness identification may be so defective as to make the identification inadmissible as a matter of law." Id. In deciding whether to exclude identification evidence, courts must examine the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188 (U.S. 1972); *United States v. Bagley*, 772 F.2d 482 (9th Cir. 1985), *cert. denied,* 475 U.S. 1023 (1986). In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Court set forth the standards for a motion to suppress due to suggestive pretrial identifications. The Court held that "reliability is the linchpin" in determining the admissibility of identification testimony and applied the "totality of the circumstances" standard. Relevant factors to be considered are: (1) the opportunity of the witness to view the criminal at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of any prior description by the witness; (4) the level of certainty demonstrated by the confrontation; and (5) the time between the occurrence of the crime and the confrontation. *Manson*, 432 U.S. at 104; *Biggers,* 409 U.S. at 199- 200; *United States v. Field*, 625 F.2d 862 (9th Cir. 1980).

From the time the Supreme Court recognized a due process right to exclude from evidence tainted eyewitness identifications, the Supreme Court has looked unfavorably on "show-up" procedures (procedures where the police show the witness a single suspect and ask whether or not the witness can identify the suspect as the perpetrator of the crime). In *Stovall v.*

---

[3]     With compliments to research and analysis in a motion filed by Ocala, Florida attorney David Wilson, in another January 6 case.

*Denno*, 388 U.S. 293 (1967), the first Supreme Court case regarding identification procedures, the Supreme Court acknowledged that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302. Forty-five years later, in 2012, the Supreme Court affirmed that the police-arranged showup at issue in *Stovall* was "undeniably suggestive," but explained that the *Stovall* court had upheld the procedure under the due process clause because the procedure was necessary (noting that necessity was "crucial" to the Stovall decision). *Perry v. New Hampshire*, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).

The Tenth Circuit Court of Appeals has also declared that "show-up identifications are less than ideal" and "should be employed only if compelled by extraordinary circumstances." *United States v. Natalini*, 42 F. App'x 122, 127 (10th Cir. 2002). In other words, show-up procedures are inherently suggestive and their use is improper unless the procedures are necessary under the circumstances. See *United States v. De Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993) (agreeing that in-person show-up procedure was impermissibly suggestive); *Mason v. United States*, 414 F.2d 1176, 1182 (D.C. Cir. 1969) (excluding pre-trial eyewitness identification because "[t]he showing of a single photograph is, like all identification procedures involving a single suspect, highly suggestive" and the procedure was "completely unnecessary"); *United States v. Thomas*, 981 F. Supp. 2d 229, 234 (S.D.N.Y. 2013) ("The Second Circuit has consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one.").

The reason for this rule is sound: [T]he single photo or one-person show-up ***implies*** that the police "have their man" and suggests that the witness give assent to what is already well-known and established. Suggestibility is one of the principal ways in which memory plays tricks

and leads to improper identifications. *United States v. Brown,* 471 F.3d 802, 804 (7th Cir. 2006).

Avoiding the use of show-up procedures, where feasible, minimizes the risks of misidentification

that are associated with asking a victim or witness to accurately remember and identify a

stranger, who was observed only briefly, during a traumatic crime. *Id.*

Prosecutors while enjoying many advantages such as nearly limitless government

resources, must also meet more compelling and strict burdens than usual for attorneys in other

context:

> In *Berger v. United States*, Justice George Sutherland, who was part of
> the Schechter majority, said the following about ***the role of the prosecu-
> tor:***
>
> > **[He] is the representative not of an ordinary party to a
> > controversy, but of a sovereignty whose obligation to gov-
> > ern impartially is as compelling as its obligation to govern
> > at all; and whose interest, therefore, in a criminal prose-
> > cution is not that it shall win a case, but that justice shall
> > be done. As such, he is in a peculiar and very definite sense
> > the servant of the law, the twofold aim of which is that guilt
> > shall not escape or innocence suffer. He may prosecute
> > with earnestness and vigor-indeed he should do so. But
> > while he may strike hard blows, he is not at liberty to strike
> > foul ones. It is as much his duty to refrain from improper
> > methods calculated to produce a wrongful conviction as it
> > is to use every legitimate means to bring about a just one.**
> > 7

*Bennett L. Gershman, "Hard Strikes and Foul Blows:" Berger v. United States 75 Years After, 42
Loy. U. Chi. L. J. 177, 179 (2010). Available at:* **http://lawcommons.luc.edu/lu-
clj/vol42/iss1/8** *(citing to  Berger v. United States, 295 U.S. 78, 88 (1935) (emphases added).*

Perhaps even more compelling:

> Also, there is little doubt that Justice Sutherland's articulation of the spe-
> cial obligation of the prosecutor to ensure that "justice shall be done"
> was influenced by then-Canon 5 of the Canons of Professional Ethics of
> the American Bar Association, which stated:
>
> > **"The primary duty of a lawyer engaged in public prosecu-
> > tion is not to convict, but to see that justice is done. The
> > suppression of facts or the secreting of witnesses capable**

       **of establishing the innocence of the accused is highly rep-
rehensible."**

*Gershman,* at 194.


### IV.    ARGUMENT:

Here, the identification of Kenneth Thomas out of thousands of hours of surveillance and private video recordings were performed by some Government staff with absolutely no knowledge of Thomas whatsoever.[4]  These are not witnesses.  They are not eyewitnesses.  They lack any foundation of knowledge. They were merely looking for a similarity in one video to another video or to a photograph of someone they don't actually know.

Thomas was among a large crowd many of whom were similarly attired, wearing facemasks and headgear.   The facts here weigh heavily in favor of precluding any identification testimony and an analysis of the facts at hand under the judicially required criteria amply demonstrates the reasons for this.

Note that the problem is with a procedure that does not pass constitutional muster for due process.  While it can be disputed as a fact question "Is that on the video Thomas or not?" first this almost requires a witness to testify and waive his Fifth Amendment rights to deny that that actually is him on the video.  This also turns the burden of proof on its head.  Thomas is presumed to be in the videos unless he proves he is not.

Instead, the Government must prove that Thomas actually did what they accuse, that

---

[4]      Interestingly, FBI "case agent" Dubrowski, one of several supervising the activities of entire teams of FBI agents and other investigators, testified in the Proud Boys case *United States v. Nordean*, Case No. 1:21-cr-00175, extensively about the process being followed in the review of as many as 500,000 videos and other evidence.  (Unfortunately the testimony of interest here was scattered throughout cross-examination by many Defendants and not all in one place.) This supports the imperfect processing and review by the FBI of these videos, many of which are still pouring in as Defendants are already going to trial or already concluded trials.

evidence shows that it is Thomas – not someone else – shown on videos doing this or that at different times.

Again, this is not the usual case by any means.  While it may seem far-fetched to wonder if two people look alike, not in a crowd of 10,000 people (as estimated by the USCP then Deputy Chief Pittman).

Therefore, Thomas by counsel challenges the procedure used and respectfully requires an identification on evidentiary video that is constitutionally sufficient and reliable.

## V.      CONCLUSION

The Defendant requests this Court to grant this Motion and such other relief as may be deemed just.  Defendant Kenneth Taylor Thomas, demands that any identification of him on videos be suppressed unless where the identification is done in a constitutionally valid and persuasive manner.  Identification must at a minimum be performed by someone with first-hand, personal knowledge of Thomas.

Dated: February 19, 2023                                  Respectfully Submitted,
                                                                              */s/ John M. Pierce, esq.*
                                                                              John M. Pierce, esq.
                                                                              21550 Oxnard Street
                                                                              3rd Floor, PMB #172
                                                                              Woodland Hills, CA 91367
                                                                              Tel: (213) 400-0725
                                                                              Email: Jpierce@johnpiercelaw.com
                                                                              Attorney for Defendant

CERTIFICATE OF SERVICE

I, John M. Pierce, hereby certify that on this day, February 19, 2023, I caused a copy of the fore-going document to be served on all counsel through the Court's CM/ECF case filing system.