## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-MJ-448** |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT KENNETH JOSEPH OWEN THOMAS'S MOTION TO DISMISS FOR VINDICTIVE, SELECTIVE, AND RETALIATORY PROSECUTION

COMES NOW Defendant Kenneth Joseph Owen Thomas ("Defendant" or "Thomas") with this Motion to dismiss for vindictive, selective, and retaliatory prosecution, pursuant to Rules 7(c)(1) and 12(b)(3)(B) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments to the United States Constitution.

Federal prosecutors have severely increased charges against Defendant Thomas when Thomas indicated he intended to defend himself.

Prosecutors are construing mere brushing against cops on Jan. 6 as felony "assaults" on law enforcement officers—in contradiction to how prosecutors treat similar conduct in other similar situations.

Prosecutors are construing mere involvement in crowd demonstrations *outside* the Capitol hours <u>after</u> Congress recessed on Jan. 6 as "disrupting official proceedings of Congress," exposing Thomas to a twenty-year prison sentence in a manner unheard of in the annals of federal prosecutions.

**BACKGROUND**

Defendant Thomas is accused of being part of a caravan of individuals which drove into D.C. from surrounding states on January 6, 2021.  Thomas allegedly watched speeches of Trump and others, and then made his way to the Capitol grounds where Thomas found himself in the midst of certain crowd chaos.

Thomas was initially charged **on May 25, 2021** with six (6) criminal counts relating to alleged participation in the events of January 6:

- Assaulting Officers in violation of 18 U.S.C. § 111(a).

- Obstruction of Law Enforcement During Civil Disorder, 18 U.S.C. § 231(a)(3)

- Knowingly Entering or Remaining in a Restricted Area in violation of 18 U.S.C. § 1752(a)(1)

- Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

- Engaging Physical Violence in Restricted Building or on Restricted Grounds, in violation of 18 USC 1752(a)(4)

- Engage in Physical Violence on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F)

Then, four months later, on **September 1, 2021**, Thomas was indicted on *ten* (10) counts relating to the same events.  Thomas pled not guilty (again) on Sept. 30, 2021.

On Jan. 25, 2022, Youngstown, Ohio News channel WKBN published the headline "Plea expected in case of East Liverpool man charged in Capitol riot."  The news story reported that "Kenneth Joseph Owen Thomas, 38, is facing several charges in the 10-count indictment," and "[a]ccording to court records, a Jan. 25 hearing was continued until March 25 so he can consider the plea offer."



Then on January 26, 2022, Thomas was indicted *yet again* on a ten-count superceding indictment.[1]  The Court's 3/23/22 minute order reflects the focus on pressuring Thomas toward a guilty plea.  The Court mentioned "the need for defense to . . . review the government's forthcoming plea offer."  Again, for the ends of justice, the Court again extended the Speedy Trial clock.

For some thirteen months, Thomas faced ten counts, including three counts of assaulting officers under 18 U.S.C. Section 111(a)(1).  But when Thomas indicated he was firing his attorney and rejecting the plea offer presented by the government, The government issued a second superseding indictment against Thomas (his 4th set of charges) on December 14, 2022 (ECF #49).

---

[1] Because the Secret Service had concealed the true whereabouts of Vice President-Elect Kamala Harris from the Justice Department for many months after January 6, hundreds of J6 indictments contained the false claim that defendants had committed crimes in the Capitol near the Vice President Elect.  When it was finally revealed that VP-Elect Harris was at the Democratic National Committee headquarters (and not the Capitol) on Jan. 6, the DOJ was forced to return to the grand juries and obtain hundreds of new indictments.

The next day, December 15, attorney John Pierce entered his appearance.  And on December 16, attorney Conte withdrew.

Thomas' new indictment contains **twelve total criminal counts**, including **two additional counts** of assaulting officers in alleged violation of 18 U.S.C. Sec. 111(a)(1). Thomas now faces **five felony counts of assaulting officers** at the Capitol during January 6 riots.

## DISCUSSION

**The government has added charges against Thomas to punish Thomas for declining the government's plea offer.**

In *United States v. Velsicol Chemical Corp.*, 498 F. Supp. 1255 (D.D.C. 1980), Judge Parker ordered dismissal of an indictment used as retaliation by the DOJ against a defendant where the United States threatened the defendant with new charges if the defendant didn't plead guilty.  The defendant angered federal prosecutors by declining to plead guilty; instead pleading no contest and refusing to 'confess' to the allegations.

Vindictiveness principles are triggered when a prosecutor without notice increases the possible sanction severity for no valid reason after the defendant has exercised a procedural right. (See *United States v. Andrews* (6th Cir. 1980), 633 F.2d 449 (6th Cir. 1980) (en banc); *United States v. Ruesga-Martinez* (9th Cir. 1976), 534 F.2d 1367; *United States v. Gerard* (9th Cir. 1974), 491 F.2d 1300; *United States ex rel. Williams v. McMann* (2d Cir. 1970), 436 F.2d 103, *cert. denied* (1971), 402 U.S. 914 (1971).

**The government's explanation defies common sense.**

For its part, the government has responded to defense emails indicating that the new charges were based on "additional case investigation."

The AUSA referenced "an email thread we had with [prior defense counsel] Mr. Conte beginning in early November 2022." "That thread reflects that in/around November 9, 2022, I reached out to Mr. Conte to (1) notify him that additional case investigation revealed at least one additional assault and we were likely going to supersede on the indictment on that basis, and (2) discuss trial dates, given the Court had required us to provide it with an update on whether a plea was likely or, if not, potential trial dates."

"Then," according to the AUSA, "we notified the Court and Mr. Thomas on the record during the November 21, 2022 status conference that we were intending to supersede, and the Court specifically contemplated the second superseding indictment when it set a March 2023 trial date." "Mr. Thomas would be hard-pressed to show he is owed a presumption of vindictiveness prior to trial," claimed the federal prosecutor, citing *United States v. Goodwin*, 457 U.S. 368, 381–82 (1982).

Contrary to the government's suppositions, the government's imposition of additional charges upon Thomas when it became clear that Thomas intended to defend himself does indeed invoke the presumption that the government acted in retaliation.

Although "a mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule," wrote the Supreme Court in *Goodwin*, cases which "pose a realistic likelihood of vindictiveness" do indeed invoke such a presumption. *Goodwin*, at 384. The due process clause prohibits the government from punishing a person because he has done what the law plainly allows him to do. *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604. In a series of cases beginning with North Carolina v. Pearce and culminating in Bordenkircher v. Hayes, the Court has recognized this basic—and itself uncontroversial—principle.  For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.

For these reasons the additional charges against Thomas imposed in the December 14, 2022 superceding indictment must be dismissed as violative of the due process clause.

## THOMAS' INDICTMENT MUST ALSO BE DISMISSED DUE TO SELECTIVE PROSECUTION.

### NEVER HAS THE JUSTICE DEPARTMENT TREATED PROTESTORS AT THE CAPITOL IN THE WAY THE JUSTICE DEPARTMENT IS TREATING JANUARY 6 DEFENDANTS

Never.  Literally never, has the Department of Justice treated protests and riots at the Capitol in this way.  There have been hundreds of such protests, and some produced extensive damage to facilities and infrastructure and even bombings, killings, and gunfire at congressmen.[2] See, e.g., *Mahoney v. United States Marshals Serv.*, 454 F. Supp. 2d 21 (DCDC 2006) ("[in] recent years . . . armed gunmen have stormed the Capitol building more than once").[3]

In 1932, tens of thousands of veterans occupied and encamped on the Capitol grounds for weeks, demanding a bonus.  Although the U.S. Army forcibly cleared the protestors from Capitol grounds and 135 people were arrested, those arrested generally faced only misdemeanor charges; despite "angry packs h[olding] their ground, defiantly wielding clubs and iron bars, yelling profanities."[4]

In 2015, Code Pink protestors took over and disrupted a hearing before the Senate Armed Services Committee, screaming "Arrest Henry Kissinger for war crimes!" and carrying signs spelling

---

[2]Laura Greggel, "10 times the US capital weathered political violence," *Live Science*, Jan. 6, 2021 https://www.livescience.com/political-violence-us-capital.html (accessed 9/16/2022). pril 4–8, 1968: Washington, D.C., riots: Following the Assassination of Martin Luther King Jr. on April 4, 1968, a four-day period of violent civil unrest erupted near the intersection of 14th and U Streets NW. Approximately 200 stores had their windows broken and 150 stores were looted, most of them emptied. Thirteen people were killed

[3] "List of Incidents of Political Violence in Washington, D.C., "https://en.wikipedia.org/wiki/List_of_incidents_of_political_violence_in_Washington,_D.C. (accessed 9/16/2022).

[4] See Wyatt Kingseed, "The Bonus Army Storm into Washington," *History.net*, 6/12/2006, https://www.historynet.com/wwi-bonus-army-protest-in-washington/ (accessed 9/16/2022)

out their hatred of the former secretary of state.[5]  <u>No one was even arrested</u>.  In 2018, hundreds of

protestors took over and disrupted the Capitol and occupied the Senate chamber and halls for

hours.[6]  This lengthy occupation of the Capitol forced senators and representatives to shelter in

place in their offices for hours.  Some three hundred protestors were arrested.[7] They ultimately paid

$50 fines.

---

[5] Sophia Rosenbaum, "McCain slams Kissinger protesters: 'Get out of here you low-life scum'," January 29, 2015, https://nypost.com/2015/01/29/mccain-to-anti-kissinger-rabble-get-out-of-here-you-low-life-scum/

[6]"Kavanaugh protesters arrested at Capitol, after thousands march on Supreme Court," *Fox News*, Oct. 4, 2018 ("By Thursday afternoon, Capitol Police began arresting hundreds of protesters inside the Hart Senate Office Building who raised their fists and loudly started chanting "Kavanaugh has got to go." Arrests were made after protesters began sitting down in the building's atrium, refusing to cooperate with law enforcement. In all, some 302 protesters were arrested and charged with unlawfully demonstrating in Senate office buildings Thursday, police said."). https://www.foxnews.com/politics/kavanaugh-protesters-arrested-at-capitol-after-thousands-march-on-supreme-court (accessed 9/22/2022).

[7] Sophie Tatum, "More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill," CNN https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html (accessed 9/17/2022).



American law has always recognized that zealous and heated protest is part of people seeking redress of grievances at the U.S. Capitol.

The same is true of state capitols, which have also been the settings for tumultuous demonstrations and protests.  In 1936 an army of up to 250 unemployed men occupied the New

Jersey State Capitol in Trenton for eight days in protest over unemployment and poverty.[8]  In 1967,

Black Panthers took over the California State capitol and actually drove out the California legislature

using semi-automatic M-1 Carbine rifles.  The longest sentence served in the matter was one year in

ja



In 2014, pro-union protestors took over and occupied the Wisconsin Capitol for many days.

"Thousands of protesters rushed to the … forcing their way through doors, crawling through

[8] Jon Blackwell, 1936: An 'army' seizes the Capitol, The Trentonian
On April 21, 1936, for the first time since the Revolutionary War, a force calling itself hostile and
insurrectionary occupied the state Capitol in Trenton. http://www.capitalcentury.com/1936.html (accessed
9/16/2022).

windows and jamming corridors." "Protesters ripped the hinges of an antique oak door at the State

Street entrance and streamed inside."[9] As the crowd scoured the building looking for the offending

legislators, police sneaked them out through an underground tunnel to a government building across

the street. But a Democratic representative posted on social media that the Republican senators

were escaping through the tunnels, so when the senators came up into the lobby, the mob was there

waiting for them.

> "The tall windows that framed the lobby were plastered with people
> yelling and banging on the glass," we wrote. "They were trapped. -The senators
> hid under a stairwell, out of view, while the police ordered a city bus to pull up in
> front of the building. Officers then formed a human wall on the sidewalk, parting
> the sea of protesters and creating a pathway for the senators to reach the bus."
> -Once the senators were on board, "the mob on the street began punching the
> windows and shaking the vehicle. … The police told the senators and staff inside
> to keep their heads down in case a window shattered."[10]

Police found dozens of .22-caliber bullets scattered across the Capitol grounds. The

occupiers drew chalk outlines of fake dead bodies etched with [Governor] Walker's name on the

floor, and carried signs that read "Death to tyrants," "The only good Republican is a dead

Republican" and one with picture of him in crosshairs with the words, "Don't retreat, Reload."[11]

There were no arrests or prosecutions.

In all of these protests, violent demonstrations, and mass occupations of the Capitol, never

has the Justice Department embarked on a wholesale crusade to find and prosecute every

conceivable potential violation of federal law.  "[I]n most cases, probable cause to arrest defeats a

claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938, 941 (7th Cir. 2020). However, "the

no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he

---

[9] Marc A. Thiessen "Opinion  Democrats were for occupying capitols before they were against it,"
*Washington Post*, January 14, 2021, https://www.washingtonpost.com/opinions/2021/01/14/democrats-
were-occupying-capitols-before-they-were-against-it/ (accessed 9/16/2022)
[10] Id.
[11] Id.

was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728, 204 L. Ed. 2d 1 (2019).

Like Thomas, the Portland protestors were accused of assaulting federal officers, committing civil disorders, and related offenses.  (But the alleged facts in the Portland cases were generally far more severe and included protestors hitting, choking, and swinging at officers with weapons.)  In each case, the United States Attorneys Office (representing both Democratic and Republican presidential administrations) treated pro-Trump protestors more harshly than anti-Trump protestors.

**In most cases, the anti-Trump demonstrators had their charges dismissed!** The selectiveness of the DOJ's approach to protests, riots and demonstrations is clear.  When *anti-Trump* protestors demonstrate, disrupt government proceedings and brutally attack federal officers, the DOJ usually dismisses the charges.  But when *pro-Trump* demonstrators demonstrate, they are exposed to years in federal penitentiaries for merely brushing or pressing against cops or tossing a traffic cone or a water bottle.

A "large majority of the Portland rioters charged with identical offenses arising out of a "political riot" had their cases dismissed, were offered pretrial diversion, or plead to significantly reduced charges." Miller's motion, page 18.  "And, unlike Mr. Miller [and Thomas], many of the Portland rioters engaged in serious assaultive conduct such as punching officers, attempting to break bones of

officers, putting officers in choke holds or head locks, and alike." *Id.*

Miller's 06/24/21 motion is attached.  In turn, Miller's motion contains numerous attached pleadings from Oregon cases, including arrest warrants showing cases involving facts far more egregious in Oregon than the facts alleged in Thomas' case.

Miller's motion was denied by Judge Nichols on December 21, 2021 (ECF # 67 in the *Miller* case).  Judge Nichols ruled that the government has broad discretion and is privy to more information than the public knows, and that there are differences between the Portland rioters and Jan. 6 protestors.  "The Portland rioters' conduct, while obviously serious, did not target a proceeding prescribed by

the Constitution and established to ensure a peaceful transition of power. . . . The circumstances between the riots in Portland and the uprising in the Nation's capital differ in kind and degree, and the Portland cases (and the government's prosecutorial decisions) are therefore not sufficiently similar to this case to support Miller's request for discovery," wrote Judge Nichols.

CONCLUSION

For all the above stated reasons, the indictment against Thomas must be DISMISSED.


Dated: February 23, 2023                                Respectfully Submitted,

                                                        */s/ John M. Pierce*
                                                        John M. Pierce
                                                        John Pierce Law P.C.
                                                        21550 Oxnard Street
                                                        3rd Floor PMB #172
                                                        Woodland Hills, CA 91367
                                                        P: (213) 349-0054
                                                        jpierce@johnpiercelaw.com

CERTIFICATE OF SERVICE

 I, John M. Pierce, hereby certify that on this day, February 23, 2023, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

*/s/ John M. Pierce*

John M. Pierce