UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. |
| | : | |
| KENNETH JOSEPH OWEN THOMAS, | : | 1:21-cr-00552-DLF |
| | : | |
| Defendant | : | |
| | : | |

## MOTION FOR DISCLOSURE OF BRADY MATERIALS AND EMORANDUM OF LAW IN SUPPORT OF KENNETH JOSEPH OWEN THOMAS'S MOTION FOR REQUIRED DISCLOSURE OF POTENTIALLY EXCULPATORY INFORMATION

Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas"), through the undersigned counsel, John L. Pierce, Esq. and presents this Memorandum of Law in support of his motion for this Court to enter an Order that the U.S. Government disclose to the Defendant promptly, the following information necessary to the Defendant's defense pursuant to pretrial discovery under Rules 6(e)(3)(C) and 16(a)(1)(A) of the Federal Rules of Criminal Procedure, Rule 16 of the same, *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny, and Gray's Due Process rights under the U.S. Constitution.   In support of his motion Thomas states as follows:

## I.  INTRODUCTION AND OVERVIEW

The operative Second Superseding Indictment  ("SSI") in this case, filed on December 14, 2022, at Dkt. No. 49, contains no allegations of fact whatsoever.  We must look if at all to the Statement of Facts filed at Dkt. # 1-1.

Disclosure of the documents, records, and information is constitutionally mandated under *Brady v. Maryland* (1963) if *<u>at any stage</u>* of the proceedings – including locating witnesses – the

1

information may be or lead to information that would cast any doubt on the alleged guilt of a Defendant.  This includes information necessary for cross-examining witnesses as well as effective preparation to question witnesses.  Constitutionally-mandated disclosure under *Brady* includes any evidence establishing a defense to an apparent *prima facie* case against the Defendant.

But again, the important goals of *Brady v. Maryland* including locating witnesses (including realizing that a person would have been in a location or position to be a witness) has been fervently ignored by the U.S. Department of Justice ("DoJ") in these January 6 prosecution cases.  The intensity with which the necessity of identifying witnesses, locating them, interviewing them, and serving them with subpoenas is strenuously resisted is concerning.

Yet the Court is urged not to fall in a ditch as too many others have:  This is not about predicting or deciding the ultimate facts.  This is a demand "Let's take a look and see."  The only showing that the Defendant needs to make is the mere possibility that the demanded records and information could affect the jury's decision to one of the elements of a charged crime.

This is not a motion to dismiss (not yet).  The Defendant needs only to show that there is a plausible possibility that the information demanded might change the result of the prosecution, even as to only one element of even one crime charged, to be potentially exculpatory information.  It is not relevant at this stage whether the prosecution argues otherwise or the Court believes one view or the other.  All that is relevant is that there is a plausible scenario under which the demanded documents, records, and information could be exculpatory or could lead to evidence of Defendant's innocence.  Once the Defendant makes that showing, no response or disagreement is in order.   We then actually read the documents – and stop guessing.

The Court is most definitely not being asked to jump to the end of the trial and decide

now at this stage what happened.  All that is in order is to actually _look_ at the documents and records and see what they actually say.

Finally, the Defendant categorically rejects explanations invented for trial.  The demand is for the contemporaneous, real-time, as-it-happened records of the decision-making and the threat assessments developing throughout the morning and early afternoon of January 6, 2021, leading to a decision at or earlier than 1:00 PM to recess the Joint Session of Congress and evacuate the U.S. Capitol.

That decision having been made by or earlier than 1:00 PM, it would be a scientific impossibility for Defendant Thomas to have obstructed an official proceeding by arriving at the Capitol at around **3:00 PM.**

Opinions of Government officials prepared for trial are unavailing.  After-the-fact conclusions are not relevant.  We know for a fact that the USCP decided to recess the official proceeding and evacuate the building.  We have not seen any official documentation of why.

We need not guess.  _**We need only read**_ the documents.  No speculating.

Again, it is not the task of the Defendant in this motion to establish what actually happened, nor is it in order for the prosecutors or the Court to try to find ways of escaping the mandates of _Brady_.  It is irrelevant whether an actual look at the documents might show something unexpected.

It is only relevant that there is a reasonable chance that actually reading the documents might reveal exculpatory information.  The Government's response is not (will not be) in order.  The Court's pre-judgment about what actually happened on January 6, 2021, will not be in order.

What is before the Court is compelling production of documents that will actually tell us what happened, _**as it was happening**_, instead of speculation.

However, we also observe that through multiple trials relating to January 6, 2021, the Government has not used any such records or documents or information about the decision-making of the USCP to recess the Joint Session of Congress.  It is not that there is inculpatory information.  If there were, the Government would be using it against various Defendants. Instead, the USCP and DoJ have furiously and fervently resisted telling the Courts the actual truth of what actually happened, in real time.  See Exhibits 2 and 3, in which the USCP was ordered to produce this information and these records in December 2021.  The USCP has defied those orders and refused to comply.

## II.  OVERVIEW AND FACTS PERTINENT TO THE MOTION

Factually, Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas") is accused of

a.  Arriving at the West Terrace of the U.S. Capitol building at approximately 3:00 PM on or about January 6, 2021.

b.  Departing the U.S. Capitol grounds  at approximately 4:40 PM on January 6, 2021.

c.  Approaching the West Terrace of the U.S. Capitol buildings in a random, uncoordinated, pathway unrelated to anyone else in response to the cries and signs of injured people in distress, displaying no plans to move in formation toward any objective.

d.  Departing the U.S. Capitol building in a conspicuously uncoordinated, random pathway disconnected from anyone else.

From these factual allegations, Thomas is accused and being prosecuted, *inter alia*, under

a.  Count One, 18 U.S.C. § 231(a)(3) -- Obstructing, impeding, or interfering with any law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder

b. Count Two, 18 U.S.C. § 1512(c)(2) -- Obstruction of an Official Proceeding and Aiding and Abetting

c. Count Three, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers,,

d. Count Four, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers,

e. Count Five, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers,

f. Count Six, 18 US.C. 111(a)(1)) Assaulting, Resisting, or Impeding Certain Officers,

g. Count Seven, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers,

h. Count Eight, 18 U.S.C. § 1752(a)(1)) -- Entering or Remaining in a Restricted Building or Grounds

i. Count Nine, 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Disruptive Conduct in a Restricted Building

j. Count Ten, 18 U.S.C. § 1752(a)(4) – Engaging in Physical Violence in a Restricted Building or Grounds

k. Count Eleven, Count Eleven, 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building

l. Count Twelve, 40 U.S.C. § 5104(e)(2)(F) – Act of Physical Violence in the Capitol Grounds or Buildings

Assuming, *arguendo*, that the Government may offer the Statement of Facts in lieu of a factually deficient indictment, that a "JOSEPH THOMAS" (alleged to be Kenneth Thomas) known to the Government only by comparing one video against another, not from any personal knowledge, is noticed in the evidence at the earliest at 3:09 PM and is observed, the document claims, on body-worn ("bodycam") videos until 3:20 PM, when he left an area of the "risers" as the document describes.

The Statement of Facts then includes extensive factual allegations of encounters from

4:22 PM to 4:30 PM.  However, the Government has not identified when it believes Thomas

departed the Capitol area entirely.  However, the Government's evidence of someone whom they

think is "Joseph Thomas" being near the U.S. Capitol apparently runs only up to about 4:40 PM

EST on January 6, 2021.

However, the recess of the Joint Session of Congress on January 6, 2021, **began at 2:13**

**PM** when Speaker Nancy Pelosi's security detail whisked her away from the Speaker's dais and

she "tossed" (figuratively speaking) the presiding officer status to Rep. Jim McGovern (D. -

Mass.)  During the prosecution case in chief of *USA v. Stewart Rhodes*, in this District Court,

Case No. 1:22-cr-00015, on October 19, 2022, the (then) U.S. House of Representatives

Parliamentarian Thomas Wickham testified that Speaker of the House Nancy Pelosi was whisked

away from the podium by security at 2:13 on January 6, 2021.

According to the Congressional Record, Rep. McGovern then took over and recessed the

House at 2:18 PM. [1]  This would be consistent with McGovern needing about 5 minutes to

unexpectedly take over, talk to the USCP and the Parliamentarian about what to do, and to then

invoke Rule I, Clause 12.  The records reflect that the Congress reconvened a few minutes later,

and finally recessed on or before 2:29 PM.

Nevertheless, the beginnings of the recess process were no later than 2:13 PM when the

U.S. Capitol Police moved Pelosi off the floor.   The USCP's after-action timeline reflects that

the USCP ordered a lock down of the U.S. Capitol at 2:00 PM, while the USCP union insists that

---

[1]       The court may take judicial notice that the House was recessed by the presiding officer at
2:18 PM, pursuant to standing Rule I, Clause 12(b) (allowing for immediate recess without a
vote upon notice of a threat).  **Congressional Record House Articles | Congress.gov | Library**
**of Congress,** Counting Electoral Votes--Joint Session Of The House And Senate Held Pursuant
To The Provisions Of Senate Concurrent Resolution 1; Congressional Record Vol. 167, No. 4
(House of Representatives - January 06, 2021)
**https://www.congress.gov/congressional-record/2021/01/06/house-section/article/H76-4**

that took place at 1:00 PM.

Then the House and the Senate very briefly reconvened but finally recessed at 2:29 PM.
The USCP actually evacuated the Capitol building at approximately 2:45 PM to 2:50 PM.[2]

That is, the decision to recess the official proceeding known as the Joint Session of
Congress was reached as early as 2:13 PM, based on causes that existed as early as 1:00 PM.

However, Defendant Thomas was not at the Capitol at 1:00 PM nor even 2:13 PM.

Thus, Count II of the crimes charged against Defendant Thomas under 18 U.S.C.
1512(c)(2) is scientifically and chronologically impossible.  Like the majority of Defendants
charged relating to the events centered around the events of January 6, 2021 at the U.S. Capitol,
it would be a violation of the laws of time and the laws of the universe for Defendant Thomas to
have caused an effect at the U.S. Capitol before he arrived.

This is not merely a question of factual evidence.  Attorney Juli Haller argues in *USA v.
Crowl,* Case No. 1:21-cr-00028 that the crime was complete and closed when the decision was
made to recess the official proceeding.  It is legally impossible for someone to participate in a
crime already completed at or before 2:13 PM, most likely at 1:00 PM.  No one could participate
in a crime already legally completed.  No one could aid or abet a crime already finished.  Once
the recess of the Joint Session of Congress had occurred, and the recess and evacuation was
under way, the crime was concluded.

The Government's case under 18 U.S.C. 1512(c)(2) rests upon reversing the laws of
cause and effect, arguing that an effect happened in time before its cause.

The U.S. Capitol Police ("USCP") ordered a "lockdown" (as its after-action timeline

---

[2]     Clearly, evacuation does not mean that the USCP left or that the building was empty of
demonstrators, but refers in this context to Members of Congress and their staff.

describes it) at 1:00 PM.[3]  Reading the various activities, it is abundantly clear that the

"lockdown" at 1:00 PM was due to the discovery of pipe bombs at the Republican National

Committee headquarters located across the intersection at the Capitol South Metro Station from

the Cannon House Office Building and about 2-3 very long blocks from the U.S. Capitol

building and about 1 long block from the Capitol grounds.

At that time, the USCP could not reasonably know if more pipe bombs were hidden

around the Congressional buildings or the Capitol complex.  One assumes that the documents

will reveal a preoccupation with determining if additional pipe bombs might be lurking threats

hidden around the area.  This is why we need to see the documents, not speculate.

By 1:15 PM, a second pipe bomb was found about 3 blocks farther South at the

headquarters of the Democrat National Committee.

The USCP after-action timeline reports the lockdown ordered by (then) Deputy Chief

Pittman at 2:00 PM on January 6, 2021.  However, the USCP union among sharp criticism of

Pittman and other USCP leadership objects that

> "Acting Chief Pittman stated that she ordered the lockdown. To be clear,
> it was actually Inspector Loyd who initially ordered the Capitol
> lockdown approximately 1 hour prior to Chief Pittman's order. That was
> the only time that day I heard Acting Chief Pittman on the radio," says
> Chairman Papathanasiou."

https://s3.documentcloud.org/documents/23566784/492350885-read-u-s-capitol-police-

labor-committee-statement.pdf  Recordings of radio communications among USCP confirms

this because USCP officers are heard laughing (perhaps out of anxiety or frustration) when

---

[3]     Publicly released in redacted form by the U.S. Department of Justice ("DoJ") in *United States v. Dan Gray*, Criminal Case No. 1:21-cr-00495, as Exhibit 1 to the Government's Opposition to Dan Gray's Notice of Alternative Perpetrator Offense, filed as Dkt. # 63-1, which is also marked as CAPD_000003203.  That same Exhibit 1, as redacted, is attached here as Exhibit 1.

Pittman ordered a lockdown of the Capitol.  Inspector Loyd had already declared a lockdown around 1:00 PM on January 6, 2021, and therefore the 2:00 PM order struck them as an hour late. Again, this is a contemporaneous, real-time, as-it-was-happening radio call recording, not after-the-fact reinterpretation or spin.  It is supported by the fervent and frustrated declarations of the USCP Labor Committee union.

Unfortunately, the Government refuses to address the task at hand, that some people committed violence, most did not; some people brawled with police, most did not; some people obstructed an official proceeding, most did not.  The task is to present admissible and reliable evidence of who did and who didn't.  The Government's unwillingness to accept that there was a diversity of behavior and actions on January 6, 2021, not a monolithic hive mind of robotic automatons is creating many very egregious reversible errors.

## III.  GOVERNING LAW WITH OVERALL ANALYSIS:

Rule 16 of the Federal Rules of Criminal Procedure requires that:

> *  *  *
>
> Rule 16. Discovery and Inspection
>
> (d) Regulating Discovery. (1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal. (2) Failure to Comply. If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

Local Rule 5.1 "DISCLOSURE OF INFORMATION" prescribes that:

(a) Unless the parties otherwise agree and where not prohibited by law, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that is known to the government. This requirement applies regardless of whether the information would itself constitute admissible evidence. The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case.

(b) The information to be disclosed under (a) includes, but is not limited to: (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged; (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty; (3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged; (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and 132 (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

(c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the government intends to call at trial, this rule does not require the government to disclose such information before a trial date is set.

(d) In the event the government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information.

(e) For purposes of this rule, the government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The government has an obligation to seek from these sources all information subject to disclosure under this Rule.

(f) The Court may set specific timelines for disclosure of any information encompassed by this rule.

(g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

Brady information must be disclosed on a rolling basis as available—"the duty to disclose is ongoing." *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987).  See *United States v. Celis*, 608 F.3d 818, 835–36 (D.C. Cir. 2010). *Giglio* obligations are also ongoing. Should the Government request it, the Court will enter a protective order precluding counsel from sharing Giglio information with their clients.

 "[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would have been different",' although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963), is very broad. *See* United States Justice Manual (USJMM) § 9-5.001. For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence--- including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence. This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence." *Id.*

The Defendant is entitled to the documents and the evidence, to the extent potentially or here likely to be exculpatory information as required by *Brady v. Maryland, 373 U.S. 83 (1963)* ; *See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan, (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014).

However, the Defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id.* Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense,

the result of the proceeding would have been different." *Id.* at 134 (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

Even apart from a Rule 29 motion to dismiss at trial, an actual conviction after trial can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id.*   Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the government can be an intentional or inadvertent failure to disclose the evidence. *Id.* at 137.

And courts in in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*.  *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

When the Defendant requests <u>*Brady*</u> materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.

Under *Brady*, evidence may still be material and favorable despite being inadmissible, provided it could lead to admissible evidence. *Saffarinia*, 424 F.Supp.3d at 91.

It is highly relevant that the Defendant is explicitly asking for specific information, not passively hoping that the prosecution will notice and think to disclose information on its own initiative.

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> " The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

> "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.[20] Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Id.* at 112.  To extend this point, the U.S. Supreme Court is saying that the requirement that a Defendant be presumed innocent until proven guilty beyond a reasonable doubt is a principle that applies to all aspects of the case, including whether a failure to disclose potentially exculpatory information violates the Due Process Clause.

> "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an Defendant,"  *Brady*, 373 U.S., at 87, 83

> S.Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The trial judge's function is limited to determining if a case for production has been successful and supervising the process. *Id.*

Closely associated with the federal rule are several U.S. Supreme Court decisions which hold that a defendant has a right to the testimony of witnesses. *See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l Responsibility Rule 3.8(d).

In *Hunter v. District of Columbia* , 47 App. D.C. 406 (D.C. Cir. 1918), for example, the D.C. Circuit Court examined an indictment that alleged that the defendants had

> "congregate[d] and assemble[d] on Pennsylvania avenue, N.W., [and] did then and there crowd, obstruct, and incommode the free use of the sidewalk thereof on said avenue" in violation of the unlawful assembly statute. *Id.* at 408. Beyond the general terms of acts prohibited by the statute, there was no averment of fact "to inform defendants of the nature of the acts which [were] relied upon by the prosecution as constituting alleged obstruction of the sidewalk, or that would enable defendants to make an intelligent defense, much less to advise the court of the sufficiency of the charge in law to support a conviction." *Id.* at 410. And the fact that the charging document "fail[ed] to set out the acts committed by the defendants which constituted the crowding bstructing of the free use of the walk by them[,]" *Id.* at 409, was a fatal flaw.

As stated by the Hunter Court:

> [i]t is elementary that an information or indictment must set out the **facts** constituting the offense, with sufficient clearness to apprise the defendant of the charge he is expected to meet, and to inform the court of their sufficiency to sustain the conviction. ... In other words, when the accused is led to the bar of justice, the information or indictment must contain the elements of the offense with which he is charged, with sufficient clearness to fully advise him of the **exact** crime which he is alleged to have committed.

*Id.* at 409, 410 *(emphasis added)* (internal quotation marks and citation omitted).

The *Hunter* Court also observed that the defendants in that case could have engaged in a number of acts that fell outside the scope of the statute, and thus, by failing to specify the defendants' particular conduct, the indictment was "too vague, general, and uncertain to meet the requirements of the established rules of criminal pleading," which in turn rendered it "insufficient in law." *Id.* at 410.

Furthermore, here in this case, the Government has spread the false implication, like an inkblot test, that the U.S. Capitol and its grounds are presumptively restricted areas.  But as Federal courts in this District have reasoned in reaching legal conclusions:

> **_The Capitol Grounds_** (excluding such places as the Senate and House floors, committee rooms, etc.) **_have traditionally been open to the public_**; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

> The courts in this jurisdiction have long recognized that **_"[t]he United States Capitol is a unique situs for demonstration activity"_** and **_"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,_** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways,

and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added).*

Thus, the Government must not only provide notice of a temporary restriction but must provide such notice in a legally effective way.  To prosecute anyone under 18 U.S.C. 1752(a)(1), which requires that a Defendant act "knowingly," the Government must prove that the Defendant acted "knowingly."  "Knowingly" is a required element that must be proven to establish guilt.

Thus, where the U.S. Capitol Police Board attempted – but failed – to provide notice, because it used flimsy paper signs approximately 11 inches by 14 inches, laminated by a thin layer of plastic[4] zip-tied to movable bike racks that were knocked over, hiding the signs, the transformation of a place normally open to the public into a restricted grounds or building has failed to take place, legally.  Even if it was the desire or plan to restrict a building or grounds, if the USCP Board failed to do so effectively, the area was never restricted.  The area was not actually ever restricted because of the inadequacy of notice, but certainly not for those arriving after the bike racks were moved or knocked over hiding the signs.[5]

---

[4]     At least one photo shows such a sign on a bike rack ripped in two.

[5]     Some have become confused by the idea that a person seeing a few people engaged in ri-oting or violence is equivalent to notice of a restriction.  That is nonsense.  A legal restriction is created by an announcement seen by the public.  A brawl does not create a restriction.  A person seeing something wrong is not required to leave the area nor are they placed on notice of a re-striction.  They are placed on notice that a few people are misbehaving, but not of a restriction.  Even observing an attack on police would indicate an inexplicable violence only.  If a person is attending a football game among 20,000 other people, and a brawl breaks out in the stands, this does not signal that no one of the 20,000 attendees is allowed to be in the stadium.  There is no legal restriction created upon those who are law-abiding, peaceful, and non-violent by seeing a few people who are violent and engaged in chaos.  The peaceful attendees are entitled to assume that the police will arrest those engaged in a brawl and the football game will resume.  Thus the idea that peaceful demonstrators were on notice of a legal restriction by seeing rioting by a few is

## IV. ARGUMENT

### A.  GOVERNMENT'S COUNT II UNDER 18 U.S.C 1512(c)(2) IS FOUNDED ON BASELESS OPINION, SPECULATION

If -- at the conclusion of the evidence -- a Defendant might have committed a crime, or perhaps not, then under our legal system and constitutional Due Process, an order of acquittal is mandatory.  Once the cream is mixed into the coffee, it cannot be removed.  Sending to the jury a Count for which there has been no sufficient, competent evidence to allow jury consideration would confuse, inflame, and incite the jury to a lawless verdict.  A Court cannot unring a bell.

The standard is that an accused is for all purposes at all times presumed innocent until proven guilty beyond a reasonable doubt.  *See, e.g., Taylor v. Kentucky*, 436 U.S. 478 (1978). The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See *id.;* see also *Patterson v. New York*, 432 U.S. 197, 215 (1977).

The Government must actually prove beyond a reasonable doubt – with respect to every element of the crime charged – that Defendant KENNETH JOSEPH OWEN THOMAS – as an individual -- intentionally and "corruptly" but also *actually* obstructed the official proceeding (Joint Session of Congress). [6]

The Government cannot offer fairy tales, fantasies, speculation, conjecture, or

---

utterly unsupported by any principle of law.  This does not alert an observer to the existence of a temporary restriction due to a Secret Service protectee under 18 U.S.C. 1752, certainly not notice of the contours and precise locations of any restrictions.

[6]      There is no right for the Government to allege crimes that don't fit the facts.  There are more than enough laws, some of which will apply.  Not all laws apply to any given fact pattern. The Government is not entitled to special treatment to force-fit an inapplicable law.  There is no shortage of laws that the Government could accurately fit to the actual facts.

imagination that maybe Defendant Thomas might have obstructed an official proceeding.[7]  The Government must prove beyond a reasonable doubt that Thomas actually did – in the real world – truly *cause* the official proceeding to be obstructed on January 6, 2021.[8]

In order to cross-examine and present his case, Thomas is entitled to any and all communications, messages, radio traffic,[9] analyses, conclusions, proposals of action, opinions, recommendations, text messages, email messages, or the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning any perceived threats and security arrangements for January 6, 2021.

These will mostly be created in or held within the headquarters of the U.S. Capitol Police.

Specifically, Thomas is entitled to records showing when the USCP and other agencies ***started*** to decide that there was a threat possibly requiring the Joint Session of Congress to be recessed, the role that the search for more pipe bombs played, when exactly the USCP decided that the Joint Session of Congress should recess, and from what threat exactly.

The earliest time at which there was any thought of recessing the Congress and evacuating the Capitol is the relevant time.  That was the time when a cause first existed.

Thus, the order to lock down the Capitol at 1:00 PM from Inspector Loyd would be the

---

[7]      It should be noted that the DoJ has chosen to depart from normal prosecutorial practices. Normally, prosecutors would pursue the ring-leaders and/or those clearly guilty of the most egregious crimes, and not pursue everyone.  The Government's choice and desire to break from past approaches and prosecute people who may barely have known why they were there is the Government creating its own problems.  We do not bend the Constitution to accommodate avoidable problems.

[8]      Meanwhile, here, the Government has charged Eleven other Counts against Thomas.

[9]      Meaning radio traffic to and from headquarters relevant to the gathering threat assessment and decisions to recess the Congress and evacuate the Capitol.  Random discussions among officers in the field are not the focus.  The official decision to recess and evacuate is.

time at which a cause existed obstructing the official proceeding, even if repeated at 2:00 PM by then Deputy Chief Pittman.

Thereby, that threat analysis and decision to recess the Joint Session will show that Thomas played no role in any aspect of obstructing the official proceeding.[10] So the records and documents are exculpatory which the Government is required to disclose under *Brady v. Maryland.* It is a metaphysical impossibility for an effect to occur hours before its cause. Only in science fiction or maybe a particle accelerator generating tachyons can a cause at 3:09 PM produce an effect at 2:13 PM, 2:00 PM, or 1:00 PM.

The impossibility of Thomas being guilty of 18 U.S.C. 1512(c)(2) is exculpatory.

Thus, the documents demanded will bring Count II to a screeching halt.

Details about the timing and development over time of the USCP's decisions on January 6, 2021, are exculpatory.

The Government has no evidence nor any prosecution theory of the case as to how **at 3:09  PM** KENNETH JOSEPH OWEN THOMAS actually obstructed the official proceeding (Joint Session of Congress) in violation of 18 U.S.C. 1512(c)(2) **at 1:00 PM** when the Capitol was ordered into "lockdown."

The actual documents and records are exculpatory because they will present undeniable, persuasive, credible, official, and undeniable evidence – not merely argument of counsel.

Conclusory opinions are not at all what is required or demanded.

The Government's entire case concerning the most serious charge of Count Two, 18 U.S.C. § 1512(c)(2) depends upon speculation, conjecture and imagination. The prosecution offers only maybes: "Well, it could have happened."

_____

[10]     It appears that other people did. Many did not.

Thomas, _as an individual_, must have **_caused_** the Joint Session of Congress to be recessed.

There are no "maybes" in criminal prosecutions.  No "maybe" can satisfy the standard of "guilty beyond a reasonable doubt."  "Close enough" does not work in criminal prosecutions.  This is not a game of horseshoes.  See, _United States v. Joshua Matthew Black, Criminal Case No. 1:21-cr-127, The Honorable District Court Judge Amy Berman Jackson deciding bench trial_ (Government failed to prove that Defendant obstructed an official proceeding).

Just as there are no "maybes" in criminal law, there is no "they" either.  Only the Defendant at bar may be considered.  What "they" did must be stricken from the courtroom.  **_Only what "he" did counts_**.  The prosecution consistently and persistently in every trial talks about what other people did having nothing to do with the Defendant(s) in the case at hand.  This prosecution is against Kenneth Thomas, not against a crowd.

This is _United States v. Kenneth Joseph Owen Thomas_ – only.  The case which the DoJ chose to bring is not _United States vs. an Unknown Crowd of 10,000 Random People._

The Government offers only speculation and imagination that Thomas's presence among other people may have obstructed the official proceeding as a group.

Even if there are no records or documents showing why the USCP recessed the Joint Session or evacuated the Capitol, the _lack_ of any records to support baseless charges against Thomas would be exculpatory.

## B.  GOVERNMENT'S COUNT II OF DELAY OF RESUMPTION OF JOINT SESSION UNDER 18 U.S.C 1512(c)(2) IS FOUNDED ON OPINION, SPECULATION

Meanwhile, pressed with this gap in its case with regard to Count II, the Government has shifted gears to arguing that even if the guilt of most people cannot be proven in causing the Joint Session to recess, nevertheless they can be prosecuted for delaying the resumption of the Joint Session.

This is problematic because the DoJ is already stretching 18 U.S.C. 1512(c)(2) unacceptably to a scenario to which it has never been applied.  Now, the delay of resumption theory would stretch the [11]

However, this, too, is only groundless speculation and of a far more extensive exercise of conjecture.  The Government has absolutely no evidence that the resumption of Joint Session of Congress at 8:09 PM later that day took even 1 second longer because of Thomas than if Thomas had metaphysically never existed, as in the classic movie "It's a Wonderful Life."

Indeed, the discovery of pipe bombs alone would have required a complete security sweep of the building even if no demonstrators or rioters had entered the building.  The pipe bomber might have.

The Government proving that Defendant Thomas elongated the process of inspecting the entire building for safety would require *an expert opinion*.  There are no expert witnesses who have been qualified to show that Defendant Thomas – as an individual – delayed the resumption of the Joint Session.  How long should it take?  That would require an opinion from an expert.  Did it take ***longer*** to resume the official proceeding because Thomas was alive standing near the U.S. Capitol on January 6, 2021?   That would be an opinion requiring an expert.

How long would the security sweep of the Capitol building have taken if Thomas had

---

[11]      Note that while the Constitution, XIIth Amendment, and the Electoral Count Act 3 U.S.C. 1 through 21, require the Congress to convene at 1:00 PM every 4 years on January 6, it is normal practice of Congress to recess, sometimes even pretending to be in the same "legislative day" for days or weeks.  It is not just a speculative possibility but a common occurrence for Congress to convene, recess, reconvene, maybe over and over.  Thus, it would have been more normal for Congress to all go home on January 6, 2021, having already convened at the required 1:00 PM time, and come back the next day on January 7, 2021.  There was no requirement nor no normality to resume later the same day.  This strains the application of 18 U.S.C. 1512(c)(2) even further.  How do you "obstruct" something that already convened and would normally not be completed in a single day by proven, established, frequent Congressional norms?

never been born, as in Jimmy Stewart's character in the movie "It's a Wonderful Life?"

Note that this is a counter-factual hypothetical.

What difference in time required to conduct a security inspection of the Capitol building would there have been Thomas being outside the Capitol building vs. never being born?

These questions would require expert opinions.  Not distinguished officials.  Experts.

But for the purposes of this motion, it is exculpatory information that the Government was required to produce under *Brady* what exactly the USCP would have to do, even if assisted by other agencies, to look in every room of the U.S. Capitol.

What steps were required before resuming the Joint Session?

What *additional* steps were required before resuming the Joint Session because Kenneth Thomas was near the Capitol building, or whatever the prosecution intends to try to prove?

How did Kenneth Thomas make the process longer?

What steps would be required due to Thomas as an individual being outside the building as contrasted with the counter-factual hypothetical of Thomas having gone hiking in the hills?

Note:  By no means does this require unredacted training material revealing any confidential techniques.  The hubris of the U.S. Capitol Police claiming well-known, non-confidential, routine, run-of-the-mill information about standard police practices is unwarranted.  But in the unlikely event that there is anything in those documents and records not already widely known to the public, those can certainly be redacted.   As we saw with the break-down of the Federal Administration's NOTAM system, government systems are often not the latest.

The issues include:  How many rooms or spaces would the USCP and other agencies under the USCP's statutory authority have to check?  How did Thomas change the number of rooms or spaces to be checked?  Actually we do not need to know if it is considered confidential

the absolute number.  We only need to know how many ___extra___ rooms or spaces had to be searched because of Thomas being at the Capitol?

If Thomas had never been born, the number of steps that the USCP would be required to undertake would be exactly the same.  The length of time required would always be the same.

For example, anyone who watches TV or movies would readily understand that the USCP and agencies assisting them would call in bomb-sniffing dogs.  The police dogs would be handled by experts in deploying those dogs and probably well known to those dogs.  So the amount of time needed to screen the U.S. Capitol would require the same amount of time whether Thomas had ever been there or not.  The time would be dictated by the size of the building and the ability of the dogs to walk and sniff – not by Thomas's presence.

Furthermore, the USCP's documents and records on this topic would show that Thomas was not the last person to leave the area.  Therefore, Thomas could not be responsible for causing any delay in the resumption of the Joint Session of Congress.

The DoJ engages in attorneys testifying unsworn that the security sweep could not start until all of the unauthorized persons had left.  But hundreds of people remained after Thomas left.  So clearly Thomas played no role in delaying the resumption of the Joint Session.

Thomas is entitled to these records and documents as exculpatory information.

The records and documents would have to tell us ___when___ the security sweep started because Defendants' counsel believes that it started long after Thomas had already left the Capitol area. They would show that the vast majority of people were still there long after Thomas had left.

Finally, the documents and records in making a threat assessment would likely discuss the fact that Congress is perfectly capable of operating in session with hundreds of visitors in the building.  There are hundreds of visitors in the U.S. Capitol every business day and yet Congress

still holds hearings and sessions in the Chambers.

Those familiar with Congress, such as former interns, point out to counsel that the USCP would be evaluating in written threat assessments a comparison between a normal day in the U.S. Capitol where it is common to have unofficial visitors in the building, yet Congressional business occurs without interruption, against some rough number of "too many" people not affiliated with Congressional staff filling up the building. The documents likely refer explicitly to the fact that Congressional business is not interrupted by the mere presence of visitors.

***The Defendant is entitled to the actual records and documents – not speculation.***

### C. DISCLOSURE OF LOCATIONS OF BARRICADES AND "RESTRICTED AREA" SIGNS AT EXACT TIME OF THOMAS'S ARRIVAL

The Government claims that certain areas around the U.S. Capitol were legally restricted on January 6, 2021, pursuant to 18 U.S.C. 1752. But that is a mixed question of law and fact.

The U.S. Capitol Police (Governing Board) has chosen by its own decision not to post any permanent signs or notices on the Capitol grounds warning that sometimes the public park of the grounds might be closed. Instead, the Board directed that small, flimsy signs (some seen in photographs torn in two as being merely paper) be affixed to light-weight, movable bike racks, appearing at a very low height at about waist-high-level in most places.[12]

To have a "Restricted Area" (grounds or building) there must be an "area" to which the restriction applies. An unidentified, indeterminate area cannot be a restricted area. For a person to *knowingly* enter a restricted area without authorization, there must be both an identifiable area

---

[12]     Most people are conditioned to understand that bike racks either ***route*** foot traffic or control when people may enter,  but ***do not*** prohibit pedestrian entrance, merely showing where to go, and/or telling pedestrians *when* the doors to an event open.  Bike racks do not signal by themselves to the average person any prohibition of entrance, but rather to signal only timing and the preferred pathway for walking.  Bike racks typically signal "This is where you walk."

that is restricted and knowledge by the person of a restriction.  One must be able to *know*

(*knowingly*) if they are on this side of the line or that side of the line.  If one cannot know if they

are on the unrestricted side of the line or on the restricted side of the line, they cannot *knowingly*

enter a restricted area.

Therefore, under *Brady*, the Government here must provide any and all photographs,

video recordings, witnesses, discussions in police radio recordings, etc., of exactly where any

signs were visible to the crowds  ***at the time that***  Defendant Thomas arrived at the vicinity of

the U.S. Capitol building.  Defendant is entitled to exculpatory evidence as to where signs were

***at that time*** – not at some other time earlier in the day.

The Government must identify exactly when and where the Government contends

Thomas approached the U.S. Capitol Grounds and the position of any "Restricted Area" signs in

that location ***at that time***.  It must identify any and all Government personnel who are witnesses

of any "Restricted Area" signs being moved or obscured before any of the Oath Keeper

Defendant arrived at the U.S. Capitol.

The Court and the prosecutors may be allergic to what they perceive as conspiracy

theories, but Thomas, by counsel, focuses here strictly on the location of potential witnesses.

Videos taken by various persons, including what some are calling "civilian video" taken

by random attendees or bystanders, were collected  and posted at "Meet Ray Epps, Part 2:

Damning New Details Emerge Exposing Massive Web Of Unindicted Operators At The Heart

Of January 6," Revolver News, December 21, 2021, accessible at:

**https://www.revolver.news/2021/12/damning-new-details-massive-web-unindicted-**

**operators-january-6/**

It must be emphasized that this is a collection of videos by others.  They cannot be

dismissed on the grounds of where they were collected and posted in one place.  These are not Revolver News' or Darren Beattie's videos.  They are the videos of eyewitnesses at the Capitol on January 6, 2021.  These are collected and posted there.  They are not Revolver's videos.

The point here is that the persons shown removing signs, removing barricades, and rolling up wire mesh fences on which notice signs were affixed are potential witnesses.

Defendant Thomas is accused of ***knowingly*** entering a restricted area without authorization.  Those shown in videos removing barricades, moving bike racks, and rolling up wire mesh fencing – and thereby removing all signs providing notice of a restriction – are potential witnesses that may exonerate Defendant Thomas.  If the signs were removed before Thomas arrived, then the *knowingly* element of the charged crime cannot be established.

Therefore, Defendant Thomas is entitled to and hereby demands any and all information of the identification of these persons for the purpose of calling them as witnesses.

### D.  DISCLOSURE OF ALL INFORMATION COLLECTED BY THE U.S. HOUSE OF REPRESENTATIVES SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6 ATTACK ON THE U.S. CAPITOL, INCLUDING RAY EPPS

The Select Committee has publicly released a great deal of information that they have gathered about the events on or leading up to January 6, 2021.  The outgoing Chair of the Select Committee Rep. Benny Thompson has publicly announced that the Select Committee would publicly release all of the information gathered.  However, the Select Committee withheld a great deal of information. For the purposes of due process and a fair trial, the Select Committee must provide this information to the defense counsel.  *Brady* is not an "if you feel like it" suggestion.

Therefore, the Government must obtain and produce January 6th Select Committee investigation depositions, closed hearing transcripts, informal interviews, and interview notes for

anyone the committee stated it has taken testimony from under oath or likewise interviewed.

This is especially important where there are witnesses who testified before the Select Committee, were then indicted, and are now legally unavailable to testify for the Defendant because they are now facing prosecution.

This includes all the Ray Epps material from the January 6 Select Committee the FBI and other federal investigative agencies.

The Government responds that the Executive Branch does not have these in its possession.  The precedents on *Brady* make clear this is irrelevant.  Whether the prosecutor has knowledge of items held by different agencies is the question.  Once the prosecution has actual, clear knowledge of the existence of potentially exculpatory information, *Brady* mandates -- subject to the penalty of the dismissal of all charges (ALL charges not just those affected directly) – that the prosecution obtain and disclose (possibly subject to the protective order) information to the defendant's counsel.

Recall that the U.S. Capitol Police is an agency of the U.S. Congress.  Both the Legislative Branch U.S. Capitol Police and the House Select Committee are intimately involved in the investigation and prosecution of the alleged crimes relating to January 6.  Therefore, there is no excuse under *Brady* jurisprudence for the U.S. Attorney's Office to obtain information from the U.S. Capitol Police but not from the Select Committee.

### E.  RAY EPPS AND HIS BREACH TEAM

As is by know exhaustively documented and well-understood, there is only one person who is caught on many, many video recordings and by many live witnesses organizing and recruiting people to "GO INTO THE CAPITOL" even if it means being arrested.  So outlandish were these efforts that many Trump supporters shouted him down as a provocateur shouting

"FED! FED! FED! FED!" warning people not to listen to Ray Epps.

What would all of the documents in the possession of the U.S. Government in any location, including the DoJ, FBI, CIA, USCP, etc. show?

We don't know.

We do know that the Defendant has a right to find out what those documents show.

Again:  Guessing is out of order.

This is not a guessing contest.

This is a demand ordered by the Constitution and the U.S. Supreme Court that: "Take a look at all the documents and see in the real world, what they actually say."

Defendant Thomas is charged with Obstruction of an Official Proceeding in Count II in violation of 18 U.S.C. 1512(c)(2).  Unusual among most criminal statutes, Count II requires not only a general requirement of intent (such as not an involuntary action, being pushed, or an unknowing action) but a specific requirement of the intent to obstruct an official proceeding "***corruptly***."

Furthermore, the DoJ is engaged in a unique set of principles that apply only in the January 6 context dubbed "January 6 Jurisprudence" that bear no resemblance to traditional criminal law.  The Government urges that anyone who was merely breathing near the Capitol obstructed the official proceeding.  Under such a view, why the crowd of 10,000 assembled within eyesight of the Capitol and a few hundred went inside and damaged property and brawled with police is relevant.

The Court must note that – obviously -- documents about Ray Epps would be likely to lead to witnesses and people *other than* Epps alone.  The Court may not stingily consider only what one man might have caused, but whom else he may be connected to as a larger group.

The only person in the universe whom we know to be guilty of 18 U.S.C 1512(c)(2) is Ray Epps, who is seen everywhere around D.C. rushing from one place to another, from an Olley's hot dog restaurant in Arlington, Virginia standing up and giving an impromptu speech to the restaurant urging people to go into the Capitol, to Black Lives Matter Plaza, to the Capitol non-stop inciting people to "go *into* the Capitol."  We also know that Ray Epps is seen on video inciting and recruiting others to attack and converge on the Capitol.  At the Ellipse Rally, Ray Epps is videotaped telling everyone as if it is part of the official plan and he is speaking for Trump and the Ellipse rally organizers that when Trump stops speaking we are all going over to the Capitol to go inside the Capitol where the matter is actually being decided.  Epps speaks as if this had been officially prearranged, not his own idea.

Demonstrating that this is no accident or mistake, Ray Epps announces – recorded on video – that he expects to get arrested for saying this, at which point people yell "*THEN DON'T SAY IT*!" and the crowd of Trump supporters begins to shout him down and protest what Epps is saying.  Under no possible scenario can Ray Epps have been acting accidentally.

He manifests his understanding that what he is urging the crowd to do may lead to their arrest.  Ray Epps is on video de-sensitizing the crowd to feel that it would be noble, patriotic, and okay to risk getting arrested.  He is conditioning the crowd to commit a crime, and imminently so.

Ray Epps is the only person whose words and actions meet the test for incitement under *Brandenburg v. Ohio*,  395 U.S. 444 (1969), and progeny.

So extreme are these contrasts that there is clearly something hidden to explain why the DoJ is prosecuting those who are innocent while not prosecuting those who are so clearly guilty.  The DoJ is prosecuting those who did not engage in such incitement as if they are all "leaders"

while studiously protecting the one person we know (so far) to be an actual ring leader.  And

again, the point is not to single out Epps, but to find witnesses and others who may appear in the

documents, records, and information.

Thus, to defend against the element of the crime charged in Count II that Thomas acted

"***corruptly***" (in the absence of any claim that he did) Thomas is entitled to all documents,

records, and information as to Ray Epps inciting people to go into the Capitol on January 6,

2021, including any information about why and if Epps was working with anyone.

Note that Ray Epps being organized, incited, funded, or directed could be of any nature,

it could be from a private organization, it could be from a government agency of the U.S.

Government, it could be from a foreign government.  The issue here is not to guess or pre-judge.

The issue is Thomas has a right to see the documents.

People have questions.  But that is irrelevant.  The documents will show what they show.

### F.  WITNESSES THAT THOMAS AIDED AND ABETTED NO ONE

The Government also violates its *Brady* obligations with regard to who and how Thomas

aided and abetted anyone, and for what purpose.  Knowing whom Thomas allegedly aided and

abetted would very likely present or lead to exculpatory evidence.  Again, one of the primary

applications of Brady is the identification and locating of witnesses who will testify for the

Defendant.  If the Government tries to prove at trial that Thomas aided and abetted a "John

Doe," but that same "John Doe" is called to the witness stand and answers "No, I had nothing to

do with that guy, what I did I did on my own, he didn't aid and abet me in any way, I didn't even

notice he was there," that testimony would clearly be exculpatory.

The DOJ's own guidance states [13] *(emphases added)*:

The first provision one finds in Title 18 of the United States Code regards **accessories to crime**. Title 18, United States Code § 2 now provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) **Whoever willfully causes an act to be done** which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Aider and abettor liability is distinct from accessory after the fact under 18 U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*, 510 U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unlike an accessory after the fact, is punishable as a principal. *Id.*

To argue or prosecute aiding and abetting, the Government must prove **that a Defendant (a) willfully (b) causes an act to be done.** This requires proof of an identifiable act by identified persons (by name or description) affected by the causation of the Defendant in an identified way.  Otherwise, **willfulness** and **causing** cannot be shown.

There cannot be aiding and abetting "in the wind" or "in the air" hovering over the situation.  An accused aids and abets only when by willful acts he causes a crime to be done by another person. That requires that the specific acts of the aider and abetting must be specifically identified and proven.  Otherwise, how can the Court determine if actions were taken willfully? How can the Court determine if the accused's actions caused another person to commit a crime?

Therefore the person alleged to have been aided and abetted would be an obvious and important witness to defeat the allegation.  Perhaps the Government seeks to avoid specificity because anyone allegedly aided and abetted would be a witness.  But *Brady* requires information that would lead to witnesses that a Defendant might choose to call in his defense.

---

[13]     See DOJ from October 1998 https://www.justice.gov/archives/jm/criminal-resource-manual-2471-18-usc-2

### G.  TYPE OF GAS USED NORMALLY BY USCP AND MPD, AND TYPE USED ON JANUARY 6, 2021

There are videos of a police officer cannon mis-firing, causing gas canisters to fall short, landing about only 2 feet from the firing cannon, effectively resulting in the law enforcement officers gassing themselves.  However, despite this being caught on video, the Government will not acknowledge this and instead uniformly blames the demonstrators and rioters for gassing officers.  Even though the situation apparently being alleged against Thomas is slightly different, knowing what kind of gas (generally speaking) is in the inventory of the USCP and MPD and knowing whether a different kind of gas or chemical spray was encountered by law enforcement officers would help Defendant Thomas identify whom may have been responsible.  That is, if officers were subjected to gas or spray that they do not use and do not have in their inventory, this would indicate that the gas was brought by demonstrators, and the allegation of stealing government property may be unsupported.  If the gas in question is in the inventory of the officers, then it may support the idea that Thomas stole gas and used it.  Therefore, even if the precise specifications are kept confidential as to the public, Thomas requires this information.

Furthermore, depending on the gas used by the USCP and MPD, it is nearly certain from the investigation so far that over-use of such gas triggers an extreme "aggressor response" that would explain both the excessive violence by police and by demonstrators alike.  When over-applied, as happened on January 6, the gas causes a psychochemical physical effect, that is an involuntary trigger of aggression.

### H.  TRAINING MATERIALS ON USE OF CROWD-CONTROL GAS USED BY USCP OR MPD, ON JANUARY 6, 2021

While again, these materials may be protected from public release, Defendant Thomas expects that these training materials will emphasize that the various types of crowd-control gas can (and often does) trigger a pharmacological reaction of an extreme aggressor response and rage, particularly if over-used in excessive quantities and/or enclosed spaces.  On one body worn camera video, a police officer is heard in the West Terrace "tunnel" yelling that the officers "cannot" use the gas "in here" (the tunnel) because it is an enclosed space and that "it will kill people."  Specifically, the officer heard on the video is referring to the fact that some of these gases chemically binds or sucks up oxygen and people may suffocate because of the excessive doses of the gas in locations where the atmosphere is not freely circulating to replenish oxygen. Thomas expects that the training materials will warn when the use of the gases is prohibited and/or dangerous, and when the over-use of gas can trigger a rage response by both police officers and others in the vicinity.

I. **INFORMATION ON USE OF CROWD-CONTROL GAS USED BY USCP OR MPD ON JANUARY 6, 2021 FROM MANUFACTURER**

Similarly, Thomas expects that any records or information from the manufacturer of crowd-control gases will warn of when over-use is prohibited, when it is dangerous, and the pharmacological response that can occur not unlike psychedelic drugs from over-use of the gases.  For example, one Defendant Dan Egvydt, known personally to another attorney to be an exceptionally mild-mannered and quiet, soft-spoken, kindly,  polite, well-mannered and gentlemanly man, is observed behaving like an enraged wild man inside the U.S. Capitol building on January 6, 2021, after being video taped by security cameras wiping his eyes and face against a strangers shoulder with inflamed eyes and tears in his eyes.  The Capitol security video recordings capture and display a "Green Hulk" like transformation from wiping his eyes

flooded with gas to suddenly running around in a rage and rushing at police like a wild man.

### J.   INFORMATION ON THE FORMATION AND BEHAVIOR OF THE (SEVERAL) CROWDS

The Government argues that there was "a sophisticated, organized attack on the Capitol [that] began just before 1 PM."  That is, the most controversial topic yet it is one where both sides completely agree.

However, the two sides sharply disagree on who is responsible.  This Defendant will insist that he had nothing to do with any of that.  So it is quite striking that the Government in these cases is arguing both sides of the same coin without seeming to realize that it is doing so. Unmistakably, it is the core thesis of the Government that that there was "a sophisticated, organized attack on the Capitol [that] began just before 1 PM."

The Defendant agrees, but ascribes this to ANTIFA activists or even – after seeing the head-scratching treatment of Ray Epps – the possible involvement of 3 letter agencies.

***SUNLIGHT IS THE BEST DISINFECTANT.***  Disclosure settles controversies.  Secrecy breeds suspicion and mistrust.

It should also be noted that the U.S. Attorney's Office has in fact consistently addressed the same topics from the Government's perspective.  The Government's almost entire case majors on the initiation and development of crowds of protestors (not crowd but different crowds in divergent places of divergent make-up and divergent conduct), some of whom deteriorated into riots or brawling, over 90% of whom did not.  The Government's case consists almost entirely of simply the mirror image, flip side of the Defendant's questions about what happened.  The Government has in every trial arising from January 6, 2021, and necessarily will here, present the

prosecutor's view of how around 1000 to 1500 of the approximately 10,000 people[14] demonstrating peacefully in the vicinity of the Capitol broke away from the main group and descended into violence, a very few assaulting police, many wandering around inside the Capitol as tourists, some of them however trying to break through the doors of the House and Senate chambers, some allegedly spraying bear spray and the like, and everything in between.

The Government's case will consist largely of its view of how the crowd developed, gathered, organized itself, and acted, while seeking to block any alternative view of those same topics. Almost the entire trial will consist of the prosecution's view of the same topics that it seeks to exclude here.

Because the accusation of who organized and developed the crowds and why is directly contrary to the Defendant's contention or understanding, the actual truth is potentially exculpatory.

The Defendant is entitled to the identity of potential witnesses whom he has requested information about as mandatory disclosure of exculpatory information. The Defendant is entitled to all information on the formation and flow and activities of the crowd, including who were the leaders and provocateurs.

## A. FAILURE TO USE ANY FORM OF AMPLIFIED PUBLIC ADDRESS SYSTEM TO NOTIFY CROWDS TO LEAVEE

Video recordings indicate that the U.S. Capitol Police used a massive, incredibly-loud public address system *only after dusk* telling people to leave the Capitol Grounds, when the sky was completely dark as shown in the body-cam and other recordings. This is not about a small

---

14      In a statement by Acting Chief of the U.S. Capitol Police, found at **https://twit-ter.com/MikevWUSA/status/1354104955553067010/photo/1,** Yogananda D. Pittman documents during a topic otherwise *not* relevant to this motion nor adopted by the Accused that the U.S. Capitol Police estimated that "tens of thousands" of demonstrators were at the U.S. Capitol. Elsewhere Pittman estimates the crowd at 10,000.

or hand-held loud speaker, but a building-wide public address systems at issue.

However, it appears that the U.S. Capitol Police and other authorities never used any amplified sound at any earlier time throughout January 6, 2021, to tell anyone to leave the Capitol building or Capitol grounds.

Of course, the laws of trespassing and parallel federal versions including 18 U.S.C. 1752 require advance notice or a request for a person to leave before the person can be prosecuted for trespass.  Similarly, 18 U.S.C. 1752 depends upon proof that a person "knowingly" enters a restricted area.

Therefore, it is exculpatory information that the U.S. Capitol Police had the technical capability – which they waited until the sky was dark after dusk to deploy – to notify crowds to depart, but chose not to use any means of notifying the crowds that they needed to leave.

Therefore, Thomas is entitled to documents and records of the logs of when any building-wide public address system was used to notify crowds that they were being asked to leave.

## V.  CONCLUSION

The Court should order production of the requested documents and records.  The Court should order the case dismissed if the Government does not comply.

Dated:  February 23, 2023

Respectfully Submitted,

*/s/ John M. Pierce*
John M. Pierce
John Pierce Law P.C.
21550 Oxnard Street
3rd Floor PMB #172
Woodland Hills, CA 91367
P: (213) 349-0054
jpierce@johnpiercelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

<u>*/s/ John M. Pierce*</u>
John M. Pierce