UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CASE NO. 1:21-cr-00552 (DLF) |
| v. | : |
| KENNETH JOSEPH OWEN THOMAS, | : |
| Defendant. | : |

**THOMAS AFFIRMATIVE DEFENSES**

COMES NOW, Defendant, KENNETH JOSEPH OWEN THOMAS, (hereinafter, "Defendant" or "Thomas"), by and through undersigned counsel, with these affirmative defenses. Each of the following affirmative defenses are supported by evidence in this case:

1) **Justifiable Use of Force (both defense of self and of others);**
2) **Justification and necessity;**
3) **The First Amendment right to petition government for redress, and to free speech, press, and assembly, and**
4) **Civil Disobedience, in connection with the First Amendment.**

**These affirmative defenses are briefly explained below:**

**2. Justifiable Use of Force.**  Thomas will show at trial that some of his alleged conduct on Jan. 6, 2021 including the acts constituting the government's claims of "assault," occurred in circumstances where law enforcement officers were engaging in aggressive *excessive* force—justifying self defense and defense of others.  Officers were unlawfully shooting protestors in the

face with rubber bullets and pepperballs and launching flash-bang grenades at protestors without warning. Thomas sacrificed himself to protect others from excessive force, while protesting for fair and transparent elections on January 6.

It is a violation of every police policy manual to shoot people in the head, face, or neck with less-than-lethal munitions, as such headshots can (and have) caused death. It is also a violation for police to aggressively push protestors away from a public building without proper warnings and opportunity to comply and disperse. It is also a violation for law enforcement officers to fail to render aid to injured protestors after police force them to the ground.

Under justified-use-of-force principles, Thomas had a right to resist and defy officers, and to use limited force to rescue a victim of law enforcement brutality.

**3. Necessity.** Thomas will also show that his actions on Jan. 6 were done in necessity. See *United States v. Bailey*, 444 U.S. 394 (1980) (escaped prisoner may argue necessity and duress on grounds his prison was dangerous, but his necessity defense fades with every day he does not seek to surrender himself to non-dangerous facility; otherwise, every trial under § 751(a) (escape) would be converted into a hearing on the current state of the federal penal system).

To invoke the necessity defense, a defendant colorably must show that: (1) he was faced with a choice of evils and chose the lesser evil; (2) he acted to prevent imminent harm; (3) he reasonably anticipated a direct causal relationship between his conduct and the harm to be averted; and (4) he had no legal alternatives to violating the law. *United States v. Aguilar*, 883 F.2d 662, 693 (9th Cir.1989), cert. denied, 498 U.S. 1046 (1991).

Necessity is, essentially, a utilitarian defense. See Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience*, 39 Stan.L.Rev. 1173, 1174 (1987).

It therefore justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. *See, e.g., Dorrell*, 758 F.2d at 432 (recognizing that "the policy underlying the necessity defense is the promotion of greater values at the expense of lesser values") (citation omitted). Pursuant to the defense, prisoners could escape a burning prison, *see, e.g., Baender v. Barnett*, 255 U.S. 224, 226, 41 S.Ct. 271, 272, 65 L.Ed. 597 (1921); a person lost in the woods could steal food from a cabin to survive, see Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev. 1193, 1205 (1985); an embargo could be violated because adverse weather conditions necessitated sale of the cargo at a foreign port, see The William Gray, 29 F.Cas. 1300, 1302 (C.C.D.N.Y. 1810); a crew could mutiny where their ship was thought to be unseaworthy, see *United States v. Ashton*, 24 F.Cas. 873, 874 (C.C.D.Mass. 1834); and property could be destroyed to prevent the spread of fire, *see, e.g., Surocco v. Geary*, 3 Cal. 69, 74 (1853).

4**. The First Amendment right to petition government for redress, and to free speech, press, and assembly** enshrines and protects Thoma' right to ascend to the nation's Capitol and join others in making their protests concerning the 2020 election known.  On Jan. 6, 2021, Thomas did what hundreds of thousands of others have done before: he made his presence known on Capitol Hill, and lifted up his voice in spirited protest against perceived government evils.  Thomas exemplified the heroism of advocacy against all odds, carrying a megaphone to inspire and express his political opinions.  The First Amendment protects even vile, threatening, violent, or anti-government speech and expression so long as such expression does not knowingly call for imminent lawless violence in circumstances where such violence is reasonably likely to cause imminent violence.

Since time immemorial, state authorities everywhere have called advocacy against government "terrorism," "sedition," "rebellion," or "civil disorder." Yet Thomas plainly advocated adherence to the Constitution and was well within his First Amendment rights to assemble, advocate, petition, demonstrate and protest on January 6.

**5. "Civil disobedience" is the willful violation of a law, undertaken for the purpose of social or political protest**. *Cf. Webster's Third New International Dictionary* 413 (unabridged, 1976) ("refusal to obey the demands or commands of the government" to force government concessions). See Note, *Applying the Necessity Defense to Civil Disobedience Cases*, 64 N.Y.U.L.Rev. 79, 79-80 & n. 5 (1989). The Constitution enshrines the bedrock principle that government may never deprive people of their lives, liberty, or property without due process of law, yet Thomas was stampeded, attacked, and indicted merely for being in a public place the government didn't want him to be.

1. At trial the evidence will show that defendant Thomas arrived on Capitol grounds relatively late in the protest, long after Congress had briefly recessed. Thomas provided aid to fellow protestors as well as law enforcement, and never went inside the Capitol.

2. The government's presentation of evidence in this case will focus on defendant Thomas' advocacy and political expression outside the U.S. Capitol on January 6, 2021. Defendant requests stern admonitions to jurors that they must not convict Thomas for advocacy and petitioning for redress of grievances.

3. Although Thomas is (outlandishly) accused under numerous statutes, the government's theory of prosecution is that Thomas was merely present on Capitol steps, that Thomas

advocated 'holding the line,' and that Thomas briefly touched officer riot shields as officers advanced in line to push protestors away from the building.

4.     The five "assault" allegations against Defendant Thomas involve mere instances where Thomas allegedly filmed with his cell phone camera held in one hand while holding out his other hand or elbow while officers pushed demonstrators away from the Capitol. Thus, Thomas' moments of contact with police riot shields were fleeting and harmless.

5.     In one point during police advancement, Thomas desperately sought to protect and help an elderly man who had fallen amidst the crowd chaos.  The government is actually prosecuting Thomas for "assaults" relating to Thomas' attempts to rescue a helpless individual from further danger.

6.     Thomas is a recognized media personality, a podcaster, a political journalist, and a videographer.  He was videoing as a member of the press on Jan. 6 to document actions of authorities.  At times during Thomas' advocacy and reporting on Jan. 6, his elbow and hand brushed and pushed harmlessly against officer shields.

7.     The government will paint Thomas as the "aggressor" in these interactions, relying on its theory that Thomas had advanced into restricted areas.

8.  Thomas will show that at the most relevant moments, the officers were advancing against him, pushing out against him and other protestors. Thus, at the moments of (light) contact in question, Thomas' alleged elbowing and pushing against officer shields was defensive and responsive rather than aggressive. The government will likely try to object to such defense evidence.

Dated: 04/30/2023                      Respectfully Submitted,

*/s/ John M. Pierce*
John M. Pierce
John Pierce Law, P.C.
21550 Oxnard Street
3rd Floor, PMB 172,
Woodland Hills, CA 91367
jpierce@johnpiercelaw.com
P: (213) 279-7648
Attorney for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

*/s/ John M. Pierce*

John M. Pierce