UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CASE NO. 1:21-cr-00552 (DLF) |
| | : |
| v. | : |
| | : |
| KENNETH JOSEPH OWEN THOMAS, | : |
| | : |
| Defendant. | : |

**DEFENDANT THOMAS'S RESPONSE AND OPPOSITION TO GOVERNMENT'S MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF USE-OF-FORCE EXPERT STEVEN HILL**

COMES NOW, Defendant, KENNETH JOSEPH OWEN THOMAS, (hereinafter, "Defendant" or "Thomas"), by and through undersigned counsel, with this response and opposition to the government's motion to exclude proposed expert testimony from use-of-force expert Steven Hill.

In summary,

(1) The Defendant Thomas Daubert Procedures called for under *Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993)* and Rule 702 of the Federal Rules of Evidence

(2) The Government in its Motion in Limine confuses the proceedings in *United States v. Alberts*, No. 21-CR-26, where in pre-trial motions counsel before the undersigned

counsel's involvement had already foreclosed with the prosecution the issue of self defense or the defense of others.  Thus, the Honorable District Court Judge Christopher Cooper ruled that the main topic of Steven Hill's proposed expert testimony had already been foreclosed before trial.

(3) The implication that Steve Hill was rejected as an expert witness is false.

(4) Rather the <u>TOPIC</u> – not the expert – was ruled out of the remaining scope of the trial by Judge Cooper.  Nevertheless, Steve Hill was permitted to testify as a fact witness introducing a large number of video recordings that he had studied originally for the purpose of his expert testimony.

(5) In both *Alberts* and *United States v. Nordean, et al.* (including Dominic Pezzola), Case No. 1:21-cr-00175, the primary issue was that defense counsel was introduced to Steve Hill only late in the court's trial schedule and became aware of his qualifications and willingness to serve (defense counsel's team having placed many calls to experts who would at first express eagerness to help but then "ghost" counsel and refuse to get involved) only after deadlines had passed.

(6) Thus, the primary issue with Steve Hill's prior designation as an expert witness was with deadlines, not any problem with the expert witness.

(7) Next, the Government makes very clear that it is not finding any fault with Steve Hill as an expert but rather trying to shape the scope of the trial and frantically trying to avoid scrutiny of certain obviously suspicious behavior:

> 1 Although not specifically raised by Thomas's expert notice, as the government has previewed in other of its filings in this matter, based on the defense's strategy in *Alberts*, it appears Thomas may seek to raise similarly improper defenses herein, including inviting jury nullification, as in *Alberts*, by attempting to "provid[e] evidence or argument to establish that his conviction would undermine the United States

    Constitution or dishonor him as a veteran of itsMilitary." *See, e.g.,* No. 21-CR-26, ECF 106 (gov't mot. re improper defenses, which sought to (1) preclude defense evidence of non-testifying officers' conduct and evidence that invited jury nullification, and (2) preclude improper affirmative defenses of self-defense or defense of others); *see also* No. 21-CR-26, ECF No. 123 at 1-2, 14-15 (discussing the affirmative defenses again raised by Alberts, such as "justifiable use of force," "necessity," First Amendment," and stating as follows: "Alberts also should be prohibited from eliciting testimony, presenting evidence, or arguing to the jury about his affirmative defenses, which previously were the subject of the government's motion in limine. Those purported defenses improperly seek jury nullification and raise legal arguments already rejected by this Court." (referring to ECF No. 77, Court's Memo. Op.)).

(8) Thus, the Government admits that its opposition is really about unfounded and unproven speculative fear about what Steve Hill might be asked by counsel.

(9) However, that is irrelevant.

(10) What are proper questions are based upon the judge's rulings (if well-grounded and impartial), not based on the expert. The expert normally does not ask himself questions. The questions are asked by counsel, and subject to objection.

(11) Therefore, speculation about what an expert could be asked is no different from unfounded fears about what a fact witness might be asked.

(12) Furthermore, where testimony disproves one or more core, key elements of one or more charged crimes, this is not an invitation to jury nullification. That is proof requiring a verdict of not guilty under established law. That would be grounds requiring the Court to dismiss the affected charges under Federal Rules of Criminal Procedure 29 and not send those charges to the jury at all.

(13) In any event, the Government's frantic attitude about certain topics being raised has nothing to do with Steve Hill's qualifications or admissibility to testify.

(14)   One of the errors made by the Government is in confusing *what* with *why*. The way events unfolded and funneled otherwise peaceful demonstrators into highly-compressed conflicts and contacts with police is an observable fact from video recordings which Steve Hill can help interpret and explain.

(15)   However, the Government is allergic to any discussion of *why* that happened which is a completely different question. The ways in which the crowds and police were pushed into conflict with each other is an entirely different topic from whatever curiosity one might have as to why those things happened.

(16)   However, in any event, the testimony goes to the core of essential elements of several crimes charged. Thus, it would be reversible error to artificially foreclose testimony on key elements of the crimes alleged. Of course, how much easier it would be to process criminal cases if only the prosecution were permitted to present evidence. That appears to be the consequence of the objections here now.

**BACKGROUND:**

Mr. Hill is one of the world's foremost authorities on police best practices, law enforcement training, use-of-force during demonstrations, and security of government facilities. Hill captained the Albuquerque, New Mexico, SWAT team for eight years before advancing to become a chief trainer of policing and security at highly-secure nuclear generation facilities under the U.S. Department of Energy. Hill has traveled the world, and trained police and security units in Malaysia, Indonesia, Syria, and many other countries.

Hill is also an expert for several Jan. 6 defense teams. In that capacity, Hill has reviewed thousands of hours of video footage relating to violence used by all sides on Capitol grounds on

January 6.  Hill testified as an overview witness of crowd videos in the Proud Boy trial before Judge Kelly in March, *United States v. Nordean, et al.*

Contrary to the government's suggestions, Steven Hill has never been found or held to lack expert credentials in any Daubert or trial or pretrial proceeding of any kind.  Rather, the courts described in the government's motion held that Hill was either not proffered far enough in advance, or that Hill's proposed expert testimony was not relevant to resolving a specific fact at issue in those proceedings.

Here, in defendant Kenneth Joseph Thomas trial, Mr. Hill will greatly assist the court and the jury understand the use of force on display at Thomas' alleged "assaults."  Mr. Hill will testify and interpret (and help the court and the jury interpret) the video exhibits in the trial.

**ARGUMENT:**

> Rule 702 of the Federal Rules of Evidence provides:
>
> Testimony by Expert Witnesses
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Clearly, Mr. Hill's testimony satisfies these requirements.  As the Court would allow all testimony before the jury "for what it's worth" for their consideration, Defendant Thomas is entitled to put on the defense of his choosing.

Specifically, Mr. Hill will describe the "kittling" and crowd-control advancement line used by police units on the west terrace, which led to Thomas' moments of contact with officers' equipment. Mr. Hill will describe the training and standard operating procedures used by the officers, and the specialty preparation, shielding, and padding used by officers in question. Mr. Hill will describe how Mr. Thomas' conduct in question was responsive, rather than offensive, and how under the circumstances, reasonable participants would not have intended to cause bodily harm in such circumstances.

Mr. Hill will also describe standard law enforcement protocols in crowd control settings such as Jan. 6. Specifically, Mr. Hill will testify that the officers did not properly warn or announce their forward advancements, as required by protocols.

The District of Columbia's First Amendment Activities Act sets forth protocols which were upheld in a recent precedent before then Chief Judge Beryl Howell, Goodwin v. District of Columbia, 579 F. Supp. 3d. 159 (D.D.C 2022), Civil Action 21-cv-806 (BAH). Black Lives Matters protestors sued the District of Columbia in this Court

> Later, near the intersection of 14th Street with Florida Avenue, MPD officers in police cars surrounded plaintiffs and their fellow protesters "without warning and without issuing commands to disperse or return home," and blocked the nearby side streets, effectively creating a police perimeter blocking plaintiffs and other demonstrators from leaving. Id. ¶ 36. Chanting "Hands Up, Don't Shoot" alongside other demonstrators, plaintiffs sought peacefully to continue walking up 14th Street within this police perimeter, but allege that MPD officers, again without warning, detonated flash grenades and deployed pepper spray at some protestors. Id. ¶¶ 37-39. Plaintiffs aver that the officers' use of flash grenades and pepper stray was directed and authorized by then-Chief Newsham, who was responsible for overseeing the officers on scene as he monitored the demonstrations. Id. ¶ 40. Plaintiffs further allege that they "had not engaged in any violent or destructive behavior prior to MPD Officers detonating flash grenades and spraying demonstrators with pepper spray, nor had they observed any other demonstrator engaging in such behavior." Id. ¶ 41.

Shortly thereafter, plaintiffs and the larger group were forced by MPD officers "to turn west down Florida Avenue, south down 15th Street NW, and then onto a side street, Swann Street NW, between 14th and 15th Streets." Id. ¶ 42.

2. Defendants' Alleged Use of Kettling and Excessive Force on Swann Street

Once the demonstrators, including plaintiffs, were herded onto Swann Street, MPD officers, without giving any orders to disperse, physically surrounded and enclosed the group, preventing anyone from leaving. Id. ¶¶ 42-44. This is a "controversial" policing technique, referred to as "kettling," which plaintiffs allege is "an express policy MPD follows to confine individuals engaged in protected speech activities." Id. ¶ 44. The kettling was effectuated by groups of officers on bicycles and on foot from "MPD's specialized unit for handling demonstrations" after being called to the scene by Lieutenants Horos and Mejia upon the instruction of Supervisory Officer Glover. Id. ¶ 46. Restrained from leaving Swann Street and uncertain as to what would occur next, many demonstrators "cried and begged to leave," including plaintiff Goodwin, who unsuccessfully pleaded with an MPD officer to be released from the kettle because she had a young child awaiting at home. Id. ¶ 48. Plaintiffs aver that, in accordance with "the District's kettling policy and/or the directives of Defendant Newsham, Defendant Glover ordered and authorized the kettling and confinement of protestors on Swann Street." Id. ¶ 46.

A new group of officers, "dressed in riot gear and armed with shields, batons, pepper spray and other weapons," then arrived on Swann Street to replace the first set of MPD officers responsible for forming the kettle. Id. ¶ 50. "[A]lmost immediately, and without warning," these officers "brandished their shields and batons and began swinging them toward Plaintiffs and other demonstrators[,]" while yelling "move back" in unison and using their batons to enclose plaintiffs and demonstrators "in an increasingly smaller space." Id. ¶ 51. At this point, Supervisory Officer Glover authorized the MPD officers on scene to use force "[p]ursuant to the District's policies, practices, and customs for responding to demonstrations, and Newsham's directives." Id.

A ruckus ensued. While confined within the kettle, which made any movement difficult for plaintiffs and other demonstrators, id. ¶ 53, including any movement to comply with any police dispersal orders had such orders been given, MPD officers "attacked Plaintiffs and others within the kettle by deploying excessive amounts of pepper spray at them," id. ¶ 54, in their faces or on or near their bodies, and caused

plaintiffs to experience "intense burning sensations in their lungs, eyes, faces, throats, and chests; severe coughing and difficulty breathing; and disorientation," id. ¶ 57. The complaint specifically alleges that Officer Crisman, among other officers, pepper sprayed plaintiffs Goodwin, Lane, Lazo, and Troper, and that Lieutenant Horos, among other officers, pepper sprayed plaintiff Pearlmutter. Id. ¶ 58. Plaintiffs further allege that MPD's use of force went beyond the deployment of chemical agents to involve "violent physical force," id. ¶ 61, with MPD officers "hit[ting] demonstrators, prodd[ing] and shov[ing] them with batons, knock[ing] them to the ground, and pinn[ing] them against cars and trees," id. ¶ 62. For instance, around the same time that plaintiffs were pepper sprayed, Officer Quarles allegedly struck plaintiff Surio with his police shield "even though [plaintiff] had done nothing to warrant the physical force that he used against her." Id. ¶ 52. A different officer "suddenly and violently pushed another person" against plaintiff Medina-Tavac, which caused this plaintiff to be "pinned against the hood of a car, f[a]ll to the ground, and [be] stepped on." Id. ¶ 63. Doe Officers "repeatedly struck Plaintiff Remick with a baton, landing blows with sufficient force to cause bruising on their arms and back," id. ¶ 64, and in addition to being struck by defendant Quarles, another Doe Officer hit plaintiff Surio with a baton so forcefully "that she sustained contusions, welts, and bruising on her upper body," id. ¶ 65. Despite allegedly complying with the officers' directives and otherwise behaving peacefully, plaintiffs Surio, Medina-Tayac, and Remick were each arrested following these incidents. See id. ¶¶ 52, 63-65.

The MPD's targeted action against protesters on Swann Street was not, in plaintiffs' view, "merely the result of one-off decisions by individual actors." Id. ¶ 67. Instead, plaintiffs contend that "the violent actions of the Doe Officers on Swann Street" were part of "a planned and coordinated strategy carried out by Officers working together at the direction of Defendant Newsham through the Supervisory Defendants on scene," id. ¶ 66, and stemming from the District's policies, practices, and customs that, for "nearly two decades," have authorized MPD to use "a combination of kettling, chemical agents, and other excessive force to detain and arrest non-violent demonstrators, particularly those who have voiced criticism of the police or government," id. ¶ 67; see also id. ¶ 69 ("Defendant Newsham made the decision to dispatch Officers in riot gear."). After monitoring and directing MPD's response to the protest, plaintiffs claim that then-Chief Newsham ultimately "acknowledged responsibility for stopping the demonstrators on Swann Street and for the Officers' conduct," id. ¶ 69, and that Supervisory Officer Glover likewise acknowledged that the officers' actions, including their use of force, "was pursuant to and within department policy," id. ¶ 70.

Plaintiffs point out that the District has been sued repeatedly for its "consistent use of kettling and excessive force" against non-violent protesters during "high-profile" protests such as those that took place at Pershing Park in 2000, Adams Morgan and the White House area in 2005, and the 2017 Presidential Inauguration. Id. ¶¶ 68, 71. These prior incidents and resulting lawsuits—together with defendants' "unlawful conduct against Plaintiffs" during the June 1, 2020 demonstrations—provided the District with notice of its failure "to properly train and supervise its officers on the lawful circumstances under which to use pepper spray or other physical force." Id. ¶ 71.

3. Plaintiffs' Arrest and Detention

U.S. Senate Committee on Public Works, Subcommittee on Public Buildings and Grounds, "*Security on the Capitol Grounds Relating to the Bombing of the U.S. Capitol,*" March 2, 1971, p. 1 ("The Capitol . . . is no ordinary building. It is the seat of the legislative branch of our Government. It is not only a working building, but one of our national shrines and as such must be open to the public. Thus, unique problems are involved when we consider the security of this building. It . . . must also be freely accessible to the public as a symbol of the national liberty we cherish").

The Senate's sergeant at arms, Robert G. Dunphy, stated that "the Capitol building has always operated with its doors open to all citizens and visitors from all over the world." *Id*. P. 2.

1. The government plays a combination of tricks in Jan. 6 trials, referencing motions in limine to preclude "estoppel" prior to trial—and then arguing at trial that their "restricted area" theory means strict liability, and that defendants are forbidden from even showing any evidence of innocent presence at the Capitol. The government files 'motions in limine' on a barrage of core issues in the case, which should always be denied because they are not tangential issues but "ultimate facts" deciding the outcome of charged crimes. A motion in limine is not permitted to function as summary judgment in criminal cases.

2.	At trial the evidence will show that defendant Thomas arrived on Capitol grounds relatively late in the protest, long after Congress had briefly recessed.  Thomas provided aid to fellow protestors as well as law enforcement, and never went inside the Capitol.

3.	The government's presentation of evidence in this case will focus on defendant Thomas' advocacy and political expression outside the U.S. Capitol on January 6, 2021. Defendant requests stern admonitions to jurors that they must not convict Thomas for advocacy and petitioning for redress of grievances.

4.	Although Thomas is (outlandishly) accused under numerous statutes, the government's theory of prosecution is that Thomas was merely present on Capitol steps, that Thomas advocated 'holding the line,' and that Thomas briefly touched officer riot shields as officers advanced in line to push protestors away from the building.

5.	The five "assault" allegations against Defendant Thomas involve mere instances where Thomas allegedly filmed with his cell phone camera held in one hand while holding out his other hand or elbow while officers pushed demonstrators away from the Capitol. Thus, Thomas' moments of contact with police riot shields were fleeting and harmless. They could not put the officers in fear of imminent harm.

6.	In one point during police advancement, Thomas desperately sought to protect and help an elderly man who had fallen amidst the crowd chaos.  The government is actually prosecuting Thomas for "assaults" relating to Thomas' attempts to rescue a helpless individual from further danger.

7.	Thomas is a recognized media personality, a podcaster, a political journalist, and a videographer.  He was videoing as a member of the press on Jan. 6 to document actions of

authorities.  At times during Thomas' advocacy and reporting on Jan. 6, his elbow and hand brushed and pushed harmlessly against officer shields.

8. The government will paint Thomas as the "aggressor" in these interactions, relying on its theory that Thomas had advanced into restricted areas.

9. Thomas will show that at the most relevant moments, the officers were *advancing against him*, pushing out against him and other protestors.  Thus, at the moments of (light) contact in question, Thomas' alleged elbowing and pushing against officer shields was defensive and responsive rather than aggressive. The government will likely try to object to such defense evidence.   Even if the officers were justified in advancing into Thomas and others bodily that does not provide them room to then accuse Thomas of battering them because they battered him.

Dated: May 02, 2023

Respectfully Submitted,

/s/ *John M. Pierce*
John M. Pierce
John Pierce Law Firm
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: jpierce@johnpiercelaw.com

*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I, John M. Pierce, hereby certify that on this day, May 2, 2023, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

/s/ John M. Pierce
John M. Pierce