```
 1   raise your right hand to be sworn in by the courtroom

 2   deputy.

 3                 JONATHAN DAVID SUMRALL, Sworn

 4                      DIRECT EXAMINATION

 5   BY MR. ROOTS:

 6   Q.  Mr. Sumrall, will you please state your full name and

 7   spell it for the court reporter.

 8   A.  Jonathan David Sumrall.  That's J-O-N-A-T-H-A-N,

 9   D-A-V-I-D, S-U-M-R-A-L-L.

10   Q.  And where are you from, Mr. Sumrall?

11   A.  Dallas, Texas.

12   Q.  And what do you do there in Dallas, Texas?

13   A.  I was a carpenter.

14   Q.  And do you have any other hobbies or side gigs?

15   A.  I have a little ministry called StopHate.com.

16   Q.  And what does that do?

17   A.  It's actually an acronym.  It stands for start turning

18   off prejudice, heal attitudes through education.  It's an

19   awareness program that encourages community communication

20   and trying to get over the division that's facing the

21   country.

22   Q.  And is there a role of blogging?  Website?  Anything?

23   A.  Yes, it's -- I don't know if it would be considered a

24   news site, but we cover a lot of current events, especially

25   the January 6th topic.  We have a lot of documentaries and
```

1    articles and videos and evidence, basically, on StopHate.com

2    that is accessible to the public.  So everything we ever

3    find about January 6th, we post it for the world to see.

4    Q.  And just so we're clear, you're not claiming you're some

5    dispassionate or neutral or unbiased observer.  You would --

6    what side would you generally be on in these questions?

7    A.   Independent.  I mean, I voted for Trump, but I've never

8    worn a Trump hat or a Trump shirt.  I'm not a political guy

9    like that.

10            I understand the division of politics, and I try

11   to kind of stay away from that.

12   Q.  You don't claim to be a neutral journalist?

13   A.  No, no.  I'm not.  I'm just a truth-seeker as far as I

14   try not to let my opinion get in the way of what we find,

15   you know, evidence-wise.  I try to be as neutral as

16   possible.

17            But I'm definitely a conservative and a Christian,

18   and there are certain, I guess, morals and standards that go

19   along with that, in my opinion.

20   Q.  Have you or your organization gotten any notoriety or

21   been on national television or anything?

22   A.  A little bit.  I was on Tucker Carlson a couple of weeks

23   ago talking about *The American Gulag Chronicles* book,

24   *Letters From Prison.*  That is a collection of the letters

25   from the guys that are in D.C. and other jails around the

1    country.  And I was fortunate enough to get an interview to

2    get some publicity for that book.

3    Q.  Just a quick question.  When or why did you -- when did

4    you start the Stop Hate organization?

5    A.  Back in 1992 during the LA riots.  I saw the video of

6    Rodney King and the police, and then the acquittal and the

7    riots.  And my wife was pregnant with my son at the time,

8    and I thought, you know:  How can we bring a kid into a

9    world like this?

10           You can't throw money at the problem.  You can't

11   put the fires out.  You can't break up the fight.  But we

12   thought maybe prevention would help, you know, keep

13   something like that from happening.  And 31 years later, it

14   seems like it's getting worse.

15   Q.  Now, you said you focus on January 6th.  Why do you

16   focus on January 6th?

17   A.  I was there.  I had several friends that went along.  We

18   went to document history.  I've thrown or held or hosted

19   rallies around the country.  I've dealt with BLM and Antifa.

20   I did the Stop the Steal rallies in Texas before January 6th

21   and did not want to go.

22           I was tired.  I was spent, and my friends kept

23   saying, "You kind of need to go.  You need to document.  You

24   know more, you know, about Antifa and BLM."  I've done this

25   for a long time.

```
 1              So at the last couple of days before, I contacted
 2   a few friends and said, "If y'all want to go, let's go."
 3              And we spread out in the crowd when we got there
 4   so we could film different areas and capture what we could
 5   as far as documenting the history of the day.
 6   Q.  If I could ask, have you had any visits by the FBI
 7   yourself about these --
 8   A.  They have been to my house at least four times.  I've
 9   interviewed with them twice.  They kind of intimidated my
10   daughter and my mother-in-law.
11              They came two other times.  Each one of them
12   answered the door.  They would not identify themselves.
13   They asked blatantly, "Who are you, and who are you with?"
14              MR. KONIG:  Your Honor, at this point I'd move to
15   strike.
16              THE COURT:  Sustained.
17              The jury will disregard the last statements about
18   the FBI.
19              THE WITNESS:  Okay.
20   Q.  Okay.  Let's just -- let's just go to January 6th.
21              When did you arrive for the January 6th events?
22   A.  We stayed north of D.C.  We got there the night before
23   and drove -- took the train in that morning pretty early.
24   We were going to meet at the Washington Monument at 8:00 --
25   kind of like everybody was going to do -- there at the
```

1   Ellipse so that we could see the speech.

2   Q.  And what time did you -- is there anything worthy that

3   you should note about the night before?

4   A.  No.  We didn't participate in any events or anything.

5   We got to the hotel, checked in, and stayed there until the

6   next morning.

7   Q.  I want to ask about the permitted -- the permitted

8   protest events.

9   A.  Uh-huh.

10              MR. KONIG:  Objection; foundation.

11              THE COURT:  Go to the phone, Counsel.

12              (The following is a bench conference

13               held outside the hearing of the jury)

14              THE COURT:  Mr. Konig?

15              MR. KONIG:  I think this is an attempt to bring in

16   information about permits that -- for rallies that were back

17   on the east side of the Capitol that the defendant did not

18   attend, did not go to, to my knowledge did not know about.

19   It's irrelevant to the claims and defenses in this case, and

20   it would be to -- it would tend to confuse the jury.

21              Alternatively, if he's trying to get into the

22   permitting process, that's kind of irrelevant to the issues

23   in this case.

24              THE COURT:  Mr. Roots, where are you going?

25              MR. ROOTS:  I believe he did know about these

1    permits and, in fact, was going to permitted events as part

2    of what he was doing there.  And I believe he was going back

3    and forth.

4             THE COURT:  All right.  I think you can ask him

5    was he aware of various -- were there permitted events and

6    whether he attended any of those permitted events.

7             I don't want you to get into the permitting

8    process and how hard it is to get a permit or whether they

9    were rescinding permits or anything like that.  Okay?

10   That's definitely irrelevant.

11             (This is the end of the bench conference)

12   BY MR. ROOTS:

13   Q.  So had you heard that there were different rallies going

14   on?

15   A.  Absolutely.

16             MR. KONIG:  Objection to hearsay.

17             THE COURT:  Sustained.

18   Q.  Were you aware going to Washington that there were

19   different rallies --

20   A.  Yes.

21   Q.  -- planned?

22   A.  Yes.

23   Q.  And, of course, what was the biggest one?

24   A.  Stop the Steal rallies.  And then Trump kind of hijacked

25   it and made it the Trump rally.

1    Q.  And that was the biggest one?

2    A.  Uh-huh.

3    Q.  But you went there to -- were there other rallies you

4    went there to attend?

5    A.  The Stop the Steal rallies, yes, which I helped organize

6    in Texas before I was aware that there would be the

7    carryover to D.C.

8    Q.  And to your understanding, were those permitted events?

9    A.  Absolutely.

10   Q.  Were those near the Capitol?

11   A.  Yes.  They were absolutely on Capitol grounds, several

12   different sections.

13   Q.  You said you were helping organize one.

14   A.  Yes.

15   Q.  Which one was that?

16   A.  The ones in Texas are the ones that I helped organize,

17   yes.

18   Q.  What about on January 6th?

19   A.  No.

20   Q.  Okay.

21   A.  Just an attendee.

22   Q.  As you -- let me just -- so did you attend any of these

23   earlier -- or did you attend any of these on January 6th?

24   A.  No.

25   Q.  The Trump speech?

1    A.  Yes.  I was at the Ellipse, but the other -- we never

2    made it to any other events after the Ellipse, I'm sorry.

3    Q.  And after Trump spoke, what did you do?

4    A.  We left before he finished speaking.  We couldn't see

5    him from where we were.

6            We tried to watch on YouTube.  Couldn't get a good

7    signal, very hit and miss.

8            So we went on down to the Capitol.  We heard

9    people saying they were going down, so we wanted to go early

10   and possibly film the whole crowd as it was coming en masse,

11   get some good shots.

12   Q.  What was the reason you couldn't get close to watch

13   Trump speak?

14   A.  There were thousands and thousands of people.  The way

15   the Ellipse is set up, we were kind of on the edge and

16   couldn't see through the trees and screens.  It was amazing.

17   A lot of people.

18   Q.  And as you approached the Capitol, if you recall, do you

19   recall seeing any signs?

20   A.  Along the path, or when we got there?

21   Q.  As you approached the Capitol.

22   A.  No, not along the path.  When we got to the very front,

23   there were some small signs on the bike racks.

24           We were probably one of the first few hundred

25   people that arrived at the Peace Monument.  So it was very

1    empty compared to how it got later in the day.  We were some

2    of the first ones there.  So there is video of some of the

3    signage on those first fences.

4    Q.  Did you take video?

5    A.  Yes.

6              MR. ROOTS:  I'd like to pull up 232.  That would

7    be Alberts 232.

8              Is this in evidence?

9              THE COURTROOM DEPUTY:  No.

10             MR. ROOTS:  Okay.

11   Q.  Mr. Sumrall, do you see the video on your screen?

12   A.  Yes.

13   Q.  Does that look like your perspective at the time?

14   A.  Yes.  That's my video.

15   Q.  What time of the --

16             MR. ROOTS:  I move to admit this video as -- this

17   will be Alberts 232.

18             MR. KONIG:  No objection.

19             THE COURT:  So moved.

20             MR. ROOTS:  I would move to publish it for the

21   jury.

22   Q.  Okay.  What time of the day is this?

23   A.  It's before 1:00.  It's approximately 12:30.

24             I can check the time stamps on my phone, if you

25   need me to.

1    Q.  And you were filming this yourself?

2    A.  Yes.  That's my video.

3            MR. ROOTS:  I'd like to just roll this a little

4    bit.

5            (Video playing)

6            MR. ROOTS:  We can stop there.  Is that the end of

7    it?

8    Q.  Okay.  Did you see any signs in that video that

9    indicated there were restricted areas or anything?

10   A.  If you study it really close, you can see some way up on

11   the lawn that go across the grass.  They can't be read from

12   where we were, but you can see little white pieces of paper

13   across the fence, all the way across.

14   Q.  Now, have you ever met someone named Christopher

15   Alberts?

16   A.  Yes.

17   Q.  Could you spot him in the courtroom?

18   A.  Yes.  There he is.

19   Q.  Had you ever met him before January 6th?

20   A.  No.

21   Q.  You have met him after?

22   A.  Yes.

23   Q.  Do you know if he was in that footage that you just

24   showed?

25   A.  He is.

1   Q.  Were you able to point him out though?

2   A.  No.

3   Q.  Were you able to point him out?

4   A.  I have not.  I have not.

5   Q.  He would have been in the crowd somewhere in front of

6   you?

7   A.  Absolutely.

8              MR. ROOTS:  I would like to pull up 233, Alberts

9   233.

10   Q.  We can go ahead -- actually, does this look like the

11   video that you took?

12   A.  This is my video, too.

13              MR. ROOTS:  Your Honor, I would like to move for

14   admission of Alberts 233.

15              MR. KONIG:  I'd just ask for a little more

16   foundation.  I don't anticipate objecting.

17   Q.  You were there, right there, filming this?

18   A.  Yes.  This is just inside the gate where Mr. Alberts has

19   just walked through just before this happened.

20   Q.  Okay.  And what time of day?

21   A.  Just after 11:55 was the -- I mean, 12:55 was the gate

22   break, so this was approximately 20 minutes after that.

23   Q.  Okay.

24              MR. ROOTS:  We'd move for admission of Alberts

25   233.

 1              THE COURT:  Any objection?

 2              MR. KONIG:  Your Honor, if it is, indeed, 20

 3    minutes after the breach, we would object as irrelevant.  It

 4    would not be where he was at the time based on the testimony

 5    in this case.

 6              MR. ROOTS:  I could ask a follow-up.

 7              THE COURT:  Raise that on cross.  I'll let it in.

 8    Go ahead.

 9              MR. ROOTS:  I can ask a follow-up question.

10              THE COURT:  It's in.  Go ahead.

11              MR. ROOTS:  I'd like to publish and play this a

12    little bit for the jury.

13              (Video playing)

14              MR. ROOTS:  Okay.  We can stop.

15    Q.  Based on that and your recollection, what was the

16    atmosphere there among the crowd?

17    A.  It was almost celebratory.  It was a -- it wasn't angry

18    at that point yet, let's say.

19    Q.  Would you call it festive?

20    A.  Yes.

21    Q.  Did you see any violence among the crowd?

22    A.  No.

23    Q.  Would you call it a riot?

24    A.  No.

25              THE COURT:  Mr. Roots, do you want to put a time

1    frame on that so that the jury is clear?

2    Q.  Let's get the time and the place.  What time of day was

3    this?

4    A.  Around 1:15-ish.

5    Q.  And this was on what location?

6    A.  On the west side, just inside the Peace Monument on the

7    sidewalk before the stair of risers that you had to go over.

8    Q.  And so this would be off the street.  This would be away

9    from the street?

10   A.  Yes.  This is already on Capitol grounds.

11   Q.  Would you say -- what did you think -- what were you

12   thinking about, if it was a restricted area of any kind?

13           MR. KONIG:  Objection to relevance.

14           THE COURT:  Overruled.

15   A.  Can you rephrase that?

16   Q.  Was there -- what were you thinking with regard to

17   whether you had authority to be where you were?

18   A.  It appeared to me from where we stood that the people

19   went to the front line where the five policemen were on the

20   sidewalk.  There was interaction, and then the crowd was

21   released into the property.  It seemed as if there had been

22   negotiations between the policemen.

23           There wasn't an altercation.  It wasn't physical

24   from what we could see from where we stood.  So everyone in

25   the back of the crowd thought it was okay.  As like Black

```
 1    Friday, everybody just went on -- they didn't run, but they
 2    walked onto the grounds.
 3    Q.  And if I could ask, how tall are you?
 4    A.  About 6'3".
 5    Q.  So you're a taller-than-average person?
 6    A.  Yes.
 7    Q.  But you were able to see above the heads of people in
 8    the front?
 9    A.  Yes.
10    Q.  If I could just ask, did it appear that the crowd was
11    following any strategy or plan of any kind?
12    A.  Absolutely not.  I mean, I think it's obvious from the
13    videos; people wandering around just wondering where they're
14    going and what they're doing.
15    Q.  Okay.  And have you come to study and find out where
16    Mr. Christopher Alberts was around this time?
17    A.  Did I study where he was?
18    Q.  Yes.  Were you aware of where he was?
19    A.  Now I am.  I wasn't that day, of course.  But, yeah,
20    we've studied as to what his location was.
21         It's actually just beyond the guitarist's head
22    about, what, 150 more yards forward.
23    Q.  Now, what did you know about the permitted protests
24    around there?
25    A.  Just that there were several.  We didn't know which one
```

1    we would land on.  We were going to try to see a couple of

2    different ones.  That's why we kind of went down early to

3    try to get a lay of the land to see where everything was set

4    up, but we didn't see any stages when we got there.

5    Q.  Did you see any boundary lines between areas?

6    A.  No.

7    Q.  Any fencing separating rally areas?

8    A.  The only fence that we saw was across the center of the

9    yard.  Like I said, halfway up the sidewalk to the Capitol

10   that was one construction fence, the plastic mesh that was

11   stretched out across.

12           But like I said, you couldn't read it from where

13   we were.  You couldn't tell if it just said construction

14   area or what.  You know, it was just pieces of paper

15   basically on something far away.

16   Q.  And let me just ask.  Were there both pro-Trump and

17   anti-Trump protests?

18   A.  Yes.

19   Q.  And any fencing between them?

20   A.  No.

21   Q.  Did you eventually see any violence?

22   A.  Yes, in the form of flash bang grenade --

23           MR. KONIG:  Objection, Your Honor.

24           THE COURT:  Excuse me?  I'm sorry?

25           MR. KONIG:  Objection, Your Honor.

```
 1                THE COURT:  What's the objection?

 2                MR. KONIG:  I believe this is going to get into

 3     areas that are not -- foundation has not been laid that he

 4     was near Mr. Alberts.

 5                THE COURT:  Sustained.

 6                MR. ROOTS:  I'd like to pull up that map.  I think

 7     it's 254.

 8                Is this in evidence?

 9                THE COURTROOM DEPUTY:  No.

10     Q.  Are you familiar with this map?

11     A.  Yes.

12     Q.  And what does this map show?

13                MR. KONIG:  Your Honor, this may be appropriate

14     for the phones.

15                THE COURT:  Yes.

16                (The following is a bench conference

17                 held outside the hearing of the jury)

18                THE COURT:  All right.  Mr. Roots, what is this,

19     and where are you going with it?

20                MR. ROOTS:  Well, this is the map of the permit

21     zone area, and I believe the government has put on another

22     map that's almost identical to this.

23                THE COURT:  The government's map was the official

24     Capitol grounds map, not permitted areas.  But what's

25     the relevance?  Does he -- what are you going to ask him
```

1     about?

2              And were there permitted rallies within the

3     restricted perimeter that day?  I have not heard that at

4     all.

5              MR. KONIG:  Your Honor, I can speak to that.

6              THE COURT:  Yes.

7              MR. KONIG:  The testimony from I believe it was

8     Captain Baboulis was that there were permits for the areas

9     on there.  I believe they were 9 and 10, which she showed in

10    her testimony.  I believe she might have said also 8.

11             Maybe it was 8 and 9.  My co-counsel says it's 8

12    and 9.

13             THE COURT:  That's on the east side?

14             MR. KONIG:  That's on the east side.  There were

15    no rallies permitted anywhere else that day.

16             This is a map from November of 2012, and this

17    witness from Dallas, Texas, just simply does not have the

18    foundation to discuss permitting at the Capitol building.

19             THE COURT:  All right.  I'll sustain it.  Move

20    on.

21             (This is the end of the bench conference)

22             MR. ROOTS:  Okay.  I guess what we'll do is

23    substitute our map with the map that's already in evidence,

24    which is number...?  It's already in evidence.  Do you guys

25    know which number that is?

```
 1                    THE COURT:  It's up.
 2                    MR. ROOTS:  Oh, there it is.
 3                    THE COURT:  Government 805.
 4                    MR. ROOTS:  That's Government 805.  Thank you.
 5       BY MR. ROOTS:
 6       Q.  Mr. Sumrall, do you see this map in front of you?
 7       A.  Yes.
 8       Q.  I'd like to direct your attention -- first of all, I
 9       believe you can write on that screen and put arrows and
10       things on it.
11       A.  Okay.
12       Q.  Would you just put your arrow of the direction that you
13       had come from.
14       A.  Okay.  (Witness complies)
15       Q.  Okay.  And down there by the -- where you begin, that
16       line -- let me just look at this and see what it says.
17                    MR. ROOTS:  Could we zoom up to that a little bit,
18       that area?  And maybe eliminate the line?
19       Q.  I just want to see what that says.
20       A.  Pennsylvania Avenue.
21       Q.  Okay.  So that's the Pennsylvania Avenue area?
22       A.  Yes.
23       Q.  Let me ask, sir.  You had come right through there --
24       A.  Yes.
25       Q.  -- on your way in?
```

```
 1              Are you aware that that's where Mr. Alberts was
 2    ultimately arrested?
 3    A.  Yes.
 4    Q.  What can you tell the jury about police presence there
 5    when you came through?
 6    A.  Like I said, I was one of the first couple of hundred
 7    people probably.  There were no police telling us where to
 8    go, what to do, anything.  There was no markers.  There were
 9    no barricades on the roads or anything leading up to the
10    Peace Monument.  No police presence whatsoever.
11              We saw police back on the street as we were
12    walking that way.  But as we got closer, there was less.
13    Q.  No police were coming out stopping truck deliveries to
14    the Labor building?
15              MR. KONIG:  Objection; leading.
16              THE COURT:  Sustained.
17    Q.  Did you hear any announcements saying "Restricted Area"
18    or anything?
19    A.  Not one.
20    Q.  Did you hear any orders to disperse?
21    A.  Never.
22              MR. ROOTS:  I'd like to thank you so much.  No
23    further questions.
24              THE COURT:  Thank you.
25              Mr. Konig.
```

```
 1                      CROSS-EXAMINATION
 2     BY MR. KONIG:
 3     Q.  Good morning, Mr. Sumrall.
 4     A.  Good morning.
 5     Q.  I'm going to actually start in the middle because it's
 6     still connected.
 7              MR. KONIG:  Could I ask you to play Defense 232
 8     that was just admitted.
 9              MS. STEVENS:  Oh, is that me?
10              MR. KONIG:  Yes, thank you.
11              MS. STEVENS:  Sorry.
12     Q.  And just before you start playing it, Mr. Sumrall, right
13     here I'm circling.  Do you see those individuals who are
14     standing there?
15     A.  Yes.
16     Q.  And those were police officers?
17     A.  Yes.
18     Q.  And in front of those police officers were some
19     barricades?
20     A.  Yes.
21     Q.  And then back here those -- that's some snow fencing?
22     A.  Yes.  That's the ones across the yard in the middle that
23     I was referring to.
24     Q.  And it had some signs on it that said "Area Closed"?
25     A.  I couldn't read them from where we were.
```

```
 1                  If you can read them in that picture.
 2      Q.  All right.
 3                  MR. KONIG:  And could you play that.
 4                  (Video playing)
 5                  MR. KONIG:  I'm going to ask you to pause right
 6      there.
 7                  And if you give me just one more second.  Thank
 8      you.
 9      Q.  This area.  I'll ask you to look at it when it replays,
10      but it appears that there are some signs hanging from those
11      bicycle racks as well?
12      A.  It's hard to tell.  Is that the fence that's halfway up
13      the yard like the other side?
14      Q.  It's the fence right before that Pennsylvania walkway
15      after the Peace Monument.
16      A.  The first barricade?
17      Q.  The first barricade.
18      A.  Yes.
19      Q.  And you saw some signs on that as well?
20      A.  We did not so much.  If you notice in the video, there
21      were already people standing against the fence.  So, I mean,
22      the signage was pretty much blocked by bodies.  You couldn't
23      see much as far as...
24                  Now, the next fence that was unmanned, you could
25      see the signs.  But like I said, they were halfway through
```

1    the yard.  We couldn't really read them from there.

2               MR. KONIG:  And then I'm going to ask you, if you

3    could, to play -- to just go to Defense 233 at 16 seconds.

4    Q.  All right.  And where I've circled there, does that

5    appear to be bicycle rack?

6    A.  It does.

7    Q.  And you saw that bicycle rack on January 6th?

8    A.  Yes.  They were everywhere.

9    Q.  And these two videos --

10   A.  Uh-huh.

11   Q.  -- actually, the first video, Exhibit 232, when you got

12   there prior to 12:57 p.m. on January 6, 2021, it didn't

13   appear to you that the Capitol was open to visitors,

14   correct?

15   A.  That was the confusion.  We heard there were permits on

16   the yard.  We were trying to gain access and see why it was

17   locked.

18   Q.  But it appeared to be locked?

19   A.  Maybe at that point.

20   Q.  At that point.  At the point before Peace Circle was

21   breached --

22   A.  Like people were waiting for the entry time.

23   Q.  -- it appeared to be locked?

24   A.  Yeah.

25   Q.  And the only people back behind those barriers were

```
 1    police officers?
 2    A.  Yes, all five.
 3            MR. KONIG:  All right.  Thank you.  You can take
 4    it down.
 5    Q.  All right.  Mr. Sumrall, you said that your primary
 6    profession is a carpenter?
 7    A.  Yes.
 8    Q.  And you have -- I think you used the term "hobby
 9    ministry"?
10    A.  Ministry, yeah.
11    Q.  And do you have any legal training other than --
12            THE COURT REPORTER:  I need you to answer.
13    A.  No.
14            THE WITNESS:  I hadn't answered yet.
15    Q.  Your website StopHate.com, that's been essentially fully
16    dedicated to January 6th since January 6, 2021, correct?
17    A.  Not fully, but mostly.
18    Q.  I mean --
19    A.  There are still other articles about other topics in the
20    media section, so it's not just a January 6th site.
21    Q.  Could you estimate for the jury about how much of
22    StopHate.com is dedicated to January 6, 2021, since January
23    6, 2021?
24    A.  Since the incident, probably over 90 percent.
25    Q.  And is it fair to characterize it as kind of a one-stop
```

```
 1    shop for information and advocacy on behalf of people who

 2    are accused of crimes on January 6th?

 3    A.  In a way, yes.

 4    Q.  And that includes prayer?

 5    A.  Yes.

 6    Q.  It includes letter writing?

 7    A.  Yes.

 8    Q.  It includes articles and research?

 9    A.  Yes.

10    Q.  Have you actually been designated as a defense

11    investigator in certain January 6th cases?

12    A.  Yes.

13    Q.  And I think you said that you were on Tucker Carlson

14    relatively recently.

15    A.  Yeah.

16    Q.  And he called it your cause, right?

17    A.  Yes.

18    Q.  Is that a fair characterization?  Is January 6th your

19    cause?

20    A.  Yes.

21    Q.  Okay.  And you also solicit donations through your

22    website?  You provide links to donation pages?

23    A.  Yes.  Could you be specific and say that it's not

24    donations to me though?

25    Q.  That's fair.
```

1    A.   Okay.   Thank you.

2              MR. KONIG:   And I'm going to ask Ms. Kozaczuk to

3    pull up a demonstrative.

4              We're not going to seek to admit this into

5    evidence, but we'd like to show it to the witness and then

6    eventually possibly the jury.

7    Q.   And do you recognize what this is?

8    A.   Yes.

9    Q.   Is this the page on StopHate.com dedicated to

10   fundraisers?

11   A.   I can't tell.   The Department of Defense -- yes, that's

12   the GiveSendGo links for the defendants.

13   Q.   Okay.

14             MR. KONIG:   And I'm going to ask Ms. Kozaczuk to

15   quickly just scroll from the top to the bottom just so the

16   witness can see it.

17             (Pause)

18   Q.   And does this appear to be a fair and accurate PDF of

19   what somebody would find if they went on to StopHate.com

20   slash, I don't know, fundraisers or whatever --

21   A.   SHDOD for that one, yes.

22   Q.   Okay.   SHDOD.

23             MR. KONIG:   And I'd ask permission to publish for

24   the jury.

25             MR. ROOTS:   No objection.

```
 1                    THE COURT:  So moved.
 2                    MR. KONIG:  And I'm going to ask Ms. Kozaczuk to
 3       just scroll down from the top to the bottom.
 4                    And while she's scrolling --
 5                    THE COURT:  Just to be clear, this is not in
 6       evidence?
 7                    MR. KONIG:  This is not in evidence.
 8                    I can move for its admission, but I don't think
 9       it's necessary, unless the Court does.
10       Q.  While Ms. Kozaczuk is scrolling down --
11                    MR. ROOTS:  What number is this?
12                    MR. KONIG:  We've not admitted it into evidence.
13       Q.  This links to 188 separate fundraising pages?
14       A.  If you say so.  I haven't counted.
15       Q.  17 rows of four individuals?
16       A.  Okay.
17       Q.  And some of those pages are, I guess, set up to fund
18       more than one person accused of crimes on January 6th?
19       A.  They're individual GiveSendGo links to their --
20       Q.  If there are three members of a family --
21       A.  Yes.  Sometimes people group their stuff together, I
22       think.
23       Q.  Okay.  And the people who you link to, it includes
24       people who were accused of things that are commonly known as
25       petty misdemeanors?
```

```
1    A.  Sure.

2    Q.  And people who are accused of much more serious crimes?

3    A.  Sure.

4    Q.  It includes Dominic Pezzola, correct?

5    A.  Yes, uh-huh, and journalists.

6        MR. KONIG:  I'm going to ask Ms. Kozaczuk --

7    Q.  And it also links to Guy Reffitt?

8    A.  Yes.

9        MR. KONIG:  I'm going to ask Ms. Kozaczuk to go to

10   Exhibit 801 at three minutes and 12 seconds.

11       All right.  You can just play it from there,

12   Ms. Kozaczuk.

13       (Video playing)

14   Q.  Have you seen this video before?

15   A.  Yes.

16   Q.  This is the first breach of the Senate Wing Door area of

17   the Capitol building?

18   A.  Yes.

19   Q.  It's about 2:13 p.m.?

20       MR. ROOTS:  Your Honor, we object.  I don't know

21   the relevance of this.

22       THE COURT:  Overruled.

23       MR. ROOTS:  Also, we object it's beyond the scope

24   of direct examination.

25       MR. KONIG:  Ms. Kozaczuk, can you pause it in just
```

```
 1    one second.
 2              THE COURT:  Goes to bias.
 3              MR. KONIG:  And you can stop there.
 4    Q.  Is that Dominic Pezzola?
 5    A.  It looks like him.
 6    Q.  And he's holding a police shield there?
 7    A.  I believe so.
 8              MR. KONIG:  You can take it down.  Thank you.
 9    Q.  You also link to a fundraising page for somebody named
10    James McGrew?
11    A.  Yes.
12    Q.  And you're aware that James McGrew has admitted to using
13    a wooden hand railing with a metal bracket at the end and
14    throwing it into a tunnel full of uniformed police officers?
15    A.  I'm not aware that he -- but if you say so.
16    Q.  And you host a fundraising page for Mr. Alberts,
17    correct?
18    A.  Yes.
19    Q.  You also, through Stop Hate, host --
20              MR. KONIG:  You can take that down.
21    Q.  -- host a podcast?
22    A.  Yes.
23    Q.  And it's called Discussion Island?
24    A.  Yes.
25    Q.  And that podcast is dedicated to January 6th?
```

1   A.  No, but there's a lot of January 6th interviews on

2   there.  We've had senators and congressmen, everybody.  It's

3   a --

4   Q.  But you would agree with the characterization it's

5   primarily related to January 6th since January 6th?

6   A.  Yes.

7   Q.  And I counted 89 podcasts since July of 2021.  Does that

8   sound about accurate?

9   A.  It sounds about right.

10  Q.  Approximately one hour each?

11  A.  Basically, yeah.

12  Q.  And you've also appeared on other podcasts about January

13  6th, correct?

14  A.  Tons.

15  Q.  Something like 65 other podcasts?

16  A.  Is that all?

17  Q.  You think it's more?

18  A.  I thought it was over a hundred, but yeah.

19  Q.  Okay.  And you stated on direct that on January 6th you

20  were in the District of Columbia?

21  A.  Yes.

22  Q.  And you went to Capitol grounds?

23  A.  Yes.

24  Q.  And you were essentially, at least during the breach of

25  the Peace Circle, right in the place near Mr. Alberts?

1    A.   Yes.

2    Q.   And your own -- what you saw when you were there near

3    Mr. Alberts, you saw the rioters push through the first gate

4    and then the second gate?

5    A.   No.   We couldn't see the gates from where I was

6    standing.   We could just see the tops of their heads and

7    shoulders.

8         I am tall so I could see the police standing

9    there.   I could see what looked like negotiation between the

10   people.   And then it just opened up.   We never saw the gates

11   until after I studied the videos.

12   Q.   So you're saying you didn't see them push through the

13   first gate and the second gate?

14   A.   No.

15   Q.   And you also saw a cop be pushed down near that time?

16   A.   No, I could not see that.

17   Q.   And you believe that that was something like a

18   nonviolent assault that you --

19   A.   I do believe that was a nonviolent assault.

20        MR. ROOTS:   Your Honor, he said he didn't see it.

21        MR. KONIG:   Okay.   He said he didn't see it.

22   Q.   Your Discussion Island podcast, did you interview

23   Mr. Alberts on December 24th of 2021?

24   A.   I did.

25        MR. KONIG:   I'm going to ask Ms. Kozaczuk to pull

1   up that podcast and play it from 18 minutes and 52 seconds

2   to 19 minutes and eight seconds.

3   Q.  That's you?

4   A.  Yes.

5          MR. KONIG:  All right.  You can play it.

6          (Video playing)

7          MR. KONIG:  Okay.

8   Q.  And did you also -- was there also an individual who was

9   associated with StopHate.com who was near where you were on

10  January 6th of 2021 and videotaped the Peace Circle at about

11  that time, 12:57?

12  A.  Yes.

13  Q.  Somebody named -- is it Daniel Goodwyn?

14  A.  No.

15  Q.  Who was it?

16  A.  David Snow.

17  Q.  Yes.

18  A.  Daniel Goodwyn is my other employee, but I never saw him

19  that day.

20  Q.  Okay.

21  A.  He went on the tower and filmed.  He was arrested.  He

22  was talked about in the impeachment trials by name.

23          MR. KONIG:  And I'm going to ask Ms. Kozaczuk to

24  bring up --

25  Q.  Did Mr. Snow videotape his time there, and did you post

1   it under something that's called "Stop Hate on the

2   Ground" --

3   A.  No.

4   Q.  -- on your media part of your website?

5          MR. KONIG:  Ms. Kozaczuk, can you pull up where it

6   says "Stop Hate," the fundraiser pages.

7   Q.  Under "SHDOD," is there a media section?

8   A.  It should be just the Department of Defense with some

9   links at the bottom to other organizations.

10  Q.  Is there a section that links to all the podcasts you've

11  done and the podcasts that you've been --

12  A.  That would be under connect -- or no, "Content and

13  Media" I think is all my interviews.

14  Q.  And there's also kind of at the bottom of that a section

15  that posts maybe three or four videos that just the headline

16  is January 6, 2021?

17  A.  Okay.

18  Q.  And they were taken, my understanding -- correct me if

19  I'm wrong -- either by you or Mr. Snow or Mr. Goodwyn?

20  A.  Probably so.  I need to see the ones you're talking

21  about.  I'm not even familiar with what you're talking

22  about.

23         MR. KONIG:  Ms. Kozaczuk, could you bring up

24  that -- what we referred to as Stop Hate on the Ground 3?

25         And could you put that to 49 seconds.

```
 1                I don't think this is the one.  I think it might
 2    be No. 2.  Sorry about that.
 3    Q.  Okay.  So do you recognize that person?
 4    A.  That is Michael Hodak.
 5    Q.  Oh, okay.  How do you spell his last name?
 6    A.  H-O-D-A-K.
 7    Q.  And is he a person who was videotaping for Stop Hate on
 8    the Ground on January 6th?
 9    A.  We actually met him that day on the way down to the
10    thing, and he was filming, and we became friends.  He had
11    spoken to someone else on the team on Facebook or something.
12    I got his video from that, yes.
13    Q.  Okay.  And were you near him when he was videotaping
14    this?
15    A.  We were pretty close at that time.
16    Q.  Okay.  And you post this on -- it actually is visible,
17    you post this on StopHate.com?
18    A.  Uh-huh.
19    Q.  And does this fairly and accurately represent --
20                MR. KONIG:  Let me ask Ms. Kozaczuk to play just a
21    little bit.
22                You can start it there.
23                (Video playing)
24                MR. KONIG:  This is not in evidence, so we
25    shouldn't have it published.
```

```
 1                THE COURT:  Do you want to move it?
 2                MR. KONIG:  I do.  I was trying to lay a bit more
 3      foundation for it, but I can.
 4                The government moves for admission --
 5                THE COURT:  Any objection, Mr. Roots?
 6                MR. ROOTS:  Objection; irrelevant.  We haven't
 7      heard that Mr. Alberts has anything to do with this.
 8                THE COURT:  So moved.  We'll admit it.
 9                MR. KONIG:  And this will be Government's 324.
10                THE COURT:  And, I'm sorry, this was played near
11      where you were filming that day?
12                THE WITNESS:  Yes.
13                THE COURT:  And it relates to the things that you
14      testified to in your direct?
15                THE WITNESS:  I would say yes.
16                MR. KONIG:  All right.  I'm going to ask
17      Ms. Kozaczuk to play from 49 seconds pausing at three
18      minutes and 17 seconds.
19                And start just by pausing, Ms. Kozaczuk, because
20      I'll have just one quick question.
21      Q.  Okay.  So right here, is this the view that you had when
22      you were at the Capitol prior -- just prior to 12:57 on
23      January 6, 2021?
24      A.  Yes.
25      Q.  And those are the officers and the bicycle racks there
```

1    that you were talking about earlier?

2    A.  Yes.

3    Q.  And the view this way, is that the view of the path that

4    eventually you took toward -- closer in toward the Capitol

5    building?

6    A.  Yes.

7              MR. KONIG:  Okay.  Please play this to 3:17.

8              (Video playing)

9              MR. ROOTS:  Your Honor, we would object on hearsay

10    grounds, if it's offered for the truth of the matter

11    asserted with any of this.

12              THE COURT:  It's not being offered for the truth.

13    Overruled.

14              (Video playing)

15    Q.  Would you agree with me that the jury has just seen the

16    breach of a first barrier and is about to see the breach of

17    a second barrier?

18    A.  I would.  But bear in mind I didn't move forward when

19    they did, so I'm 30 yards behind them still.

20    Q.  And right before Ms. Kozaczuk paused, those were police

21    officers standing behind those barriers?

22    A.  Yes.

23              MR. KONIG:  Okay.  Ms. Kozaczuk, could you play

24    this to six minutes.

25              (Video playing)

1   Q.  And, Mr. Sumrall, you'll agree with me that we have just

2   seen a third line of bike rack barriers?

3   A.  Yes.

4   Q.  And behind those bike rack barriers were more officers?

5   A.  The same officers, I believe.  I think they moved back

6   from station to station at this time.

7   Q.  They were uniformed officers --

8   A.  Yes.

9   Q.  -- that were behind each station --

10  A.  Yes.

11  Q.  -- of those three sets of barriers?

12  A.  Uh-huh, yes.

13  Q.  And, Mr. Sumrall, your purpose for going on January 6th

14  was to stop the steal?

15  A.  No.

16  Q.  So do you remember that same Discussion Island episode

17  where you were interviewing Mr. Alberts on December 24,

18  2021?

19  A.  Yes.

20  Q.  And do you remember telling him, in fact, "We did go to

21  stop the steal"?

22  A.  Do you understand what it's like to talk for a crowd?

23  Q.  So you did say, "We did go to stop the steal"?

24  A.  "We," being the collect -- the people went to challenge

25  the election.

```
1              Now, there were many different reasons.  Some
2     people went because of the COVID, the masking, the
3     different --
4     Q.  But the question before you, sir, is did you say, "We
5     did go to stop the steal"?
6     A.  Sure.
7     Q.  And you didn't go into the Capitol building on January
8     6th?
9     A.  No.
10    Q.  Do you know other people who went into the Capitol and
11    have been charged?
12    A.  Yes.
13    Q.  Okay.  And who are those people?
14    A.  Daniel Goodwyn, one of the journalists that works for
15    me.  Shawn Witzemann, another journalist that works for me.
16    Q.  Shawn Witzemann hasn't been charged?
17    A.  Yes, he's been charged.
18    Q.  The question, sir, is:  Do you know people who went into
19    the Capitol building on January 6th who haven't been charged
20    with crimes?
21    A.  Yes.
22    Q.  And please name them.
23    A.  Taylor Hanson.
24    Q.  Okay.  Who else?
25              MR. ROOTS:  Objection; irrelevant.
```

```
 1              MR. KONIG:  It goes to the witness's credibility,
 2     Your Honor.  It also goes to his bias.
 3              THE COURT:  Go to the phones.
 4              (The following is a bench conference
 5               held outside the hearing of the jury)
 6              THE COURT:  All right.  You're asking him to name
 7     people who he knows that went in that have not been charged?
 8              MR. KONIG:  Yes, people who he knows who may be
 9     accused of breaking the law that he knows.
10              It goes to his credibility.  It's pretty well-
11     established that --
12              THE COURT:  Why does it go to his credibility?
13              MR. KONIG:  Him being willing to name the people
14     who have committed crimes.
15              MR. ROOTS:  Your Honor, these are crimes invented
16     in the government.  This is all an interpretation of the law
17     by the government.
18              THE COURT:  That's besides the point.
19              MR. ROOTS:  Your Honor, I would just add that --
20              THE COURT:  Hold on.  Hold on, Mr. Roots.
21              I'm somewhat uncomfortable with compelling this
22     man to be a witness against folks who he knows who committed
23     crimes that day under the guise of credibility.
24              I mean, the credibility point is if he does not
25     name them, he's somehow uncredible?
```

1      MR. KONIG:  Well, this is obviously not compelled

2   speech.  He's testifying voluntarily.

3      But he -- but it goes to his bias.  It goes to his

4   credibility.

5      I mean, if he's -- if he's willing to testify

6   truthfully --

7      MR. ROOTS:  Your Honor, he is not claiming to be

8   unbiased.

9      THE COURT:  I'll allow it.  You put him up,

10   Mr. Roots, and he's under oath, and he volunteered to be

11   here notwithstanding the admonitions that the Court gave him

12   this morning, and so you could have anticipated this.  All

13   right?

14      MR. ROOTS:  We object to this.  It's just using a

15   witness to be the FBI.  So they're going to be investigators

16   now?

17      THE COURT:  He took the stand.

18      (This is the end of the bench conference)

19   BY MR. KONIG:

20   Q.  So my question was:  Please name individuals who you

21   know who went into the Capitol building on January 6th who

22   have not been charged with crimes.

23   A.  I don't think it's my job to dox people.

24      MR. KONIG:  Your Honor, I'm going to ask you to

25   instruct the witness to answer the question.

```
 1                   MR. ROOTS:  Objection, Your Honor.

 2                   THE COURT:  To the extent you know.

 3                   I'll tell you what, let's take a break.

 4                   Ladies and gentlemen, we're going to take a five-

 5      minute break and come back.  We're going to resolve this one

 6      issue and then finish up.  Okay?

 7                   (Jury exits courtroom)

 8                   THE COURT:  All right.  Sir, if you could step

 9      down, and if we could put him in a witness room.  Okay?

10                   THE DEFENDANT:  I just want to go to the bathroom

11      while they duke out what they're going to duke out.  I trust

12      my attorneys to --

13                   THE COURT:  Why don't you go to the bathroom and

14      come back.

15                   THE DEFENDANT:  Yes, Your Honor.

16                   THE COURT:  You should be here.  You should be

17      here.

18                   And don't run.  Don't run.

19                   Let's wait for him.

20                   MR. KONIG:  Okay.

21                   (Pause)

22                   MR. ROOTS:  Your Honor, since this is my

23      objection, can I speak first?

24                   THE COURT:  We're going to wait for your client to

25      come back.  Okay?
```

```
 1                    (Pause)
 2               THE DEFENDANT:  Thank you, Your Honor.
 3               THE COURT:  All right.  So, first of all,
 4      Mr. Konig, this is -- proper or not, it is unorthodox, and I
 5      would have appreciated a heads up.
 6               MR. KONIG:  I apologize, Your Honor.  My -- I
 7      have a friend who is a tax fraud prosecutor who it's
 8      apparently very common in his federal practice to ask
 9      similar questions in tax fraud prosecutions of the
10      individuals who are testifying about others they know who
11      have -- who have not -- who do not pay their taxes.
12               In a case that he sent, which I still don't have,
13      the case name --
14               THE COURT:  Under the same -- let's stop.
15               All right.  We have a defense witness who
16      voluntarily testified, who's admonished about his own Fifth
17      Amendment privilege and his own potential criminal exposure,
18      and did not testify on direct as to any other potential
19      perpetrators of crimes that day that is asked on cross to
20      identify people who he knows who may have committed crimes
21      who have not been charged.  And the basis is credibility?
22               MR. KONIG:  Yes, Your Honor.
23               THE COURT:  Now, explain to me how his answer to
24      that question one way or the other or refusal to answer that
25      question goes to his credibility, meaning whether he was
```

1     truthful on direct.

2                    MR. KONIG:  I think it goes to his credibility in

3     that the jury can weigh whether his testimony on direct

4     should be credited if he's unwilling to answer truthfully

5     the questions that are propounded to him.

6                    THE COURT:  Because he is declining to identify

7     people who have committed crimes?

8                    MR. KONIG:  Yes, Your Honor.  And the case

9     citations are *United States vs. Birk*, B-I-R-K, District of

10    Colorado, Judge Blackburn; and *United States vs. Waller*,

11    W-A-L-L-E-R.

12                   THE COURT:  Do you have cites for those?  *Birk*?

13                   MR. KONIG:  I don't.  I can ask for them.

14                   THE COURT:  All right.  *U.S. vs. Waller*, W-A-L-L-

15    E-R?

16                   MR. KONIG:  Yes, District of Nevada, Judge Mahan,

17    M-A-H-A-N.

18                   THE COURT:  And the judge in *Birk*?

19                   MR. KONIG:  The judge?  I believe it was

20    Blackburn.  Yes.

21                   THE COURT:  Okay.  So the only way that it would

22    affect his credibility is if he were to refuse to answer.

23    And why would that make him less credible -- his direct

24    testimony less credible than not?

25                   MR. KONIG:  I think his refusal to testify

1    truthfully reflects poorly on his ability to testify

2    truthfully.

3             THE COURT:  Okay.  Mr. Roots.

4             Mr. Dalke, do you want to add anything?  This is a

5    fairly unique situation.

6             MR. KONIG:  Mr. Dalke just whispered to me that it

7    also is relevant to his bias in this case.  His ties to the

8    January 6th community makes him unwilling or unable to

9    testify in a way that would reflect poorly on a January 6th

10   defendant or a prospective January 6th defendant.

11            THE COURT:  Mr. Roots.

12            MR. ROOTS:  This is so outrageous.

13            I can only begin to say that this is not aimed at

14   bias or credibility.  Mr. Sumrall does not even -- does not

15   claim to be unbiased.  He is clearly a voice for the

16   downtrodden, the January 6th defendants.  He's a voice for

17   that community.

18            This is aimed at humiliating him, embarrassing

19   him, making him out people that he knows, turning him into a

20   cheese-eating rat and a snitch on the stand to snitch other

21   people out.  This is aimed at humiliation and destruction of

22   him.  He doesn't claim to be biased.

23            This is not cross-examination.  This is not

24   impeachment.  It's doing nothing more than pretending that

25   they're the FBI and doing an FBI investigation of a witness

1     about other people not even related to this case.

2          This is absolutely outrageous.  It violates the

3     Sixth Amendment.

4          Mr. Alberts has a Sixth Amendment right to have

5     witnesses for his defense to come and testify in his defense

6     without them being intimidated and threatened by the most

7     powerful government that ever lived so that they -- and by

8     the way, this is all based on the government's theory that

9     these conceptual imaginary red lines represent a, quote,

10    crime.  Again, we can test that.  There is case law.

11    *Jeanette Rankin* --

12         THE COURT:  Counsel, the question is whether they

13    went into the building.  Okay?  He didn't ask about any red

14    line.

15         Mr. Konig, I'll give you an opportunity to

16    respond.

17         MR. KONIG:  Your Honor, to streamline proceedings,

18    it would be sufficient for the government if he states that

19    he refuses to answer the question.

20         And I will ask him another question as to whether

21    he knows of crimes somewhere else.  And if he answers that

22    he refuses to identify those people, I will move on.

23         THE COURT:  All right.  Let's bring him back.

24         I'm going to instruct the jury unless he wants to

25    answer -- and I'm not going to make him answer -- that he

1    has respectfully declined to identify anybody else.

2              Is that fair, Mr. Roots?

3              MR. ROOTS:  Yes.  And this is a huge First

4    Amendment violation.  This violation -- the First Amendment

5    right of people to show up and petition the government for

6    redress of grievances.

7              THE COURT:  Very well.  Let's bring him back.

8              MR. ROOTS:  And it's beyond the scope.

9              THE COURT:  All right.  Welcome back, Mr. Sumrall.

10   Sorry for the delay.

11             Is it fair to say that you would prefer not to

12   answer the last question that was posed to you?

13             THE WITNESS:  Yes.

14             Is it about my expertise?

15             THE COURT:  No.  That's all you need to say.

16             THE WITNESS:  Okay.

17             THE COURT:  All right.  Let's bring the jury back.

18             MR. KONIG:  Your Honor, while they're coming in, I

19   do have one other question that is similar that I think the

20   instruction would be appropriate for or whatever, if that's

21   okay with the Court.

22             THE COURT:  Why don't we go to the phones quick.

23             (Jury enters courtroom)

24             THE COURT:  All right.  Welcome back.  I believe

25   we resolved the issue, just one moment.

```
 1                    (The following is a bench conference
 2                     held outside the hearing of the jury)
 3                    MR. KONIG:  The other question would be:  Has
 4        anyone admitted to you that they committed an assault on
 5        January 6, 2021?
 6                    THE COURT:  And what's the relevance?
 7                    MR. KONIG:  Same reason as --
 8                    THE COURT:  I'm going to exclude that.
 9                    MR. KONIG:  Okay.
10                    THE COURT:  Okay?
11                    MR. KONIG:  Thank you, Your Honor.
12                    (This is the end of the bench conference)
13                    THE COURT:  All right.  Ladies and gentlemen,
14        before the break Mr. Konig asked the witness whether he knew
15        people who had gone into the Capitol and had not been
16        charged with crimes.
17                    I am going to permit the witness to decline to
18        answer that question.  Okay?  So we'll move on.
19        BY MR. KONIG:
20        Q.  Mr. Sumrall, your relationship with Mr. Alberts, that
21        began sort of as a result of your advocacy?
22        A.  Yes.
23        Q.  And but now, you know, more than two years later, you
24        see him as a friend and a brother?
25        A.  Yes.
```

1    Q.  And you do fundraising for Mr. Alberts, or you link to

2    his fundraising?

3    A.  For everyone, yes.

4    Q.  And you actually have a Twitter page, too, right?

5    A.  Yes.

6    Q.  And it's @helpstophate?

7    A.  Yes.

8    Q.  And you have Tweeted or reTweeted since April 4th eleven

9    times about Mr. Alberts's case?

10   A.  I wouldn't know.  I don't run that solely by myself.  We

11   have several people that post content to that.

12   Q.  But you wouldn't disagree with it?

13   A.  I wouldn't disagree with it, no.

14   Q.  Eleven times?

15   A.  We try to keep it even so everyone should have had

16   eleven times since then.  We just go through the circle.

17   Q.  And it's actually been ten times since this trial began?

18   A.  Maybe on Twitter, yes.  Because it's an active trial,

19   yes.

20   Q.  And we've talked about your Discussion Island podcast.

21   You've interviewed Mr. Alberts two times?

22   A.  Yes.

23   Q.  And you interviewed him about January 6th?

24   A.  Yes.

25   Q.  And he admitted in his interview that he was on the

1    northwest steps staircase?

2    A.  Yes.

3    Q.  And he admitted that he was pepper sprayed?

4    A.  Yes.

5    Q.  And he said, "That pepper spray didn't end up doing much

6    because I was wearing my gas mask"?

7    A.  Yes.

8    Q.  And he said that he was wearing his gas mask, and I

9    quote, "because I knew that shit was coming eventually"?

10   A.  Yes.

11            MR. ROOTS:  Objection; cumulative.

12            THE COURT:  Overruled.

13   Q.  You also talked about people pushing riot cops around

14   1:00 to 1:20, right?

15   A.  I would have to refresh my memory.  It's been quite a

16   while.

17   Q.  When discussing -- did you discuss riot cops, and

18   Mr. Alberts told you that they were pushed because people

19   were angry that day?

20   A.  Maybe so.

21   Q.  Okay.  And did Mr. Alberts then say, "I get it.  You're

22   not supposed to do that, but resisting tyranny is one of our

23   God -- that is exactly what the Constitution was made for"?

24   A.  Exactly.

25   Q.  And, in fact, you responded similar to that.  You said,

```
 1    "We have to.  It's our job."

 2    A.  It's our job.

 3    Q.  And Mr. Alberts replied to you, "It's necessary to

 4    resist tyranny in its many shapes and forms"?

 5    A.  Yes.

 6    Q.  And Mr. Alberts told you about his reasons for going to

 7    the Capitol on January 6th, correct?

 8    A.  I don't know.

 9    Q.  He told you that enough was enough; is that right?

10    A.  Okay.

11    Q.  And he told you that he stood on his morals on January

12    6, 2021?

13    A.  Good.

14    Q.  Did he tell you that?

15    A.  I imagine so, if you're saying he did.  I can't -- like

16    I said, it's been a while.  I don't go back and watch the

17    interviews.  I don't have time.

18    Q.  And he told you that he couldn't take it anymore.  "You

19    got to eventually draw a line in the sand."

20             And he drew his, and it got stepped on; and he

21    drew his and it got stepped on, and it got stepped on, and

22    then finally that day he said, "Enough is enough, and that's

23    why I went down there."

24    A.  Yes.

25    Q.  Your own view of January 6th.  "It was a huge set-up"?
```

```
 1    A.   Yes.  I think it was unprecedented.

 2    Q.   Your view, you've said, "It was a huge set-up," correct?

 3    A.   Yes, yes.

 4    Q.   And you did see it as a takeover of the Capitol?

 5    A.   No.

 6    Q.   Did you have a podcast on January 8th of 2021 with

 7    somebody named Mark Sutherland?

 8    A.   Probably.

 9    Q.   And you called it "Texan and Brit"?

10    A.   Yes.

11    Q.   He's, I guess, British?

12    A.   He's from the U.K., yes.  He lives there.

13    Q.   Did you tell him:  "Now think about this.  In two hours

14    the people took the Capitol of the United States with no

15    weapons"?

16    A.   That's right.

17    Q.   Okay.  And you also saw January 6th as a warning,

18    correct?

19    A.   Uh-huh, yes.

20    Q.   If the courts don't do it and the system doesn't do it,

21    the protesters might not remain peaceful next time?

22    A.   Yes.

23    Q.   And also your view is that "If the protesters can do

24    that in two hours with no weapons, they really don't want to

25    piss us off"?
```

```
1    A.  Exactly.

2    Q.  And you think that it's a clarion call?

3    A.  No.

4              THE COURT REPORTER:  A what call?

5              MR. KONIG:  A clarion call.

6    A.  I'm not sure I understand what a clarion call is.

7    Q.  We need to take our world back and our country back?

8    A.  No.  I think we need to stand up for our rights and make

9    sure that they're met.  It's not about --

10   Q.  Did you say on that podcast:  "Because that's what needs

11   to happen.  We need to take our world back, our country

12   back, our government back from these tyrants.  They treat us

13   like sheep.  They don't listen to us, and they don't

14   represent us"?

15   A.  That's all true.

16   Q.  And you said it?

17   A.  Yes.  It's true.

18   Q.  And do you also believe that the protesters on January

19   6th, their back was against the wall, and you don't want to

20   corner a wild animal?

21   A.  Yes.

22   Q.  So finally, prosecutions for alleged crimes committed on

23   January 6th.  You don't believe that you or anyone else

24   there did anything wrong?

25   A.  I never said that.
```

1    Q.  Isn't it your position that "We didn't do anything

2    wrong.  I can say that for 99 percent of the people there"?

3    A.  Yes, that is true.

4    Q.  And that is your view.  You don't believe anyone not in

5    law enforcement should be prosecuted for the conduct on

6    January 6th?

7    A.  I never said that.

8    Q.  Okay.

9    A.  I have said that if you committed a crime, you deserve

10   the penalty for that crime.

11   Q.  99 percent of people charged shouldn't have been

12   prosecuted?

13   A.  I agree with that.

14   Q.  Okay.  And that includes all the people involved with

15   those 188 fundraisers?

16   A.  No, by any means.  That's a far stretch.  No.

17        There are people on that list that are guilty.

18   Q.  Okay.

19   A.  But they are accused.  They haven't been -- so that's

20   the justice --

21   Q.  99 percent of the people?

22   A.  A lot of these people just trespassed, and there have

23   been, as usual, charges added on over and above to get that

24   little plea.

25   Q.  But that's the first -- I mean, you testified before,

1    right --

2    A.  No.

3    Q.  -- it didn't really matter whether there are people who

4    just trespassed or there are people who did much, much more

5    serious crimes, you link to their fundraising pages?

6    A.  I always link -- innocent until proven guilty.

7    Q.  So the answer is yes.  So the answer is yes, sir?

8    A.  Yes.  Innocent until proven guilty.

9    Q.  So finally, your view on what happens next.

10            Divine justice and vengeance, correct?

11   A.  No.

12   Q.  Did you not say on the December 24, 2021, podcast with

13   Mr. Alberts that "there's going to be divine justice and

14   vengeance for what's going on for the January 6th patriots"?

15   A.  "Divine" meaning God, not man.

16   Q.  Divine justice?

17   A.  Divine.  Not me.

18   Q.  You just get the rewards?

19   A.  I don't care about that.  That's not my place either.

20   Q.  Mr. Alberts, you told him, "We just get to reap the

21   rewards of it"?

22   A.  "We," the people.

23   Q.  "Our people get out of jail"?

24   A.  Yes, hopefully.

25   Q.  "The bad people are put into jail"?

```
 1    A.   Hopefully so.

 2    Q.   And that includes the FBI?

 3    A.   It could, if they acted improperly.

 4    Q.   That includes prosecutors?

 5    A.   If they act immorally.

 6    Q.   That includes judges?

 7    A.   It could.

 8    Q.   And lawsuits commence?

 9    A.   Absolutely.  Please.

10    Q.   And suing people who have slandered all your good names?

11    A.   Wouldn't you?

12    Q.   Called you horrible things, jeopardized your

13    livelihoods, caused pain and suffering, emotional distress?

14    A.   Absolutely.

15    Q.   Loss of standing in the community, slander, libel, and

16    defamation?

17    A.   Yes.

18    Q.   These are all the things they'll have to pay for?

19    A.   Yes.

20              MR. KONIG:  I pass the witness, Your Honor.

21              MR. ROOTS:  Thank you, Mr. Sumrall.

22              I'd like to play Alberts 232 again, which we've

23    seen.

24              MR. KONIG:  To the extent it's cumulative, I would

25    object.
```

```
1                MR. ROOTS:  This is redirect of their cross on

2     this very video.

3                THE COURT:  Overruled.

4                MR. ROOTS:  Let's play this, if we can.

5                      REDIRECT EXAMINATION

6     BY MR. ROOTS:

7     Q.  Now, during this, as it was playing previously,

8     Mr. Konig pointed you to some law enforcement officers.  Do

9     you recall that?

10    A.  Yes.

11    Q.  Are the law enforcement officers the focus, really, of

12    this video?

13    A.  No.

14                MR. KONIG:  Objection.

15    Q.  Were you focusing on law enforcement?

16    A.  No.

17                (Video playing)

18    Q.  You're familiar with December 12th?

19    A.  Yes.

20    Q.  The Stop the Steal rally on December 12th?

21    A.  In D.C.?

22    Q.  In D.C.

23    A.  Yes.

24    Q.  Were you in attendance?

25    A.  No.
```

```
1              MR. KONIG:  Objection; outside the scope, and
2       relevance.
3              THE COURT:  Sustained.
4       Q.  Have you seen video of the U.S. Capitol at other times
5       during big rallies?
6              MR. KONIG:  Objection to relevance.
7              THE COURT:  Sustained.
8       Q.  Are you familiar with your state capitol in Austin,
9       Texas?
10             MR. KONIG:  Objection to relevance.
11             THE COURT:  Sustained.
12      Q.  Well, in that video that we're watching there, does this
13      look like what would normally be a police presence at a
14      rally of this size?
15             MR. KONIG:  Objection to relevance.
16             THE COURT:  I'll allow that.
17      A.  I would expect more police.
18      Q.  And you're familiar -- are you aware that at other times
19      there has been?
20      A.  Yes.  Over 2020, several incidences, they seemed to be
21      short of police there.
22             MR. KONIG:  Objection to relevance.
23             THE COURT:  Sustained.
24      Q.  Just focusing on this video that you took.
25      A.  Uh-huh.
```

```
 1    Q.  Does the paltry sum of law enforcement --

 2               MR. KONIG:  Objection; leading.

 3               THE COURT:  Sustained.

 4    Q.  What could you discern about the restrictedness of that

 5    setting from the number of officers there?

 6    A.  It seemed like they were massively outnumbered.  There

 7    were probably 5,000 people against five policemen.  It

 8    didn't seem like a good ratio for the cops.

 9    Q.  And if they were -- if there was a restricted area, do

10    you think there would be more cops?

11    A.  Absolutely.

12    Q.  Now, you are a journalist with media credentials,

13    correct?

14    A.  Yes.

15    Q.  You saw that the prosecution pulled up your -- one page

16    from your StopHate.com?

17    A.  Yes.

18               MR. ROOTS:  I would like to move that into

19    evidence, if we can, for the jury.

20               MR. KONIG:  No objection.

21               THE COURT:  So moved.

22               MR. ROOTS:  And that would be -- what would be the

23    number?

24               MR. KONIG:  I don't know on your numbering system.

25               MR. ROOTS:  Let's call it Alberts 232.1.
```

1    Q.  Let me ask:  Is this a money maker for you?

2    A.  Not for me personally, no.

3    Q.  Is this a money maker for your organization?

4    A.  No.

5    Q.  It raises money for each -- each -- well, each one of

6    those defendants has a GiveSendGo link?

7    A.  It actually goes directly to them.  We don't even touch

8    the money.

9    Q.  Do you make money or lose money on this listing?

10   A.  I lose a lot of money.

11   Q.  Have you ever contended that you're unbiased about all

12   these things?

13   A.  Not completely.

14   Q.  Let me ask you about some of those individual

15   defendants, some of those January 6th defendants on your

16   website.

17            MR. KONIG:  I'll object to the extent it's

18   irrelevant.

19            MR. ROOTS:  It goes directly to their cross.

20            THE COURT:  Let's see where you're going.

21   Q.  Dominic Pezzola --

22   A.  Yes, sir.

23   Q.  -- has a link.  Has he been convicted of any crime?

24   A.  Not that I'm aware of.

25            MR. KONIG:  Objection; 403.

```
1              THE COURT:  Overruled.
2   Q.  Does everyone deserve a defense in America?
3   A.  Absolutely.
4   Q.  Why do you think it's important for defendants to raise
5   money for their legal defenses?
6   A.  Because it's expensive.
7   Q.  Now, in that video of your podcast that was played, you
8   said something like -- you talked about an officer pushed
9   down at the gate.  Do you recall that?
10  A.  Yes.
11  Q.  Just to be clear, you did not see that on January 6th?
12  A.  Not from where I was standing, no.  I saw it after the
13  fact on video.
14  Q.  Okay.  And you learned about it later?
15  A.  Yes.
16             MR. KONIG:  Objection to leading.
17             THE COURT:  Overruled.
18  Q.  The officer had fallen down at the first gate --
19  A.  Yes.
20  Q.  -- or been pushed or -- during that, such as it was?
21  A.  Yes.
22  Q.  And you learned about that later?
23             MR. KONIG:  Objection to leading, asked and
24  answered; and also this witness said he's not a --
25             THE COURT:  Sustained on the leading.
```

```
 1              MR. KONIG:  -- personal witness on this.
 2              THE COURT:  Sustained on the leading.
 3              MR. ROOTS:  Okay.
 4    Q.  And then the prosecutor played a video of Mr. Hodak.  Do
 5    you recall that?
 6    A.  Yes.
 7    Q.  Was that the perspective where you were -- was
 8    Mr. Hodak's perspective there your perspective?
 9    A.  In the beginning of the video.  But as they moved
10    forward, we stayed behind.
11    Q.  You also -- at some speech or something the prosecutor
12    showed or mentioned, you said the words "we went to stop the
13    steal."
14    A.  Yes.
15    Q.  Do you recall that question?
16    A.  Yes.
17    Q.  When you said "we," was that meaning you, or was that
18    meaning like "we" the fans of the football team or the
19    group?
20    A.  I was speaking about the public.  My team went to
21    document history.  So we didn't go to stop the steal.
22              We went to witness the Stop the Steal people and
23    the mask people and the lockdown people and the jobs people
24    and -- there were a lot of different protesters for a lot of
25    different reasons there that day.
```

1   Q.  Similar question about when you said "takeover of the

2   Capitol."  Is taking over the Capitol really taking over the

3   Capitol?

4   A.  No.

5   Q.  So the two hours or two and a half hours when protesters

6   occupied the Capitol, they didn't really take over the

7   Capitol?

8           MR. KONIG:  Objection to leading.

9           THE COURT:  Sustained.

10  Q.  Would you say that their political views --

11          MR. KONIG:  Objection --

12  Q.  -- ultimately prevailed?

13          MR. KONIG:  -- to relevance.

14          THE COURT:  Rephrase, Counsel.

15  Q.  Well, the protesters that day, to the extent they took

16  over the Capitol, that means they occupied the hallways and

17  parts of the building --

18  A.  Yes.

19  Q.  -- for a short time?

20  A.  Yes.

21  Q.  Now, you were asked about whether you thought it was a

22  set-up.  Why did you feel that January 6th was a set-up?

23  A.  I've been to multiple events before and seen police

24  presence, seen Antifa and BLM as counterprotesters.

25          MR. KONIG:  Objection as to relevance and also

```
 1    beyond the -- really the purpose of this witness.
 2              MR. ROOTS:  They opened the door.
 3              THE COURT:  Sustained.
 4              MR. ROOTS:  Could we play Alberts 292.
 5              (Video playing)
 6    Q.  Do you recall this video?
 7    A.  Yes.
 8    Q.  Is this your video?
 9    A.  No.
10    Q.  Were you in this area?
11    A.  No.
12    Q.  Does this look like a fair and accurate depiction of
13    events -- some events on January 6th?
14    A.  Yes.
15              MR. ROOTS:  Your Honor, we move for admission.
16              MR. KONIG:  Your Honor, we object.  I mean, this
17    is -- now we're in --
18              THE COURT:  Go to the phones.
19              (The following is a bench conference
20               held outside the hearing of the jury)
21              THE COURT:  Okay.  I'm sorry, I missed the
22    foundation.  Did he say he took this?
23              MR. ROOTS:  He did not say he took it.  I can
24    build more foundation, but it's of that same general time
25    and period.
```

```
 1              THE COURT:  All right.  Mr. Konig?
 2              MR. KONIG:  It wasn't clear that he did say that
 3     or that he was there.  But also, I mean, we're now
 4     introducing evidence in rebuttal that, you know, we don't
 5     have an opportunity to recross him on, and I'm not even sure
 6     what this purports to show.
 7              THE COURT:  What's the point, and how does it go
 8     to the cross?
 9              MR. ROOTS:  Well, this actually has a witness that
10     says the words "they set this up for us," so it was the
11     absolute -- it just goes to their credibility and what this
12     witness has said.
13              THE COURT:  I'll disallow it.  Sustained.
14              (This is the end of the bench conference)
15     BY MR. ROOTS:
16     Q.  You're aware of all the people who have been charged and
17     prosecuted for January 6th?
18     A.  Yes, sir.
19     Q.  Do you feel they've been set up in some ways?
20     A.  Yes, sir.
21              MR. ROOTS:  No further questions.  Thank you.
22              THE COURT:  Very well.  Sir, thank you very much
23     for your testimony.  You can step down.  Don't discuss your
24     testimony with anyone in this case until the end of the
25     case.
```