```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Thursday, April 6, 2023
6-DOMINIC J. PEZZOLA,             9:00 a.m.
                     Defendants.
- - - - - - - - - - - - - - - - x
```

_____
              TRANSCRIPT OF JURY TRIAL – DAY 61
                  *** MORNING SESSION ***
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:    Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          Nadia Moore, Esq.
                          Conor Mulroe, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

**APPEARANCES CONTINUED:**

For the Defendants:     Carmen D. Hernandez, Esq.
                        7166 Mink Hollow Road
                        Highland, MD 20777
                        (240) 472-3391

                        Nayib Hassan, Esq.
                        LAW OFFICES OF NAYIB HASSAN, P.A.
                        6175 NW 153 Street
                        Suite 209
                        Miami Lakes, FL 33014
                        (305) 403-7323

                        Sabino Jauregui, Esq.
                        JAUREGUI LAW, P.A.
                        1014 West 49 Street
                        Hialeah, FL 33012
                        (305) 822-2901

                        Steven A. Metcalf, II, Esq.
                        METCALF & METCALF, P.C.
                        99 Park Avenue
                        6th Floor
                        New York, NY 10016
                        (646) 253-0514

                        Roger I. Roots, Esq.
                        ROGER ROOTS, ATTORNEY AT LAW
                        113 Lake Drive East
                        Livingston, MT 59047
                        (775) 764-9347

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111

**Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.**

# C O N T E N T S

**WITNESS:**                                                    **PAGE:**

STEVEN HILL:
Direct Examination by Mr. Metcalf................17383

1    similar to the way the Government put on officers to say,

2    "Look at that happening, look at that happening" -- now, you

3    know, some of that can bleed a little into, "Well, did it

4    appear that somebody call," you know -- but I mean, this is

5    a fact witness and I'm going to treat the witness the way

6    other fact witnesses who have talked about video -- I've

7    treated them all.  So if you object, we'll take it as it

8    comes.

9              MR. METCALF:  All right.  Thank you.

10             THE COURT:  All right.  So Madam Deputy Clerk, you

11   can bring in the jury.

12             And if you want to bring in your witness now,

13   that's fine, or wait until the jury is seated.

14             (Brief pause.)

15             THE DEPUTY CLERK:  Jury panel.

16             (Jury returned to jury box.)

17             THE COURT:  All right.  Everyone may be seated.

18             Ladies and gentlemen, welcome back.

19             We will now hear from a witness called by

20   Defendant Pezzola.

21             MR. METCALF:  Thank you, Your Honor.

22             Defendant -- Mr. Pezzola calls Steven Hill.

23        **STEVEN HILL, WITNESS FOR DEFENDANT PEZZOLA, SWORN**

24             THE COURT:  You may proceed, sir.

25             MR. METCALF:  Thank you, Your Honor.

```
 1                    DIRECT EXAMINATION
 2   BY MR. METCALF:
 3   Q.  Good morning, Steven.  How are you?
 4   A.  Good morning, I'm fine.
 5   Q.  Do you mind -- do you prefer Steve or Steven?
 6   A.  Steve is fine.
 7   Q.  Okay.  Can you spell your full name for the record,
 8   please?
 9   A.  Sure.  My name's Steven Kay Hill, S-T-E-V-E-N, K-A-Y,
10   H-I-L-L.
11   Q.  And just as brief background, are you currently employed
12   or are you now retired?
13   A.  I'm hopefully finally retired.
14   Q.  And I have that you first started your career with the
15   U.S. Air Force; is that correct?
16   A.  Yes, I did.  A law enforcement specialist.
17   Q.  Say again.
18   A.  I was a law enforcement specialist.
19   Q.  Okay.  Yeah.  The one thing we have to do is both of us
20   have to make sure that we are close to the mic.
21   A.  Sure.
22   Q.  How long were you in that position for?
23   A.  Almost six years.
24   Q.  And then, after that, you became a police officer?
25   A.  I did, for the Albuquerque Police Department.
```

1   Q.  How long were you with Albuquerque police?

2   A.  I retired after 19 years.

3   Q.  And what was it -- can you explain some of the -- or

4   some of the positions you had with the Albuquerque police?

5   A.  Yes, sir.  When I first hired on the police department,

6   I was in a repeat offender project unit -- it was an

7   undercover unit -- for the first eight years.  Got promoted

8   to sergeant.  Supervised field services officers.  I then

9   took over the Albuquerque Police Department SWAT team for my

10  last eight years on the department.

11  Q.  Okay.  Just make sure you're closer to the mic.

12  A.  Yeah.

13  Q.  Now, after you retired with the Albuquerque police, you

14  then became a training instructor?

15  A.  Well, so I've always been a training instructor, even on

16  the police department.  Certified in a lot of different

17  programs.  But I was hired by a place called Sandia National

18  Laboratories which is one of our large nuclear laboratories

19  for the United States where they hired me specifically to be

20  a lieutenant in the training program.  So I was training.

21  Q.  And what would you train?

22  A.  Just about everything.  So I was a certified firearms

23  instructor for lethal, less-lethal weapons systems.  So I

24  would train in the use of force, again, lethal, less-lethal.

25  I would also -- well, just about everything.  The main

1    reason they hired me was because of my expertise in hostage

2    rescue.  I -- on the police department, that was one of our

3    primary jobs.  I had a lot of experience with it.  So I went

4    to DOE to train hundreds of their police officers how to

5    protect vulnerable, high-risk materials or people.

6    Q.  All right.  I'm going to show you what I have premarked

7    as Pezzola Exhibit-259, I believe I should be at.

8              THE DEPUTY CLERK:  You said you were going to --

9              THE COURT:  Madam Deputy Clerk, if you could --

10   the microphone for -- all right.  Very well.

11             THE DEPUTY CLERK:  You said -

12             MR. METCALF:  Where did I end yesterday?  I ended

13   with 258 or 259?

14             THE DEPUTY CLERK:  Okay.  Hold on a second.  258.

15             MR. METCALF:  Okay.  So this is Pezzola-259.

16   BY MR. METCALF:

17   Q.  Do you recognize this picture?

18   A.  I do.

19   Q.  And what is that picture of?

20   A.  So that is the Albuquerque Police Department's -- it's a

21   V-100.  It's an armored vehicle back in that day.  It's at

22   the place called Upper Pat Hurley Park.  The --

23             THE COURT REPORTER:  I'm sorry.  What?

24             THE WITNESS:  V-100.  Victor 100.

25   BY MR. METCALF:

 1   Q.  Steve, this is you when you were at the Albuquerque

 2   Police Department; right?

 3   A.  Yes, it is.  Yes.

 4   Q.  And you remember this picture being taken?

 5   A.  I do.  Yes.

 6          MR. METCALF:  I now move for this to be admitted

 7   as evidence, Your Honor.

 8          MR. MULROE:  No objection.

 9          THE COURT:  All right.  It will be admitted.  And

10   permission to publish.

11          MR. METCALF:  Thank you, Your Honor.

12   BY MR. METCALF:

13   Q.  So now we're going to put it on the screen.

14   A.  Okay.

15   Q.  All right.  So this was when you were -- were you with

16   the SWAT team at this time?

17   A.  Yes, I was.

18   Q.  All right.  So explain what you remember about this

19   picture.

20   A.  Yeah.  So Upper Pat Hurley Park --

21          MR. MULROE:  Your Honor, I'm going to object on

22   relevance and 403.

23          MR. METCALF:  Just a brief explanation, then I'm

24   going to move on.

25          THE COURT:  Overruled.

1          THE WITNESS:  Okay.  So our tactical team, SWAT,

2    K-9, we would park this vehicle up at that particular park.

3    It's a nice, you know, pretty area to shoot photographs.  So

4    that's me in front of the V-100 armored personnel vehicle.

5    I believe it was around 1997-ish when we shot the

6    photographs, but there were a number of different

7    photographs with myself and other team members, K-9,

8    negotiators, with the vehicle in that park.

9    BY MR. METCALF:

10   Q.  Okay.  So now that you're retired, you've spent some

11   time taking a look at some of the videos from January 6th;

12   is that --

13   A.  A lot of time, yes, sir.

14   Q.  Okay.  I'm going to show you what has been marked as

15   Pezzola Exhibit-200.

16          MR. METCALF:  And I ask that this be admitted into

17   evidence and published for the jury.

18          THE COURT:  Is there objection?

19          MR. MULROE:  No objection.

20          THE COURT:  All right.  It will be admitted.  And

21   permission to publish.

22   BY MR. METCALF:

23   Q.  Mr. Hill, when this comes on, I'm going to play

24   approximately -- a little bit less than a minute and --

25   before I start asking you questions again.  So I ask that

 1    we -- just bear with me for this minute.

 2              MR. METCALF:  And I ask that, for the record, this

 3    video be played from 6 minutes and 46 seconds to 7 minutes

 4    and 42 seconds.

 5              THE DEPUTY CLERK:  This is No. 200, sir?

 6              MR. METCALF:  Yeah.

 7              THE DEPUTY CLERK:  This is Exhibit-200?

 8              MR. METCALF:  200.  Whatever is 200, I want this

 9    to be placed in.

10              THE DEPUTY CLERK:  Yeah, there's nothing.

11              MR. METCALF:  There's nothing there?  Okay.  Good.

12              (Brief pause.)

13    BY MR. METCALF:

14    Q.  Just one second, Mr. Hill.  I'm sorry.  We had it pulled

15    up.

16    A.  Sure.

17              (Brief pause.)

18              (Video played.)

19              MR. METCALF:  So you can start around 6:40.

20              (Video played.)

21    BY MR. METCALF:

22    Q.  Are you familiar with this video, Mr. Hill?

23    A.  Yes, sir, I am.

24    Q.  Now, at the beginning of where we just started the

25    video, can you describe what is happening at the beginning

1    of where we started at around 6:40.

2    A.  Yes, sir.  You'll see the line of protesters have moved

3    up to, like, the bottom set of stairs there along the

4    Capitol building.  You'll see some uniformed officers that

5    are on -- normal uniformed badges, you know, gun belts,

6    equipment, just your standard patrol officers, the attire

7    they're wearing.  After a couple of moments with, you know,

8    people talking, yelling back and forth, then you'll see

9    what's called a hard squad or, basically, a skirmish line.

10   The officers in the heavier protected material, they line up

11   or they move across --

12   Q.  Okay.  Hang on.  Let's stop right there.

13   A.  Okay.

14            MR. METCALF:  Can we go back to approximately

15   seven minutes on this video, please.

16   BY MR. METCALF:

17   Q.  Now, you mentioned lines.

18   A.  Yes, sir.

19            (Video played.)

20   BY MR. METCALF:

21   Q.  Is there more than one line that's being done here?

22   A.  Primarily, yes.  It's a skirmish line and we --

23   basically, we --

24   Q.  What is a skirmish line?

25   A.  Yeah.  Perfect.  So like you'll see -- in an NFL game,

17390

1    you'll see the, you know -- a line of individuals that will

2    face off with each other.  Okay?  You've got two separate

3    lines running lateral to each other.  The purpose of the

4    skirmish line is to keep one group from going one direction

5    and the -- to hold them back.  So you'll see the officers

6    are --

7    Q.  Hang on one second.

8    A.  -- in a skirmish line.

9    Q.  So it -- that's what you see happening here?

10   A.  I do.  Yes.

11   Q.  And then is there another line behind that skirmish

12   line?

13   A.  Eventually, what you'll get -- what you'll see is you'll

14   see the uniformed officers in the harder attire -- and

15   they'll pull in front of these uniformed officers.  That

16   technically is the front of the skirmish line when those --

17   they're called a hard squad -- when they get in front of the

18   officers.

19   Q.  Okay.  And then is there ever a line of officers after

20   the skirmish line?

21   A.  So there are.  We call them linebackers.  So the

22   skirmish line is the line up front.  Right behind them,

23   there may be a linebacker, basically, a handful of different

24   officers in a leadership role.  Basically, their role is to

25   keep the skirmish line straight, make sure nobody can get

```
 1      between it.  So they're -- they can fill in or they can just
 2      move officers left to right just to make sure that they've
 3      got a good secure line of officers.
 4              MR. MULROE:  Your Honor, may we be heard at
 5      sidebar briefly?
 6              THE COURT:  Yes.
 7              (Bench conference:)
 8              MR. MULROE:  Your Honor, I didn't want to object
 9      and interrupt, but I do think that we've pretty quickly
10      gotten into improper expert opinion testimony from this
11      witness.  I think that, you know, the initial response was
12      just to describe the visual of what was being shown in the
13      video, but when we get into the terminology like "skirmish
14      lines" and, certainly, the purpose of these things and who
15      was in leadership and what's going to happen and why, I do
16      think that's expert testimony and improper.
17              THE COURT:  I think -- I -- Mr. Metcalf, I think,
18      in general, the Government is right.  I mean, it's a fine
19      line here, but when we get into those terminologies and
20      opining about, well, what the purpose of A or B or C was --
21      I mean, I think that's right.  He gets, you know, a little
22      leeway to give commonsense, kind of, you know -- the kind of
23      thing that other witnesses have said, but he doesn't get to
24      use -- and I know this is tough because you prepped him as a
25      witness -- as an expert, but I think you're going to have to
```

```
 1    control him a little more about just observing the facts and

 2    not drawing upon his, you know, expertise and using these

 3    kind of terms and all the rest.

 4              MR. METCALF:  Understood.

 5              THE COURT:  Okay.

 6              MR. METCALF:  I will.

 7              THE COURT:  All right.  And -- all right.  You may

 8    proceed.

 9              (Return from bench conference.)

10              MR. METCALF:  May I ask that we go to 10 minutes

11    and 50 seconds.

12    BY MR. METCALF:

13    Q.  Now, Mr. Hill, I want to just go to exactly what you see

14    and what you can observe and have observed on this video.

15    A.  Yes, sir.

16              THE COURT:  You know what?  Can I see counsel at

17    sidebar for one quick moment?

18              (Bench conference:)

19              THE COURT:  You know, I just offer this thought to

20    both counsel, you know?  What's hard is that this is a

21    direct.  And, Mr. Metcalf, it may be that Mr. Mulroe won't

22    object if you lead him a bit in a way that doesn't -- that

23    you can get answers from him that don't -- that the -- you

24    can control him better in terms of going into some of these

25    terms and all the rest.
```

```
 1                   Mr. Mulroe, is that fair?

 2                   MR. MULROE:  I think that's fair.  Yeah.

 3                   THE COURT:  Okay.  All right.

 4                   (Return from bench conference.)

 5                   MR. METCALF:  Can we play until 11:05, please.

 6                   (Video played.)

 7                   MR. METCALF:  Pause right there.

 8       BY MR. METCALF:

 9       Q.  Mr. Hill, can you explain what you just saw there?

10       A.  Yes.  Certainly.  So you see the gentleman in the back

11       has -- it looks like a bus driver hat --

12       Q.  Mr. Hill, can you please --

13       A.  Sorry.  Sure.

14       Q.  Show me which -- circle the screen on which individual

15       you're talking about.

16       A.  Okay.  So the gentleman in the back is one of the

17       commanders.  He would be the one that's in charge --

18       Q.  Mr. Hill -- yeah, without getting into the lines and the

19       terminology --

20       A.  Yes, sir.

21       Q.  -- what do you see that individual who you just circled

22       do?

23       A.  Certainly.  So that gentleman is trying to get the

24       attention of the team of officers that are up --

25                   MR. MULROE:  Object to foundation.
```

1          MR. METCALF:  Your Honor, I could rephrase.

2          THE COURT:  All right.  Very well.

3    BY MR. METCALF:

4    Q.  What is that officer specifically doing in that clip

5    that I just showed?

6    A.  All right.  He's giving a physical circle the wagons --

7    try to get somebody's attention, and then he's pointing at

8    the crowd.

9          MR. METCALF:  Okay.  Can we go back.  Can we play

10   from 10:59 to 11:04.  I'm going to ask that it be played at

11   0.5, so a much slower speed as well, just for the record.

12         (Video played.)

13         MR. METCALF:  Now -- pause right there.

14   BY MR. METCALF:

15   Q.  This is the individual that you're talking about?

16   A.  It is, yes.

17   Q.  And that was the circular motion that you were referring

18   to?

19   A.  Correct.

20         MR. METCALF:  Keep playing.

21         (Video played.)

22   BY MR. METCALF:

23   Q.  And then he points down into the crowd?

24   A.  Yes, he does.

25         MR. METCALF:  Okay.  You can pause it there.

1      BY MR. METCALF:

2      Q.  In reviewing your videos, have you come to identify or

3      learn that -- who the person is I just circled?

4      A.  Yes, sir.

5      Q.  Who is that?

6      A.  That's Mr. Pezzola.

7              MR. METCALF:  Can we go to 11:15, please.

8       Actually -- yes.

9              (Video played.)

10              MR. METCALF:  Pause it right there.  Go just a

11     little bit further.

12              (Video played.)

13              MR. METCALF:  Go back to 11:10.

14     BY MR. METCALF:

15     Q.  I'm going to play you five seconds, from 11:10 to about

16     11:15.

17     A.  Yes, sir.

18              (Video played.)

19              MR. METCALF:  Pause.

20     BY MR. METCALF:

21     Q.  Do you know whose hat this is?

22     A.  That is Mr. Pezzola's hat.

23              MR. METCALF:  Keep playing.

24              (Video played.)

25              MR. METCALF:  Keep playing until I tell you to

1       stop.

2                  (Video played.)

3                  MR. METCALF:  Stop.

4       BY MR. METCALF:

5       Q.  Do you see what I just circled up there?

6       A.  Yes, sir.

7       Q.  And what did you observe as far as in that direction

8       goes?

9       A.  Yeah.  So I believe this is two of the Capitol Police

10      officers coming down off the -- off of the ledge, still over

11      the top of the crowd.

12      Q.  And do they remain at that elevated position?

13      A.  They move -- those guys move a little further down to

14      talk to or confront some protesters that are also up on top

15      of that ledge.

16      Q.  Okay.

17                 MR. METCALF:  So just play.

18                 (Video played.)

19                 MR. METCALF:  For the record, I'm having the video

20      continue to play from 11:18.

21                 (Brief pause.)

22                 Pause right there.

23      BY MR. METCALF:

24      Q.  Did you see other officers up in this area --

25      A.  Yes, sir.

```
1    Q.  -- as well?

2    A.  Yes.

3    Q.  And then do you eventually see other officers gathered

4    to the left of the screen?

5    A.  Right.  Up on top, yes, sir.

6    Q.  And how many -- do you remember how many officers

7    gathered in that one area?

8    A.  I believe right around this time there are between three

9    and four officers that are up in that area.  It starts with

10   two and then they keep adding -- there are more officers

11   that arrive.

12   Q.  And where the -- where the -- Inspector Loyd, where he's

13   circled and pointed to, was he signaling in the general

14   vicinity where you see those other officers in that elevated

15   position?

16   A.  He is pointing directly at them.  Yes, sir.

17             MR. METCALF:  Okay.  Keep playing.

18             (Video played.)

19             MR. METCALF:  Pause.

20   BY MR. METCALF:

21   Q.  Is this the officers that we were just referring to?

22   A.  It is.  Yes, sir.

23   Q.  And can you describe what you've seen with regards to

24   this formation and with these officers?

25   A.  Yes.  Certainly.  So the gentleman -- the officer on the
```

1    left has a shield and is basically holding the shield up

2    between the crowd and himself, also the other people up on

3    the balcony.

4    Q.  When you speak about someone, let's circle that.

5    A.  Circle.  Okay.  So this officer's got a ballistic

6    shield.  He -- or not a ballistic, but a shield to prevent

7    projectiles from being thrown up there, (indicating.)  He's

8    using that shield to ensure nobody throws anything up

9    towards the next group of officers.

10   Q.  What about the next individual, the one next to him?

11   A.  Okay.  So she has a less-lethal weapon system that's

12   called an FN 303.

13   Q.  Okay.  So she has something similar to a gun?

14   A.  It -- right.  Less lethal, but it looks very similar to

15   a rifle.

16   Q.  Okay.  And then what about the individual here that I

17   just circled in red?  (Indicating.)

18   A.  My recollection is he's holding a camera and he's trying

19   to videotape down below.

20   Q.  Okay.  And then this individual here?  (Indicating.)

21   A.  Command staff.  A commander of some sort.

22   Q.  So the -- there's -- of the officers that are lined up

23   in this elevated position, there's only one who has a gun

24   from your review of this?

25   A.  For the moment, there's one.  Another will arrive

1   shortly after that.

2          MR. METCALF:  I'd ask that we go to 11:40 and play

3   it until approximately 12:00.

4          (Brief pause.)

5          Now, playing --

6          (Video played.)

7          MR. METCALF:  Pause it.

8   BY MR. METCALF:

9   Q.  Is this now when you referred to another officer coming

10  with the gun?

11  A.  That's correct.

12  Q.  Okay.

13          MR. METCALF:  Okay.  So now, let's go back through

14  this lineup.

15          THE WITNESS:  Okay.

16  BY MR. METCALF:

17  Q.  Is this individual in the first picture that we just

18  went through?

19  A.  That's correct, with -- that's an FN 303.

20  Q.  So that's the officer who was there -- so it -- I'll

21  rephrase.

22          Essentially, since the last time we looked at

23  this, this officer now appeared; is that accurate?

24  (Indicating.)

25  A.  He's new.  That's correct.

```
 1    Q.  Okay.  Now, in that clip that I just showed you, which
 2    was approximately 11:50 to 11:58, do you -- what do you
 3    observe happening at that time?
 4    A.  Okay.  So --
 5    Q.  Actually, hang on one second, Mr. Hill.  I'm sorry.  It
 6    was 11:45 to 11:58 that I -- that was just played.  Do
 7    you -- do you want me to play that again?  Do you remember
 8    what happened during that time?
 9    A.  I have a pretty good idea, but if -- if you'd play it
10    again just for --
11              MR. METCALF:  Could you go to 11:45, please.
12              (Video played.)
13    BY MR. METCALF:
14    Q.  What is happening there?
15    A.  So this is shortly after the officer on the right --
16    this officer here, (indicating) with the 303, had fired
17    less-lethal rounds into the crowd, and they had struck a few
18    people --
19    Q.  Mr. Hill, remember, in that clip that I just showed
20    you -- it's a little bit hard to ascertain, but --
21    A.  Okay.
22    Q.  -- without getting into certain definitions --
23    A.  Sure.
24    Q.  -- okay -- what did you just -- what did you just
25    observe happening in the crowd?
```

17401

```
1    A.  Yeah.  So the crowd's pissed.  If you look at the crowd,
2    they're angry.  They're -- most of the individuals in the
3    crowd are looking up at the -- this team that's on top,
4    yelling at them, pointing at them, flipping them the bird,
5    yelling, you know -- yelling obscenities, things like this.
6    They're angry at what they had just witnessed here.
7    Q.  And what did they just witness?
8    A.  Less-lethal barrage from the -- from this --
9    Q.  Okay.  Mr. Hill --
10   A.  -- right here.
11   Q.  -- is there someone named Joshua Black in that crowd
12   that gets shot at that specific time?
13   A.  There is --
14   Q.  Okay.
15   A.  -- yes.
16   Q.  And could you describe -- because it's very difficult to
17   see it in that clip, but is that the time frame that this
18   happens?
19   A.  Yes, sir.  That's right.
20           MR. METCALF:  Okay.  So let's go back.  Can we go
21   back to 11:45.
22           (Video played.)
23   BY MR. METCALF:
24   Q.  Now, where was -- from your understanding, where was
25   Joshua Black in this --
```

1    A.  So Mr. Black, that is his arm, (indicating) his yellow

2    work glove, and he's in that location.

3    Q.  Okay.  And he just got hit or is this around the exact

4    time that he gets hit in the face?

5    A.  It's half a second from now, he will -- he'll be hit in

6    the face with one of these 303 rounds.

7         MR. METCALF:  Okay.  Can you press "play."

8         (Video played.)

9         THE WITNESS:  Right there.

10   BY MR. METCALF:

11   Q.  Okay.  So that movement, right, that we just saw behind

12   this guy with the hat, is that precise moment that we --

13   that you believe that he was shot in the face?

14   A.  It is, but it correlates with the other videos, but

15   that -- that's fine.

16   Q.  Oh, we're going to go to the other videos.  So yes.  I

17   just want to make sure that that's the precise time that

18   that happens.

19        MR. METCALF:  Can we go to 12:20 and play it to

20   12:35.

21        (Video played.)

22        MR. METCALF:  Keep playing.

23        (Video played.)

24   BY MR. METCALF:

25   Q.  Describe what's happening in that scene.

1    A.  So the crowd's quite upset.  They just witnessed this

2    man get shot in the face.  There's -- they're yelling.

3    Yeah, they're yelling at the police officers:  "They just

4    shot him in the fucking face.  They shot him in the fucking

5    face."  This is blood from Mr. Black.

6            MR. METCALF:  Okay.  Can you keep playing, please.

7            (Video played.)

8            MR. METCALF:  Can you pause it.

9    BY MR. METCALF:

10   Q.  What's happening here?

11   A.  So this is Joshua Black -- Mr. Black.  He's being

12   treated.  Basically, he's spitting blood in that water

13   bottle.  The lady right behind him is trying to put a little

14   liquid on it to wash it off.  She identifies herself as

15   medically trained.  There are also other people that are

16   around him that are going to try and provide medical help to

17   him.

18   Q.  Okay.  Let's watch that.

19           MR. METCALF:  Keep playing, please.

20           (Video played.)

21           MR. METCALF:  Pause it, please.

22   BY MR. METCALF:

23   Q.  Do you recognize this individual who came next to

24   Mr. Black?

25   A.  Yes.  I've seen him a number of times in the videos

```
 1    and --

 2    Q.  Is that Ryan Samsel or would --

 3    A.  Yes --

 4    Q.  -- you identify that --

 5    A.  -- Mr. Samsel.  That's --

 6    Q.  -- as Ryan Samsel?

 7    A.  That's Samsel.  Yes.

 8            MR. METCALF:  Keep playing, please.

 9            (Video played.)

10            MR. METCALF:  Pause right there.

11    BY MR. METCALF:

12    Q.  Describe what -- anything else that you saw in that

13    clip.

14    A.  Yeah.  So there's quite a bit going on, but you can hear

15    an individual at the beginning of this saying "Look, we need

16    to get him out of here.  He needs to be treated."  You'll

17    see that the two gentlemen that are up front and close to

18    him are trying to provide treatment.  That's -- they had a

19    little package that's called QuikClot.  Basically,

20    it's designed for gunshot --

21            MR. METCALF:  Can you take it off.

22            THE WITNESS:  -- wounds or large penetrating

23    wounds.  So they're going to try and put that on him.  But

24    you'll notice that the one gentleman who puts rubber gloves

25    on is trying to put a piece of gauze inside Mr. Black's
```

1  mouth.  You can see the gauze there.  And while he's going

2  in there, it looks like he's going to try and remove the

3  round -- the munition that's inside there.  The gentleman

4  next to him --

5  BY MR. METCALF:

6  Q.  Hang on.  Mr. Hill, right -- with that point --

7  A.  Yes.

8  Q.  -- I'm showing you what has been marked as Pezzola-172A.

9  Do you see --

10  A.  Yes.

11  Q.  -- that picture on your screen?

12  A.  I do.

13  Q.  And is that a picture of what you just described and

14  what you just saw?

15  A.  Yes.

16          MR. METCALF:  I'd ask that this be admitted and

17  published.

18          MR. MULROE:  No objection.

19          THE COURT:  It will be admitted.  And permission

20  to publish it.

21  BY MR. METCALF:

22  Q.  And the bullet is still in his cheek at that point?

23  A.  That's correct.  That is a munition from the FN 303.

24  You can tell by the yellowish color on the back of it and,

25  you know, the fact that it went completely through the

 1     cheek, punched a hole into his mouth where they're trying

 2     to, basically, stop the bleeding on the inside.

 3     Q.  Okay.  So now, after that scene -- I mean, that scene

 4     that we just saw, the crowd, then, gets a little riled up,

 5     to say the least, right --

 6               MR. MULROE:  Object to leading.

 7               THE COURT:  Sustained.

 8     BY MR. METCALF:

 9     Q.  Explain what the crowd was doing during that time from

10     what you observed in watching that video?

11     A.  They're angry.  They're upset.  They're pissed because

12     one of their own has just been shot in the face with, you

13     know, something they --

14               MR. MULROE:  Object to foundation.

15               THE COURT:  Overruled.

16               You may continue to answer the question, sir.

17               MR. SMITH:  So he's been shot by a less-lethal

18     munition that penetrated his cheek, went inside of his

19     mouth, and did an awful lot of damage.

20               MR. METCALF:  Okay.  I'm going to play now from 15

21     minutes until about 15:08.  Can we please play that.

22               (Video played.)

23               MR. METCALF:  Pause.

24     BY MR. METCALF:

25     Q.  What do you see these two individuals doing?

1    (Indicating.)

2    A.  Well, so one of the officers from the hard squad has

3    reached in and grabbed Mr. Black.  And it looks like he's

4    trying to take him into custody.  And these two gentlemen --

5    Q.  Mr. Hill -- it's a good point.  Let's back up.  So you

6    see that right before --

7    A.  Yes.

8    Q.  -- the clip I just played?

9    A.  Yes, sir.

10    Q.  Okay.  How much before?

11    A.  Just --

12    Q.  A couple of seconds?

13    A.  -- two seconds.

14        MR. METCALF:  Can we go to 14:50.

15        (Video played.)

16        MR. METCALF:  Pause right there.

17    BY MR. METCALF:

18    Q.  Is this the same individual who did the circular motion?

19    A.  That's -- that is him.

20    Q.  And then -- and he was before back in this area,

21    (indicating); right?  Not elevated, but he was back in that

22    vicinity before; right?

23    A.  Yes, he was.

24    Q.  So he has now come into the crowd?

25    A.  Right.

1    Q.  And then is this the time where it looks -- where -- or

2    what you explained as they tried to bring him in?

3    A.  Yes.

4              MR. METCALF:  Okay.  Can we play it.

5              (Video played.)

6              MR. METCALF:  Pause it right there.

7    BY MR. METCALF:

8    Q.  Who else is he speaking to at this point in time?

9    A.  Okay.  So he's talking with -- so Mr. Black is talking

10   to one of the members on the hard squad, one of the Capitol

11   Police officers, and you can see a dialogue between the two

12   of them.

13   Q.  And who tries to bring him -- who looks as if they try

14   to bring him away?  Is it this individual right here?

15   (Indicating.)

16   A.  Yes, you can see him grab his arm and actually

17   physically hold onto him and try and drag him out of the

18   crowd.

19   Q.  And then after that, what do you see the rest of the

20   people standing next to him do?

21   A.  That was a mistake.  The crowd's very upset.

22   "You're" -- basically, you know, "You're not taking him.

23   He's one of ours."  They get visibly and physically upset

24   with the police officers.

25             MR. METCALF:  Okay.  Can we go to 15:47, please.

```
 1     Can we play that until 15:53.

 2                (Video played.)

 3     BY MR. METCALF:

 4     Q.  Is this the same area?

 5     A.  Yes.  Yes.

 6     Q.  This is less than a minute later?

 7     A.  Yes.

 8                MR. METCALF:  Keep playing until 16:00.

 9                (Video played.)

10                MR. METCALF:  Pause it there.  Can you actually go

11     to 16:14, please.

12     BY MR. METCALF:

13     Q.  Do you recall watching this part of it -- of this video?

14     I'm going to actually play this from 16:14 until 16:22.  So

15     it's only seven seconds.

16                (Video played.)

17     BY MR. METCALF:

18     Q.  Do you recall seeing that?

19     A.  Yes, sir.

20                MR. METCALF:  Okay.  Can we go back to 16:16 and

21     pause it.  Can we try to get that a little clearer.

22                (Video played.)

23     BY MR. METCALF:

24     Q.  What do you remember seeing here --

25     A.  So --
```

1    Q.  -- in this area?  (Indicating.)

2    A.  -- two of the -- at least two of the Capitol Police

3    officers are on the ground in the crowd.  Mr. Pezzola is on

4    the ground on his back in the crowd --

5    Q.  And that --

6    A.  -- and then --

7    Q.  -- time -- at that specific point in time --

8    A.  Yeah.

9    Q.  -- this specific point in time --

10   A.  Yeah.

11   Q.  -- does Mr. Pezzola have his hands on that shield?

12   A.  I don't -- I'm not sure if he has his hand on the

13   shield.  There's a gentleman with a W that has his hands on

14   the shield at this point.

15   Q.  So there's somebody else hold- -- who has their hands on

16   the shield?

17   A.  Yes, sir.  Right.

18   Q.  And then shortly after this, within seconds,

19   Mr. Pezzola's no longer captured in this video?

20   A.  That's correct.

21          MR. METCALF:  I'm going to ask that we switch to

22   Pezzola-136.

23          Can we unpublish.

24   BY MR. METCALF:

25   Q.  Mr. Hill, I'm going to show you what's already been

```
 1    admitted as evidence as Pezzola-136.
 2    A.  Yes, sir.
 3             MR. METCALF:  And I ask that it be able to be
 4    published to the jury.
 5             THE COURT:  You have permission to publish it.
 6    Yes.
 7    BY MR. METCALF:
 8    Q.  Have you seen this video before?
 9    A.  I have.  Yes, sir.
10             MR. METCALF:  Can we play this video, please.
11             (Video played.)
12             MR. METCALF:  Can we actually play from 1:33 to
13    1:49.
14             (Video played.)
15             MR. METCALF:  Stop there.
16    BY MR. METCALF:
17    Q.  What's happening in the video at this point?
18    A.  So this video's from the angle of the camera crew.  It's
19    the cameraman that's up top with the officers with the
20    less-lethal weapons.
21    Q.  So when we were talking about the officers, one of
22    them -- there was four of them at first.  One of them --
23    A.  Yes.
24    Q.  -- had a gun?
25    A.  Yes, sir.
```

1   Q.  Then another officer came who also had what appeared to

2   be a gun?

3   A.  Yes.

4   Q.  It's from that vantage point?

5   A.  Correct.

6   Q.  Okay.  And what did you just see?  And circle where

7   you're referring to.

8   A.  So as you watch across, you'll see a round from the

9   FN 303 travel across here, (indicating) and strike this

10  gentleman right here, (indicating.)

11  Q.  Where did it strike that gentleman?

12  A.  It strikes him in the -- right in the face, in the ear

13  area.

14          MR. METCALF:  Okay.  Can we go to 4 minutes and

15  play that until 4:20.

16          (Video played.)

17          MR. METCALF:  Pause.

18  BY MR. METCALF:

19  Q.  Did you see -- or explain what you just saw.

20  A.  So once again -- and the reason I say it's the FN 303 is

21  because you can see the yellow as it travels across.  The

22  other less lethal was shooting the red.  This one's shooting

23  the yellow.  A yellow round -- munition comes across and it

24  strikes this man somewhere between his right hand and his

25  cheek or chin.  Somewhere in that area of his face.

```
 1              MR. METCALF:  Can we go to 6:10, please, and play

 2     to 6:25.

 3              (Video played.)

 4              MR. METCALF:  Pause.

 5     BY MR. METCALF:

 6     Q.  Describe what you saw there.

 7     A.  Again, the round from the FN 303 striking this man in

 8     the back of the neck, (indicating.)

 9              MR. METCALF:  Can we go to 6:20 -- actually, can

10     we play this until 6:45.

11     BY MR. METCALF:

12     Q.  I want you to tell me what you observe from here until

13     6:45.

14     A.  Mm-hmm.

15              (Video played.)

16     BY MR. METCALF:

17     Q.  Do you see anything there?

18     A.  Yeah.  So the same gentleman that got hit in the back of

19     the neck, he then turns and he's struck in the center of his

20     chest.

21     Q.  Can you circle him, please.

22     A.  Yes, sir.  This gentleman right here, (indicating.)

23     He's struck somewhere in the center of the chest area with

24     that 303 round, and you can watch the round fall off and

25     land on the ground.
```

```
 1                    MR. METCALF:  Can we go to -- just a second.

 2                    (Brief pause.)

 3                    Just one second, Your Honor.

 4                    (Brief pause.)

 5                    (Video played.)

 6                    MR. METCALF:  Is that it?

 7       BY MR. METCALF:

 8       Q.  I'm going to show you what's been marked as Pezzola-171.

 9                    MR. METCALF:  And I ask that this be admitted into

10       evidence and published for the jury.

11                    MR. MULROE:  No objection.

12                    THE COURT:  All right.  It will be admitted.  And

13       permission to publish.

14                    MR. METCALF:  Can you go to 1:54 on this video,

15       please.

16                    (Video played.)

17                    MR. METCALF:  Can -- you can play from there.  Can

18       we play from --

19                    (Video played.)

20                    MR. METCALF:  Pause it there.

21       BY MR. METCALF:

22       Q.  Have you seen this video?

23       A.  I have.  Yes, sir.

24       Q.  Okay.  Could you describe what you're seeing now.

25       A.  So this is the FN 303.  It's a less-lethal rifle.
```

1    Q.  Mr. Hill, can you read the warning sign on that.

2    A.  Yeah.  So that's -- I can't read it in this one, but

3    I've read it a lot.

4    Q.  What does it say?

5    A.  So under the warning sign, it says "Improper use can

6    result in death" and "Do not shoot this at the head or face

7    of anybody; could result in death," is what it says.

8    Q.  Now, this is the same vantage point that we were just

9    talking about as well; right?

10    A.  It is.  Yes, sir.

11            MR. METCALF:  Okay.  Can we go to 1 minute and 20

12    seconds, please.

13            (Video played.)

14            MR. METCALF:  Okay.  So we're playing it from 1:14

15    to about 1:23.

16            (Brief pause.)

17    BY MR. METCALF:

18    Q.  Can you describe what just happened in that video or do

19    you need --

20    A.  Yes.

21    Q.  -- me to play that again?

22    A.  No, that's good.

23            So the gentleman that was in the blue shirt who

24    got hit twice, he turns; he moves off a slight, you know --

25    a few feet away.  Mr. Black is in that photo, and that's

```
 1    when Mr. Black gets hit in the face.
 2              MR. METCALF:  Okay.  So let's -- yeah, go 10
 3    seconds.  That's fine.
 4    BY MR. METCALF:
 5    Q.  I'm going to need you to circle where you're referring
 6    to.  So before we play it --
 7    A.  Yes.
 8    Q.  -- this is the same scene that we're talking about with
 9    Joshua Black who got shot in the face?
10    A.  Yes.
11    Q.  Okay.
12    A.  Yes.
13    Q.  Can you circle where he approximately is.
14    A.  Yes.  He's right there, (indicating.)  That's his yellow
15    gloves.
16    Q.  Okay.  And this is the exact time frame that he gets
17    shot from this vantage point?
18    A.  He will, yes.
19    Q.  Okay.  Can you point out when he does get shot.
20              MR. METCALF:  Can we play it now.
21              (Video played.)
22              THE WITNESS:  Now.
23              MR. METCALF:  Stop.
24    BY MR. METCALF:
25    Q.  Was that it?
```

```
 1    A.  That was it, yes.
 2             MR. METCALF:  Can you just go to 1:22.
 3    BY MR. METCALF:
 4    Q.  Is this him right there after being shot?
 5    A.  It is, yes.
 6             MR. METCALF:  Can we go to 46 seconds -- actually,
 7    excuse me, 34 seconds.
 8    BY MR. METCALF:
 9    Q.  I'm going to show you --
10             MR. METCALF:  Pause it right there.
11    BY MR. METCALF:
12    Q.  I'm going to show you from 34 seconds to 40 seconds.  Is
13    this the same inspector that we spoke about?
14    A.  Yes, it is.
15    Q.  And this is the individual who does the circular signal?
16    A.  It is.
17             MR. METCALF:  Okay.  Can we play this until 40
18    seconds, please.
19             (Video played.)
20             MR. METCALF:  Can you go back.
21    BY MR. METCALF:
22    Q.  Can you just -- can you describe what you just saw.
23    A.  Yeah.  So the commander or the leader was getting the
24    attention of the team up top, directing them to fire down at
25    certain targets --
```

```
 1                 MR. MULROE:  Object to foundation.
 2                 THE WITNESS:  -- in the crowd.
 3                 THE COURT:  Sustained.
 4                 MR. METCALF:  Can we go back to 35 seconds.
 5                 (Brief pause.)
 6                 Stop.
 7       BY MR. METCALF:
 8       Q.  Is this the same motion made by the same individual that
 9       we observed on that other video?
10       A.  Yes, it is.
11       Q.  And this is the same time that he does the circular
12       signal?
13       A.  Yes, it is.
14       Q.  And he appears to be looking at who?
15       A.  He's looking directly up at the team with the
16       less-lethal weapons.
17                 MR. METCALF:  Okay.  Can we go -- can we play from
18       here with sound.
19       BY MR. METCALF:
20       Q.  I want you to listen -- after this motion is being made,
21       I want you to listen to the sound --
22       A.  Yes, sir.
23       Q.  -- and tell me if you hear anything.
24                 (Video played.)
25       BY MR. METCALF:
```

```
1     Q.  Did you hear anything?
2             MR. METCALF:  Pause.
3     BY MR. METCALF:
4     Q.  Did you hear anything right there?
5     A.  Just -- right now, it's just the crowd -- just crowd
6     noise.
7     Q.  Okay.
8     A.  I can hear something in the bottom, but -- you'll hear
9     it in a minute.
10            MR. METCALF:  Okay.  Keep playing, please.
11            (Video played.)
12            MR. METCALF:  Pause.
13            THE WITNESS:  Yeah.
14    BY MR. METCALF:
15    Q.  What did you hear?
16    A.  So you've got somebody that's up at the same level of
17    the camera that is directing the rounds or the -- directing
18    the targeting of people down at the bottom.  So you can hear
19    somebody's identifying a description of an individual and
20    then telling the person with left -- less-lethal to engage
21    that person.
22    Q.  Do you hear any shots go off?
23    A.  So you have to listen to it really closely, but you can
24    hear the pop, pop, pop of the shots and -- or directly after
25    that, you hear somebody saying, "Boom, boom," as the rounds
```

 1    are impacting.

 2    Q.  You also heard identifying factors like colors that

 3    people were wearing or anything along those lines?

 4    A.  You --

 5    Q.  I'm going to replay --

 6    A.  Yes --

 7    Q.  -- the last --

 8    A.  -- slight- --

 9    Q.  -- 10 seconds.

10    A.  Yeah, slightly on this one.

11              MR. METCALF:  Can you go just 10 seconds back.

12              (Video played.)

13              MR. METCALF:  Pause.

14    BY MR. METCALF:

15    Q.  Did you hear --

16    A.  Yeah.  Yeah.

17    Q.  -- anything about a shirt --

18    A.  Right.  "Gray shirt.  Gray top."

19              MR. METCALF:  Keep playing.

20              (Video played.)

21              MR. METCALF:  Pause.

22              THE WITNESS:  Right here.  Mm-hmm.

23              MR. METCALF:  Keep playing.

24              (Video played.)

25    BY MR. METCALF:

1    Q.   Now, did you just -- what did you just see?

2    A.   So initially, it appears they were talking about the

3    gentleman that was up on the top of this area here.  They

4    identify him relatively well.

5    Q.   Hang on one second.  I'm going to rephrase the question.

6    A.   Okay.

7    Q.   This individual right here, (indicating) I want you to

8    focus on him.

9    A.   Yes.

10             MR. METCALF:  Could we go back two seconds,

11   please.  So I'm going to play at 1:18 -- actually, 1:17.

12   BY MY.  METCALF:

13   Q.   And then this individual --

14             MR. METCALF:  Pause.  Pause.

15   BY MR. METCALF:

16   Q.   This individual here, (indicating) is standing next to

17   Joshua Black; right?

18   A.   Yes.

19   Q.   Okay.  I want you to focus on him and then I want you to

20   let us know if this is the time frame when Joshua Black gets

21   shot.

22   A.   Yes.

23             MR. METCALF:  Can you play from here, please.

24             (Video played.)

25             MR. METCALF:  Pause.

```
 1    BY MR. METCALF:

 2    Q.  What did you just see?

 3    A.  Yeah.  So you -- that was the time frame when Mr. Black

 4    got hit.  The -- it's, kind of, hard to make out exactly

 5    what the guy is saying, but he had just identified the guy

 6    in blue that he was trying to hit.

 7    Q.  And did you see the guy in blue get hit first?

 8    A.  He did, yes.

 9    Q.  Approximately how many seconds before Joshua Black was

10    hit?

11    A.  Second-and-a-half, two seconds.  It was pretty quick.

12             MR. METCALF:  Your Honor, at this time, I'm going

13    to transition.  So is -- would you want to break for lunch?

14             THE COURT:  All right.  If it's a good stopping

15    point, that's fine.  Actually, can I just have counsel at

16    sidebar for one moment.

17             (Bench conference:)

18             (Following proceedings under seal:)

19    ████████████    ██████    ██████████████████

20    ██████████    ████████████████████████████████

21    ████████████████████████████████    ██████████████

22    ████████████████████████████████████████████████

23    ████████████████████████████████████████████████

24    ████████████████████████████████████████

25    ████████████████████████████████████████
```

17423



```
 1              (Return from bench conference.)

 2              (Following proceedings in open court:)

 3              THE COURT:  All right.  Ladies and gentlemen, it's

 4      lunchtime, as you know.  We'll dismiss you for lunch and

 5      we'll see you on the other side of that.

 6              (Jury returned to jury room.)

 7              THE COURT:  All right.  Sir, you may step down.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  Absolutely.

10              (Witness steps down.)

11              THE COURT:  All right.  So why don't I see you

12      back -- it's 12:30.  Why don't we come back at 1:45, have an

13      extra 15 minutes for lunch.  1:45.

14              MR. METCALF:  Thank you.

15              THE DEPUTY CLERK:  All rise.

16              (Luncheon recess taken at 12:28 p.m.)

17                    *  *  *  *  *  *  *  *  *  *  *
```

18              **CERTIFICATE OF OFFICIAL COURT REPORTER**

19      **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

20      **that the above and foregoing constitutes a true and accurate**

21      **transcript of my stenographic notes and is a full, true and**

22      **complete transcript of the proceedings to the best of my**

23      **ability, dated this 6th day of April 2023.**

24                              **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                                **Official Court Reporter**
25                              **United States Courthouse**
                                **Room 6722**



**333 Constitution Avenue, NW**
**Washington, DC 20001**

1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

2

3    * * * * * * * * * * * * * * *  )
    UNITED STATES OF AMERICA,      )   Criminal Action
4                              )    No. 21-00175
                Plaintiff,      )
5                              )
       vs.                    )
6                              )
    ETHAN NORDEAN, JOSEPH R. BIGGS,  )   Washington, D.C.
7    ZACHARY REHL, ENRIQUE TARRIO and )   April 6, 2023
    DOMINIC J. PEZZOLA,           )   1:55 p.m.
8                              )
               Defendants.     )
9                              )
    * * * * * * * * * * * * * * *  )
10

11

             TRANSCRIPT OF JURY TRIAL - DAY 61
12                 **AFTERNOON SESSION**
        BEFORE THE HONORABLE TIMOTHY J. KELLY,
13           UNITED STATES DISTRICT JUDGE

14

15

16   APPEARANCES:

17   FOR THE GOVERNMENT:    JASON B.A. McCULLOUGH, ESQ.
                       ERIK M. KENERSON, ESQ.
18                    CONOR MULROE, ESQ.
                       NADIA MOORE, ESQ.
19                    UNITED STATES ATTORNEY'S OFFICE
                        FOR THE DISTRICT OF COLUMBIA
20                    555 Fourth Street, Northwest
                    Eleventh Floor
21                    Washington, D.C. 20530

22   FOR THE DEFENDANT      NICHOLAS D. SMITH, ESQ.
           NORDEAN:       DAVID B. SMITH, PLLC
23                    1123 Broadway
                    Suite 909
24                    New York, New York 10010

25

1    <u>APPEARANCES, CONT'D:</u>

2

3    FOR THE DEFENDANT          JOHN D. HULL, IV, ESQ.
            BIGGS:             HULL McGUIRE, P.C.
                               1420 N Street, Northwest
4                              Washington, D.C. 20005

5                              NORMAN A. PATTIS, ESQ.
                               PATTIS & SMITH, LLC
6                              383 Orange Street
                               First Floor
7                              New Haven, Connecticut 06511

8

9    FOR THE DEFENDANT          CARMEN D. HERNANDEZ, ESQ.
            REHL:              7166 Mink Hollow Road
                               Highland, Maryland 20777
10

11   FOR THE DEFENDANT          NAYIB HASSAN, ESQ.
            TARRIO:            LAW OFFICES OF NAYIB HASSAN, P.A.
12                             6175 Northwest 153rd Street
                               Suite 209
13                             Miami Lakes, Florida 33014

14                             SABINO JAUREGUI, ESQ.
                               JAUREGUI LAW, P.A.
15                             1014 West 49th Street
                               Hialeah, Florida 33012

16

17   FOR THE DEFENDANT          STEVEN METCALF, II, ESQ.
            PEZZOLA:           METCALF & METCALF, P.C.
18                             99 Park Avenue
                               Sixth Floor
19                             New York, New York 10016

20                             ROGER ROOTS, ESQ.
                               LAW OFFICES OF ROGER ROOTS
21                             113 Lake Drive East
                               Livingston, Montana 59047

22

23

24

25

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2

3                                 Direct      Cross         Red.

4

5      WITNESSES FOR THE DEFENSE:

6

7      Steven Hill

       Jaclyn Kosinski

8

9

10     EXHIBITS RECEIVED IN EVIDENCE

11

       Government's Exhibit No. 445E

12
       Government's Exhibit No. 1750

13
       Defendant Pezzola's Exhibit No. 182

14
       Defendant Tarrio's Exhibit Nos. 170-1 through

15        170-46

16     Joint Exhibit No. 3

17

18

19

20

21

22

23

24

25

17454



17455



17456



17457



17458



17459





17461



17462



17463





17465



17466



17467



17468



1

2

3

4

5

6

7    (Whereupon, the courtroom was duly unsealed.)

8    (Thereupon, Mr. Hill entered the courtroom and the

9 following proceedings were had:)

10    THE COURT:  Mr. Metcalf, it just may take a moment

11 to unseal the overflow room.

12    MR. METCALF:  Okay.

13    THE COURT:  I'd just ask you to pause for one

14 moment.

15    MR. METCALF:  Will do.

16    THE COURTROOM DEPUTY:  Okay.  We're good.

17    THE COURT:  You may proceed, Mr. Metcalf.

18    MR. METCALF:  Thank you.

19   (STEVEN HILL, DEFENSE WITNESS, PREVIOUSLY SWORN.)

20     CONTINUED DIRECT EXAMINATION

21 BY MR. METCALF:

22 Q.  Good afternoon, Mr. Hill.  How are you doing?

23 A.  Good.  Thank you.

24 Q.  Thanks for sticking around.

25    So I want to show you a different video from a

Hill - DIRECT - By Mr. Metcalf

```
1    slightly similar angle.
2              MR. METCALF:  Can we show the witness Pezzola 182?
3              (Whereupon, segments of Defendant Pezzola's
4    Exhibit No. 182 were published to the witness.)
5    BY MR. METCALF:
6    Q.  Mr. Hill, have you seen this video or does this video
7    look familiar to you?
8    A.  Yes.  I've seen this.
9              MR. METCALF:  Your Honor, I'd ask that this be
10   admitted and published.
11             MR. MULROE:  No objection.
12             THE COURT:  It shall be admitted.  And permission
13   to publish.
14             (Whereupon, Defendant Pezzola Exhibit No. 182 was
15   entered into evidence.)
16             MR. METCALF:  Thank you, your Honor.
17   BY MR. METCALF:
18   Q.  This is going to be quick.  I want to focus on the first
19   five seconds.  Okay?  And ultimately I want to go back to
20   the same individual that we've somewhat spoken about, the
21   guy with the blue sweatshirt.  Okay?
22             MR. METCALF:  So if you'd play for just the first
23   five seconds, please.
24             (Whereupon, segments of Defendant Pezzola's
25   Exhibit No. 182 were published in open court.)
```

```
 1              MR. METCALF:  Can you go back one second, please.
 2    Now I'm going back to three seconds.
 3    BY MR. METCALF:
 4    Q.  What happened in that first five seconds of this video?
 5    A.  Well, the gentleman that's laying down -- you circled
 6    him in red -- was struck by what appeared to be a pepper
 7    ball round.  You can see the puff of smoke.
 8    Q.  Okay.  Did that look more white?
 9    A.  Yes.  Yes.
10    Q.  Now, this individual right here, do you see who I just
11    circled there?
12    A.  Yes, sir.
13              MR. METCALF:  Can you play the next second or two.
14              (Whereupon, segments of Defendant Pezzola's
15    Exhibit No. 182 were published in open court.)
16    BY MR. METCALF:
17    Q.  Do you see his face there?
18    A.  I do.
19    Q.  What does it appear to be on his face?
20    A.  So this is the gentleman that was standing up a little
21    higher on the stage earlier when the munition from the
22    FN 303 struck him in the face.  That's a wound.
23              MR. METCALF:  Okay.  So I want to go back to
24    Pezzola 171, please.
25
```

```
 1    BY MR. METCALF:

 2    Q.  All right.  Let's do a little bit of an overview,

 3    because we just jumped back and forth.  So you viewed a

 4    whole bunch of these videos.

 5              MR. METCALF:  Before we play -- I'll let you know

 6    when to play.

 7    BY MR. METCALF:

 8    Q.  You've viewed a whole bunch of these videos.  You've

 9    compared and contrasted them with each other.  Right?

10    A.  I have.  Yes.

11    Q.  And you've looked at these -- one scene from various

12    different angles?

13    A.  Yes.

14    Q.  And that's what we basically did here today?

15    A.  Correct.

16    Q.  All right.  Now, let's start from the signal that Loyd

17    gave.

18    A.  All right.

19    Q.  At the time he gave that signal, how was the crowd

20    basically acting before he gave the signal?

21    A.  So you were -- you're seeing the crowd as pushing

22    against the officers, officers pushing back.  The officers

23    are doing a good job at keeping line integrity.  A little

24    bit of both --

25              MR. MULROE:  Object to improper expert testimony.
```

17473

```
1              THE COURT:  Sustained.
2    BY MR. METCALF:
3    Q.  Without giving your opinion, can you explain in detail
4    how the situation was prior to Loyd giving that circle
5    signal?
6    A.  Yes.  So as you can see in the video, you can see the
7    demonstrators are pushing against the police officers; the
8    police officers are pushing against the demonstrators.  You
9    can also see there are -- it's a shoving match.  No one is
10   punching or swinging.  They're pushing and shoving back and
11   forth.
12   Q.  And does that change drastically after he gives the
13   signal?
14   A.  Absolutely.
15              MR. MULROE:  Object to leading.
16              THE COURT:  Sustained.
17   BY MR. METCALF:
18   Q.  After that signal is given, what then happens with the
19   whole -- with the whole crowd?
20   A.  So after the signal is given, you see less lethals
21   launched into the crowd.  And in a few moments after this
22   timeframe, the crowd gets angrier and angrier -- angry
23   because of what they've seen.
24   Q.  And then it ultimately leads to Joshua Black getting
25   shot in the face?
```

```
 1    A.  It does and --

 2              MR. MULROE:  Object to leading.

 3              THE COURT:  Sustained.

 4    BY MR. METCALF:

 5    Q.  And then -- so after the signal -- we went through a

 6    couple, but after the signal, how many shots would you say

 7    happened, if you had to guess, between the signal and Joshua

 8    Black getting shot?

 9    A.  There are at least ten rounds that are fired, probably

10    more.

11    Q.  And you could see and hear these shots?

12    A.  Yeah.  I have a high-decibel hearing loss, so I really

13    have to listen to it on headphones, but I've listened to

14    this many times.

15    Q.  Okay.  And then after -- and how long of a time period

16    would you say it took from the signal to Black getting shot,

17    approximately?

18    A.  Five, six seconds.  I mean, it's relatively quick.

19              MR. METCALF:  Okay.  Let's go through Pezzola 131

20    and start at 35 seconds.

21              THE COURT REPORTER:  Excuse me.  Is this 171 or

22    131?

23              MR. METCALF:  This is 171.

24              (Whereupon, segments of Defendant Pezzola's

25    Exhibit No. 171 were published in open court.)
```

```
 1                    MR. METCALF:  Pause.

 2                    I think we missed it.  Can you go back to 35

 3        seconds, please?  Actually, go to 30 seconds.

 4                    (Whereupon, segments of Defendant Pezzola's

 5        Exhibit No. 171 were published in open court.)

 6        BY MR. METCALF:

 7        Q.  So let's recap this now from this angle.

 8                    MR. METCALF:  Play.

 9                    (Whereupon, segments of Defendant Pezzola's

10        Exhibit No. 171 were published in open court.)

11                    MR. METCALF:  Stop.

12        BY MR. METCALF:

13        Q.  You saw Inspector Loyd do the signal there.  Right?

14        A.  I did, yes.

15        Q.  And we're at 37 seconds.  I want you to -- let's

16        visually -- and let's also try to hear as best we can.

17        A.  Right.

18                    MR. METCALF:  Can you play at 38 seconds, please.

19                    (Whereupon, segments of Defendant Pezzola's

20        Exhibit No. 171 were published in open court.)

21        BY MR. METCALF:

22        Q.  Did you just hear that?

23        A.  Yes.

24        Q.  That was at 43 seconds.

25        A.  Yeah.
```

```
 1                    MR. METCALF:  Can you play.
 2                    (Whereupon, segments of Defendant Pezzola's
 3        Exhibit No. 171 were published in open court.)
 4                    MR. METCALF:  Stop.
 5        BY MR. METCALF:
 6        Q.  Did you just hear that?
 7        A.  I did.
 8        Q.  That was at 48 seconds.
 9                    MR. METCALF:  Actually, let's go back to 43
10        seconds.  Let's see if we see the bullets.  Or go to 42
11        seconds.  Let's see if we see this one at 42 seconds.
12                    (Whereupon, segments of Defendant Pezzola's
13        Exhibit No. 171 were published in open court.)
14                    MR. METCALF:  Play again.
15                    (Whereupon, segments of Defendant Pezzola's
16        Exhibit No. 171 were published in open court.)
17        BY MR. METCALF:
18        Q.  Did you see that one?
19        A.  I did not.
20                    MR. METCALF:  Can you go to 41 seconds and slow it
21        down, please.
22                    (Whereupon, segments of Defendant Pezzola's
23        Exhibit No. 171 were published in open court.)
24                    THE WITNESS:  There.  Right there.  Yes.
25
```

```
1    BY MR. METCALF:

2    Q.  Did you see that?

3    A.  I did.  Yes.

4    Q.  Okay.  That's 43 seconds.

5              MR. METCALF:  Let's go back to 48 seconds -- or

6    let's go to 47 seconds and stop at 50.  Regular speed.

7              (Whereupon, segments of Defendant Pezzola's

8    Exhibit No. 171 were published in open court.)

9              MR. METCALF:  Stop.

10   BY MR. METCALF:

11   Q.  Did you hear that one?

12   A.  Yes.

13   Q.  Now we're at 50 seconds.

14             MR. METCALF:  Keep going.

15             (Whereupon, segments of Defendant Pezzola's

16   Exhibit No. 171 were published in open court.)

17   BY MR. METCALF:

18   Q.  Did you hear that one?

19   A.  Yes.

20             MR. METCALF:  Keep playing.

21             (Whereupon, segments of Defendant Pezzola's

22   Exhibit No. 171 were published in open court.)

23   BY MR. METCALF:

24   Q.  Did you hear that one?

25   A.  Yes.
```

1    Q.  Now, before that shot, what did you hear?

2    A.  You can hear somebody in the background calling in the

3    shot, telling him, you know, go -- basically, shoot at the

4    guy with the gray jacket and the baseball hat or

5    something -- some type of --

6    Q.  Did you hear "gray hair" right there?

7    A.  And gray hair.  Yes.

8             MR. METCALF:  Can you go to 1:03 and play to 1:05.

9    I just want to make sure we get that right.

10            (Whereupon, segments of Defendant Pezzola's

11   Exhibit No. 171 were published in open court.)

12            MR. METCALF:  Stop.

13   BY MR. METCALF:

14   Q.  Now, after you heard "the gray hair," you saw a shot.

15   Right?

16   A.  Yes.

17   Q.  After -- immediately thereafter -- so now we're at 1:07,

18   1:08 -- another shot you heard.  Right?

19   A.  Right.

20            MR. METCALF:  Now play.

21            (Whereupon, segments of Defendant Pezzola's

22   Exhibit No. 171 were published in open court.)

23   BY MR. METCALF:

24   Q.  Okay.  Did you hear a shot there?  Did you hear a shot

25   at 1:17?

```
 1              MR. METCALF:  Let's go back.  1:16 --
 2    BY MR. METCALF:
 3    Q.  I'm going to play from 1:16 to 1:22.  I want you to --
 4    let's listen to how many shots we hear in six seconds.
 5    Ready?
 6              (Whereupon, segments of Defendant Pezzola's
 7    Exhibit No. 171 were published in open court.)
 8    BY MR. METCALF:
 9    Q.  How many shots did you hear in that short timeframe?
10    A.  Yeah.  Four or five shots.  But I --
11    Q.  This was --
12    A.  -- I'm much better with my earplugs.  Sorry.
13    Q.  But this is the timeframe that Black is shot, then.
14    Right?
15    A.  It is, yes.
16    Q.  And he was shot at 1:22 in this video.
17    A.  Yes.
18              MR. METCALF:  Go back to 1:22.
19              (Whereupon, segments of Defendant Pezzola's
20    Exhibit No. 171 were published in open court.)
21              MR. METCALF:  Stop there.
22    BY MR. METCALF:
23    Q.  This is Black being shot there.  Is that --
24    A.  That is --
25    Q.  -- correct?
```

1   A.   Yes.   That's right.

2   Q.   Okay.   So 35 seconds is when Inspector Loyd gives the

3   signal.   We are at 1:22.   So we are less than a minute after

4   that signal.

5   A.   Right.

6   Q.   How many shots would you say that you can see or hear,

7   approximately?

8   A.   There's more than ten.

9   Q.   And of those shots that you have been able to trace by

10   slowing these videos down, how many of those shots hit

11   people in the face?

12   A.   Five.   Five or six of them.

13   Q.   And after that -- this is the same area that Mr. Pezzola

14   ended up coming into possession with the shield?

15   A.   Correct.

16   Q.   And approximately how much time after this scene that we

17   just showed did Pezzola come into contact with the shield?

18   A.   I believe it's under 30 seconds.   It's relatively fast.

19           MR. METCALF:   I appreciate it, Mr. Hill.   Thank

20   you.

21           MR. MULROE:   The Court's indulgence just one

22   moment.

23           THE COURT:   Very well.

24                   CROSS-EXAMINATION

25

1    BY MR. MULROE:

2    Q.  Good afternoon, Mr. Hill.

3    A.  Hi.  How are you?

4    Q.  Good.  Thanks.

5           So you testified, when you were introducing

6    yourself, about your career, impressive career.  Thank you

7    for being with us today.

8    A.  Thanks.

9    Q.  And you mentioned that part of your duties when you were

10   in law enforcement included protecting -- I think your

11   phrase was "high-risk people."  Is that right?

12   A.  High-risk articles and people.  Yes.

13   Q.  High-risk articles and people.

14          So high-risk people would include people who,

15   because of their position, are at a greater risk of sort of

16   targeted violence.  Correct?

17   A.  Yes.  Yes.

18   Q.  They include -- the vice president of the United States

19   would be one such person?

20   A.  Correct.

21   Q.  Members of Congress would be --

22   A.  I've protected both of them.  Yes.

23   Q.  And then your knowledge of what happened at the Capitol

24   on January 6th is based primarily on videos you've reviewed.

25   Is that right?

```
1    A.  Based on what?

2    Q.  Primarily on videos that you've reviewed.  Correct?

3    A.  No.  No.  So --

4    Q.  Your testimony here to this jury was based purely on

5    videos that you reviewed.  Correct?

6    A.  My testimony today has been based primarily on video.

7    Q.  And you'd agree that what is depicted in those videos is

8    an extremely volatile situation.  Correct?

9    A.  It is.

10   Q.  You understood that, prior to the videos Mr. Metcalf

11   showed you, rioters had used force to make their way onto

12   restricted Capitol grounds?

13   A.  I had seen --

14          MR. METCALF:  Your Honor, objection as to scope.

15   My testimony started at this area.

16          MR. MULROE:  I think what happened before is

17   relevant to the actions that the officers took.

18          THE COURT:  Sustained.  Sustained.  But --

19   sustained for now.

20   BY MR. MULROE:

21   Q.  Well, let me ask the question this way, Mr. Hill:  You

22   understand that a number of different things happened prior

23   to the events that are in the videos that Mr. Metcalf showed

24   you?

25   A.  Yes, sir.
```

```
 1    Q.  Let's look at some of the videos from that timeframe.
 2              MR. MULROE:  Ms. Rohde, could we have, just for
 3    the witness, Government 225.
 4              And I'll ask Madam Deputy, when you have the book
 5    open, can you just let me know whether 225 is in evidence
 6    yet?
 7              With the Court's indulgence, I'll just move the
 8    speaker real quick so we have the sound.
 9              THE COURT:  Yes, sir.
10              MR. MULROE:  I apologize.  Is Government 225 in?
11              THE COURTROOM DEPUTY:  Yes.  Yes, sir.
12              MR. MULROE:  Thank you.
13              If we could then publish to the jury Government
14    Exhibit 225 starting at the one minute, 33-second mark.
15              (Whereupon, segments of Government's Exhibit
16    No. 225 were published in open court.)
17    BY MR. MULROE:
18    Q.   So, Mr. Hill, do you recognize the perspective of this
19    video kind of being the same as the videos that you were
20    commenting on earlier?
21    A.  It is.
22    Q.  Taken from elevated position --
23    A.  An elevated position.
24    Q.  Basically at the Capitol Building looking down onto the
25    west plaza?
```

1    A.  You're correct.

2    Q.  And let me ask you this:  Is it your position that it

3    was impossible for members of that crowd to turn around and

4    leave?

5              MR. METCALF:  Objection, your Honor.  Calls for

6    speculation and expertise as well.

7              THE COURT REPORTER:  I can't hear you, sir.

8              MR. METCALF:  Calls for an expert opinion and also

9    it calls into question speculation.

10             THE COURT:  Mr. Mulroe, let me just hear you all

11   at sidebar to set some ground rules here.

12             (Whereupon, the following proceedings were had at

13   sidebar outside the presence of the jury:)

14             THE COURT:  Mr. Mulroe, we all jumped up and down.

15   He wasn't testifying as to conclusions.  And, you know,

16   after a little rocky start in the beginning, he basically

17   did testify as to facts:  This was here; that was there.

18             I gave you the leeway in terms of scope because I

19   think you're right; you must provide the greater context in

20   which the jury is going to evaluate what happened here.

21   Fine.  But, like, his position about whether people could

22   leave or not leave, I think that is beyond what we allowed

23   in terms of drawing conclusions.

24             MR. MULROE:  Your Honor, I can move on.  What I

25   was shooting at here is actually impeachment.  His expert

Hill - CROSS - By Mr. Mulroe

1     notice stated that his position was that it was impossible

2     for people to escape.  I think that's just self-evidently

3     false.  So I think --

4               THE COURT:  But then I didn't qualify him as an

5     expert.  So again, I think it's fair for you to point out

6     whatever facts you want and -- just like Mr. Metcalf did.

7     But let's keep it to that.

8               MR. MULROE:  Yes, your Honor.

9               (Whereupon, the following proceedings were had in

10    open court:)

11    BY MR. MULROE:

12    Q.  So looking at the video, Mr. Hill, these people are

13    basically all facing towards the Capitol Building and not

14    away from the Capitol Building.  Correct?

15    A.  That's correct.

16    Q.  And it does not appear, from what we can see in this

17    frame of the video, that anyone is trying to make their way

18    back from whence they had come and leave the scene.

19    Correct?

20    A.  It looks like pretty much the whole crowd is heading

21    towards -- or facing the direction of the Capitol Police

22    officers, with the Capitol being right behind them.

23    Q.  And at this point, Mr. Black had not yet been injured.

24    Correct?

25    A.  That's correct.

Hill - CROSS - By Mr. Mulroe

 1          MR. MULROE:  Let's play just a bit of the video,

 2     Ms. Rohde.

 3          (Whereupon, segments of Government's Exhibit

 4     No. 225 were published in open court.)

 5     BY MR. MULROE:

 6     Q.  Now, Mr. Hill, in your review of the videos or in your

 7     preparation for testimony generally, have you ever attempted

 8     to count the number of people who were present on the west

 9     plaza around this timeframe?

10     A.  Just rough estimates.  Yes, sir.

11     Q.  Are you able to give the jury a rough estimate of sort

12     of the ratio of members of the crowd compared to members of

13     law enforcement?

14     A.  Right.  So there are close to 500 people there.  There

15     are 50, 60 police officers.

16     Q.  Badly, badly outnumbered?

17     A.  Correct.  Right.

18     Q.  And again, at this point, as we saw in the video, the

19     crowd was quite loud?

20     A.  They were loud.  They were yelling and chanting.

21     Q.  They were members of the crowded who were sort of

22     engaging with law enforcement, shoving?

23     A.  There were a couple of them in that -- that pocket.

24     Q.  And the crowd was quite angry.

25     A.  Well, they were angry.  Yes.

1    Q.  And this is prior to Mr. Black's injury.  Correct?

2    A.  Not like they were after he got hit.

3    Q.  I want to play for you Government's Exhibit 398 that I

4    believe is in evidence.

5           THE COURTROOM DEPUTY:  It's in.  Yes.

6           MR. METCALF:  Your Honor, unfortunately, I have to

7    object to the scene as far as scope goes.  Timeframe.

8           THE COURT:  I'm going to overrule.  I'm going to

9    overrule that objection.

10          MR. MULROE:  If we could publish 398, please.  And

11   play when you're ready, Ms. Rohde.

12          (Whereupon, segments of Government's Exhibit

13   No. 398 were published in open court.)

14   BY MR. MULROE:

15   Q.  So in the radio clip, there was a reference to less than

16   lethal or -- you understand that also to be less lethal?

17   A.  The correct term is "less lethal."  And that's correct.

18   Q.  Less lethal.  So that would be describing the

19   projectiles that we saw being fired during your direct

20   testimony?

21   A.  Right.  The FN 303 and the pepper balls are considered

22   less lethal.

23   Q.  And we heard the line in the radio clip about "Identify

24   agitators."  Correct?

25   A.  Correct.

1    Q.  And that does not suggest that they were firing

2    indiscriminantly into the crowd, but that they were

3    selecting particular individuals who they believed were

4    appropriate targets of the less lethal.  Correct?

5    A.  They were selecting three individuals.

6            MR. MULROE:  Let's have Government 226, which --

7    sir, you correct me if I'm wrong, but I believe this will be

8    the same video that you were describing as Pezzola

9    Exhibit 171.

10           MR. METCALF:  Right.

11   BY MR. MULROE:

12   Q.  Does it appear to be the same video here?

13   A.  It looks like it.  Yes, sir.

14   Q.  And the perspective of the video is above the ground

15   level.  Correct?

16   A.  It is.

17   Q.  And some distance back from the ground level?

18   A.  It's about 40 meters.

19   Q.  And based on what you testified --

20   A.  Yes.

21   Q.  -- the less-lethal projectiles were being fired from

22   approximately the same spot where this video was being

23   filmed from?

24   A.  You're right.  Correct.

25   Q.  So it's some distance back from the crowd?

Hill - CROSS - By Mr. Mulroe

1    A.  Right.

2    Q.  And nothing at all that we've seen in these videos gives

3    you any reason to think that the officers were just firing

4    at random into the crowd.  Correct?

5    A.  That's correct.

6    Q.  And there's no way to tell from the video what part of

7    the body the officers would have been aiming for.  Correct?

8    A.  You could only see where they're hitting.  You can't see

9    where they're aiming.  You're correct.  There's no laser

10   designator or anything like that.

11   Q.  And I'll ask you the same question here that I asked

12   about the previous exhibit, Government 225.  But in terms of

13   the direction that members of the crowd by and large are

14   facing, it is toward the officers and towards the Capitol

15   Building rather than away.  Correct?

16   A.  Yes.  A majority of them are looking in the direction of

17   the officers right here with the skirmish line.  A number of

18   them are looking up at the less lethal and pointing at the

19   less lethal site of the team facing the direction of

20   Capitol.

21            MR. MULROE:  If we could skip to the one-minute,

22   20-second mark.

23            (Whereupon, segments of Government's Exhibit

24   No. 226 were published in open court.)

25

1    BY MR. MULROE:

2    Q.  I don't want to just retread everything Mr. Metcalf

3    asked you, but here we have Mr. Black.  Correct?  I've

4    circled an individual in the --

5    A.  Yes.

6    Q.  -- roughly in the center of the screen.

7    A.  Yes.

8              MR. MULROE:  And if we could just play a couple of

9    seconds.

10   BY MR. MULROE:

11   Q.  And you tell us whether this is the portion of the video

12   where he sustains the injury to his cheek.

13   A.  Okay.

14             (Whereupon, segments of Government's Exhibit

15   No. 226 were published in open court.)

16             THE WITNESS:  That was it.  Yes.

17   BY MR. MULROE:

18   Q.  All right.  So about one minute and 23 seconds into

19   Government 226.  Correct?

20   A.  Correct.  Yes.

21   Q.  All right.  And you said that it was about 37 seconds

22   into this video that what you described as the signal, the

23   hand circle, took place from the officer?

24   A.  That sounds about right.  Yeah.

25             MR. MULROE:  So Ms. Rohde, let's go back to the

1   very beginning of this video.  And so at zero minutes, zero

2   seconds -- obviously, prior to 37 seconds.

3              (Whereupon, segments of Government's Exhibit

4   No. 226 were published in open court.)

5   BY MR. MULROE:

6   Q.  So no signal has been given at this time.  Correct?

7   A.  It's not been given.  And you cannot -- you can't see

8   the commander yet.

9   Q.  And likewise, Mr. Black hasn't been shot through the

10  cheek at this point?

11  A.  Right.  That's right.

12             MR. MULROE:  Let's play the video and we'll play

13  it to 39 seconds, please.

14             (Whereupon, segments of Government's Exhibit

15  No. 226 were published in open court.)

16  BY MR. MULROE:

17  Q.  All right.  Again, he has not yet taken a pepper ball to

18  the face.  Correct?

19  A.  Not a pepper ball.  What he took to the face was the

20  FN 303.  Different than the pepper ball.

21  Q.  No projectile to --

22  A.  He's not taken a projectile to the face.  That's

23  correct.

24  Q.  And thank you for correcting me.

25             But whatever it was hasn't happened yet?

```
1    A.  It has not happened yet.

2    Q.  The crowd, however, is engaging pretty forcefully with

3    police officers at this --

4    A.  Yeah, you'll --

5    Q.  -- point.  Correct?

6    A.  -- notice the crowd --

7              THE COURT REPORTER:  Counsel, I'm not getting the

8    end of your question.

9              MR. MULROE:  I apologize, Madam Court Reporter.

10   BY MR. MULROE:

11   Q.  The crowd is engaging pretty forcefully with police

12   officers at this point.  Correct?

13   A.  There is a lot of pushing and shoving.  The crowd is

14   pushing and yelling and carrying on.  That's correct.

15   Q.  And you understand that, in terms of layout of the

16   scene, these officers are forming a line that separates the

17   members of the crowd from the Capitol Building.  Correct?

18   A.  That's their skirmish line.  That's the purpose of it.

19   Yes, sir.

20   Q.  And here, in the very front, engaging with the officers,

21   is Mr. Black.  Correct?

22   A.  The red baseball hat and the camouflage.  That is him.

23   Q.  Now, you pointed out a couple -- few individuals who had

24   projectiles hit them.  So I just want to ask you about each

25   of those.
```

```
 1              MR. MULROE:  Ms. Rohde, if we could go to 36

 2   seconds of the same exhibit, so just back a few seconds.

 3   BY MR. MULROE:

 4   Q.  And I'm circling in the bottom center of the screen a

 5   guy who has got a black baseball cap with maybe an orange

 6   brim -- I don't know if it's the Orioles, but let's take a

 7   look at him.  And we'll play for a few seconds.

 8              (Whereupon, segments of Government's Exhibit

 9   No. 226 were published in open court.)

10   BY MR. MULROE:

11   Q.  I'll pause it there.  Do you see the hat pop off his

12   head?

13   A.  Yes.  I saw a yellow projectile knock the hat off his

14   head.

15   Q.  And just so we can follow him through the frame, he's

16   the one carrying this colorful flag.  Correct?

17   A.  Yes, sir, he is.

18   Q.  He has got sort of a furry hood on the coat that he's

19   wearing?

20   A.  Right.

21   Q.  So let's watch and see where, if anywhere, he goes.

22              MR. MULROE:  If we let this play another ten

23   seconds or so.

24              (Whereupon, segments of Government's Exhibit

25   No. 226 were published in open court.)
```

Hill - CROSS - By Mr. Mulroe

```
 1                    MR. MULROE:  Pause there.

 2    BY MR. MULROE:

 3    Q.  So looking at his hat and his flag at about 52 seconds,

 4    he has removed himself from the front line and retreated

 5    maybe 10, 15, 20 feet back after being hit.  Correct?

 6    A.  That had to hurt.  So yes, he did move away.

 7    Q.  The projectile appears to have had some deterrent effect

 8    on him?

 9    A.  The purpose of the projectile is to deter people.

10                    MR. METCALF:  Let's go to one minute, 19 seconds.

11    BY MR. MULROE:

12    Q.  And we have seen this guy in the blue hoodie, correct,

13    I've circled in the middle?

14    A.  Yes.  That's right.

15    Q.  If we play a few seconds, we'll see whether he is hit.

16                    (Whereupon, segments of Government's Exhibit

17    No. 226 were published in open court.)

18                    MR. MULROE:  We'll pause there.

19    BY MR. MULROE:

20    Q.  And catching the very end of it, but did you see that,

21    after taking the projectile, he turned around and began

22    walking away?

23    A.  That's the second time he was hit.  And that's correct.

24    He turned and he moved back into the crowd about five feet.

25    Q.  He gets hit twice.  Right?  We saw the second one?
```

1    A.  That's correct.  Yes, sir.

2              MR. MULROE:  Let's go to 47 seconds.

3              (Whereupon, segments of Government's Exhibit

4    No. 226 were published in open court.)

5    BY MR. MULROE:

6    Q.  And I'll direct your attention to -- where is he now?

7              MR. MULROE:  Maybe play one more second for me,

8    Ms. Rohde.  A little more.  A little more.

9              Can we go back to 1:45.

10             (Whereupon, segments of Government's Exhibit

11   No. 226 were published in open court.)

12             MR. MULROE:  The Court's indulgence just one

13   moment.

14             My apologies.  Can we go to 48 seconds, zero

15   minutes, 48.

16             (Whereupon, segments of Government's Exhibit

17   No. 226 were published in open court.)

18   BY MR. MULROE:

19   Q.  So I'm going to direct you, Mr. Hill, to this guy --

20   it's a little blurry -- but on the left side of the screen,

21   red cap and kind of a beige large coat he seems to be

22   wearing.

23   A.  Yes, sir.

24             MR. MULROE:  Let's play that.

25             (Whereupon, segments of Government's Exhibit

Hill - CROSS - By Mr. Mulroe

1    No. 226 were published in open court.)

2         MR. MULROE:  Pause there.

3    BY MR. MULROE:

4    Q.  And I think you pointed out on direct that he takes one

5    kind of to the brim of the hat or sort of the head and

6    shoulders area?

7    A.  Yeah.  In the face.  Yeah.

8    Q.  And then let's take a look at what he does after that.

9         MR. MULROE:  Ms. Rohde, if you could play.

10        (Whereupon, segments of Government's Exhibit

11   No. 226 were published in open court.)

12        MR. MULROE:  Pause.

13   BY MR. MULROE:

14   Q.  So the guy with the red hat, after being hit, sort of

15   shelters himself and, like the others, moves away from the

16   front of the action.  Correct?

17   A.  He does move away.  Yes.

18   Q.  And are you aware, in your review of videos generally,

19   what that guy did after that?

20   A.  I'm not sure where he went.  No.

21   Q.  You don't know about him in the Capitol Building?

22   A.  No.  I'm not sure where he went.  I've been focusing on

23   this part; lately, anyway.

24        MR. MULROE:  Let's go back to the radio, briefly,

25   Government's 366, please, which I believe is in evidence.

```
 1              And if we may publish that.
 2              (Whereupon, segments of Government's Exhibit
 3    No. 366 were published in open court.)
 4    BY MR. MULROE:
 5    Q.  So again, in the radio clip we hear targeting of
 6    particular individuals in a crowd.  Correct?
 7    A.  Yes.  Somebody different than we just saw.
 8              MR. MULROE:  Let's have 229, please, Ms. Rohde,
 9    which I believe is in evidence.
10              MR. METCALF:  I'm sorry.  What was the last
11    exhibit?
12              MR. MULROE:  The radio clip was 366.
13              MR. METCALF:  Thank you.
14              MR. MULROE:  And right now we're pulling up 299 --
15    229.  I'm sorry.  229.
16              Ms. Rohde, we'll play that until 29 seconds.
17              (Whereupon, segments of Government's Exhibit
18    No. 229 were published in open court.)
19    BY MR. MULROE:
20    Q.  So in the radio clip we heard a moment ago there was
21    reference to a man with a gas mask and American flag shirt
22    that appeared to be this guy who is grabbing an officer by
23    the throat?
24    A.  That's correct.
25              MR. METCALF:  Objection as to that question, your
```

1    Honor.  We ask that the answer be stricken.  There's no way

2    for this individual to be able to make that conclusion.

3              THE COURT:  Overruled.  He can answer the

4    question.

5    BY MR. MULROE:

6    Q.  I'll ask you the question this way:  The man that we see

7    grabbing an officer by the throat, is he wearing an American

8    flag shirt and a gas mask?

9    A.  He is.  Yes.

10             MR. MULROE:  Let's play that until about 42

11   seconds.

12             (Whereupon, segments of Government's Exhibit

13   No. 229 were published in open court.)

14   BY MR. MULROE:

15   Q.  And it's at this part of the video that we see

16   Mr. Pezzola jump into that fray and grab a shield.  Correct?

17   A.  To do what?  I see Mr. Pezzola coming into the fray.

18   Correct.

19   Q.  And he's bringing himself there.  Right?

20   A.  I'm sorry?

21   Q.  He's bringing himself there.  Correct?

22             MR. METCALF:  Objection as to what another person

23   is doing.  And the --

24             THE COURT:  No.

25             MR. METCALF:  -- form of that question.

```
1              THE COURT:  That's overruled.
2              THE WITNESS:  Mr. Pezzola is coming into the
3    crowd.
4    BY MR. MULROE:
5    Q.  Right.  He's not being --
6    A.  He's pushing in like everybody is that's around him.
7    Q.  He's not being shoved from behind, as far as you can
8    tell, against his will?
9    A.  I don't know.  A lot of people were being pushed from
10   behind.  If you look at the camera crews, the camera crews
11   are pushing to get in there.  So I don't know that I could
12   say he's not being pushed.  But he is moving in towards the
13   police officer who is bending over.
14   Q.  And I'll ask you the same question I've asked a couple
15   of times before, but we don't see any substantial portion of
16   this crowd attempting to escape from the scene, do we?
17   A.  Not --
18             MR. METCALF:  Objection as to the characterization
19   and the word "escape."  Calls for a legal definition.
20             THE COURT:  Overruled.
21             THE WITNESS:  So not around the camera circle.
22   You see other people in the crowd kind of turning and
23   looking away.  But everybody within that camera circle is
24   diving in for a great shot or whatever they're planning on
25   doing.
```

1    BY MR. MULROE:

2    Q.  A couple more radio clips.

3              MR. MULROE:  370, please.

4              (Whereupon, segments of Government's Exhibit

5    No. 370 were published in open court.)

6    BY MR. MULROE:

7    Q.  The crowd is being combative, consistent with the videos

8    that we've seen?

9    A.  He's describing that.  Yes, sir.

10             MR. MULROE:  372, please.

11             (Whereupon, segments of Government's Exhibit

12   No. 372 were published in open court.)

13   BY MR. MULROE:

14   Q.  And again, that description, fighting with officers on

15   the line, essentially is just what we saw in the videos.

16   Correct?

17   A.  Yeah, so --

18             MR. METCALF:  Your Honor, now we're definitely out

19   of the scope.  The timeframe on that last one was 1:30.

20             THE COURT:  Overruled.

21             THE WITNESS:  Okay.  So yeah, as -- that's what I

22   was about to say, is that's 15 minutes after the entire --

23   you know, the entire push.  So, you know, this crowd has

24   continued to go back and forth with police officers, but

25   once that gentleman gets hit, this crowd erupts and starts

Hill - CROSS - By Mr. Mulroe

1     going after the officers.

2     BY MR. MULROE:

3     Q.  I'm going to do one more video that I will ask for, just

4     for the witness, 445E.

5             And I'll note for the record this is a clip

6     from --

7             MR. METCALF:  Pezzola 200.

8             MR. MULROE:  Pezzola 200.  Thank you, Mr. Metcalf.

9             (Whereupon, segments of Government's Exhibit

10    No. 445E were published to the witness.)

11    BY MR. MULROE:

12    Q.  Do you recognize the scene here, Mr. Hill?

13    A.  Yes, I do.

14    Q.  Part of what you saw before during your direct

15    testimony?

16    A.  Yes.  That's correct.

17            MR. MULROE:  We'd move to admit 445E.

18            MR. METCALF:  No objections.

19            THE COURT:  It will be admitted.  And permission

20    to publish it.

21            (Whereupon, Government's Exhibit No. 445E was

22    entered into evidence.)

23            MR. MULROE:  Ms. Rohde, before we play it, let's

24    just keep it still on the screen.

25

```
 1    BY MR. MULROE:

 2    Q.  So we see people giving some medical care to Mr. Black

 3    here.  Correct?

 4    A.  That's correct.

 5    Q.  And these people giving him this care are right up next

 6    to him.  Correct?

 7    A.  They are, yes.

 8    Q.  And they've got a very good view of his injury?

 9    A.  Well, his injury is covered.  That's actually a lousy

10    view.  There's a better view of it when you actually see the

11    projectile inside his mouth.  But they've covered it with

12    Quick Clot, and so that's why you can't see it as well.

13    Q.  Certainly these people have a better view of Mr. Black

14    than people who were behind them in the crowd, though.

15    Correct?

16    A.  Oh, I'm -- I'm sure of that.  Yeah.

17    Q.  And these people all appear to be in control of their

18    actions?

19    A.  Yeah.  So the gentleman on the left was the one

20    screaming, "They shot him in the fucking face.  They shot

21    him in the fucking face."

22              He was very irate.  And then he turns and he

23    starts working on this guy.

24              And then -- well, anyway.  And then we get more

25    reaction.
```

Hill - CROSS - By Mr. Mulroe

1    Q.  So these people who are giving him some medical care are

2    not flying into a rage and stealing shields from police

3    officers, are they?

4              MR. METCALF:  Objection.  Argumentative.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yeah.  So these guys have stopped

7    what they're doing.  There's a lull in the action.  They're

8    rendering aid in what they believe is proper for a gunshot

9    wound.  And they're doing a good job.

10             MR. MULROE:  Let's play the video.  Ms. Rohde,

11   I'll ask you at a certain point to pause it.

12             (Whereupon, segments of Government's Exhibit

13   No. 445E were published in open court.)

14             MR. MULROE:  Let's pause it there.

15   BY MR. MULROE:

16   Q.  So the officer on the left side of the screen in the

17   hard gear is now crouching down next to Mr. Black?

18   A.  Yes, he is.

19   Q.  And it might be obscured in this shot, but he's got his

20   left hand on Mr. Black's shoulder?

21   A.  Correct.

22   Q.  It looks like he's talking to him?

23   A.  It looks like they're conversing.  Yes.

24   Q.  Sir, when you were in law enforcement, you made arrests.

25   Correct?

1    A.   Hundreds.

2    Q.   When you were in law enforcement, you sometimes had the

3    opportunity to render aid to people who needed medical

4    attention?

5    A.   A lot.

6    Q.   And just looking at this video, you don't know what that

7    officer in the riot gear is doing right at this moment, do

8    you?

9    A.   Right here at this minute, I don't know what he's doing.

10            MR. MULROE:   Let's play a bit more.

11            (Whereupon, segments of Government's Exhibit

12   No. 445E were published in open court.)

13            MR. MULROE:   Let's pause it.

14   BY MR. MULROE:

15   Q.   So one of the members of the crowd has shoved himself in

16   between Mr. Black and the officer and people are shouting,

17   "He's one of ours.  He's one of ours."  Correct?

18   A.   The officer grabbed Mr. Black's collar and was pulling

19   him towards their line.  So yes, that was -- I believe

20   Samsel was the guy's name.

21   Q.   Your view of the video was that the officer was grabbing

22   him and pulling him?

23   A.   By the collar, yes.  Yeah.  He's actually pulling him

24   towards the police lines when Samsel puts his arm over him

25   and separates them.

Hill - CROSS - By Mr. Mulroe

1    Q.  And so if, assuming -- if they were attempting to arrest

2    Mr. Black, that would be interfering with his arrest,

3    wouldn't it?

4              MR. PATTIS:  Objection.

5              MR. METCALF:  Objection, your Honor.  Calls for a

6    hypothetical answer.  And that's essentially what we're

7    trying to avoid here today.

8              THE COURT:  I'm going to sustain the -- I'm going

9    to sustain the objection.

10   BY MR. MULROE:

11   Q.  Mr. Hill, I think you used the phrase "an awful lot of

12   damage" to describe Mr. Black's injury.  Did I get that

13   right?

14   A.  You did.

15             MR. MULROE:  The Court's indulgence one moment.

16   BY MR. MULROE:

17   Q.  So unlike some of those other individuals who we

18   highlighted, Mr. Black did not retreat from the west

19   terrace, did he?

20   A.  He stayed in that area.  Yes.

21   Q.  We have skipped ahead in Government 445E to the

22   four-minute, one-second mark.

23             MR. MULROE:  I'll ask Ms. Rohde to play from

24   there.

25             (Whereupon, segments of Government's Exhibit

 1    No. 445E were published in open court.)

 2    BY MR. MULROE:

 3    Q.  Mr. Black remained at the Capitol for some time after

 4    this, didn't he?

 5    A.  I believe he did.  Yes.

 6              MR. MULROE:  May we have, just for the witness,

 7    Government Exhibit 1750.

 8              (Whereupon, segments of Government's Exhibit

 9    No. 1750 were published to the witness.)

10    BY MR. MULROE:

11    Q.  Do you recognize Mr. Black there?

12              MR. METCALF:  Your Honor, I'm sorry to do this,

13    but I have to go -- object on scope grounds as well.

14              THE COURT:  Well, let me just address it on the

15    phones briefly.

16              (Whereupon, the following proceedings were had at

17    sidebar outside the presence of the jury:)

18              THE COURT:  Mr. Metcalf, I've tried to police

19    scope in various ways here.  But the whole point of this --

20    that you used was to show how badly he was injured.  The

21    Government is now rebutting that by saying, Look, he didn't

22    run off to go get medical attention.  In fact, he made his

23    way all the way to the Senate floor, it looks like.  So I

24    think they get to do this, to rebut kind of the point you

25    were trying to make.

```
 1              You may proceed, Mr. Mulroe.
 2              (Whereupon, the following proceedings were had in
 3      open court:)
 4      BY MR. MULROE:
 5      Q.  Would you recognize Mr. Black in the photo?
 6      A.  I do.
 7              MR. MULROE:  We move to admit 1750.
 8              THE COURT:  It will be admitted and permission to
 9      publish.
10              (Whereupon, Government's Exhibit No. 1750 was
11      entered into evidence.)
12      BY MR. MULROE:
13      Q.  And so here we have him still up and about on two feet.
14      Correct?
15      A.  He still is on two feet.
16      Q.  In fact, he is right there on the Senate floor, isn't
17      he?
18      A.  He absolutely is.
19              MR. MULROE:  No further questions.  Thank you,
20      Mr. Hill.
21              THE WITNESS:  Sure.
22              THE COURT:  Any redirect, Mr. Metcalf?
23              MR. METCALF:  Yes, your Honor.
24                      REDIRECT EXAMINATION
25
```

1   BY MR. METCALF:

2   Q.  Mr. Hill, while I'm trying to pull up a couple of

3   videos, do you remember, in your review of the videos --

4   after Mr. Black was shot, do you remember ever seeing

5   Mr. Pezzola checking his head or feeling his head?

6   A.  Yes, he did.  I do.

7   Q.  In the movement that he made, did it seem as if he was

8   feeling his head to see if he had been hit?

9              MR. MULROE:  Object to foundation.

10              THE COURT:  Well, sustained as to foundation.

11   BY MR. METCALF:

12   Q.  You've paid attention specifically to a lot of different

13   videos that show the whole interaction that happened, that

14   brief interaction where Mr. Pezzola got the shield.  Right?

15   A.  I did.

16   Q.  And you freeze-framed these videos?

17   A.  Right.

18   Q.  And you've stopped them time after time?

19   A.  Yes.

20   Q.  And we paused them and we zoomed in on them?

21   A.  Yes, sir.

22   Q.  And we zoomed out?

23   A.  We did.

24   Q.  And we tried to do everything we could to figure out

25   exactly what was going on second by second?

```
 1    A.  Right.
 2    Q.  And do you recall seeing Mr. Pezzola looking down at any
 3    point after that blood was on the floor?
 4    A.  Yes, I do.
 5    Q.  Do you recall Mr. Pezzola at certain points ducking
 6    down?
 7              MR. MULROE:  Your Honor, I'd object on best
 8    evidence rule.
 9              MR. METCALF:  I can play the videos, your Honor.
10    I just am looking to pull them up.
11              THE COURT:  If you'd like to do that, Mr. Metcalf,
12    that would be fine.
13    BY MR. METCALF:
14    Q.  Do you recall seeing Mr. Pezzola, after Mr. Black was
15    shot, pointing at the officers?
16    A.  Yes.
17              MR. MULROE:  Same objection.
18              THE COURT:  I think -- are you about to play a
19    video?
20              MR. METCALF:  Yes.  I'm just -- since this got
21    brought up, I had to pull up a different video.  And I'm
22    actually going through getting the specific timeframe.  So I
23    just need the Court's indulgence for a moment.
24              THE COURT:  You have my indulgence, sir.
25              MR. METCALF:  Thank you.
```

```
 1    BY MR. METCALF:
 2    Q.  Do you recall Mr. Pezzola pointing at the officers after
 3    Mr. Black was shot at all?
 4    A.  Yes, I do.
 5              MR. MULROE:  Same objection.
 6              THE COURT:  I'm sorry.  I thought you were going
 7    to bring up the video and ask him a question about the
 8    video.  So when you asked for my indulgence, I thought you
 9    meant to just give you a moment to tee that up.
10              MR. METCALF:  Yes.  So while I'm teeing it up, I
11    wanted to still ask a couple of questions.  So I did that
12    one poorly.
13              Just one second.
14              I'd ask that the witness be shown Pezzola 182.
15              (Whereupon, segments of Defendant Pezzola's
16    Exhibit No. 182 were published to the witness.)
17    BY MR. METCALF:
18    Q.  Do you remember going through this video?
19    A.  Yes, sir.
20              THE COURT:  This is in evidence, correct?
21              MR. METCALF:  This is in evidence, yes, your
22    Honor.
23              THE COURT:  So it may be published.
24              (Whereupon, segments of Defendant Pezzola's
25    Exhibit No. 182 were published in open court.)
```

1   BY MR. METCALF:

2   Q.  Now, if you could, could you circle where the blood was

3   that was on the floor, approximately?

4   A.  I mean, it's down under these guys right here.

5   Q.  And that appears to be Mr. Samsel.  Right?

6   A.  Yes.

7   Q.  And that's the individual who stuck his -- put his arm

8   in between Mr. Black and the officers?

9   A.  That's correct.

10             MR. MULROE:  Objection.  Leading.

11             THE WITNESS:  That's right.

12             MR. METCALF:  Was that an objection?

13             THE WITNESS:  That's correct.

14             THE COURT:  The objection was leading.  So

15   sustained as to the leading.

16   BY MR. METCALF:

17   Q.  What did Ryan Samsel do when the officers picked up

18   Mr. Black?

19   A.  Yeah.  So he steps in between them, places his arm over

20   the officer's arm.

21   Q.  What do other people around him do after that?

22   A.  The same thing.  They're trying to pull Mr. Black away

23   from the police officer.

24   Q.  And then are there other individuals who are not holding

25   Mr. Black but are in close proximity as well?

1   A.  They're pushing forward.  Yes, sir.

2   Q.  And then are there a lot of words that exchange between

3   those individuals and police?

4   A.  They're more upset about this than anything --

5                MR. MULROE:  Object to foundation.

6                THE COURT:  Let me talk to you at sidebar, please.

7                (Whereupon, the following proceedings were had at

8   sidebar outside the presence of the jury:)

9                THE COURT:  Mr. Metcalf, it's sort of the same --

10  Mr. Metcalf, whether this is foundation or the best evidence

11  rule, if you're just asking about this without showing him

12  the part you're asking about, regardless of whether either

13  of those things technically apply, the Government is just

14  going to go back and say -- and ask to do recross, because

15  you're sort of asking him questions without linking it up to

16  the video.  And I'm going to have to let them go back and do

17  this again.

18                So again, why don't you just show him the video

19  you're asking him about and then ask him the questions.

20                MR. METCALF:  Will do.

21                MS. HERNANDEZ:  I'm sorry, your Honor.  Will we be

22  taking a break soon?  Just a bathroom break.

23                THE COURT:  We will be taking -- Mr. Metcalf, how

24  much longer do you think you have?  I'm not trying to rush

25  you.  I just want to know.

Hill - REDIRECT - By Mr. Metcalf

```
1              MR. METCALF:  Less than five minutes.
2              THE COURT:  So at the end of this, we will take a
3    break.
4              (Whereupon, the following proceedings were had in
5    open court:)
6              MR. METCALF:  Can we play the first 12 seconds of
7    this, please.  This is Pezzola 182.
8              (Whereupon, segments of Defendant Pezzola's
9    Exhibit No. 182 were published in open court.)
10   BY MR. METCALF:
11   Q.  Have you identified Mr. Pezzola in this video?
12   A.  Oh, let's see here.  I just saw him.  So yes.  Here is
13   Mr. Black, and that's Mr. Pezzola's hat right there.
14             MR. METCALF:  Can we play that back?  Can we go
15   back five seconds, please?
16             (Whereupon, segments of Defendant Pezzola's
17   Exhibit No. 182 were published in open court.)
18             MR. METCALF:  Stop there.
19   BY MR. METCALF:
20   Q.  Can you describe what Mr. Pezzola is doing?
21   A.  Yeah.  So he was -- first he was covering his head and
22   looking around, ducking, as if he's protecting his head with
23   his hands.
24             MR. METCALF:  Can we go to Pezzola 171, please.
25             (Whereupon, segments of Defendant Pezzola's
```

1    Exhibit No. 171 were published in open court.)

2              MR. METCALF:  Let's go to a minute and 40 seconds.

3              (Whereupon, segments of Defendant Pezzola's

4    Exhibit No. 171 were published in open court.)

5              MR. METCALF:  Stop there.  Can you play from 1:35

6    to 1:40, please?

7              (Whereupon, segments of Defendant Pezzola's

8    Exhibit No. 171 were published in open court.)

9              MR. METCALF:  Stop.

10   BY MR. METCALF:

11   Q.  Mr. Hill, what was the crowd doing at this point in

12   time?  This side of the crowd.

13   A.  They were surging back and forth.  So as you can see,

14   Mr. -- well, here, Mr. Black is being treated initially.

15   But the crowd is looking up at the guys that are shooting

16   the less lethal.

17   Q.  Okay.  So they were -- and were they using anything

18   or -- how did you know that they were looking up at them

19   besides just their head movements?

20   A.  Yeah.  So not just looking up at them, but a number of

21   people were pointing up at them like this and a number of

22   them were extending their middle fingers at the guys.  They

23   were yelling at the less lethal guys.

24   Q.  Now, when they were up -- when the officers were up at

25   that elevation, should it matter that a couple of shots were

1    good if a couple of shots were bad?

2              MR. MULROE:  Object to relevance, improper opinion

3    testimony.

4              THE COURT:  Sustained.

5    BY MR. METCALF:

6    Q.  At the time that Mr. Black was shot, was he being -- was

7    he specifically being aggressive?

8    A.  He was not.

9    Q.  Were others around him being aggressive?

10   A.  I would actually say around him, no.  The guy in the

11   blue shirt was not aggressive.  They're yelling at officers,

12   but nobody was touching officers at that point in that

13   general area that those pepper -- or those 303 rounds were

14   coming in at.

15   Q.  But a couple of feet over, there were a couple of people

16   who would be considered agitators --

17   A.  Yes.

18   Q.  -- or being aggressive?

19   A.  Further to the left of this we had people who were very

20   aggressive with the police officers.

21   Q.  But Mr. Black was not at the time he was shot?

22   A.  The whole time of this video, Mr. Black was just -- the

23   most he was doing was just pushing up against shields.

24   Q.  And Mr. Pezzola, during that time, didn't seem to be an

25   aggressor or agitator --

                    Hill - REDIRECT - By Mr. Metcalf

```
 1    A.  That's correct.
 2              MR. MULROE:  Objection.  Leading.
 3              THE WITNESS:  He was not.
 4              THE COURT:  Sustained as to leading.
 5    BY MR. METCALF:
 6    Q.  At that time -- before Mr. Black was shot, did
 7    Mr. Pezzola seem to be an agitator or someone who was wiling
 8    [sic] up the crowd?
 9    A.  No.
10    Q.  Was it only after Mr. Black was shot that Mr. Pezzola
11    started pointing towards police?
12    A.  Yes.
13              MR. METCALF:  I have nothing further.  Thank you,
14    Mr. Hill.
15              THE WITNESS:  Thank you.
16              THE COURT:  All right.  Sir, you may step down.
17    Thank you for your testimony.
18              THE WITNESS:  Thank you, your Honor.
19              (Witness excused.)
20              THE COURT:  Ladies and gentlemen, we'll take our
21    ten-minute afternoon break and continue in a moment.
22              Madam Deputy, if you'd bring them to the jury
23    room.
24              THE COURTROOM DEPUTY:  Yes.
25              (Whereupon, the jury exited the courtroom at 3:22
```