**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No.** |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | **1:21-cr-00552 (CRC)** |
| | : | |
| **Defendant** | : | |
| | : | |

_____

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S TRIAL BRIEF AND SUPPLEMENT TO DEFENDANT'S TRIAL BRIEF

Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas"), through the undersigned counsel, John M. Pierce, Esq. and Roger Roots, Esq., and hereby responds to the Government's objections to the Defendant's Trial Brief, and SUPPLEMENTS the Defendant's Trial Brief, as follows:

Well, the Government is getting closer. But some attention to the actual laws applicable is still required. Starting with the clearest and shortest issues first for expediency, Defendant hereby supplements his Trial Brief and Replies to the Government's Opposition:

### A)  EFFECT OF DEFENDANT'S CONDUCT ON COMMERCE

The statute 18 U.S.C. § 231(a)(3) is often mis-labeled as "civil disorder" which is not an accurate description of this convoluted statute. It is a statute – whether this makes any sense or not – against affecting interstate commerce through allegedly interfering with (in one January 6 case, *United States v. Richard Barnett,* talking to police officers to see if he could retrieve his American flag) law enforcement officers engaged in official duties of responding to a civil

1

disorder. It was passed specifically to address rioting that directly harmed commerce like burning down businesses.  (Of course, today's Department of Justice did nothing to apply this statute to its intended purpose of protecting against rioting from 2012 to 2020.)

Here, with no discernible relationship to commerce from demonstrations on January 6, 2021, the current DoJ once again indulges in "creative prosecution" by using various statutes in ways they were never intended and where the statutes do not apply.

The Government decries "speculation."  Indeed.  Yet they depend upon it.  Without the power of speculation and conjecture, the Government would have no case in almost all January 6 related prosecutions.

It is an ironic part of our criminal justice system that the Government may not speculate, because it must eliminate reasonable doubt and foreclose alternative scenarios, whereas defense attorneys frequently do speculate to show that there is an alternative scenario and reasonable doubt.  But today's prosecutors repeatedly refer to maybes and conjecture in lieu of evidence.

The prosecution under 18 U.S.C. § 231(a)(3) requires speculation that any unexplained variance from day to day in retail sales is as a result of a Defendant's actions.

The Government objects that:

> Specifically, that the civil disorder have a "net effect" on commerce. The statute only requires that the Defendant's conduct "in *any way or degree* obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 231(a)(3) (emphasis added).

So the Government is starting to catch on that the effect on commerce must be from ***the Defendant's conduct*** – not from some other cause.  However, the Defendant Thomas did nothing whatsoever that affected commerce.

An estimated 500,000 to 1 million supporters of then President Donald Trump were

present on or about January 5, 2021, throughout the District of Columbia.  Deputy Chief of the

U.S. Capitol Police estimated that about 10,000 people were at or around the U.S. Capitol.

Therefore, if there was an effect on [interstate] commerce, it would be caused by the

presence of 500,000 to 1 million people at or around the Ellipse area near the White House and

the Washington Monument, not by Thomas.

The Government cannot put on any evidence that "the Defendant's conduct" had any

effect of any kind upon [interstate] commerce.  The prosecution has nothing but speculation

throughout.  Compare this to the intended purpose of the statute.  Antifa and other anarchists or

leftist street gangs burned down businesses across the country really starting in 1999 in the

Seattle protests but getting going from 2012 through 2020.

Random fluctuations in daily retail sales requires speculation as to why.  Riots of looting

and arson do not.  If a crowd – in which a Defendant is actually in a conspiracy with – loots a

Best Buy store of televisions and then burns the store down, followed by Nike and Addidas

stores, Apple electronics stores, there is no speculation.  Yet the DoJ has no interest in

prosecuting those riots by its political allies.

So the charge fails on the facts and the lack of evidence.  There will not be (could not be)

any competent evidence tying random fluctuations in daily retail sales to Defendant's conduct.

If retail sales fluctuated from day to day, is that in any way different from any other day of the

year or any year?  Do retail sales fluctuate for no apparent reason?  Why do sales at a particular

store imply *causation* from Defendant Thomas' actions.

Retail sales that do not occur on a Wednesday will likely be compensated for by sales on

the following day, if there is a need or demand for the items sold.  Therefore, retail sales on only

one particular day are not a valid measurement of any effect on interstate commerce.

3

However, the statute is clearly dependent upon the Congress' power to regulate *interstate*

*commerce*:

A

Article I, Section 8, Clause 3 of the United States Constitution
grants Congress the power "[t]o regulate Commerce with foreign
Nations, and among the several States, and with the Indian Tribes." The
Supreme Court "ha[s] identified three broad categories of activity that
Congress may regulate under its commerce power." *United States v.
Lopez*, 514 U.S. 549, 558 (1995). "First, Congress may regulate the use
of the channels of interstate commerce. Second, Congress is empowered
to regulate and protect the instrumentalities of interstate commerce, or
persons or things in interstate commerce, even though the threat may
come only from intrastate activities. Finally, Congress's commerce
authority includes the power to regulate those activities having a
substantial relation to interstate commerce, those activities that
substantially affect interstate commerce . . . ." Id. at 558-59 (citations
omitted).

The statute in question, by its terms, regulates anyone who
"transports or manufactures for transportation in commerce any firearm,"
18 U.S.C. § 231(a)(2), where "commerce" is defined as "commerce (A)
between any State or the District of Columbia and any place outside
thereof; (B) between points within any State or the District of Columbia,
but through any place outside thereof; or (C) wholly within the District
of Columbia," 18 U.S.C. § 232(2).

We hold that the statute is a valid exercise of the commerce power
pursuant to both the first and second Lopez categories. First, as required
for category one, the statute regulates "the use of the channels of
interstate commerce." Under the statute, those channels may not be used
for the transportation of firearms, where those firearms are to be used in
furtherance of a "civil disorder," as that term is defined.

Huff argues that the activity that the statute regulates is criminal
rather than commercial in nature, and that the activity therefore does not
fall within the scope of Congress's regulatory power. But as this court
explained in Coleman, "[t]he 'commerce' that Congress may regulate
through the first Lopez prong is not limited to economic matters, but
rather may encompass using the channels of interstate commerce to bring
the spread of any evil or harm to the people of other states from the state
of origin." 675 F.3d at 620 (quotation marks omitted). In other words,
the question under the first Lopez category is essentially whether the
channels of interstate commerce are being used; whether their use has

4

any direct connection to commerce is irrelevant. Here, the statute concerns the transportation of a firearm through those channels. The statute thus comports with the requirements of the Commerce Clause.

The statute also falls within the second Lopez category, under which Congress may regulate "persons or things" in interstate commerce. Huff was a "person," and his firearm, a "thing," in interstate commerce. See Coleman, 675 F.3d at 621 ("When Coleman traveled across state lines, he became a 'person . . . in interstate commerce.'").

*United States v. Huff*, 630 F. App'x 471, (6th Cir. 2015)

Meanwhile, the Defendant must have intended to affect interstate commerce.  The

Government here in this case complains that the standard requirement of *mens rea* or *scienter* or

intent is improperly adding an additional element to the crime.  Not so.  Almost every crime

includes the element of acting knowingly, willfully, and intentionally.  This is always an element

of almost every crime, whether explicitly stated or not.

The only judicial construction of § 231 has found that intent is an essential element of the offense.

"* * * It is true that Section 231 (a) (3) does not specifically refer to intent, but it only applies to a person who `commits or attempts to commit any act to obstruct, impede, or interfere\' with firemen or law enforcement officers. Under such phraseology, it will not be presumed that Congress intended strict liability for inadvertent or accidental occurrences where, as here, the crime is grounded on the common law. *Morissette v. United States*, 342 U.S. 246, 262-263, 72 S.Ct. 240, 96 L.Ed. 288 * * *." National Mobilization Com. to End War in Viet Nam v. Foran, 411 F.2d 934, 937 (7th Cir. 1969).

We agree that § 231(a) (3) must be construed to require intent.

*United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1972)

For example, if a stable boy in an 1800's Chicago barn took fright at a civil

disturbance happening in the street and knocked over an oil lamp running into the

5

barn, he could not be guilty of the effect on commerce from half the city burning

down from the hay that caught fire accidentally.

> In view of the fact that the majority believes the evidence is insufficient to support the appellants' conviction, we need not consider the First Amendment implications of the appellants' conduct. In the appropriate case, we will examine the record in light of the Supreme Court's language in *Noto v. United States*, 367 U.S. 290, 299-300, 81 S.Ct. 1517 1522, 6 L.Ed.2d 836 (1961):
>
>> (T)he requisite criminal intent * * * must be judged *strictissimi juris*, for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.
>
> See also Scales v. United States, 367 U.S. 203, 229-230, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); United States v. Spock, 416 F.2d 165, 172-173, 178-179 (1st Cir. 1969).

*U.S. v. Dodge*, 538 F.2d 770 (8th Cir. 1976)  (WEBSTER, Circuit Judge, concurring in part and dissenting in part).

### B)  Defendant's reading of 18 U.S.C. § 111(a)

As briefed above, the requirement of *scienter* or *mens rea* is necessarily included in every criminal statute whether stated or not.

Therefore, the Government must prove as an element of the crime that Defendant Thomas intended to assault a police officer and intended to cause the officer harm.  Touching a riot shield as an encouragement for the two sides to keep a peaceful distance and avoid the outbreak of violent conflict does not meet the statute.  As with another January 6 case, engaging a police officer in conversation cannot establish a violation of 18 U.S.C. § 111(a), such as where a demonstrator asked permission to go back and retrieve his American flag that he had left behind, and complied in all respects with officer's responses and directions.

6

In *Carter v. United States* , the Supreme Court determined the *mens rea* requirement in § 2113(a). 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). It concluded that, to establish a violation of § 2113(a), the government must prove the defendant acted with "general intent—i.e., proof of knowledge with respect to the actus reus " of generic bank robbery. Id. "Put differently, the prosecution must show that the defendant knew 'the facts that ma[de] his conduct fit the definition of the offense.' " *United States v. McNeal* , 818 F.3d 141, 155 (4th Cir. 2016) (quoting *Elonis v. United* States , —— U.S. ——, 135 S.Ct. 2001 2009, 192 L.Ed.2d 1 (2015) ).

Although not necessarily determining that § 2113(d) contains a mens rea requirement, we have held that "use" of a deadly weapon in § 2113(d) requires more than mere possession. *United States v. Odom* , 329 F.3d 1032, 1035 (9th Cir. 2003). Thus, "[t]he common denominator to the decisions affirming convictions under § 2113(d) is that the robber knowingly made one or more victims at the scene of the robbery aware that he had a gun, real or not." Id. (emphasis added). McDuffy does not challenge this interpretation.4

With that background in mind, we now turn to interpreting § 2113(e). When interpreting a statute, "[w]e start, as always, with the language of the statute." *Williams v. Taylor* , 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). The language of § 2113(e) does not contain an explicit *mens rea* requirement. However, the Supreme Court has determined that, even when a statute does not specify a mens rea, "[s]ome indication of congressional intent, express or implied, is required to dispense with mens rea as an element of a crime." *Staples v. United States* , 511 U.S. 600, 606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (italics omitted). In the cases where congressional intent is lacking in the statute, courts must read a mens rea requirement into the statute, but "only that mens rea which is necessary to separate wrongful conduct from 'otherwise innocent conduct.' " *Carter v. United States* , 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (italics omitted) (quoting United States v. X–Citement Video, Inc. , 513 U.S. 64, 72, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ). We are tasked with applying this framework to the enhancement in § 2113(e).

*United States v. Van Mcduffy*, 890 F.3d 796 (9th Cir. 2018).

Therefore, touching a police officer cannot violate the statute without the intent to assault

and harm the officer.  These officers are not fragile butterflies.

The Government recites that:  "The statute only requires that a person forcibly assault, resist,

oppose, impede, intimidate, or interfere with any person who is designated as a federal law enforcement officers. 18 U.S.C. § 111(a)(1)."

But then the Government tries to delete "forcibly" from the statute.  Clearly, the term "forcibly" requires the intent to harm the police officer, not to simply urge the police to maintain a distance from the crowd in the pragmatic interests of avoiding an outbreak of violence.

So what would the allegations look like if actions were _not_ "forcibly."  What would the finder of fact consider if Defendant Thomas _non-forcibly_ engaged an officer in conversation while the officer was on duty, or asked an officer by words, hand gesture, or holding up an arm not to encroach into the person's personal space?  Does a police officer have to comply with a citizen's requests.  Maybe not.  But can an officer walk right up to a person's body and "get in their face" and then turn around and blame the person for instinctively reacting to protect themselves?

If a person is pushed from behind in a crowd, or trips or falls, or lunges to the aid of an elderly man just to the left of the officer who is being pushed down to the ground by the crowd, even if the officer misinterprets the motion as directed against the officer when it is plainly to come to the aid of the falling elderly man, intent is a requirement of the crime and it must be proven beyond a reasonable doubt.

### C)  Separating First Amendment requirements for restricting Capitol Grounds

The Government also responds askew to the arguments of the Defendant.  Perhaps the presentation was not as clear as it might have been and should be clarified.

> "In my view, 18 U.S.C. § 231(a)(3) does not apply to acts arguably protected by the First Amendment, see *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971), cert. denied, 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131 (1972)."

*U.S. v. Dodge,* 538 F.2d 770 (8th Cir. 1976)  (WEBSTER, Circuit Judge, concurring in part and dissenting in part).

The U.S. Capitol Grounds is a public park.  The 58.8 acres are used for musical performances by the National Symphony Orchestra and/or military bands for the enjoyment of the general public who are free to enter.  *See,* Architect of the Capitol, "Concerts at the U.S. Capitol," **https://www.aoc.gov/what-we-do/programs-ceremonies/concerts**

At times, the grounds were used to celebrate such things as National Watermelon Day, passing out watermelon to random members of the general public who might wander past.  The national park that is the U.S. Capitol Grounds have been recognized as a public forum in binding and Circuit precedent.

But the point is not that no regulation is possible, but that regulation must comply with strict scrutiny.  Here, the Government has not gone through the process of strict scrutiny.  Congress with trillions of dollars to spend each year did not engage a sign shop to make proper signs, but ran off paper signs on a photocopier.  Being subject to movement and destruction, those paper signs even if laminated could not provide the legal notice necessary to legally transform a public park into a restricted area.  The fact that the Congress did not invest a little in providing proper notice to the public may be highly unfortunate, but it is the Government's burden to provide such notice to change the status of the Grounds.  Even if the signs remained visible, posted on mobile bike racks, one could never know *where* the boundary line of restriction was supposed to be.  To know that somewhere some part of the Grounds might be restricted, but not know where the line is, would fail to incriminate any person to "knowingly" enter a restricted area.

The Government recites that "The Defendant's knowledge of these signs and other

indicators that he was in a closed area is a matter of fact to be decided by the factfinder.3"  And this is surely true, unless the Government can rig the case so that the factfinder will be deprived of the facts with which to find the truth.

The Government recites "The government may exclude from the Capitol "any group which is noisy, violent, armed, or disorderly in behavior, any group which has a purpose to interfere with the processes of Congress, any member of Congress, congressional employee, visitor or tourist; and any group which damages any part of the building, shrubbery, or plant life." *Jeanette Rankin Brigade*, 342 F. Supp at 580."  However, as previously and repeatedly briefed by the Defendant, *Jeanette Rankin Brigade* explicitly rejected the idea that the Capitol Grounds require the atmosphere or quiet of a library and reject the regulation of noisy protest.

The Government further recites that "On January 6, 2021, the government closed a limited area immediately surrounding the Capitol for a limited time and did so in such a way that anyone who wished to protest the proceedings inside of the Capitol could still do so within sight and earshot of the building."

And this would be a worthy goal and appropriate, had the U.S. Capitol Police (an agency of Congress) actually done that.  But it did not in fact do that.  The fabricated photograph of the Capitol viewed from above with a phony red line digitally drawn around it was never visible to the public.  It would appear that the doctored photograph was created exclusively for litigation purposes.  It was never posted at the Capitol site.  Counsel has not had the time to search through all news reports but is not aware that any mention of restrictions on the U.S. Capitol Grounds ever occurred prior to the onset of criminal prosecutions.

If it were the goal of the USCP to close a limited area immediately surrounding the Capitol – in the name of the U.S. Secret Service for the benefit of protecting the Secret Service's work in guarding Secret Service protectee – the unusual exercise in economy of movable bike racks and

paper signs would not accomplish the balancing act of competing interests by establishing an

appropriate boundary.


Dated:  May 18, 2023                    RESPECTFULLY SUBMITTED
                                        **KENNETH JOSEPH OWEN THOMAS**,

                                        *By Counsel*

                                        _____/s/_____
                                        Roger Root, Esq.
                                        John Pierce Law Firm
                                        21550 Oxnard Street
                                        3rd Floor, PMB #172
                                        Woodland Hills, CA 91367
                                        Tel: (213) 400-0725
                                        Email: ***jpierce@johnpiercelaw.com***
                                        Attorney for Defendant

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed on this May 18, 2023, with the Clerk of
the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which
will send an electronic copy of to the following CM/ECF participants.  From my review of the
PACER account for this case the following attorneys are enrolled to receive notice and a copy
through the ECF system.

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
601 D Street, NW
Washington, DC 20530
**Samantha.Miller@usdoj.gov**

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW

Washington, DC 20530
**Sean.McCauley@usdoj.gov**


_____/s/_____
Roger Root, Esq.