UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
* * * * * * * * * * * * * * *    )
UNITED STATES OF AMERICA,        )       Criminal Action
                                 )        No. 21-00040
              Plaintiff,         )
                                 )
    vs.                          )
                                 )
PATRICK EDWARD McCAUGHEY, III,   )       Washington, D.C.
TRISTAN CHANDLER STEVENS and     )       September 13, 2022
DAVID MEHAFFIE,                  )       3:04 p.m.
                                 )
              Defendants.        )
                                 )
* * * * * * * * * * * * * * *    )
```

ORAL RULING
BEFORE THE HONORABLE TREVOR N. McFADDEN,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:      KIMBERLY L. PASCHALL, ESQ.
                         JOCELYN P. BOND, ESQ.
                         ASHLEY AKERS, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                         555 Fourth Street, Northwest
                         Eleventh Floor
                         Washington, D.C. 20530


FOR THE DEFENDANT        LINDY R. URSO, ESQ.
        McCAUGHEY:       LAW OFFICES OF LINDY R. URSO
                         810 Bedford Street
                         Suite 3
                         Stamford, Connecticut 06901


FOR THE DEFENDANT        LAUREN COBB, ESQ.
        STEVENS:         OFFICE OF THE FEDERAL DEFENDER
                         NORTHERN DISTRICT OF FLORIDA
                         3 West Garden Street
                         Suite 200
                         Pensacola, Florida 32502

APPEARANCES, CONT'D:

FOR THE DEFENDANT          WILLIAM L. SHIPLEY, JR., ESQ.
        MEHAFFIE:          LAW OFFICES OF WILLIAM L. SHIPLEY
                           Post Office Box 745
                           Kailua, Hawaii 96734


REPORTED BY:               LISA EDWARDS, RDR, CRR
                           Official Court Reporter
                           United States District Court for the
                             District of Columbia
                           333 Constitution Avenue, Northwest
                           Room 6706
                           Washington, D.C. 20001
                           (202) 354-3269

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is
 2   Criminal Case 21-40, the United States of America versus
 3   Patrick Edward McCaughey, III, Tristan Chandler Stevens and
 4   David Mehaffie.
 5              Counsel, please come forward to identify yourself
 6   for the record, starting with the Government.
 7              MS. PASCHALL:  Good afternoon, your Honor.
 8   Kimberly Paschall for the United States with my colleagues,
 9   Jocelyn Bond, Ashley Akers and our paralegal, Kyle Metz.
10              THE COURT:  Good afternoon, folks.
11              MR. URSO:  Good afternoon, your Honor.  Lindy Urso
12   for Mr. McCaughey.
13              THE COURT:  Good afternoon, Mr. Urso.
14              Good afternoon, Mr. McCaughey.
15              MS. COBB:  Lauren Cobb for Tristan Stevens.
16              THE COURT:  Good afternoon, Ms. Cobb.
17              Good afternoon, Mr. Stevens.
18              MR. SHIPLEY:  Good afternoon, your Honor.  William
19   Shipley on behalf of Defendant David Mehaffie, who's present
20   in court.
21              THE COURT:  Good afternoon, Mr. Shipley.
22              Good afternoon, Mr. Mehaffie.
23              Before I render my verdict, is there any
24   outstanding issue that we should be discussing?
25   Ms. Paschall?
```

```
 1              MS. PASCHALL:  Not from the Government, your
 2    Honor.
 3              THE COURT:  Mr. Urso?
 4              MR. URSO:  No, your Honor.
 5              THE COURT:  Ms. Cobb?
 6              MS. COBB:  No, your Honor.
 7              THE COURT:  Mr. Shipley?
 8              MR. SHIPLEY:  Nothing, your Honor.
 9              THE COURT:  I make the following findings of fact
10    and conclusions of law in support of the Court's verdict in
11    United States versus Patrick McCaughey, Tristan Stevens and
12    David Mehaffie:
13              This verdict is taken in full recognition of the
14    standard jury instructions, including, but not limited to,
15    the Government's burden to prove its case beyond a
16    reasonable doubt.  It is made having carefully considered
17    the testimony presented and the evidence and stipulations
18    admitted during the course of the trial.
19              I'm utilizing the elements that the parties have
20    agreed to during this trial, which boil down to the
21    Government's proposed elements for each offense, plus a
22    couple additions and tweaks that the parties have proposed.
23              Before I begin, I want to make a few general
24    remarks about the credibility of the witnesses who testified
25    before me.
```

1           Unlike most cases, this one overwhelmingly relied

2      upon videotaped evidence showing exactly what occurred

3      during the time in question.  Indeed, there are few

4      questions here about what occurred when.  The central

5      questions are ones of intent and the legal implications of

6      those actions.  This somewhat diminishes the importance of

7      the eyewitness testimony here.

8           I also note several eyewitnesses, including some

9      of the officers, were at times testifying at least in part

10     based on their review and understanding of the videos and

11     photographs.  While it's true that an eyewitness can provide

12     additional context that a mere outside reviewer of a video

13     could not, I think at times the witnesses were able to offer

14     little beyond the video evidence and indeed occasionally

15     misinterpreted the video evidence.

16          Thus, while I generally find the Government's

17     witnesses credible, there were times when the videos and

18     photographs provided more reliable evidence of what

19     occurred.

20          Also, having carefully considered the testimony of

21     Officer Hodges and Sergeant Gonell in this case, their

22     testimony was more that of victims than of typical law

23     enforcement officers who have nothing to gain or lose from

24     their truthful testimony.

25          I do not believe that either intentionally lied

under oath.  But there were times when their testimony was
undermined by other credible evidence.  I'm thinking in
particular of Sergeant Gonell's claim that Mr. Stevens
struck him with a stolen baton.  The Government has not
credited this claim and neither do I.

As to the defense witnesses, I found Dr. Calvin
John to be completely credible, but his testimony was of
limited relevance.

The other witnesses, Ms. Mehaffie, Mr. Mehaffie
and Mr. McCaughey, each had a significant stake in the
outcome here.  And while I do credit much of their
testimony, where their testimony conflicts with my findings
below, I think that is because they shaded their testimony
to be more favorable to their case than the facts allowed.

Before discussing the various charges against the
Defendants, I note that the Capitol's west lawn, lower west
terrace and west terrace tunnel were scenes of shocking
violence and hostilities towards police by midafternoon on
January 6th, 2021.  The Government has introduced evidence
of lengthy standoffs, fights and numerous attacks on
officers throughout the area.  Rioters sprayed officers with
OC and bear spray and fire extinguishers, threw things at
them, used their own shields against them and used poles and
other weapons to strike them.  They also hurled insults and
epithets at the officers.

1        All three Defendants observed these things.

2   Indeed, at times they participated in some of these attacks.

3        No police officer should have had to endure these

4   attacks and provocations.

5        Incidentally, two longtime police sergeants, one

6   from the Metropolitan Police Department and one from the

7   U.S. Capitol Police, testified in this trial that they

8   believed the police reacted differently to these attacks

9   because of the Black Lives Matter riots in the previous

10  year.  One said he was worried about getting fired for

11  overreacting to the rioters.  Both supervisors voiced fears

12  about police brutality claims.

13        Their testimony and the lengthy video footage in

14  evidence here suggests that at least some police officers

15  were more timid and less willing to repel the rioters

16  because they were afraid their departments would not support

17  them, did not have their backs.  While none of this excuses

18  the Defendants' actions or the conduct of other rioters,

19  their testimony is suggestive of the chaos and violence that

20  can occur when senior government leaders fail to support and

21  defend law enforcement officers.

22        With that context, I make the following specific

23  findings of fact and conclusions of law as to the charged

24  conduct:

25        I turn first to Counts 14, 16 and 33, which relate

1    to actions by Mr. McCaughey and Mr. Stevens.  These counts

2    charge the two Defendants with at various times that day

3    aiding and abetting the other rioters in forcibly

4    assaulting, resisting, opposing, impeding or interfering

5    with certain officers in violation of 18 USC 111(a)(1).

6         Although I will go through the various aiding and

7    abetting elements in a moment, this theory of liability

8    requires that others violate the statute.  So I will first

9    list the elements underlying 111(a)(1) and explain how the

10    other rioters in the tunnel met those elements.

11         The first element is that someone must assault,

12    resist, oppose, impede, intimidate or interfere with a law

13    enforcement officer.  An "assault" means any intentional

14    attempt or threat to inflict injury upon someone else when

15    coupled with an apparent present ability to do so.  An

16    assault also requires a finding by the Court that the

17    Defendant acted forcibly and intended to inflict or intended

18    to threaten injury.

19         The terms "resist," "oppose," "impede,"

20    "intimidate" and "interfere with" carry their everyday,

21    ordinary meanings.

22         Count 4 covers the timeframe from 2:49 p.m. to

23    2:51 p.m. on January 6th, 2021.  Within that timeframe,

24    Sergeant Mastony's body-worn camera shows police locked with

25    a group of rioters in the tunnel, specifically from 2:48

1    p.m. and 15 seconds to 2:50 p.m. and 36 seconds.  I'm

2    looking to Exhibit 232.

3          At the very least, I find those rioters were

4    resisting, opposing, impeding and interfering with officers

5    by forming a barrier to prevent them from clearing the

6    tunnel.

7          Count 16 covers the timeframe from 2:56 to 2:58

8    p.m.  During that time period, Sergeant Bogner's body-worn

9    camera shows rioters again blocking the police line in the

10   tunnel and preventing the police from pushing the crowd out

11   of the tunnel.  And I'm looking to Exhibit 206.4.  Again,

12   this is resisting, opposing, impeding and interfering at the

13   very least.

14         Count 33 covers 4:15 to 4:19 p.m.  During this

15   time, footage shows rioters packed tightly against the

16   police line.  They begin to push as one group against the

17   line, forcing police to retreat into the tunnel.  I'm

18   looking at Exhibit 101.6.  These are all Government

19   exhibits.  Again, this activity qualifies as resisting,

20   opposing, impeding and interfering at the very least.

21         The second element is that someone does so

22   forcibly.  A person acts forcibly if he used force,

23   attempted to use force or threatened to use force against a

24   police officer.

25         As to Count 14, the rioters clearly used force.

1    Sergeant Mastony's body-worn camera again shows rioters

2    pressed up against the police line from 2:49 p.m. until 2:51

3    p.m.

4           Count 16:  As shown on Sergeant Bogner's camera,

5    multiple rioters forcibly pushed against the police line.

6    This is most evident at 2:56 and 37 seconds and 2:57 and 34

7    seconds on Exhibit 206.4.

8           The same applies as to Count 33.  Exhibit 101.6

9    shows prodigious efforts by rioters to push past the police.

10   This involved coordinating their pushes to exert the

11   greatest possible amount of force on the police line.  It is

12   most clearly seen on Exhibit 106.1 from 4:16 and 14 seconds

13   to 4:16 and 36 seconds.

14          The third element is that someone did the acts

15   intentionally.  Many people in the tunnel between 2:49 p.m.

16   and 2:51 p.m. acted intentionally.  And I find that these

17   rioters were acting intentionally.

18          Exhibit 206.10 shows rioters continuing to press

19   against police and spraying the police line with a fire

20   extinguisher at 2:49 and 25 seconds.  There's no doubt in my

21   mind that the rioters were intentionally acting against the

22   police here.

23          Count 16:  The evidence clearly shows that the

24   rioters at this time acted intentionally.  Not only had many

25   of them entered the tunnel voluntarily, but videos showed

1    them bringing shields and other objects to use against the

2    police.  I'm looking to Exhibit 101.2 at 2:56 p.m. and 23

3    seconds and 2:56 and 47 seconds.

4         Rioters can also be heard on Sergeant Bogner's

5    body-worn camera at 2:57 saying, "This is our house."

6    That's Exhibit 206.4.

7         The same analysis applies to Count 33.  Rioters

8    continued to move into the tunnel and pushed into the police

9    line at Exhibit 101.6.

10        The fourth element is that any of the prohibited

11   conduct occurred against an officer who was then engaged in

12   the performance of his official duties.

13        For all counts and at all times, the officers were

14   obviously engaging in their official duties protecting the

15   Capitol from unauthorized visitors.  They were all wearing

16   official law enforcement gear and insignia.  Their duty was

17   to clear the tunnel and protect the Capitol and those inside

18   it, and they could not do so properly because of the

19   rioters' presence and conduct.

20        The fifth element is a bit complicated.  To be a

21   felony, someone must make physical contact with the officer

22   or act with the intent to commit another felony.  This

23   element presents a legal dispute between two of the

24   Defendants and the Government.  For these three counts, the

25   Government's theory is that rioters in the tunnel were

1    resisting, opposing, impeding, intimidating and interfering

2    with officers in the tunnel, all with the intent to commit

3    another felony.

4          According to the Government, they intended to

5    commit either obstruction of an official proceeding or civil

6    disorder, both felonies.  And Defendants Stevens and

7    McCaughey aided and abetted those violations.

8          Defendants Stevens and McCaughey argue that 111

9    does not permit this theory.  They say that even acting with

10   felonious intent cannot be a felony under Section 111 unless

11   the same person committed an assault.

12          I disagree.  First, the words of the statute

13   appear clear enough to me.  Section 111(a) explicitly refers

14   to the acts in violation of Subsection (a)(1).  To be sure,

15   those acts encompass forcible assaults against officers.

16   But they also cover forcible opposition, interference with

17   and impeding officers.

18          And the statute says a felony accrues when such

19   acts involve the intent to commit another felony.  The

20   natural implication of this language means that forceful

21   interference with officers, for example, with the intent to

22   commit another felony is a felony violation of the statute.

23   The phrase "such acts" refers to all six verbs in

24   Section 111(a)(1), and those verbs go beyond physical

25   assaults.

1        The Fourth and Seventh Circuits agree with this

2   interpretation of the statute.  And I'm looking to *United*

3   *States versus Briley*, 770 F.3d 267, Pages 273 and 274, from

4   the Fourth Circuit in 2014; and *United States versus Stands*

5   *Alone*, 11 F.4th 532, Pages 535 and 537, from the Seventh

6   Circuit in 2021.

7        Both circuits convincingly reason from the text of

8   the statute that the verbs other than "assault" carry

9   through into the felony provision of Section 111(a).

10        I'm aware of contrary authority from the Tenth

11   Circuit, but that decision rests on binding precedent in

12   that circuit about a prior version of the statute.  I'm

13   looking to *United States versus Wolfname*, 835 F.3d 1214,

14   from the Tenth Circuit in 2016.

15        None of these decisions are binding on this Court,

16   but I am persuaded by the text of the statute that the

17   fourth and center of the circuits are correct.

18        The upshot is that rioters in the tunnel could

19   have committed felony violations of Section 111(a) if they

20   acted with the intent to commit another felony.  As I will

21   detail later when discussing the Defendants, I find the

22   evidence overwhelmingly shows that rioters inside the tunnel

23   on January 6th acted with the intent to commit civil

24   disorder.

25        At all times relevant to Counts 14, 16 and 33,

1     rioters in the tunnel knowingly obstructed officers as part

2     of a civil disorder as defined by the statute.  That is

3     enough for them to commit a felony violation of Section

4     111(a).

5            Now for the elements of aiding and abetting, which

6     applies to Defendants Stevens and McCaughey:  First, others

7     must commit each of the elements of a Section 111(a)(1)

8     violation that I have just listed and as I've explained.

9     This element has been met.

10           Second, the Defendants knew that assaulting,

11    resisting, opposing, impeding or interfering was going to be

12    or was being committed by others.  Looking to Count 14,

13    Mr. Stevens entered the tunnel at approximately 2:50 p.m.

14    Mr. McCaughey entered about five seconds later, according to

15    Exhibit 101.2.

16           The video evidence shows that rioters had by then

17    been pressed against the police line for almost eight

18    minutes.  Defendants McCaughey and Stevens both suggest that

19    they did not know rioters at the front of the mass in the

20    tunnel were interfering with officers.

21           I reject this argument as implausible.  Not only

22    is Defendant McCaughey tall enough to see deeper into the

23    tunnel; police officers shouted continuously at the rioters

24    to get back.  I believe he heard those shouts.  And at

25    around 2:50 and 44 seconds, McCaughey clearly observed a

1    roiling group of rioters pushing in unison.

2              I do not believe that anyone seeing this scene

3    could have concluded that the rioters were pushing against a

4    door or some other object.

5              And the group was retreating, something only

6    police would cause.  Needless to say, a door does not push

7    rioters back.

8              As for Defendant Stevens, he is several feet

9    further into the tunnel than Defendant McCaughey.  At 2:50

10   p.m. and 38 seconds, video shows him observing the retreat

11   of those rioters in front of him, at which point he leaned

12   his body into the people in front of him.

13             Again, doors do not cause the kind of mass retreat

14   that Stevens observed at this moment.  The only plausible

15   explanation is that he knew there were officers at the end

16   of the tunnel.  This is confirmed by his next actions.  Ten

17   seconds after bracing against someone in front of him, he

18   raised his hand and started counting up to three.  Although

19   the group remained uncoordinated despite this, the group

20   finally pushed as one at 2:50 p.m. and 57 seconds after

21   Defendant Stevens had for the third time counted to three.

22   I'm looking to Exhibit 101.2.

23             One would be hard pressed to conclude that

24   Mr. Stevens went to this trouble if the rioters at the front

25   faced only a set of doors.

1    Having reviewed the videos and heard testimony

2    from a number of individuals who were there on that day, I

3    am fully convinced that both Defendants knew what was

4    happening and specifically knew that the people at the front

5    of the line were pushing against and into police officers

6    trying to prevent the crowd's entry into the Capitol

7    Building.

8    Going to Count 16:  As described a moment ago in

9    relation to Count 14, Mr. Stevens by 2:56 p.m. had seen

10   police officers push rioters back.  He also knew that other

11   rioters were obstructing police because at 2:56 p.m. and two

12   seconds he saw rioters passing riot shields forward.  They

13   would not bring riot shields to fight with a door.  The only

14   explanation is that rioters at the front needed shields to

15   keep their place in front of the police.

16   Any doubt as to Mr. Stevens's knowledge of police

17   presence is dispelled by a video taken by his own cell phone

18   while in the midst of the rioters.  The video clearly

19   depicts police helmets at the end of the tunnel.  I'm

20   looking to Exhibit 419.3.

21   As to Count 33:  According to Exhibit 101.6,

22   Mr. Stevens positioned himself in the mass of rioters near

23   the tunnel entrance.  Video captures him at 4:16 p.m. and 15

24   seconds just outside the entryway.  Given his proximity, I

25   am fully convinced that he knew people were mere feet in

1    front of him and were interfering with officers.

2         More, by now he had already been into the tunnel,

3    pushed against officers and engaged in the altercation with

4    Sergeant Gonell.  The crowd of rioters outside the tunnel

5    would indicate to him that officers remained inside and that

6    rioters were still trying to push through the officers.

7         Third, I find that the Defendants performed an act

8    in furtherance of the offense.  Looking to Count 14, I have

9    already described Stevens's actions to coordinate pushes by

10   the rioters.  He took upon himself a leadership role at that

11   moment.  The Court counts five attempts by Mr. Stevens

12   between 2:50 p.m. and 2:51 p.m. to count rioters up to

13   another push.

14        At exactly 2:51 p.m., Mr. McCaughey joined a

15   coordinated push by rioters in the tunnel, according to

16   Exhibit 101.2.  He continued to add his weight to the push

17   for about 12 seconds before falling back at the direction of

18   other rioters.

19        Looking to Count 16, here again, Mr. Stevens

20   joined a coordinated heave-ho along with other rioters.

21   According to the video, he began that push at 2:56 p.m. and

22   pushed until 2:57 p.m. and 21 seconds.  That is about a

23   30-second period.  That's on Exhibit 101.2.  His cell phone

24   video footage of the moment also captures the crowd chanting

25   "Heave" in Exhibit 419.3.

1          On Count 33, as in the prior count, Mr. Stevens

2     joined a coordinated push against the police line.  At 4:16

3     p.m. and 35 seconds, he is inside the tunnel and pushes his

4     body weight against the person in front of him, moving

5     rhythmically with others as they pushed en masse.  He again

6     pushed forward at 4:17 p.m. and 40 seconds and he pushes for

7     about the next ten seconds in Exhibit 101.6.  These are

8     actions in furtherance of the interference taking place by

9     rioters ahead of him.

10          Fourth, the Defendants knowingly performed their

11    acts for the purpose of aiding, assisting, soliciting,

12    facilitating or encouraging others in committing that

13    offense.

14          Looking to Count 14, Mr. McCaughey's push speaks

15    for itself because of my earlier finding that he saw

16    officers at the end of the tunnel and knew that rioters had

17    engaged them.  He joined the coordinated push in an effort

18    to help them try to break through into the building.  I find

19    he did so knowingly.

20          Exhibit 101.2 shows Defendant McCaughey joined the

21    heave-ho without the assistance of anybody behind him.  No

22    one forced him or pushed him into the group.  He joined

23    voluntarily.  And at various points in his testimony,

24    Mr. McCaughey affirmed that he entered the tunnel and

25    remained there of his own accord.

1           So, too, for Mr. Stevens:  He knew that rioters

2      had engaged with the police line and were interfering with

3      the police officers' attempt to clear the tunnel.  Yet he

4      led the rioters in a series of coordinated pushes and he

5      stopped only when the police began to make inroads against

6      the rioters in the tunnel.  The natural inference from that

7      behavior is that he led the pushes for the purpose of

8      helping those at the front of the group continue to

9      interfere and impede and oppose and resist the police

10     officers.

11          Looking back to Count 16, I have covered much of

12     the applicable conduct here already.  Mr. Stevens saw the

13     riot shields go forward into the tunnel and still pushed

14     into the back of the group pressed against the police line.

15     Particularly in light of his countdowns mere minutes

16     earlier, I conclude that Mr. Stevens joined the heave-ho

17     with the purpose of aiding those who were interfering with

18     officers at the front of the group.

19          Looking to Count 33, based on my prior

20     conclusions, Mr. Stevens knew about police in the tunnel and

21     that others were pushing against them.  He not only joined

22     that push, but maneuvered himself farther into the tunnel.

23     The video shows no effort by him to retreat or to arrest the

24     push from those behind him.  The only possible conclusion,

25     particularly given that he had already interfered with

1    police himself and that he had come back to the tunnel, is

2    that Mr. Stevens did all of this to aid those rioters ahead

3    of him who were engaged with police.  And I'm looking to

4    Exhibit 101.6 for that, among others.

5            Fifth, the Defendants acted with the intent that

6    others commit the offense of assaulting, resisting,

7    opposing, impeding or interfering with law enforcement

8    officers.  On Count 14, for the same reasons as I mentioned

9    under the fourth element, I find that Defendant McCaughey

10   joined the coordinated push at 2:51 p.m. with the intent to

11   help other rioters ahead of him in the tunnel to continue

12   impeding police officers.  I think they were also opposing,

13   resisting and interfering with police officers.  His

14   decision to join the press of other rioters cannot be

15   explained any other way.

16           I also find that Mr. Stevens led pushes with the

17   intent to help rioters at the front of the group for the

18   reasons I've already discussed.

19           Turning to Counts 16 and 33:  For the reasons I've

20   just mentioned under the previous elements for these two

21   counts, I find that Mr. Stevens pushed with the intent that

22   others in front of him would continue obstructing officers

23   in the tunnel.

24           The upshot of all of this is that based on these

25   conclusions, I find Mr. McCaughey guilty on Count 14 of

1    aiding and abetting felony violations of Section 111(a) and

2    I find Mr. Stevens guilty on Counts 14, 16 and 33 of the

3    same offense.

4              Turning now to Counts 21, 24 and 25:  These allege

5    that Defendants McCaughey and Stevens assaulted a law

6    enforcement officer with a deadly or dangerous weapon in

7    violation of 18 USC 111.  This offense shares the five

8    elements I just mentioned for a violation of 111(a)(1).  In

9    addition, to show a violation of 111(b), the Government must

10   show that the Defendants used a deadly or dangerous weapon.

11             An object is a deadly or dangerous weapon if it is

12   capable of causing serious bodily injury or death to another

13   person and the Defendant used it in that manner.

14             As defined in 18 USC 1365(h)(3), "serious bodily

15   injury" means bodily injury involving a substantial risk of

16   death, extreme physical pain, protracted and obvious

17   disfigurement or protracted loss or impairment of the

18   function of a bodily member, organ or mental faculty.

19             In determining whether an object is a deadly or

20   dangerous weapon, I may consider both the physical

21   capabilities of the object used and the manner in which the

22   object was used.

23             I first consider Count 24, which was Defendant

24   McCaughey's assault on Officer Daniel Hodges.  As to the

25   first element, I find that Mr. McCaughey did indeed assault,

1  resist, oppose, impede and interfere with Officer Hodges

2  when he pinned the officer against the door frame using a

3  stolen police shield.

4       Having carefully reviewed the videos and the

5  testimony of Mr. McCaughey, Officer Hodges and others, I

6  find that Mr. McCaughey used the force of his body and the

7  force of those other rioters behind him and working in

8  unison with them pushed against Officer Hodges.  He also did

9  so intentionally.

10       I note he did this while saying to Officer Hodges,

11  "Go home" and "Don't use that stick on me, boy."  His

12  actions to pin Officer Hodges against the door frame

13  rendered Officer Hodges defenseless from the attack of

14  another rioter who yanked off Officer Hodges's gas mask,

15  dislodged his helmet and struck him with his own police

16  baton.

17       While this was occurring, Mr. McCaughey told

18  Officer Hodges, "Let go of the stick;" in other words, the

19  baton Officer Hodges was trying to use to defend himself.

20       I specifically reject Mr. McCaughey's suggestion

21  that he was also saying this to the other rioter.  Officer

22  Hodges was also clearly engaged in the performance of his

23  duties and the Defendant also made physical contact with

24  him, satisfying the fourth and fifth elements of 111(a)(1).

25       I also find that in committing this assault,

1    Mr. McCaughey used a deadly or dangerous weapon.  Having

2    listened carefully to the testimony about police shields and

3    having reviewed one myself, I do not believe that a shield

4    is necessarily or inherently a dangerous weapon, but that it

5    is capable of causing bodily injury or death and the

6    Defendant used it in this manner.

7           To support this finding, I make the following

8    observations:  First, Sergeant Mastony, who I find to be

9    very credible, explained that CDU, or civil disturbance

10   unit, officers are taught to use shield strikes to push

11   people out of the way.

12          He also testified that he at one point on January

13   6th struck a rioter with the edge of a shield to stop the

14   rioter from assaulting another officer.  I think both of

15   these are examples of how a shield, which I'd normally

16   consider a piece of defensive equipment, can be used

17   offensively.

18          Second, I credit Officer Hodges's claim that

19   Mr. McCaughey's use of the shield caused him significant

20   pain, specifically in his lungs, his head and his face, that

21   it crushed him and its hard surface prevented him from

22   fighting against the assault and that he screamed out in

23   part in pain because of Mr. McCaughey's actions against him.

24          I also credit Officer Hodges's claim to have

25   suffered large bruises and pain all over his body, and I

1    believe those injuries were in part caused by

2    Mr. McCaughey's actions.

3           I recognize Officer Hodges previously stated that

4    he called out for help; and as I suggested at the outset, I

5    think Officer Hodges does harbor some understandable anger

6    and resentment at Mr. McCaughey and other rioters which

7    could theoretically influence his testimony.

8           Notwithstanding all this, I did believe him as to

9    these above points, having considered his demeanor on the

10   stand and all of the surrounding evidence.  And I think the

11   video evidence broadly corroborates his claims.

12          Officer Hodges credibly testified to feeling

13   rather embarrassed by the whole episode, which probably

14   explains why he claimed he yelled out for help, rather than

15   admitting in his earlier interview that he was actually in

16   significant pain.

17          Third, I reject the arguments made on

18   Mr. McCaughey's behalf to the contrary.  While it is true

19   that another rioter was pushing against Mr. McCaughey's

20   back, I don't think this meant he couldn't control what he

21   was doing or that he had no place to move.  Rather, I think

22   he was working in unison with those behind him to push the

23   police officers, and Officer Hodges specifically.

24          Similarly, I don't think the fact that

25   Mr. McCaughey's arms were flush against his chest meant that

1   he wasn't pushing.  Rather, I agree with the Government that

2   he was using his full body weight, along with the force and

3   the weight of the people behind him, to lean into the

4   shield, crushing Officer Hodges against the door frame.

5         I also completely reject the suggestion that

6   Exhibit 801, which is the shield, is somehow not

7   substantially similar to the shields used in the tunnel on

8   January 6th.

9         I credit the testimony of Captain Ortega on this

10  point, and I'll note that I was able to bend the edges of

11  this shield just as you can see the edges being bent in the

12  videos.  I also think the weight of this shield is

13  substantially similar to the weight of the shield

14  Mr. McCaughey used.

15        McCaughey's most compelling argument is that his

16  actions to get assistance for Officer Hodges show that he

17  did not intend to harm him just beforehand.  Having

18  carefully reviewed the video and considered the witnesses'

19  testimony, I ultimately agree with the Government that this

20  moment of humanity stands in contrast with Mr. McCaughey's

21  actions moments before rather than explaining them.  I think

22  Officer Hodges's gut-wrenching cries of pain shocked

23  Mr. McCaughey into merciful action.  But I also think

24  Mr. McCaughey's statements and conduct during the assault

25  speak for themselves and can't be undone by his subsequent

1   kindness.

2          Finally, I reject the argument that only the blade

3   end of the shield can cause serious bodily injury.  I'm

4   reminded of the fate of Giles Corey, immortalized in Arthur

5   Miller's play *The Crucible*.  Mr. Corey, accused of

6   witchcraft, was sentenced to death by *peine forte et dure*;

7   in other words, being pressed to death.  He was bound on the

8   ground; a flat board not dissimilar to a shield was placed

9   on his chest; and weights were placed on the board until he

10  was crushed to death.

11         With sufficient weight, a flat surface like a

12  shield can certainly cause serious bodily injury or death,

13  especially when the victim is wedged between it and a hard

14  narrow surface like a door frame.

15         And, of course, in this case, this was not just

16  the weight of one individual on the shield, but the weight

17  of many, the various rioters working in unison with the

18  Defendant to crush Officer Hodges.

19         I now consider Count 25, charging Mr. McCaughey

20  with assaulting Officer Foulds.  This incident occurred

21  shortly after Mr. McCaughey assaulted Officer Hodges when

22  Officer Foulds tried to close the double doors separating

23  the rioters from the officers.

24         The first element is whether the Defendant

25  assaulted, resisted, opposed, impeded, intimidated or

1    interfered with Officer Foulds.  The evidence overwhelmingly

2    shows that Mr. McCaughey resisted, opposed, impeded and

3    interfered with Officer Foulds by repeatedly trying to

4    prevent him from closing the door, indeed by reopening it

5    once Officer Foulds had partially closed the door.

6         I also find that Mr. McCaughey indeed assaulted

7    Officer Foulds.  The Government sees at least three separate

8    strikes by Mr. McCaughey.  While this incident was captured

9    by multiple cameras, the footage is often blurry where the

10   actors are partially obscured.  I clearly see at least one

11   strike at 3:13 p.m. and 44 seconds on Exhibit 961.

12        As Officer Foulds tries to close the door,

13   Mr. McCaughey uses his shield to reopen the door and hit

14   Officer Foulds's hand, which was on the crash bar.  I also

15   credit Officer Foulds's testimony that Mr. McCaughey

16   repeatedly struck at him and also shoved him with the

17   shield.  I found Officer Foulds to be very credible and to

18   have a clear memory of the events.  Despite the rather

19   blurry video evidence, I fully credit Officer Foulds's

20   testimony on this point.

21        Having considered the evidence and the testimony

22   of Mr. McCaughey and Officer Foulds, I also find the

23   Defendant was acting forcibly and intentionally here.

24        I therefore discredit Mr. McCaughey's testimony

25   that he never struck anyone with his shield and that he

1    never swung it at anyone.  I agree with him that at times he

2    was trying to block Officer Foulds's baton strikes, but

3    that's not all he was doing.  I believe he was acting

4    offensively and actively resisted Officer Foulds's effort to

5    close the door by striking and shoving him with the shield.

6          The final two elements of 111(a)(1) are also

7    easily satisfied here.  Officer Foulds was clearly engaged

8    in the performance of his official duties and Mr. McCaughey

9    did make physical contact with him.  In any event, he was

10   acting with the intent to commit another felony, i.e. civil

11   disorder.

12          I do not believe, however, that the Government has

13   met its burden under 111(b) to show that Mr. McCaughey was

14   using a dangerous weapon at the time.  To be sure, a shield

15   can be a dangerous weapon for the reasons I've already

16   stated.  But here, his use of it was to shove and strike at

17   Officer Foulds in ways that could not have caused serious

18   injury or death.

19          Notably, Officer Foulds readily conceded that he

20   was not at all injured by the Defendant in this interaction.

21   And having reviewed the evidence, I believe the Defendant

22   was primarily trying to prevent Officer Foulds from closing

23   the door and to ward off Officer Foulds's baton strikes

24   rather than mounting a serious attack on Officer Foulds.

25          I now turn to Count 21, charging Mr. Stevens with

1    felony assault on Sergeant Gonell:  The first element is

2    whether the Defendant assaulted, resisted, opposed, impeded,

3    intimidated or interfered with Sergeant Gonell.  The

4    evidence overwhelmingly shows that by pressing against

5    Sergeant Gonell with the shield, Mr. Stevens did all of

6    these things.  The defense has not argued otherwise.

7           Mr. Stevens also did so forcibly and

8    intentionally, satisfying the third and fourth elements of

9    the offense.  I note he called Sergeant Gonell a pussy while

10   he did all of this, underlining that his actions were not

11   accidental.

12          The final two elements of 111(a)(1) are also

13   easily met here.  Sergeant Gonell was engaged in the

14   performance of his duties and Mr. Stevens made physical

15   contact with him.  Additionally and in the alternative,

16   Mr. Stevens was also acting with the intent to commit civil

17   disorder, a felony.

18          While the defense has not really contested any of

19   this, Ms. Cobb rejects the suggestion that her client used a

20   deadly or dangerous weapon as defined in Section 111(b).

21   She notes Sergeant Gonell didn't even really claim to have

22   been injured by Mr. Stevens's actions, only that he felt

23   uncomfortable, was frustrated and felt impeded.

24          I think this understates Sergeant Gonell's

25   testimony slightly.  He also spoke about the burning

1    sensation he felt when his face shield was pushed up and

2    that his head was pushed back in an awkward manner.

3            Sergeant Gonell also initially testified that

4    Mr. Stevens had struck him with a stolen baton, but the

5    Government has not relied on that claim and I do not credit

6    Sergeant Gonell's assertion on that point.

7            Ultimately, I agree with Mr. Stevens that the

8    Government has not proven the deadly weapon element beyond a

9    reasonable doubt.  Sergeant Gonell's injuries seem to have

10   come from other rioters, not Mr. Stevens.  And having

11   carefully reviewed the video evidence, I think Mr. Stevens's

12   use of the shield was substantially similar to the actions

13   of most of the other rioters at the front of the line -- and

14   those of the frontline officers -- who were all using the

15   shields to push against one another.

16           I think the dislocation of Sergeant Gonell's face

17   shield and helmet are not of themselves the types of actions

18   likely to cause serious injury or death, even if they were

19   intentionally caused by Mr. Stevens.

20           More, Sergeant Gonell was not being crushed

21   between Mr. Stevens's shield and a fixed object, as Officer

22   Hodges was.

23           The video evidence shows an officer clearly

24   pushing into Sergeant Gonell's back to support him against

25   the opposing line.  That officer could have relented and

1    given Sergeant Gonell escape space had he been in danger of

2    serious injury.

3              For all these reasons, I find Mr. McCaughey guilty

4    on Count 24 as charged, guilty on Count 25 of

5    Section 111(a)(1), but not guilty of the 111(b) enhancement.

6    And I find Mr. Stevens guilty on Count 21 of Section 111(a),

7    but not guilty of the Section 111(b) enhancement.

8              I turn now to Count 12, which charges Mr. Mehaffie

9    with aiding and abetting violations of 111(a)(1) from 2:40

10   to 3:18 p.m.

11             Much of my analysis, however, focuses on the time

12   from 2:52 to 3:18 p.m., during which Mr. Mehaffie perched on

13   a ledge out outside the tunnel.  The elements are the same

14   as the aiding and abetting counts against Mr. McCaughey and

15   Mr. Stevens, which I stated at the outset.

16             So for Defendant Mr. Mehaffie to be guilty, others

17   must have committed Section 111(a)(1) violations during that

18   timeframe.

19             It is obvious that they did:  During all of that

20   time, rioters packed the tunnel, attacking the police line

21   and pressing against it, all with the intent to commit civil

22   disorder as I previously described in the prior counts.

23             That finding takes care of the first aiding and

24   abetting element, which is that others commit

25   Section 111(a)(1) offenses.

1          The second element is that Mr. Mehaffie knew that

2     assaulting, resisting, opposing, impeding or interfering was

3     going to be committed by others or was being committed by

4     others.  The video evidence shows clearly that he knew

5     others were engaged with police officers.  Indeed, he was at

6     the front of the police line at 2:42 p.m. while others

7     around him were striking at police.  I'm looking to Exhibit

8     921 for that.

9          So by the time he ascended to the elevated

10    position right outside the tunnel, Mr. Mehaffie already had

11    seen rioters engage with police.  And then from his perch,

12    Mr. Mehaffie saw rioters near him hurling objects into the

13    tunnel, spraying various substances as well as pushing as a

14    group.  This is all shown in Exhibit 101.2.

15         I believe he saw that activity, which was so close

16    to him.  And to make more clear that he knew others were

17    interfering with police, Exhibit 950 is a cell phone video

18    taken from a similar vantage point as Mr. Mehaffie's and

19    mere feet away from him.  It clearly shows police helmets

20    pressed against the rioters.  Situated just behind that same

21    perspective, Defendant Mehaffie saw the rioters were

22    impeding police.

23         I specifically reject any notion that he couldn't

24    see into the tunnel because of the lighting or because

25    people's heads blocked his view.  Of course he couldn't see

1    everything perfectly, but I find he clearly saw the fighting

2    at the front and was well aware of what was happening.

3              The third element is that Mr. Mehaffie performed

4    an act in furtherance of the offense.  This is very

5    straightforward.  Once Mr. Mehaffie took his position, he

6    began to direct rioters into the tunnel.  Upon review of the

7    entire video, I count at least 12 times where he gestured

8    rioters into the tunnel.  And I'm looking again to

9    Exhibit 101.2.

10             True, as he noted during his testimony, he also

11   guided other rioters out of the tunnel as part of a

12   makeshift system in which he told rioters how to enter and

13   how to exit.  But the element merely requires an act in

14   furtherance of the resistance against officers.

15   Mr. Mehaffie's repeated efforts to get new people into the

16   melee obviously furthered their interference, impeding and

17   opposing police officers.

18             And at 2:56 p.m., Mr. Mehaffie even helped pass a

19   shield to the rioters at the other end of the tunnel,

20   thereby actively assisting their continued interference.

21   And again I'm looking to Exhibit 101.2.

22             I find that Mr. Mehaffie's gestures coincided with

23   attacks on the officers.  He directed rioters into the

24   tunnel at 2:56 p.m.  According to Sergeant Bogner's

25   body-worn camera, rioters further into the tunnel were at

1    the same time pressed against police.  This happened at 3:12

2    p.m., when Mr. Mehaffie waved in rioters while those in the

3    tunnel engaged in a coordinated push against the police

4    line.  And I'm looking again to Exhibit 101.2.  The

5    simultaneous addition of more rioters at Mr. Mehaffie's

6    direction helped that interference with police officers.

7           The final two elements are the most disputed of

8    this charge.  The fourth element is that Mr. Mehaffie

9    knowingly performed his acts for the purpose of aiding,

10    assisting, soliciting, facilitating or encouraging others in

11    committing the offense.

12           The fifth element requires him to act with the

13    intent that others commit the offense.  Mr. Mehaffie argues

14    that he intended to keep people safe.  During his testimony,

15    he recounted how a friend of his had been injured at a The

16    Who concert in the 1970s because a number of concertgoers

17    got stuck between locked doors and the crush of the crowd

18    behind them.

19           Mr. Mehaffie said that on January 6th, he grew

20    panicked and fearful that another crush might happen unless

21    he directed traffic into and out of the tunnel; thus, he

22    told rioters on which side of the tunnel to enter and on

23    which side to exit.  He did not intend for anyone to get

24    hurt, according to him.

25           I credit that Mr. Mehaffie grew panicked during

1   the initial moments, given his knowledge of the concert and

2   his own experience in the tunnel.  However, I think he

3   overstates the extent to which this initial experience and

4   recollection directed his subsequent activities.  The risk

5   of a crush increases with more people, yet Mr. Mehaffie

6   continued to direct more people into the tunnel.  And his

7   own words at the time prove that he did so to continue the

8   interference with the police officers.  Just after taking

9   his position above the fray, Mr. Mehaffie yelled to those

10  below, "We don't hurt them; we push" at Exhibit 301 at one

11  minute and 23 seconds.

12          Seconds later, he tells the same group to "Push"

13  again, at two minutes and nine seconds.  He more than most

14  would know from The Who concert that pushing in a confined

15  space is actually quite dangerous to all involved.  He also

16  helped pass a shield forward in the crowd, an action that is

17  inconsistent with his purported motives and one that he

18  rightly admitted he now regrets.

19          From all of these actions, I conclude that even if

20  he wanted to minimize injuries to protesters, he still

21  wanted those entering the tunnel to continue their

22  disruptive efforts against the police.  These two intentions

23  not mutually exclusive.

24          For these reasons, I conclude beyond a reasonable

25  doubt that Mr. Mehaffie directed rioters into the tunnel

1    with the intent and purpose that they would interfere with

2    police officers.

3            I note that the Government has not argued he

4    wanted the crowd to assault the officers.  Indeed, there was

5    evidence of him repeatedly telling people not to hurt the

6    officers and of him taking poles and other potential weapons

7    away from the rioters.  And I'm looking to his Exhibit BBB.

8            While these were important exculpatory steps, they

9    do not help him to escape liability for the nonassaultive

10   conduct, including resisting, opposing and interfering with

11   officers.

12           I also specifically find that he and those he was

13   aiding and abetting were acting with the intent to commit

14   civil disorder.  I therefore find Mr. Mehaffie guilty on

15   Count 24 of aiding and abetting a felony violation of

16   Section 111(a).

17           Next, the Government charges all Defendants in

18   Count 34 with obstruction of an official proceeding in

19   violation of 18 USC Section 1512(c)(2).  The elements for

20   this crime are as follows:  First, the Defendants attempted

21   to or did obstruct or impede an official proceeding; second,

22   the Defendants intended to obstruct or impede an official

23   proceeding; third, the Defendants acted knowingly with

24   awareness that the natural and probable effect of their

25   conduct would be to obstruct or impede the official

1      proceeding; and, fourth, the Defendants acted corruptly.  To

2      act corruptly, a defendant must use unlawful means or act

3      with an unlawful purpose.  The Defendant must also act with

4      consciousness of wrongdoing, which means with an

5      understanding or awareness that what the person is doing is

6      wrong.

7             I note that all parties have now agreed to this

8      definition.  I think the Government has proven the first

9      element as to all three Defendants.  I find that their

10     actions, battling police officers on the doorstep of the

11     Capitol Building, had the natural and probable effect of

12     obstructing and impeding the certification.  It was

13     impossible for this official proceeding to continue,

14     especially given the presence of so many other rioters with

15     whom they were working in concert.

16            Inspector Hawa's testimony makes clear that

17     Capitol Police stopped the certification because of the

18     rioters outside and inside the building.  I'm looking to

19     Exhibit 1000, Pages 16 and 17.

20            To show the Defendants' intent, the Government

21     notes that each Defendant traveled from out of state for the

22     Stop the Steal Rally.  Each then marched from the rally to

23     the Capitol and each was involved in a protracted and

24     violent struggle to get into the Capitol.

25            As to the first two points, I think those are only

1    weak evidence of an intent to obstruct the certification.

2    Thousands of people attended the Stop the Steal Rally, and I

3    think many, if not most, did not come to obstruct the

4    certification.  As I've heard in other January 6th cases,

5    many came just to see the president before he left office or

6    to lend him moral support or to voice their disappointment

7    with the election result.

8           Similarly, much of the crowd at the Ellipse ended

9    up walking to the Capitol grounds.  They went for various

10   reasons, including, but not limited to, because they

11   expected the president was going to be there as he said he

12   was going to go there and because that's where the crowd

13   headed.

14          The third point, that the Defendants involved

15   themselves in a violent struggle to enter the building, is

16   more convincing.  That's where the certification was

17   supposed to be occurring, and it is natural to assume that

18   someone who is willing to battle police to get inside a

19   building must have a great interest in what is going on

20   inside.

21          Those actions, combined with the fact that the

22   Defendant had just participated in a rally entitled Stop the

23   Steal, certainly suggest that they intended to "stop the

24   steal" by breaking into the Capitol Building and preventing

25   the certification.

1        I note Officer Abdi testified on direct

2    examination that he thought rioters were trying to hurt

3    members of Congress or to destroy property inside the

4    Capitol Building.

5        Both of these hypotheses are certainly plausible,

6    and neither of them would necessarily meet the requisite

7    intent here.  So I think these general allegations help the

8    Government, but are not alone sufficient.  The Government

9    does not suggest otherwise, and it provides additional

10   details as to each Defendant that I consider separately.

11       As to Mr. McCaughey, I find the Government has

12   proven the second element.  I believe he intended to

13   obstruct and impede the certification.  In addition to the

14   general evidence I just mentioned, the Government notes that

15   he's admitted to being concerned about the election

16   integrity, that he spoke repeatedly with Mr. Paranjape about

17   his concerns with election fraud, that he heard President

18   Trump speak about the certification being in progress, that

19   he told the officers to "Go home" and that "Our issue is not

20   with you" and that "People in there make more in a month

21   than you do in a year.  Why are you risking your life for

22   them?"

23       Having considered all this evidence, I find that

24   these statements show Mr. McCaughey was knowledgeable about

25   the certification and was intent on stopping it.  His

1    repeated allusions to congressional representatives suggest

2    his focus was on them and stopping their work of certifying

3    the election.  And his prior discussions about election

4    fraud and testimony about the certification process

5    confirmed his knowledge of the electoral count.

6         I've considered his claim that he thought the

7    certification was complete and that he just wanted to

8    protest inside, and I find that incredible.  There is no

9    reason to think protesting inside the Capitol Building would

10    be any more impactful or efficacious unless he hoped that it

11    would obstruct the certification.

12         More, having carefully observed his demeanor and

13    testimony on the witness stand, this was one of several

14    claims by him I found to be unbelievable and inconsistent

15    with the facts and common sense.

16         Similarly, his claim that he was acting with not a

17    lot of awareness of what was going on is also incredible.

18    For the same reasons, I find the Government has proven the

19    third element that Mr. McCaughey acted knowingly.

20         Finally, I find that he acted corruptly, that is,

21    he used unlawful means -- assaulting police officers -- and

22    with consciousness of wrongdoing.  No one could think

23    battling police officers in these circumstances was

24    acceptable.  In particular, I note that even after he saw

25    Officer Hodges injured, he carried on to battle against

 1     Officer Foulds.  I have no doubt that he understood what he

 2     was doing was wrong.

 3              For all these reasons, I find Mr. McCaughey guilty

 4     on Count 34.

 5              Turning now to Mr. Stevens:  The Government notes

 6     that he filmed a portion of the rally in which Professor

 7     Eastman said, "We are demanding that Vice President Pence

 8     this afternoon at 1:00 p.m. -- that he let the legislature

 9     take a look at this."

10              In addition, Mr. Stevens said to an officer, "Do

11     you know what happens when you commit treason?"  And he gave

12     a thumbs up when the police line broke.

13              I find that the Government has not met its burden

14     on this element.  The Government's evidence against

15     Mr. Stevens on this count is thinner than its evidence

16     against either Co-Defendant.  Even assuming the Defendant

17     was carefully listening to Professor Eastman and not just

18     videoing the size of the crowd, which seems more likely to

19     me, Professor Eastman specifically mentioned 1:00 p.m.,

20     while the Defendant didn't try to enter the Capitol Building

21     until well after 2:00 p.m.

22              Mr. Stevens's actions and statements, however

23     odious, are consistent with various intentions, including

24     that he was just angry at the congressmen and officers and

25     wanted to hurt them and damage the Capitol for their *fait*

1    *accompli*.  I therefore find him not guilty on Count 34.

2              As to Mr. Mehaffie, the Government points to the

3    fact that he knew about the certification process from 2017;

4    he strenuously urged family members to attended the rally;

5    he's admitted to hearing President Trump say the vice

6    president could do something about the certification; his

7    decision to leave his family on the Capitol lawn to climb to

8    the tunnel entrance; his statements that "If we can't fight

9    over this wall, we can't win this battle" and "We don't want

10   to hurt you, but it's our Capitol"; and his efforts to

11   negotiate with officers and placate the crowd outside the

12   tunnel.

13             In response, Mr. Shipley points out that

14   Mr. Mehaffie had testified that he knew the certification

15   goes quickly and that he believed it was already over by the

16   time he got to the Capitol and the fact that his family was

17   near the end of the crowd going to the Capitol.

18             I cannot discredit Mr. Mehaffie on this point.  He

19   testified in some detail about his prior knowledge of the

20   certification process and he also testified that his family

21   had discussed on the way to the Capitol that Vice President

22   Pence had made clear that he believed he had no option but

23   to certify the election and that the certification had

24   likely already occurred.

25             This was broadly consistent with the uncontested

1    testimony that they were near the end of the crowd heading

2    to the Capitol and with Mrs. Mehaffie's testimony that they

3    wanted to show Congress that people are concerned about

4    voter fraud, not that they thought they could stop the

5    certification.

6         It is certainly plausible that Mr. Mehaffie had

7    some change of heart after he was separated from his family

8    or that he learned that the certification had not yet

9    occurred at some point while on the Capitol grounds.  But

10   the Government has introduced no evidence on these points.

11        Ultimately, the burden is on the Government to

12   prove each element of the crime.  As the Government argues,

13   it rarely has direct evidence of someone's intent, and

14   circumstantial evidence such as it has admitted here can be

15   persuasive.

16        But that effort is complicated where the Defendant

17   takes the stand and credibly disavows the Government's

18   theory.  I think his testimony is enough to raise a

19   reasonable doubt as to his intent in attempting to enter the

20   Capitol, and therefore find Mr. Mehaffie not guilty on

21   Count 34.

22        I move next to Count 25, which charges all

23   Defendants with civil disorder in violation of 18 USC

24   Section 231(a)(3).  I've already previewed my verdict on

25   this.  The first element of this offense is that the

1    Defendants knowingly committed an act or attempted to commit

2    an act with the intended purpose of obstructing, impeding or

3    interfering with one or more law enforcement officers.

4            Much of what I've already said applies to this

5    element.  Each Defendant knowingly engaged in multiple

6    actions to impede the work of law enforcement officers.

7    Although I think this point is self-evident from the video

8    evidence, I mainly look to Mr. McCaughey's joining a mass

9    push against the police line at 2:51 p.m., Mr. Stevens's

10   coordination of a heave-ho against officers at exactly the

11   same time and Mr. Mehaffie's directing rioters into the

12   tunnel as actions that Defendants knowingly took with the

13   intended purpose of impeding and interfering with law

14   enforcement officers.

15           I've already rejected Mr. Mehaffie's argument that

16   when he directed rioters at the mouth of the tunnel he did

17   not intend to impede the officers at the other end.

18           The second element is that at the time of the

19   Defendants' acts, law enforcement officers were engaged in

20   the lawful performance of their official duties incident to

21   and during a civil disorder.  As I've already said, these

22   officers were obviously engaged in the lawful performance of

23   their official duties.

24           The statute defines "civil disorder" as any public

25   disturbance involving acts of violence by assemblages of

1    three or more persons which causes an immediate danger of or

2    results in damage or injury to the property or person of any

3    other individual.  I find that the events of January 6th,

4    2021, qualify.

5         Again, this is largely self-evident from the

6    totality of the video evidence and testimony in this case.

7    Thousands of rioters gathered on the Capitol that day and

8    committed numerous acts of violence against officers.

9         For example, this trial featured video of a rioter

10   forcibly grabbing the mask off of the face of Officer Hodges

11   in the tunnel.  In other videos, rioters were shown poking

12   at the police line with various objects.  I'm looking at

13   Exhibit 301, timestamp seven minutes and 22 seconds and

14   eight minutes and 31 seconds and Exhibit 411 at 29 seconds

15   and 34 seconds.  Even before then, Officer Chapman's

16   body-worn camera shows him in an altercation with a rioter

17   on the west front of the Capitol at 2:23 p.m. and the viewer

18   can see other rioters similarly engaged with officers in

19   that area on Exhibit 210.

20        Sergeant Mastony's and Lieutenant Donigian's

21   cameras capture rioters advancing into the police line and

22   engaging in hand-to-hand combat with officers just before

23   2:30 p.m. at Exhibits 215.1 and 232.10.  The video evidence

24   shows beyond any reasonable doubt that numerous acts of

25   violence occurred at the Capitol that day.  Sergeant Mastony

1    testified that 14 of his officers were injured by rioters on

2    January 6th.

3         The evidence also shows windows being shattered,

4    government fencing and other materials being damaged and

5    that a civilian died in the tunnel during the commotion.

6         The third element is that the civil disorder in

7    any way or degree obstructed, delayed or adversely affected

8    either interstate commerce or the movement of any article or

9    commodity in interstate commerce or the conduct or

10   performance of any federally protected function.

11        I've already reviewed the evidence submitted by

12   the Government as to the performance of Safeway on January

13   6th.  According to Exhibit 701, Safeway closed its D.C.

14   locations at 4:00 p.m. on January 6th.  When Safeway

15   communicated that decision to employees, Mayor Bowser had

16   already announced a citywide curfew to begin at 6:00 p.m.

17   that night, according to Exhibit 710.

18        Safeway's decision to close clearly hurt its

19   business and obstructed interstate commerce.  Exhibit 702

20   shows that almost every Safeway location in the District

21   suffered large decreases in sales and revenue compared to

22   the same date one year earlier.  Some stores lost as much as

23   50 percent of their typical revenue.  And the stipulated

24   testimony of Safeway manager Mr. Tippet found at

25   Exhibit 1002 discusses how Safeway stores could not receive

1    shipments of inventory on the night of January 6th.

2         So I find interstate commerce was indeed

3    obstructed at Safeway on January 6th.

4         The Defendants argue that, even so, it was the

5    mayor's curfew that obstructed commerce, not the ongoing

6    civil disorder at the Capitol.

7         I disagree.  The mayor's order was made necessary

8    only by the civil disorder, so I cannot view it as some

9    superseding event for purposes of causation.

10        Without the events at the Capitol, there would be

11   no curfew and therefore no effect on interstate commerce.

12   In any event, Safeway did not need to shut down a full two

13   hours ahead of the curfew.

14        Mr. Tippet testified that Safeway made the

15   shutdown decision, quote, "for the safety of the employees

16   due to the incident down at the Capitol," closed quote, at

17   Exhibit 1002, Page 4.

18        I conclude that even if the events at the Capitol

19   could be viewed as separate from the curfew order, Safeway

20   closed its doors and stopped the flow of interstate commerce

21   because of the events at the Capitol.

22        For these reasons, I find all three Defendants

23   guilty on Count 35.

24        Before I proceed to the next counts, I want to

25   make a few observations that are generally relevant to them

1    and all Defendants:  Under the statute, a "restricted

2    building or grounds" means any posted, cordoned-off or

3    otherwise restricted area of a building or grounds where a

4    person protected by the Secret Service is or will be

5    temporarily visiting.

6            Captain Ortega testify that the vice president was

7    in the Capitol for the Electoral College certification.  In

8    stipulated testimony, Inspector Hawa of the Secret Service

9    also explained the boundaries and process for creating the

10   restricted area on January 6th.

11           I credit this testimony that the restricted area

12   on that day extended from the west front of the Capitol down

13   the west lawn to the Garfield and Peace Memorials, as

14   indicated by the red line in Exhibit 508.

15           Mr. Stevens has argued at various points that the

16   vice president cannot temporarily visit a building where he

17   has an office.

18           No judge in this district has agreed with this

19   argument.  I do not either, for the reasons stated by Judge

20   Contreras in *United States versus Andries*, 2020 Westlaw

21   768684 at *16 from this district on March 14th, 2022.  No

22   testimony elicited in this trial has raised any doubts in my

23   mind on this point.

24           I also find that on the morning of January 6th,

25   the restricted area was clearly marked with snow fencing and

1    "Area Closed" signs.  I recognize that by the time the

2    Defendants entered the area some of that fencing may have

3    been damaged or removed.  Nonetheless, at least by the time

4    they entered the tunnel, I have no doubt each one of them

5    knew they could not be there; in other words, that they had

6    entered a restricted area.

7          They have climbed walls and scaffolding, passed by

8    battles with law enforcement officers, heard the LRAD system

9    blaring and other various alarms sounding in the tunnel and

10   observed OC spray in the air.  And, of course, it was

11   perfectly obvious to them the police were trying to get them

12   out of the tunnel.  So I find that each of them knowingly

13   entered a restricted area on January 6th, 2021.

14         Now to the specific counts:  Counts 36 and 37

15   charge Mr. McCaughey and Mr. Stevens with disorderly and

16   disruptive conduct in a restricted building or grounds with

17   a deadly or dangerous weapon in violation of 18 USC

18   1752(a)(2) and (b)(1)(A).

19         The first element is that the Defendants engaged

20   in disorderly or disruptive conduct in or in proximity to

21   any restricted building or grounds.  Disorderly conduct

22   occurs when a person is unreasonably loud and disruptive

23   under the circumstances or interferes with another person by

24   jostling against or unnecessarily crowding that person.

25   Disruptive conduct is a disturbance that interrupts an

1    event, activity or the normal course of a process.

2             For many of the reasons discussed, Defendants

3    McCaughey and Stevens engaged in disorderly conduct.  They

4    jostled against police officers in the tunnel and pressed up

5    against police at various times.  I've already explained the

6    "restricted building or grounds" definition and explained

7    why the Government has met this portion of the element.

8             The second element is that the Defendants engaged

9    in their conduct knowingly and with the intent to impede and

10   interrupt the orderly conduct of government business or

11   official functions.

12            As discussed in other counts, and for those

13   reasons, I find that Mr. McCaughey and Mr. Stevens knowingly

14   engaged in disruptive conduct and they had an intent to

15   disrupt the orderly conduct of business.

16            As to Mr. McCaughey, I've already explained that

17   he intended to obstruct the certification inside the

18   Capitol.  And like the other rioters on that day,

19   Mr. Stevens went to significant lengths to bypass the police

20   and enter the building.

21            Regardless of whether Mr. Stevens intended to

22   obstruct the certification, I find beyond a reasonable doubt

23   that, based on his efforts to enter the building, he

24   intended at least to disrupt the normal flow of

25   congressional business.

1          The third element is that the Defendants' conduct

2     occurred when, or so that, their conduct in fact impeded or

3     disrupted the orderly conduct of government business or

4     official functions.

5          This element is also easily met, as Inspector Hawa

6     testified the Capitol went into lockdown at 2:00 p.m.

7     because rioters had breached the security perimeter.  I'm

8     looking to Exhibit 1000 on Pages 16 and 17.  The Capitol

9     remained in lockdown until later that evening because of the

10    continued presence of the rioters.

11         The fourth and final element, that the Defendant

12    used or carried a dangerous weapon:  "Deadly or dangerous

13    weapon" has the same definition as above in Counts 21, 24

14    and 25.  My analysis on this element is the same as it is in

15    those counts.  Accordingly, I find the Defendant

16    Mr. McCaughey guilty on Count 37 of disruptive conduct with

17    a dangerous weapon.

18         For Mr. Stevens, I find him guilty on Count 36 of

19    disruptive conduct under 18 USC 1752(a)(2), but not guilty

20    of the dangerous weapon enhancement in 1752(b)(1)(A).

21         Turning next to Counts 44 and 45, which charge

22    Mr. McCaughey and Mr. Stevens with physical violence in a

23    restricted building or grounds with a deadly or dangerous

24    weapon in violation of 18 USC 1752(a)(4) and (b)(1)(A):  The

25    first element is that the Defendants engaged in any act of

1   physical violence against any person or property in any

2   restricted building or grounds.

3          The term "restricted building or grounds" is the

4   same definition I've already mentioned, and I find it is met

5   for the reasons I previously stated.

6          Mr. McCaughey and Mr. Stevens engaged in physical

7   acts of violence.  They both pushed against officers in the

8   tunnel.  They also used shields to shove police officers.

9   Mr. McCaughey had an altercation with Officer Foulds where

10  he struck him with a stolen shield; and Mr. Stevens used a

11  shield to press into the body, face and helmet of Sergeant

12  Gonell.

13         Regardless of whether those shields are dangerous

14  weapons, those acts constitute acts of physical violence.

15         The second element is the Defendants acted

16  knowingly.  Again, much of what I have said before is

17  relevant here as well.  When in front of Officer Hodges,

18  Mr. McCaughey did not try to retreat; instead, he pressed

19  forward and told the officer to go home.  He also stayed to

20  engage Officer Foulds even though he had room to retreat.

21         Mr. Stevens likewise pressed forward into the

22  police line.  Video also shows him adjusting the placement

23  of his shield to further attack Sergeant Gonell.  And at one

24  point, he tried to grasp another officer's baton, all while

25  refusing to back up.

1          In light of that evidence, I find that both men

2    knowingly undertook their acts of physical violence.

3          The third element is that in doing such acts, the

4    Defendants used or carried a deadly or dangerous weapon.

5    "Deadly or dangerous weapon" has the same definition as in

6    the other charges already considered.

7          My conclusion on this element is the same as it is

8    in those counts.  Accordingly, I find Mr. McCaughey guilty

9    on Count 45 of physical violence with a dangerous weapon and

10   I find Mr. Stevens guilty on Count 44 under 18 USC

11   1752(a)(4), but not guilty of the dangerous weapon

12   enhancement found in 1752(b)(1)(A).

13         Turning now to Count 52, which charges all

14   Defendants with disorderly or disruptive conduct in a

15   Capitol building or grounds in violation of 40 USC

16   5104(e)(2)(D):  The first element of this offense is that

17   the Defendants engaged in disruptive conduct in any of the

18   U.S. Capitol buildings and, of course, the Capitol Building

19   is covered in that definition.  And "disorderly and

20   disruptive conduct" has the same definition I've already

21   discussed for Counts 36 and 37.

22         I've already discussed how Mr. McCaughey and

23   Mr. Stevens engaged in disorderly or disruptive conduct.

24   So, too, for Mr. Mehaffie.  He jostled officers at one end

25   of the tunnel and, although without any visible weapon, he

1    crowded them.  And his loud directions to passing rioters

2    continued a disturbance that impeded the business of

3    Congress on that day.

4          I reject Mr. McCaughey's argument that he was not

5    yet in the Capitol Building.  The tunnel is an enclosed

6    portal leading directly to the inner parts of the building

7    and is accessed from outside the Capitol.  He was far enough

8    in to be considered in the building.  Indeed, at one point

9    he entered a set of doors, the first set of doors.

10          In any event, the statute prohibits disruptive

11   conduct at any place in the grounds.  Given his close

12   proximity to the Capitol, indeed I think it is inside the

13   Capitol.  The tunnel was undoubtedly part of the Capitol

14   grounds.

15          The second element is that the Defendants did so

16   with the intent to impede, disrupt or disturb the orderly

17   conduct of a session of Congress or either house of

18   Congress.  Again, I've already explained how Mr. McCaughey

19   and Mr. Stevens acted with this intent.

20          I also find that Mr. Mehaffie did so as well.  He

21   testified that he knew other rioters were trying to enter

22   the building or to in some way disrupt congressional

23   business.  He directed those rioters to continue doing so.

24   As explained in Count 12, Mr. Mehaffie's stated intent was

25   to keep everybody safe.  Nonetheless, that still entailed an

1    intent to let others into the tunnel for purposes of getting

2    into the building.

3            The third and final element is that the Defendants

4    acted willfully and knowingly.  A defendant acts willfully

5    if he acts with the intent to do something the law forbids;

6    that is, to disobey or disregard the law.  I've already

7    described that all Defendants acted knowingly.  I've also

8    decided that they acted willfully.  All undertook their

9    actions with the intent to at least enter a restricted area.

10           And I find it unbelievable that they did not know

11   the law prohibited them and others from engaging in fights

12   with the police officers.

13            Accordingly, I find all three Defendants guilty

14   on Count 52.

15           Finally, Count 53 charges all Defendants with acts

16   of physical violence in the Capitol grounds or building in

17   violation of 40 USC 5104(e)(2)(F).  The first element is

18   that the Defendant engaged in an act of physical violence in

19   the Capitol grounds or in any of the Capitol buildings.

20           "Act of physical violence" is defined as any act

21   involving an assault or infliction or threat of infliction

22   of death or bodily harm on an individual; or, two, damage to

23   or destruction of real or personal property.

24           For Mr. McCaughey and Mr. Stevens, their

25   altercation with Officer Hodges and Sergeant Gonell

1    respectively qualify as acts of violence.  Those officers

2    testified that they felt bodily harm from those incidents.

3           No such evidence attends Mr. Mehaffie.  Although

4    he came into contact with the police line, he kept his hands

5    above his head and was pushed by someone behind him into the

6    police.  This is all shown in detail on Mehaffie Exhibit

7    BBB.

8           The Court therefore finds that Mr. Mehaffie

9    engaged in no act of physical violence himself.  That said,

10   the indictment includes the aiding and abetting statute, 18

11   USC Section 2.  Mr. Mehaffie's counsel argued at closing

12   that merely citing Section 2 is not enough to charge aiding

13   and abetting.  According to him, the written description of

14   the charge must include some discussion of aiding and

15   abetting.

16          I heard no argument from the Government on this

17   point.  But under binding precedent in this circuit, quote,

18   "The federal statute creating liability for aiding and

19   abetting is considered embodied in every federal

20   indictment," closed quote, from *United States versus Kelly*,

21   552 F.3d 824, Page 832, from the D.C. Circuit in 2009.

22          Indeed, a jury may receive an aiding and abetting

23   instruction even, quote, "where the indictment does not

24   allege a violation of the aiding and abetting statute," from

25   *United States versus Kegler*, 724 F.2d 190, Page 200 to 201,

1    from the D.C. Circuit in 1983.

2         The indictment here does include such an

3    allegation, so I may consider whether Mr. Mehaffie aided and

4    abetted acts of physical violence.

5         For many of the same reasons I've stated in the

6    other charges, I find that he did.  Mr. Mehaffie directed

7    rioters into a tunnel, where many of them berated police and

8    pushed against them.  These are acts of physical violence.

9         The second element is that the Defendants did so

10   knowingly and willfully.  As discussed before, I conclude

11   that Mr. McCaughey and Mr. Stevens acted knowingly and with

12   the knowledge that the law prohibited their actions.

13        I also find that Mr. Mehaffie acted knowingly and

14   willfully when he aided and abetted similarly knowing and

15   willful violations of 40 USC 5104(e)(2)(F).  What I said in

16   my analysis of Count 12 governs here.

17        Accordingly, I find Mr. McCaughey and Mr. Stevens

18   guilty on Count 53 as principals and Mr. Mehaffie guilty as

19   an aider and abettor.

20        Ms. Paschall, do you have any questions about my

21   verdict?

22        MS. PASCHALL:  No, your Honor.

23        THE COURT:  Mr. Urso?

24        MR. URSO:  No, your Honor.

25        THE COURT:  Ms. Cobb?

```
 1              MS. COBB:  No, your Honor.

 2              THE COURT:  Mr. Shipley?

 3              MR. SHIPLEY:  No, your Honor.

 4              THE COURT:  Is the Government seeking a change in

 5    the release conditions as to Defendant Mehaffie?

 6              MS. PASCHALL:  For Mehaffie and Stevens, no.

 7              For McCaughey, yes.  Now that he's been convicted

 8    of a crime of violence, we would ask for a step-back.

 9              THE COURT:  Ms. Chaclan, can we look for a

10    sentencing date for Mr. Mehaffie?

11              How about January 13th at 10:00 a.m.?

12    Ms. Paschall, does that work for the Government?

13              MS. PASCHALL:  10:00 a.m., your Honor?

14              THE COURT:  Yes.

15              MS. PASCHALL:  Yes.  That's fine.

16              THE COURT:  Mr. Shipley, does that work for you?

17              MR. SHIPLEY:  Your Honor, I'm afraid that date

18    does not work for me.  I have a civil trial in Hawaii.

19              THE COURT:  That's fine.

20              Ms. Cobb, does that work for you?

21              MS. COBB:  The 13th of January?  Is that what you

22    said?

23              THE COURT:  Yes.  At 10:00 a.m.

24              MS. COBB:  Yes.

25              THE COURT:  I'll instruct you, Mr. Stevens,
```

1    Mr. Mehaffie and Mr. McCaughey, for each of you I'll be

2    asking the probation office to prepare a presentence report

3    to assist me in sentencing.  You may be present for that

4    interview.  And if you wish, you may also ask for your

5    attorney to be present.  You'll have an opportunity to

6    object to the presentence report before it's completed and

7    again before I see it.

8            Mr. Stevens, I'll direct you to return for

9    sentencing on Friday, January 13th, at 10:00 a.m. in this

10   courtroom and to continue to abide by the release conditions

11   that you're currently on.  I'll also ask for any memoranda

12   in aid of sentencing to be filed by January 6th.

13           Mr. Shipley, when are you free, sir?

14           MR. SHIPLEY:  Your Honor, if it would be

15   permissible, could I communicate to your clerk?  I'm having

16   trouble getting my calendar.  Could I communicate to your

17   clerk dates that I'm available in that timeframe?

18           THE COURT:  Well, no.  I'm going to set a date.

19   If you need to ask for a continuance, that's fine.

20           MR. SHIPLEY:  Okay.  We'll do that.  I think the

21   week following the week the Court suggested is okay.  It's

22   going to be a short trial.  It's been reset three times and

23   I'm confident it's going this time.

24           THE COURT:  I'll actually in trial all that week.

25   Now about Friday the 27th at 10:00 a.m.?

```
 1              MR. SHIPLEY:  I'll either make it work or
 2     communicate with the Court.
 3              THE COURT:  Ms. Paschall, does that work for you?
 4              MS. PASCHALL:  The 27th at 10:00 a.m. is fine,
 5     your Honor.
 6              THE COURT:  So, Mr. Mehaffie, I'll direct you to
 7     report for your sentencing at 10:00 a.m. on Friday, January
 8     27th, in this courtroom.  And I'll direct any memoranda in
 9     aid of sentencing to be filed by January 20th.
10              Ms. Cobb, anything further for your client?
11              MS. COBB:  No, your Honor.
12              THE COURT:  And, Mr. Shipley, anything further for
13     your client?
14              MR. SHIPLEY:  Nothing, your Honor.
15              THE COURT:  You all are dismissed.  Thank you.
16              Mr. Urso, I'll hear from you on release
17     conditions.
18              MR. URSO:  Thank you, your Honor.
19              The first point I'd just point out, your Honor, is
20     I know about ten days ago in this courthouse another
21     defendant in a different case before Judge Mehta -- he was
22     actually convicted of 111(b) and sentenced to ten years.
23     And he was allowed out.  And so sort of in terms of a
24     general equitable argument, I'd ask the Court to consider
25     that as one of the sort of circumstances, extenuating
```

1      circumstances.

2              Mr. McCaughey obviously has been out on a

3      substantial bond package with a perfect record, full

4      compliance, not a single problem since May of 2021.

5              And in addition, he's currently in the midst of

6      renovating his mother's house, the house that he lives in,

7      sort of an ongoing project.  He was hoping to get it

8      finished before he went in.  His mother's here.  It's just

9      him and his mom living in the house and he's going to sort

10     of leave her in the lurch as well.

11             For those reasons, your Honor, I'd ask that the

12     Court extend Mr. Mehaffie's [sic] conditions of release with

13     the other Co-Defendants.  I understand it's a higher

14     burden -- a high burden.  But we think especially in light

15     of what happened with Mr. Webster it wouldn't be

16     inappropriate.

17             THE COURT:  Mr. Urso, are you free on January 26

18     at 10:00 a.m.?

19             MR. URSO:  Yes, your Honor.

20             And the one other point I'd make is the

21     sentencings are a little longer than we normally have.  And

22     the pretrial confinement, as your Honor knows from the

23     pretrial proceedings, is a little bit different than prison

24     sentence confinement.  So with a little delay in the

25     sentencing, that's another extenuating circumstance I think

1    the Court should consider.  Mr. McCaughey, if he's

2    incarcerated now, is going to have to serve extra time --

3    extra more difficult time, I think, safe to say.

4              THE COURT:  Ms. Paschall, are you free on January

5    26 at 10:00?

6              MS. PASCHALL:  Yes, your Honor.

7              THE COURT:  I'm going to set sentencing for

8    January 26 at 10:00 a.m. in this courtroom.  I am also

9    directing counsel to file any memoranda in aid of sentencing

10   by January 19th.

11             The statutory test for bond post-conviction is the

12   Defendant must show and the Court must find by clear and

13   convincing evidence that the person is not likely to flee or

14   pose a danger to the safety of any other person or the

15   community to continue release pending sentencing.

16             Absent Government consent to release in

17   crimes-of-violence cases, no release is allowed unless the

18   Court makes the finding and there's substantial likelihood

19   for a motion for acquittal that a motion for acquittal or

20   new trial will be released.

21             I find the Defendant's release conditions should

22   be revoked.  I think there is evidence here that he's now

23   been found guilty of multiple assaults on law enforcement

24   officers; and as I've said, I did not believe his testimony

25   at several points and frankly don't trust that he would

1     return for sentencing.

2              Marshals, I'll ask you to take the Defendant into

3     custody and return him for sentencing on January 26.

4              Ms. Paschall, anything further for the Government?

5              MS. PASCHALL:  No, your Honor.  Thank you.

6              THE COURT:  Mr. Urso?

7              MR. URSO:  No, your Honor.  Just -- is there any

8     chance we could squeeze him in on the 13th?  Any reason we

9     couldn't?

10             THE COURT:  Yes.  I don't feel comfortable doing

11    two sentencings in one day.  I don't think that would be

12    fair to either Defendant.

13             Mr. McCaughey, step back with the marshals.

14             Thanks, folks.

15             (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE</u>

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 15th day of October, 2022.


<u>/s/ Lisa Edwards, RDR, CRR</u>
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269