UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. |
| | : | |
| KENNETH JOSEPH OWEN THOMAS, | : | 1:21-cr-00552 (CRC) |
| | : | |
| Defendant | : | |
| | : | |

_____

## KENNETH JOSEPH OWEN THOMAS' MOTION TO DISMISS FOR MULTIPLE SIGNIFICANT BRADY, GIGLIO AND JENKS VIOLATIONS

Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas"), through the undersigned counsel, John L. Pierce, Esq. and Roger I. Roots, Esq., hereby moves to dismiss this case, with prejudice, based on numerous significant and material Brady, Jenks, and Giglio violations. These violations are so outrageous and egregious that they justify the most severe sanctions available to the Court, including dismissal of this case with prejudice. Thomas presents this Motion and Memorandum of Law in support of this Motion. Additionally, Thomas notes that the law requires the striking of testimony of specific prosecution witnesses, and moves for an order alerting Metropolitan Police Department supervisors regarding the testimony of officers Campanale and Niewenhous.

## INTRODUCTION AND OVERVIEW

As the Court has been made aware, the prosecution in this case provided, by email, several previously-undisclosed FBI 302 reports on the night of May 17, 2023, at 7:43 PM. This was after all prosecution witnesses with the exception of Case Agent Brown had already finished testifying.

Defendant's chief investigator E. Lambert responded:  "I am referring to the passage in Campanale's 302 where it states, and I quote verbatim: '*Campanale has testified several times before, both in D.C. District Court and D.C. Superior Court, Campaanle testified in other January 6 cases, most recently in U.S. v. Wren*[1]. It was a long year (2020) for Campanale, and January 6th was "piggybacking" on that.'"

Turns out, however, only eight (8) days ago, in *Wren*, Donnie Duane Wren and  Thomas Harlen Smith were convicted of the very conduct that Campanele and others accused Defendant Thomas here of doing:

> According to evidence presented in court, Smith and Wren traveled from Mississippi and Alabama to D.C. to attend former President Trump's rally. After reaching the Capitol grounds, Smith entered the Tunnel, attempted to break a window with his flagpole, and pushed into the Capitol. Later, on the Upper West Terrace, Smith and Wren pushed against a police line –holding them back for twenty seconds. Smith then kicked an officer to the ground and threw a metal pole -- hitting an officer in the head. After the he left Capitol grounds, Smith messaged on Facebook, "we stormed the capitol."

**https://www.justice.gov/usao-dc/pr/two-cousins-found-guilty-eleven-felony-charges-including-assault-dangerous-weapon-related**

In the videos presented on Friday by the Defendant, the man also wearing a tan jacket, but with very long graying hair down his back, who actually assaulted police officers – while Thomas did not – ***is Donnie Duane Wren***.  Therefore, only 2-3 weeks ago, Officer Campanele testified against the actual person who shoved back police officers in *United States v. Wren* but then testified here in this case at bar that it was Defendant Thomas who committed those acts.

The Court may remember from the video Exhibit 711, Donnie Duanne Wren is shown actually doing what Defendant Thomas is accused of doing:

---

[1]     Criminal Case No. 21-cr-00599



Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014) (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)). "[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

Many trial attorneys over the centuries have had difficult clients. Organizational clients have superior resources to individuals, but can generate more confusion. Nevertheless, the Constitutional demands of not depriving an individual of his liberty simply because an organization like the Federal Bureau of Investigation or the U.S. Capitol Police or the U.S. Department of Justice loses, mishandles, or knowingly withholds information or misinforms line

prosecutors can never be justifiable for obtaining a criminal conviction.

Here, it – once again but very clearly – appears that after the battle cry of then U.S. Attorney [2] to mis-use the legal process to create "shock and awe" generated a hamburger joint like assembly line of charges thrown together carelessly and without adequate review of the evidence, even though the shortest statute of limitations is apparently five years.  See 18 U.S. Code § 3282.

Specifically, how did the Government indict Defendant Thomas with regard to five specifically-identified law enforcement officers (and the indictment is specific only to those particular officers in each of five counts) without every talking to any of them before two weeks ago?  Obviously, either that claim is inaccurate and the interview notes were withheld and/or the grand jury heard only the "summary witness" testimony of an FBI case agent lacking any personal knowledge other than watching videotapes.

Analyzing these includes the circumstances that Defendant Thomas did not enter the U.S. Capitol building, but that the allegations concern events on the Capitol Grounds.  When it comes to materiality of issues, testimony, and evidence, of course the Government has thrown twelve (12) Counts at the Defendant – not just the five (5) Counts of assault -- meaning that a properly zealous defense has to address all of these Counts as much as possible.

---

[2]     Michael Sherwin: "After the 6th, we had an inauguration on the 20th. So, I wanted to ensure, and our office wanted to ensure, that there was shock and awe that we could charge as many people as possible before the 20th. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, 'If we go there, we're gonna get charged.'"  See:  Inside the prosecution of the Capitol rioters, CBS News, Mar. 22, 2021, available at: **https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021- 03-21/**

Whatever one might think of the benefits of discouraging out of control demonstrations (although the evidence shows that leadership failed their rank-and-file officers and could have prepared properly, it is not acceptable to criminally convict innocent people or people guilty of lesser crimes than those actually charged).  (And recall that guilt or innocence (not proven) applies individually to each of the 12 separate Counts.)

Thomas is accused and being prosecuted, *inter alia*, under

    a.  Count One, 18 U.S.C. § 231(a)(3) -- Obstructing, impeding, or interfering with any law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder

    b.  Count Two, 18 U.S.C. § 1512(c)(2) – [Corruptly] Obstructing an Official Proceeding and [and/or] Aiding and Abetting [3]

    c.  Count Three, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers [specific officer named by initials][4]

    d.  Count Four, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers [specific officer named by initials]

    e.  Count Five, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers [specific officer named by initials]

    f.  Count Six, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers [specific officer named by initials]

    g.  Count Seven, 18 US.C. 111(a)(1) Assaulting, Resisting, or Impeding Certain Officers [specific officer named by initials]

    h.  Count Eight, 18 U.S.C. § 1752(a)(1)) -- Entering or Remaining in a Restricted Building or Grounds

    i.  Count Nine, 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building [or Grounds]

    j.  Count Ten, 18 U.S.C. § 1752(a)(4) – Engaging in Physical Violence in [on] a Restricted Building or Grounds

    k.  Count Eleven, 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building [or Grounds]

    l.  Count Twelve, 40 U.S.C. § 5104(e)(2)(F) – Act of Physical Violence in the Capitol Grounds or Buildings

The operative Second Superseding Indictment ("SSI") in this case, filed on December

---

[3]    Based on filings by the Government in *United States v. Rivera* especially including on appeal it appears that 40 U.S.C. § 5104(e)(2)(D) is a lesser-included offense of 18 U.S.C. § 1512(c)(2). However, both have been charged already in the indictment and are before the Court and the jury.

[4]    It occurs to counsel that in jury instructions the jury should be instructed the names of the officers not just their initials because the evidence was presented under their last names.

14, 2022, at Dkt. No. 49, contains no allegations of facts.  The statement of Facts was filed at

Dkt. # 1-1 against a "JOSEPH THOMAS" (which Thomas testified is the name he uses).  The

allegations are that Thomas is noticed in the evidence at the earliest at 3:09 PM and is observed,

the document claims, on body-worn ("bodycam") videos until 3:20 PM, when he left an area of

the "risers."  The statement of Facts then includes extensive factual allegations of encounters

with law enforcement especially from around 4:22 PM through 4:30 PM.

      The recess of the Joint Session of Congress on January 6, 2021, began at 2:13 PM when

Speaker Nancy Pelosi's security detail whisked her away from the Speaker's dais and she

"tossed" (figuratively speaking) the presiding officer status to Rep. Jim McGovern (D. - Mass.)

During the prosecution case in chief of *USA v. Stewart Rhodes*, in this District Court, Case No.

1:22-cr-00015, on October 19, 2022, the (then) U.S. House of Representatives Parliamentarian

Thomas Wickham testified that Speaker of the House Nancy Pelosi was whisked away from the

podium by security at 2:13 on January 6, 2021.  While the process took some time up through

2:29 PM, the causation of the recess had already occurred as of 2:13 PM.  Therefore, Thomas is

accused to have obstructed about 30 to 50 minutes before he arrived the Joint Session of

Congress.  According to the Congressional Record, Rep. McGovern then took over and recessed

the House at 2:18 PM. [5]

      Finally, we note that throughout all January 6 prosecutions the USAO has taken the

---

[5]     The court may take judicial notice that the House was recessed by the presiding
officer at 2:18 PM, pursuant to standing Rule I, Clause 12(b) (allowing for immediate
recess without a vote upon notice of a threat).  **Congressional Record House Articles |
Congress.gov | Library of Congress,** Counting Electoral Votes--Joint Session Of The House
And Senate Held Pursuant To The Provisions Of Senate Concurrent Resolution 1;
Congressional Record Vol. 167, No. 4 (House of Representatives - January 06, 2021)
**https://www.congress.gov/congressional-record/2021/01/06/house-section/article/H76-4**

position that only information on the prosecutor's desk so to speak is within the scope of

disclosure.  Certainly, it may seem an impossible task for a prosecutor to know what they do not

know.  *But the prosecutor is not the party*.  The party is the United States of America.  If

elements of the U.S. Government fail to cooperate and fail to advance the Government's interests

by providing required information, it is the United States of America which falls short.  Many an

attorney is held hostage to his or her client's resistance to making discovery.  But the client pays

the price.  The USAO are the Government's attorneys, not the Complainant.

As a result, the response of prosecutors that they did not know or could not know is

neither (necessarily) the prosecutor's fault nor an excuse to convict a U.S. citizen of serious

crimes based on the prosecutor's *client* dropping the ball.

## ARGUMENT AND APPLICATION OF LAW TO THESE FACTS

### A.  THE SHOCKING TESTIMONY OF MPD OFFICER ANTHONY CAMPANALE

**At trial, the government sprang a new false criminal accusation on Thomas without warning and while withholding 302s relating to the fabricated crime accusation.**

On May 2, 2023, according to the FBI interview notes, the prosecutors here Suzanne

Miller and Sean McCauley, interviewed Anthony Campanele with Alexis Brown.  The

Government certainly knew that Campanele was accusing Wren and

The Defendant's exhibit list reflexively asked for (by listing) everything about Officer

Daniel Thau, even though the Defendant did not yet all have those documents which the

Government would be expected to have, including any excessive use of force reports.  Thus the

Exhibit List was in effect also a request for these records.  On May 3, 2023, the Government

objected to these records regarding Thau as not being relevant exhibits.

As defense counsel prepared for trial here, counsel focused on the allegations in the indictment.  Specifically, defense counsel reviewed videos and other evidence relating to the five "assault" accusations.  Counsel also briefly prepped for examination of an incident on January 6 wherein defendant Thomas was under a canopied bleacher/scaffold area looking eastward toward the Capitol building through a large cut window in the canopy.  The incident involved a brief exchange between an officer named Anthony Campanele, .  During the exchange, Thomas was handed a pocket knife by a mysterious unidentified fellow demonstrator[6] and asked to cut some zip ties connecting braces of the scaffolding.

---

[6]   Although the government has objected vehemently to the ability of the defense to probe the facts around this individual, Thomas has reason to believe the mysterious individual might have been an undercover agent, informant, or government CHS.  Grounds for this belief include much information that numerous uncharged individuals played major roles in instigating violence and destruction on January 6.  For example, several mysterious individuals were handing out tools and materials to protestors on January 6 and shouting at protestors to charge into the Capitol. The first window pane broken in the Capitol on January 6 was broken by a man whom the government claims is unidentified.  An unidentified "scaffold commander" was visibly seen rolling up perimeter fencing and then climbed to the top of the scaffold and urged protestors to breach the Capitol over a megaphone, etc.



As a preliminary matter, the Jencks Act requires that testimony of any witness "shall be stricken." So Campanale's testimony must be stricken from the trial. But the true nature of this Jencks violation is so serious that it requires dismissal of this entire case with prejudice.

Last night, late in the evening of May 19, after a week of long exhausting days of trial, the defense noticed references in the withheld, late-disclosed, previously-secret 302s indicating Officer Campanale's prior testimony in other cases. The prosecution revealed in last night's email exchange that "Campanale has testified several times before, both in D.C. District Court and D.C. Superior Court, Campanale testified in other January 6 cases, most recently in *U.S. v. Wren*.

The defense has not been provided with any transcript of Campanale's testimony in U.S. v. Wren. However, a bit of searching about that case reveals that Wren is the individual seen

pushing against the shields of Corporal Ainsworth (and other cops) at the precise time that Thomas is (falsely) accused of pushing them.  There could never be a more obvious example of a Jencks or Brady violation.

Thomas demands an immediate halt to the pending trial so that Campanale's trial transcript can be obtained from the Smith and Wren prosecutions and reviewed, as prosecutors claim the transcripts from 10 days ago are not yet available.

Upon information and belief, Campanale's transcript in the "Wren case" may likely reveal that Campanale implicated Wren and Smith in the assaults on Corporal Ainsworth but did not implicate Thomas.  Thus, this is a Brady violation of the highest order in addition to being a Jencks violation.

On May 19, 2023, E. Lambert responded again to prosecutors:

> Sorry for the second email, but I just went back to my email from this morning re Campanale 302s: we had two for him, one from 5/2/23 and one from 5/9/23. All the 302s from May 2023 were just provided to you this week. Some of the witnesses had just one 302 from that timeframe, others had two. Again, with the exception of Ainsworth, we'd never interviewed any witness-officer prior to May 2023 for this case.  Hope this clarifies.

Also, Campanale was _not_ one of the five officers whom Thomas was accused of assaulting.  Therefore,  contrary to the Court's concerns, the defense would not have focused on Campanele without the required disclosures.  The defense was aware of Campanale's name on the government's witness list, *but was not provided any 302s or written reports regarding Campanale*.  And now, after the government has rested, the government informs us (just a few hours ago) that the government also withheld Jencks material relating to Campanale—including *even a transcript of Campanale's trial testimony against a fellow January 6er seen next to Thomas pushing the very cops that Thomas is falsely accused of pushing*.

For a brief moment as shown in Exhibit 236, Thomas accepted a folded pocket knife from the stranger and indicated he might comply with the stranger's request.  The exchange then triggered a ***warning*** from Officer Campanale, who ordered Thomas not to cut the zip ties. Thomas complied immediately with Campanale's instructions and handed the knife back to the unidentified "protestor."  None of the police officers ever told Thomas or others to leave.  He was just warned not to cut the zip ties on the tarpaulin over the back of the "risers," which Thomas admits was a mistake.[7]

The brief episode was captured on Officer Campanale's bodycam.  Thomas never damaged any property, and never cut any zip tie or anything else.  At trial, however, the defense was shocked when Campanale took the stand for the United States and *falsely testified that he witnessed Thomas damaging United States property*.  Campanale testified that he could have arrested Thomas for property destruction.  Campanale specifically indicated that Thomas had cut the window in the white tarp!

The false accusation came so fast and unexpectedly that Thomas' counsel had no time to formulate an objection.  Thomas' team had been provided with utterly no discovery relating to such an accusation; and Thomas' indictment contains no such allegation.

To say the least, Campanale's falsely incriminating testimony shocked the defense table. Counsel had not previously considered Campanale to be a major government witness at all, and had intended to use Thomas' brief interlude with Campanale to show the jury that Thomas was

---

[7]        Note that there are many kinds of agitators or provocateurs maybe for no other reason than simply being trouble-makers by nature.  Suspicions about why have been controversial.  But that should not limit the inquiry here.  Where someone simply hands Thomas a folded knife and asks him to cut the zip ties holding the tarpaulin, although one might wonder, why didn't that other man just do it himself, why did he try to involve Thomas, Thomas admits he at first complied but then snapped out of it and asked in effect "What am I doing?" and then handed it back.

generally respectful and compliant with officer commands.

The defense table had to scramble to find some bodycam video from another MPD officer which clearly showed that Metro PD officers cut the very holes in the tarp which Campanale falsely accused Thomas of cutting.  (At that moment, defense counsel did not know that Campanale himself participated in such tarp cutting; this fact was only revealed on cross-examination of Campanale.)

Astoundingly, the United States <u>even objected to the defense showing the exculpatory video</u> to the jury.  Exhibit  236 (bodycam footage from Metro officer Paul Dean) showed plainly that *Metro officers themselves were responsible for slashing and cutting the window holes* in the canopy tarp.  And on cross-examination, Campanale revealed that *he himself is depicted on the bodycam footage cutting and damaging the tarp*.  And there is no evidence—none whatsoever—that Thomas committed the property destruction he was unexpectedly accused of.  *And the government well knew this.*

In light of the Court's discussion, note that Thomas was never charged with property destruction until this accusation popped out at trial.  Therefore, counsel would not have prepared for this false and incredibly damaging and prejudicial accusation under the lack of disclosure.

This is one of the most extreme cases of misconduct in the history of the Justice Department's years-long crusade against January 6ers.  And even more significantly, the government withheld from the defense the 302s relating to Officer Campanale's fabricated claims, so that  the defendant was unaware until these government <u>lies were unleased live at trial before a jury</u>.

**B.  MOTION TO DISMISS FOR MULTIPLE BRADY VIOLATIONS**

1. Apparently the prosecution and the FBI met with Samantha Miller Leono, Ainswoth, Newhous and Campanele on May 11, 2023.  Each one generated a 302.

2. Yet on May 19, 2023, Samantha Miller told the court they didn't know the 302s existed.

3. Shawn McCauley told the Court on the afternoon of 5/19/2023that  Prince Georges County.


**C.       THE INABILITY TO USE THE THAU BODYCAM**

The Defendants provided their exhibit list to the United States.  The Government immediately moved to preclude the Thau bodycam evidence from evidence, telling the Court the Thau bodycam footage was irrelevant.  This led the Court to order the order the Thau bodycam footage inadmissible on

Then, after the testimony of Campanelle was over, the defense, was provided with Campanelle's 302, which revealed that Campanelle was briefed and instructed by Thau.  Thau was the most out-of-control officer on the west terrace on Jan. 6. Thau—a high-ranking Metro PD supervisor—both committed unlawful excess force on Jan. 6.  Thau instructed Campanele when Campanele came on duty that "Pain compliance was not working" and that "they were out-numbered 1000 to 1" and "not to go around that corner or it was going to be bad."

It is safe to assume that in this case Campanele followed the directions of higher-ranked Thau and used excessive force in response to this alarmist guidance by Thau.  This is directly relevant because Thomas was alleging affirmative defenses in response to police excessive use of force.

The following issues

Newenhouse "did see blood but no specific person bleeding"

Why was Ainsworth interviewed 3 different times.

The government charged Thomas with five assaults without even consulting the officers.

### D.  THAU'S MISCONDUCT, EXCESSIVE FORCE, AND INSTRUCTIONS TO LOWER-LEVEL OFFICERS TO USE EXCESSIVE FORCE

On Jan. 6, Supervisor Thau can be seen on many bodycams on the upper west terrace screaming at lower officers and instilling fear and panic among them.  Thau can be heard screaming "We need more fucking munitions.  Blast munitions. Around 1:18, Thau screamed up to Capitol less-lethal shooters to "Shoot them, shoot them!," pointing at the nonviolent crowd.

At around 1:23, Thau says "Give me your fucking taser" and rips it out of another officer's hans, then turned, moved to front lines, pushes another officer out of the way and tazed a standing demonstrator.  At another point on Jan. 6, Thau accidentally tazed himself.

Thau dropped another officer's tazer and dropped it in the crowd of demonstrators.

At around 2:18, Thau can be heard on his own bodycam talking to a commander.  Thau or the other officer says "we're hitting innocent people."  Thau states "For each one we 'take out' there are 10 more getting angrier."  Both were laughing.

At around 2:25, Thau tells officer Rich to shoot a 40mm launcher into the balcony where the crowd was.  Something happened to the round, perhaps a misfire.  "Just fucking shoot," screams Thau.  The round lands in the skirmish line of officers.  A number of impacted officers then retreat as they were cross contaminated.  Thau tazed at least four people on Jan. 6.  Thau even walked up to other officers, took their weapons and use them.

Thau also ordered other officers to use excessive force.

Thau said we're hitting innocent people.  Normal "pain compliance was not working"
Thus, less-lethal force would not work and suggesting Thau told them that high (or even the
highest) level of force was necessary.

Thau's violent command and conduct on Jan. 6 is so notorious that it became the subject
of a special report by the Internal Affairs bureau.
Counseled shooting people at elevated positions, (where they might fall from if hit), instructed
lower officers to fire less-lethal munitions at protestors without warning (a violation of Metro
policy), without gas masks.

Told Campaneli not to go around the corner…

The importance of not knowing that Thau played a role in Thomas' allegations cannot be
overstated.  The defense was deprived of the ability to question Campanelli about instructions to
use illegal force.

Thau counseled and ordered lower officers to violate their own procedures and policies.
The government argued (and won) that the Metro policies are irrelevant, and GOT THE
POLICY MANUALS RULED OUT OF EVIDENCE AS IRRELEVANT.  That alone
fundamentally changed the trial.

Said differently, Thomas' trial would have been completely and fundamentally different
if the 302s had been properly provided to the defense.  If the defense had had access to the
missing 302s, defense counsel would have had a winning argument for keeping the Metro PD
training manuals on the exhibit list.  And defense could have used the training manuals to cross-
examine and impeach the officers regarding violations of the officers' training and policies.


**E.  DEFENSE COUNSEL WAS FUNDAMENTALLY DECEIVED
     ABOUT THE NATURE OF THE ASSAULT CLAIMS**

Significantly, defense counsel began preparing for trial by examining the relevant videos of Thomas' contacts with law enforcement on Jan. 6.  Obviously, counsel focused on the conduct of Thomas in the videos—and nowhere did it appear Thomas had pushed over any officer(s). (There were officers who tripped or fell in the videos, but these falls occurred nowhere near Thomas in the videos; and so defense counsel barely took notice of them.)  All the while the secret missing 302s would have informed counsel to prepare in an entirely different manner.

**THE GOVERNMENT'S IMPROPER LATE-DISCLOSED "PTSD" TESTIMONY SHOCKED THE DEFENSE**

At trial, Thomas was suddenly confronted with a recently-fabricated claim by MPD officer Robert Niewenhous that Thomas had contributed to Niewenhous' "undiagnosed PTSD"—a claim which had not been provided to the defense.

Post Traumatic Stress Disorder is a serious medical condition that must be reported to supervisors.  Both OSHA rules and the MPD rules require this.  Medica records must be generated, and provided to opposing parties wherein the mentally ill officer claims the party caused his or her PTSD mental illness.  The Thomas defense team was never provided any such records.

Significantly, a confirmed medical diagnosis of PTSD generally ends a patrol officer's career.  Police Departments must generally provide severance and disability protection for any such officer, and that officer must not be further allowed to patrol a community.  Numerous civil cases hold that such an officer becomes no longer fit for patrol duty, as they can be a danger to members of the community.  For one thing, PTSD requires treatment that may include mind-altering drugs.

The Department of Justice's own reports indicate the severe impacts of a PTSD diagnosis

for any patrol officer.

In a recent preliminary study, we used measures of brain function to determine the effects of PTSD on police decision making.2 We recorded electroencephalography (EEG) while police officers were presented with a decision-making situation. Then, we compared the decision-making abilities of those officers having higher levels of PTSD with those that have low or no PTSD levels. Results suggested that officers who have higher levels of PTSD had greater brain activation in areas related to rapid decision making. Disruptions in rapid decision making by an officer who has PTSD may affect brain systems due to heightened arousal to threats, inability to screen out interfering information, or the inability to keep attention.

DOJ: PTSD among Police Officers: Impact on Critical Decision Making

May 2018 | Volume 11 | Issue 5 https://cops.usdoj.gov/html/dispatch/05-2018/PTSD.html#:~:text=Results%20suggested%20that%20officers%20who%20have%20higher%20levels,interfering%20information%2C%20or%20the%20inability%20to%20keep%20attention

In Thomas' trial, prosecutors slipped in a recently-created claim that Niewenhous had suffered extreme "PTSD-like" mental trauma from Thomas. Conveniently, Niewenhous claimed his mental condition was "undiagnosed." Thomas' defense team had no way of anticipating or preparing for such testimony. Then, on the night of May 17—after Niewenhous had already finished testifying—the United States provided Niewenhouse's May 11 302.

Significantly, Niewenhouse had (unbeknownst to the defense) claimed he "felt he had "PTSD" from his experiences that day" and that he "experienced "zoning out reactions" when reminded of January 6." "NIEWENHOUS could not go to any mall or crowded area for months after January 6."

Obviously, if true, this officer must be immediately taken off street patrol.

(Defense counsel notes that Niewenhous' bodycam footage from that day evidence him laughing at times. And Niewenhous' Facebook posts from January 6 include selfies in which Niewenhous smiled for his camera and posted the images.)

Even more outrageously, AUSA Miller falsely eluded to Niewenhous' undiagnosed "PTSD" while cross-examining defense witness Steven Hill on May 19—further compounding the prejudicial impact of this newly-fabricated notion on Thomas' jury. (Defense counsel was threatened by the Court with a fine after trying to recross Niewenhous to soften the blow of this outrageously prejudicial reference.)

Additionally, prior to trial, the United States vehemently argued (successfully) to have the MPD policy manuals which plainly require any claim of injury of any officer to be reported to supervisors. Defense counsel was deprived of the ability to use these MPD policies to cross-examine Niewenhous regarding his shocking claim. (All the while, even as the AUSAs argued for precluding the policy manuals, they were sitting on and withholding a secret claim that one of their principal witnesses would spring an "undiagnosed PTSD" claim upon the defense at trial.)

## GOVERNING LAW

### A. Suppressed Information Must be "Material" – Often Analyzed as "Exculpatory" but not Necessarily; just "Material"

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014).

However, the Defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id*. Prejudice to the

Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 134 (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

"[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would have been different",' although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

## B. *Brady* Requires Disclosure of Any information That is Inconsistent With Any Element of Any Crime Charged

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963),  is very broad. *See* United States Justice Manual (USJMM) § 9-5.001.  For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence---including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence.  This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence."  *Id.*

The Defendant is entitled to the documents and the evidence, to the extent potentially or here likely to be exculpatory information as required by *Brady v. Maryland, 373 U.S. 83 (1963) ; See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

### C.  Requirements Under the Jencks Act

**18 U.S. Code § 3500 - Demands for production of statements and reports of witnesses** *(Emphases added)*

(a)  In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c)  If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d)  If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, ***the court SHALL*** *strike from the record the testimony of the witness,* and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(e)  The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

> **(1)** a written statement made by said witness and signed or otherwise adopted or approved by him;
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Meanwhile, the Courts have interpreted the Jencks Act:

1. Was the recording in the possession of the government?[8]

The government acknowledges that its disclosure obligation extends

---

[8]    Clearly referring to all levels of government.

beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

"[T]he duty of disclosure affects not only the prosecutor, **but `the government as a whole, including its investigative agencies,'** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied *Brady* and *Jencks* requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[9]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady

---

[9]     This understated reference doesn't fully explain that the prosecution arose directly out of "WMATA regulations" concerning a threatening showdown on the WMATA bus between a passenger and a bus driver.  WMATA security responded to the threatening situation but then turned the investigation over to the Metropolitan Police Department.

obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

* * *

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

* * *

**The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.**

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).*

* * * When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.

**When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee,** *cf. United States v. Agurs***, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

**_Wilson v. United States_, 568 A.2d 817 (D.C. 1990)** *(paragraph break added for emphasis and bold emphases added).*

## D.  Requirements of Rule 16

Rule 16 of the Federal Rules of Criminal Procedure requires that:

* * *

Rule 16. Discovery and Inspection

(d) Regulating Discovery. (1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal. (2) Failure to Comply. If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

### E. Requirements of Local Rule 5.1

Local Rule 5.1 "DISCLOSURE OF INFORMATION"  prescribes that *(Reformatted for clarity of analysis and emphases added).*

(a) Unless the parties otherwise agree and where not prohibited by law, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that is known to the government. ***This requirement applies regardless of whether the information would itself constitute admissible evidence.*** The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense ***as soon as reasonably possible after its existence is known***, so as to enable the defense to make effective use of the disclosed information in the preparation of its case.

(b) The information to be disclosed under (a) includes, but is not limited to:

(1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged;

***(2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty;***

***(3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged;***

*(4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and*

*(5) Impeachment information*, which includes but is not limited to:
  (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and
  (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

(c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the government intends to call at trial, this rule does not require the government to disclose such information before a trial date is set.

(d) In the event the government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information.

*(e) For purposes of this rule, the government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The government has an obligation to seek from these sources all information subject to disclosure under this Rule.*

(f) The Court may set specific timelines for disclosure of any information encompassed by this rule.

(g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

## F.  Overturning Conviction for *Brady* Violation

Even apart from a Rule 29 motion to dismiss at trial, an actual conviction after trial can

be overturned on appeal for violation of *Brady* if evidence favorable to the accused for

exculpatory or impeachment purposes was suppressed by the government which prejudiced the

accused. *Id*.   Favorability to the accused means exculpatory or impeachment value. *Id.*

Suppression by the government can be an intentional or inadvertent failure to disclose the

evidence. *Id*. at 137.

And courts in in this jurisdiction disfavor narrow readings by prosecutors as to their

obligations under *Brady*.  *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported*

*by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).


### G.  Disclosures Cannot be Hidden or Buried Within Mountain of Information

When the Defendant requests *Brady* materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.


### H.  Inadmissible Evidence Still Required under *Brady*

Under *Brady*, evidence may still be material and favorable despite being inadmissible,

provided it could lead to admissible evidence. *Saffarinia*, 424 F.Supp.3d at 91.

It is relevant that the Defendant explicitly asked for specific information, not passively

hoping that the prosecution will notice and think to disclose information on its own initiative.

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> " The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * *

*"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

"If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

### I.   Materiality Includes Creating Reasonable doubt

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.[20] Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Id.* at 112.  To extend this point, the U.S. Supreme Court is saying that the requirement that a

Defendant be presumed innocent until proven guilty beyond a reasonable doubt is a principle that

applies to all aspects of the case, including whether a failure to disclose potentially exculpatory

information violates the Due Process Clause.

### J.   Evidence Relevant to Impeachment of Witnesses is Required Disclosure under *Brady*

"Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an Defendant,"  *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make

> the difference between conviction and acquittal. Cf. *Napue v. Illinois*,
> 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The
> jury's estimate of the truthfulness and reliability of a given witness
> may well be determinative of guilt or innocence, and it is upon such
> subtle factors as the possible interest of the witness in testifying
> falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The

trial judge's function is limited to determining if a case for production has been successful and

supervising the process. *Id.*

### K.      Disclosures that Could Reveal Potential Witnesses is Material

Closely associated with the federal rule are several U.S. Supreme Court decisions which

hold that a defendant has a right to the testimony of witnesses. *See, United States v. Dennis*, 384

U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the
> property of neither the prosecution nor the defense. Both
> sides have an equal right, and should have an equal
> opportunity, to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l
Responsibility Rule 3.8(d).

### L.  All Agencies of Government Likely to Have Information (e.g., Involved in the Investigation) are Required to Provide *Brady* Disclosures

While *Brady* obligations do not extend to the entirety of the government, they do include

any and all investigative agencies who worked on the case or agencies related who knew or

should have known that information would be material to a prosecution arising from their direct

involvement.

Here the U.S. Capitol Police are directly related and fully aware of the events of January

6, 2021.  The USCP is an agency of Congress.  The USCP and Congress are the two primary alleged victims and the USCP is the primary investigative agency in terms of the immediacy to events and geographic proximity.  Most of the witnesses and investigators from the Federal Bureau of Investigation have no first-hand knowledge of the events of January 6, 2021, but are merely reviewing the reports of others, primarily USCP officers.

The City of Washington, D.C.'s Metropolitan Police Department had undercover officers on the scene at the U.S. Capitol on the early afternoon of January 6, 2021, and were on standby under memoranda of understanding to respond to assist the U.S. Capitol Police.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial."** ***Coleman v. United States***, **515 A.2d 439, 446 (D.C.1986). (quoting** ***Lewis v. United States***, **393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.
>
> The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know—information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused.").

> **However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).  Furthermore,*

## M.        Disclosures that Would Help Establish Affirmative Defenses

With regard to establishing an affirmative defense, a proffer must provide a "minimum standard" but what is that standard?  The U.S. Supreme Court has shined a bit of a light on this in a glancing blow as enough "as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense…."

That is, if the Defendant's proffered factual allegations that – if the jury believed the proffered facts – the affirmative defense could be found true by the jury, then the proffer is legally sufficient.  Of course, the jury retains a lot of decision-making.  But facts that would "support" a finding that the affirmative defense was established at trial, then the facts noticed prior to trial are adequate:

> But precisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense—here that of duress or necessity.

*United States v. Bailey United States v. Cogdell,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)

Here, the Government wishes to play the role of the jury as well as the prosecutor.  The Government has offered no argument concerning the law, only that the Government and the

Defendant dispute the facts, and therefore the Government should win automatically.

> Two bedrock characteristics of our system of trial by jury, a system the Supreme Court has labeled "fundamental to the American scheme of justice," *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444 1447, 20 L.Ed.2d 491 (1968), are that jury deliberations occur in seclusion and that the jury serves as the sole finder of fact. Regarding the first characteristic, not only is "the sanctity of jury deliberations... a basic tenet of our system of criminal justice," *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir.2002), but courts go to great lengths to protect that sanctity.   * * * *
>
> * * *
>
> No less fundamental than jury seclusion is the principle that the jury — not the trial judge and not the attorneys — serves as the trier of fact. As the Supreme Court has said:
>
>> Of course, ... in a jury trial the primary finders of fact are the jurors. Their overriding responsibility is to stand between the accused and a potentially arbitrary or abusive Government that is in command of the criminal sanction. For this reason, a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict, regardless of how overwhelmingly the evidence may point in that direction. The trial judge is thereby barred from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused.
>
> *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 572-73, 97 S.Ct. 1349 1355, 51 L.Ed.2d 642 (1977) (citations omitted). This court has also emphasized the importance of the jury as fact-finder. Indeed, "our opinions have repeatedly emphasized our conviction that the jury's role as fact-finder is ... central to our jurisprudence." *United States v. Comer*, 421 F.2d 1149, 1154 (D.C.Cir.1970); see *also Belton v. United States*, 382 F.2d 150, 156 (D.C.Cir.1967) ("[T]he principle that the jury should be permitted to find the facts is a cornerstone of our jurisprudence...."). Underscoring the importance of that role, this court, sitting en banc, has declared that "[a]ny undue intrusion by the trial judge into this exclusive province of the jury is error of the first magnitude." *United States v. Thomas*, 449 F.2d 1177, 1181 (D.C.Cir.1971) (en banc).
>
> * * *

*United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004) (Tatel, Circuit Court Judge, Concurring).

**N.  Heavier Burden Upon the Government To Prepare the Criminal Prosecution Case with Full Research and Understanding of the Case**

An additional consideration on this requirement is the obligation of the prosecution to fully understand the case, not merely the evidence arguing for conviction, but also the evidence arguing for acquittal.  A prosecutor is obligated not to start a criminal prosecution or to terminate one already started if there is sufficient exculpatory evidence to raise a reasonable doubt.  Trial attorneys need to know what may arise adverse to their case.

Here, no doubt the prosecutors have been hampered by the obviously casual, endemic disregard of *Brady* requirements throughout the FBI and other agencies.  But the Defendants face far worse consequences and have been harmed as well.

Prosecutors while enjoying many advantages such as nearly limitless government resources, must also meet more compelling and strict burdens than usual for attorneys in other context:

> In *Berger v. United States*, Justice George Sutherland, who was part of the Schechter majority, said the following about ***the role of the prosecutor:***
>
> > **[He] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.** [7]

*Bennett L. Gershman, "Hard Strikes and Foul Blows:" Berger v. United States 75 Years After, 42 Loy. U. Chi. L. J. 177, 179 (2010). Available at:* ***http://lawcommons.luc.edu/luclj/vol42/iss1/8*** *(citing to  Berger v. United States, 295 U.S. 78, 88 (1935) (emphases added).*

Perhaps even more compelling:

Also, there is little doubt that Justice Sutherland's articulation of the special obligation of the prosecutor to ensure that "justice shall be done" was influenced by then-Canon 5 of the Canons of Professional Ethics of the American Bar Association, which stated:

> **"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."**

*Gershman,* at 194.

**CONCLUSION**

The Court should

????

Dated:  May 20, 2023                RESPECTFULLY SUBMITTED
                                    **KENNETH JOSEPH OWEN THOMAS**,

                                    *By Counsel*

                                    _____/s/_____
                                    Roger Root, Esq.
                                    John Pierce Law Firm
                                    21550 Oxnard Street
                                    3rd Floor, PMB #172
                                    Woodland Hills, CA 91367
                                    Tel: (213) 400-0725
                                    Email: *jpierce@johnpiercelaw.com*
                                    Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that this document is being filed on this May 20, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
601 D Street, NW
Washington, DC 20530
**Samantha.Miller@usdoj.gov**

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
**Sean.McCauley@usdoj.gov**


_____/s/_____
Roger Root, Esq.