# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case No.** |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | **1:21-cr-00552 (CRC)** |
| | : | |
| **Defendant** | : | |
| | : | |

_____

## DEFENDANT'S MOTION TO DISMISS FOR MULTIPLE SIGNIFICANT BRADY AND JENKS VIOLATIONS

Defendant KENNETH JOSEPH OWEN THOMAS ("Thomas"), through the undersigned

counsel, John L. Pierce, Esq. and Roger I. Roots, esq., hereby moves to dismiss this case, with

prejudice, based on numerous significant and material Brady and Jenks violations.  These

violations are so outrageous and egregious that they justify the most severe sanctions available to

the Court, including dismissal of this case with prejudice.  Thomas also demands that the

testimony of trial witnesses Ainsworth, Campanale, and *****[1] be stricken due to these

violations.  Thomas also suggests that these officers' supervisors be informed of these officers'

testimony at trial.  (Note that counsel will file exhibits separately, redacted.)

As the Court has been made aware, the prosecution in this case provided, by email,

several previously-undisclosed FBI 302 reports on the night of May 17, 2023, at 7:43 PM. This

was after most significant prosecution witnesses had already finished testifying.

---

[1] This witness' name is redacted.  The grounds for striking this prosecution witness' testimony involve the witness's claims of mental illness ("undiagnosed PTSD")—which the prosecution blamed on Thomas and other January 6 demonstrators—on the witness stand.  Thomas submits that the combination of lack of notice, inability to cross-examine or probe the witness regarding these mental illness claims, and precluded policy manuals with which to challenge ********'s claims, requires this witness' testimony be entirely stricken.

The government's slow trickle of late disclosures and continued withholding of exculpatory and legally-required materials continues at the time of this writing. Fewer than 24 hours ago, counsel learned that the government has withheld, in plain violation of the Jencks Act, a materially relevant transcript of its second witness, Officer Anthony Campanale, in a rival trial before a different judge involving the identical players and the identical location and issues. Thomas has been deprived of a fair trial, and due process, and the ability to adequately for trial. This prejudicial damage continues at the time of this filing, and further revelations seem to be discovered by the defendant each hour.

1.  THE UNDISCLOSED 302S RELATING TO CORPORAL AINSWORTH DEPRIVED DEFENDANT OF EFFECTIVE CROSS-EXAMINATION

The prosecution concealed from the defense evidence that Ainsworth's version of being assaulted unexplainably became more specific over time. When Ainsworth first gave a report to the FBI, Ainsworth said nothing about being pushed down by an assailant. Ainsworth indicated he was wearing a bodycam, but it fell off and was never recovered. (These initial reports to the FBI, dated February 12, 2021, were provided to defense in advance of trial.)

But during trial, Ainsworth surprised the defense with a new claim that defendant Thomas, specifically, among a crowd of many others, assaulted him by knocking him onto the ground. Thomas was not prepared for this surprising testimony. And upon cross-examination, Ainsworth testified he was "100% certain" that Thomas was the assailant who pushed him over on January 6.

The evidence that had been provided to Thomas showed no such facts. In fact, all videos of the moment show that Thomas was as many as 10 feet away at the time Corporal Ainsworth went to the ground (perhaps by being pushed by another demonstrator). Ainsworth testified that

his bodycam was apparently operating but that it fell off during January 6 and that a supervisor picked up the bodycam and put it in his pocket.

Later on the evening after Ainsworth left the witness stand (May 17), the United States provided additional 302 reports to the defense taken on May 11, 2023. This secret, undisclosed, 302, did indeed give indication that Thomas had pushed Ainsworth to the ground. The newly disclosed Ainsworth 302 also inexplicably said Ainsworth never had a bodycam on January 6.

The government's failure to disclose all the Ainsworth 302 reports left Thomas' legal team with an inability to adequately prepare for trial.

### 2.   THE SHOCKING TESTIMONY OF MPD OFFICER ANTHONY CAMPANALE

**The government's withholding of Campanale's 302 reports and prior testimony has utterly deprived Defendant of a fair trial.**

**At trial, the government sprang a new false criminal accusation on Thomas without warning and while withholding 302s relating to the fabricated crime accusation.**

As defense counsel prepared for trial, counsel focused on the allegations in the indictment. Specifically, defense counsel reviewed videos and other evidence relating to the five "assault" accusations. Counsel also briefly prepped for examination of an incident on January 6 wherein defendant Thomas was under a canopied bleacher/scaffold area looking eastward toward the Capitol building through a large cut window in the canopy. The incident involved a brief exchange between Thomas and an officer named Anthony Campanale. During the exchange, Thomas was handed a pocket knife by a mysterious unidentified fellow demonstrator[2] and asked to cut some zip ties connecting braces of the scaffolding.

---

[2] Although the government has objected vehemently to the ability of the defense to probe the facts around this individual, Thomas has reason to believe the mysterious individual might have been an undercover agent, informant, or government CHS. Grounds for this belief include much information that numerous uncharged individuals played major roles in instigating violence and destruction on January 6. For example, several mysterious individuals were handing out tools and materials to protestors on January 6 and shouting at protestors

For a brief moment around 3:30 pm on Jan. 6, Thomas accepted the pocket knife from the stranger and indicated he might comply with the stranger's request.  The exchange then triggered a warning from Officer Campanale, who ordered Thomas not to cut the zip ties.  Thomas complied immediately and handed the knife back to the unidentified "protestor."

The brief episode was captured on Officer Campanale's bodycam.  Thomas never damaged any property, and never cut any zip tie or anything else.  At trial, however, the defense was shocked when Campanale took the stand for the United States and *falsely testified that Campanale witnessed Thomas damaging United States property*.  Campanale testified that he could have arrested Thomas for property destruction.  Campanale specifically indicated that Thomas had cut the window in the white tarp!

The false accusation came so fast and unexpectedly that Thomas' counsel had no time to formulate an objection.  Thomas' team had been provided with utterly no discovery relating to such an accusation; and Thomas' indictment contains no such allegation.

To say the least, Campanale's falsely incriminating testimony shocked the defense table.  Counsel had not previously considered Campanale to be a major government witness at all, and had intended to use Thomas' brief interlude with Campanale to show the jury that Thomas was generally respectful and compliant with officer commands.

The defense table had to scramble to find some bodycam video from another MPD officer which clearly showed that Metro PD officers *cut the very holes in the tarp* which Campanale falsely accused Thomas of cutting.  (At that moment, defense counsel did not know

---

to charge into the Capitol. The first window pane broken in the Capitol on January 6 was broken by a man whom the government claims is unidentified.  An unidentified "scaffold commander" was visibly seen rolling up perimeter fencing and then climbed to the top of the scaffold and urged protestors to breach the Capitol over a megaphone, etc.

that Campanale himself participated in such tarp cutting; this fact was only revealed on cross-examination of Campanale.)

Astoundingly, the United States <u>even objected to the defense showing the exculpatory</u> <u>video</u> to the jury.  Exhibit #236 (bodycam footage from Metro officer Paul Dean) showed plainly that *Metro officers themselves were responsible for slashing and cutting the window holes* in the canopy tarp.  And on cross-examination, Campanale confessed that *he himself is shown on the bodycam footage cutting and damaging the tarp*.  And there is no evidence—none whatsoever—that Thomas committed the property destruction he was unexpectedly accused of.  *And the government well knew this.*

This is one of the most extreme cases of misconduct in the history of the Justice Department's years-long crusade against January 6ers.[3]   And even more significantly, the government withheld from the defense the 302s relating to Officer Campanale's fabricated claims, so that the defendant was unaware until these government <u>lies were unleashed live at trial</u> <u>before a jury</u>.

Campanale was not one of the five officers whom Thomas was accused of assaulting. The defense was aware of Campanale's name on the government's witness list, *but was not provided any 302s or written reports regarding Campanale*.  And now, after the government has rested, the government informs us (just a few hours ago) that the government <u>also withheld</u>

---

[3] U.S. Attorney Michael Sherwin: "After the 6th, we had an inauguration on the 20th. So, I wanted to ensure, and our office wanted to ensure, that there was shock and awe that we could charge as many people as possible before the 20th. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, 'If we go there, we're gonna get charged.'"  See: Inside the prosecution of the Capitol rioters, CBS News, Mar. 22, 2021, available at: **https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021- 03-21/**

<u>Jencks</u> material relating to Campanale—including *even a transcript of Campanale's trial testimony against a fellow January 6er seen next to Thomas <u>pushing the very cops that Thomas is falsely accused of pushing</u>*.



As a preliminary matter, the Jencks Act, 18 U.S. Code § 3500(d), requires that testimony of any witness "shall be stricken" if the United States elects not to comply with an order of the court to provide Jencks materials.  So Campanale's testimony must be stricken from the trial. But the true nature of this Jencks violation is so serious that it requires dismissal of this entire case with prejudice.

Last night, late in the evening of May 19, after a week of long exhausting days of trial, the defense noticed references in the withheld, late-disclosed, previously-secret 302s indicating Officer Campanale's prior testimony in other cases.  It was revealed in an email exchange that

"Campanale has testified several times before, both in D.C. District Court and D.C. Superior

Court, Campanale testified in other January 6 cases, most recently in *U.S. v. Wren*."

  The defense has not been provided with any transcript of Campanale's (now month-old)

testimony in *U.S. v. Wren*.[4]  However, a bit of searching about that case reveals that Wren and

Wren's cousin Thomas Harlen Smith are individuals seen pushing against the shields of Corporal

Ainsworth (and other cops) at about the same time that Thomas is (falsely) accused of pushing

them.  There could never be a more obvious example of a Jencks or Brady violation.

  **Thomas demands an immediate halt to the pending trial so that Campanale's trial
transcript can be reviewed (along with the other transcripts in the Smith and Wren trial.)**

  Upon information and belief, Campanale's transcript in the "Wren case" may likely

reveal that Campanale implicated Wren and Smith in the assaults on Corporal Ainsworth but did

not implicate Thomas.[5]  Thus, this is a Brady violation of the highest order in addition to being a

Jencks violation.

  It seems to be significant that counsel for the United States explained their late disclosure

of 302s by saying they were unaware of the reports.  Yet it appears that every member of the

prosecution team were present at the May 11 302 meetings.

  3. THE PROSECUTION'S SABOTAGE OF THE DEFENSE'S ABILITY TO USE THE
THAU BODYCAM

  The Defendant provided his exhibit list to the United States on April 28, 2023.  The

government quickly moved to preclude the Thau bodycam evidence, telling the Court the Thau

---

[4] Criminal Case No. 21-cr-00599

[5] A phone conversation with Wren's attorney, George Pallas on Saturday seems to indicate Wren and Smith were
convicted of assaulting an unnamed officer—who is likely Ainsworth.  Pallas' efforts to get federal prosecutors to
actually name Wren and Smith's victim were apparently denied by Judge Walton.  (Ainsworth did not testify in the
Smith/Wren trial.)

bodycam footage was irrelevant and lacked an evidentiary foundation to the Thomas case.  These representations led the Court to order the Thau bodycam footage inadmissible.

But after the testimony of Campanale was over, the government provided the defense with Campanale's 302s, which revealed that Campanale had met, was briefed, and was actually deployed and directed by Sergeant Thau on January 6.

Sergeant Thau was the most out-of-control officer on the west terrace on Jan. 6. Thau—a high-ranking Metro PD supervisor—committed unlawful excessive force on Jan. 6 and hyped and directed lower officers such as Campanale to use unlawful excessive force.

The undisclosed secret Campanale 302s revealed that prosecutors and the FBI case agent had met with Campanale on May 2—the day before prosecutors submitted their objections to Thomas' exhibit list.  It is obvious now, upon reflection, that Campanale's (April 21) testimony in the Smith and Wren trial was quite fresh at that time and would have been discussed during the meeting.

Thus, the day before filing objections to Thomas' exhibit list (May 3) on 'relevance' and 'foundation' grounds, prosecutors knew well that Daniel Thau's conduct and bodycam footage was both relevant and foundational to the Thomas case.  Moreover, prosecutors knew at that time that Campanale had recently testified at a trial involving the same major players which the Thomas trial involved.  Yet the United States withheld the Campanale 302 about the May 2 meeting and also withheld Campanale's trial transcripts.  (Note that Campanale's Smith/Wren testimony is now a month old; yet prosecutors (when recently confronted) say the transcript is still unavailable.)

Sergeant Thau's violent command and conduct on Jan. 6 is so notorious that it became the subject of a special report by the Internal Affairs bureau, "Final Investigation Regarding the Use of Force (ECD) by Sergeant Daniel Thau of the Special Operations Division on January 6, 2021." Thau's interaction, guidance, and direction of Campanale were relevant and foundational to Thomas' defense. Thomas' trial would have been a completely different trial if Thomas had had access to these undisclosed documents. At minimum, Thomas' counsel could have cross-examined Campanale regarding these features of Campanale's January 6 experience.[6]

The United States knew Thomas was arguing excessive force, self defense, and defense of others. They knew the connection between Campanale and Sergeant Daniel Thau was directly relevant to such issues. And they knew that the Smith/Wren trial before Judge Walton (which they knew Campanale testified in) *involved similar claims by Smith and Wren of excessive force,*

---

[6] On Jan. 6, Sergeant Thau can be seen on many bodycams on the upper west terrace screaming at lower officers and instilling fear and panic among them. Thau can be heard screaming "We need more fucking munitions. Blast munitions. Around 1:18, Thau screamed up to Capitol less-lethal shooters to "Shoot them, shoot them!," pointing at the nonviolent crowd of protestors.

At around 1:23, Thau is heard on his bodycam saying "Give me your fucking taser" as Thau rips it out of another officer's hand. Thau then turned, moved to front lines, pushed another officer out of the way and tazed a standing protestor. At another point on Jan. 6, Thau accidentally tazed himself. And at still another occasion, Thau dropped another officer's tazer in the crowd of demonstrators.

At around 2:18, Thau can be heard on his own bodycam talking to a commander. Thau or the other officer says "we're hitting innocent people." Thau states "For each one we 'take out' there are 10 more getting angrier." Both were laughing. At around 2:25, Thau tells officer Rich to shoot a 40mm launcher into the balcony where the crowd was. Something happened to the round, perhaps a misfire. "Just fucking shoot!" screams Thau. (The round landed in the skirmish line of officers, forcing a number of impacted officers to retreat as they were cross contaminated with CS gas. Thau tazed at least four people on Jan. 6.

All of this conduct directly conflicted with numerous MPD written policy manuals. The MPD's Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations, for example, states that "It is the declared policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia, and to engage in First Amendment assembly near the object of their protest so they may be seen and heard." Thau directed shooting people at elevated positions, (from where they might fall), instructed lower officers to fire less-lethal munitions at protestors without warning (a violation of Metro policy), and directed officers to deploy nerve agents without gas masks.

Immediately upon Campanale's arrival at the Capitol on Jan. 6, Thau informed Campanale that officers were outnumbered a thousand to one," that normal "pain compliance was not working," and that "if [officers] go around the corner, it's not going to be good." Thus, less-lethal force would not work, and lethal force was justified and sanctions.

*self defense and defense of others* <u>*at the same location at the same time*</u> as the facts in the Thomas case. (Note that while Smith and Wren were indeed convicted of several counts on May 5, their self-defense and defense-of-others defenses <u>*prevailed*</u> <u>regarding some counts, which Wren was acquitted of on May 5</u>.)

Just prior to the beginning of the Thomas trial on May 15, the prosecution team had a second meeting with Campanale (on May 9), which was memorialized in a May 11, 302 report. The new 302 left out all mention of Campanale's trial testimony two weeks earlier in Smith/Wren and also left out all mention of the role played by Sergeant Thau. And the United States withheld the Campanale 302s from Thomas until the night of May 17, after Campanale and Ainsworth had already left the witness stand.

4. THE GOVERNMENT'S IMPROPER LATE-DISCLOSED "PTSD" TESTIMONY SHOCKED THE DEFENSE

At trial, Thomas was suddenly confronted with a recently-fabricated claim by MPD officer Robert ********** that Thomas had contributed to ************' "undiagnosed PTSD"—a claim which had not been provided to the defense.

Post Traumatic Stress Disorder is a serious medical condition that must be reported to supervisors. Both OSHA rules and the MPD rules require this. Medical records must be generated, and provided to opposing parties wherein the mentally ill officer claims the party caused his or her PTSD mental illness. The Thomas defense team was never provided any such records.

Significantly, a confirmed medical diagnosis of PTSD generally ends a patrol officer's career. Police Departments must generally provide severance and disability protection for any such officer, and that officer must not be further allowed to patrol a community. Numerous civil

cases hold that such an officer becomes no longer fit for patrol duty, as they can be a danger to

members of the community.  For one thing, PTSD requires treatment that may include mind-

altering drugs.

The Department of Justice's own reports indicate the severe impacts of a PTSD diagnosis

for any patrol officer.

> In a recent preliminary study, we used measures of brain function to determine the
> effects of PTSD on police decision making.2 We recorded lectroencephalography
> (EEG) while police officers were presented with a decision-making situation.
> Then, we compared the decision-making abilities of those officers having higher
> levels of PTSD with those that have low or no PTSD levels. Results suggested
> that officers who have higher levels of PTSD had greater brain activation in areas
> related to rapid decision making. Disruptions in rapid decision making by an
> officer who has PTSD may affect brain systems due to heightened arousal to
> threats, inability to screen out interfering information, or the inability to keep
> attention.

DOJ: PTSD among Police Officers: Impact on Critical Decision Making May 2018,  Volume 11,
Issue 5 https://cops.usdoj.gov/html/dispatch/05-
2018/PTSD.html#:~:text=Results%20suggested%20that%20officers%20who%20have%20highe
r%20levels,interfering%20information%2C%20or%20the%20inability%20to%20keep%20attent
ion.

In Thomas' trial, prosecutors slipped in a recently-created claim that ******* had

suffered extreme "PTSD-like" mental trauma from Thomas.  Conveniently, ****** claimed his

mental condition was "undiagnosed."  Thomas' defense team had no way of anticipating or

preparing for such testimony.  Then, on the night of May 17—after ******** had already

finished testifying—the United States provided *********'s May 11 302.

Significantly, ********* had (unbeknownst to the defense) claimed he "felt he had

"PTSD" from his experiences that day" and that he "experienced "zoning out reactions" when

reminded of January 6."  "********** could not go to any mall or crowded area for months after

January 6."

Obviously, if true, this officer must be immediately taken off street patrol.

(Defense counsel notes that ********'s bodycam footage from that day evidence him laughing at times.  And *******' Facebook posts from January 6 include selfies in which ******* smiled for his camera and posted the images.)

Even more outrageously, AUSA Miller falsely eluded to ********'s undiagnosed "PTSD" while cross-examining defense witness Steven Hill on May 19—further compounding the prejudicial impact of this newly-fabricated notion on Thomas' jury. (Defense counsel was threatened by the Court with a fine after trying to recross ******** to soften the blow of this outrageously prejudicial reference.)

Additionally, prior to trial, the United States vehemently argued (successfully) to have the MPD policy manuals which plainly require any claim of injury of any officer to be reported to supervisors.  Defense counsel was deprived of the ability to use these MPD policies to cross-examine ********** regarding his shocking claim.  (All the while, even as the AUSAs argued for precluding the policy manuals, they were sitting on and withholding a secret claim that one of their principal witnesses would spring an "undiagnosed PTSD" claim upon the defense at trial.)

## CONCLUSION

Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014)  (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  "[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

Thomas requests (1) dismissal of this case and indictment, with prejudice, or (2) in the

alternative, the striking of witnesses Ainsworth, Campanale, and *************.  Additionally,

for community safety and integrity, Thomas suggests that the supervisors of these law

enforcement witnesses be notified of their testimony in this trial.


Dated:  May 20, 2023                          RESPECTFULLY SUBMITTED
                                              **KENNETH JOSEPH OWEN THOMAS**,

                                              *By Counsel*

                                              _____/s/__Roger Roots_____
                                              Roger I. Root, Esq.
                                              John Pierce Law Firm
                                              21550 Oxnard Street
                                              3rd Floor, PMB #172
                                              Woodland Hills, CA 91367
                                              Tel: (213) 400-0725
                                              Email: ***jpierce@johnpiercelaw.com***
                                              Attorney for Defendant


                                              _____/s/__John M. Pierce_____
                                              John M. Pierce, Esq.
                                              John Pierce Law Firm
                                              21550 Oxnard Street
                                              3rd Floor, PMB #172
                                              Woodland Hills, CA 91367
                                              Tel: (213) 400-0725
                                              Email: ***jpierce@johnpiercelaw.com***
                                              Attorney for Defendant


## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that this document is being filed on this May 20, 2023, with the Clerk of
the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which
will send an electronic copy of to the following CM/ECF participants.  From my review of the
PACER account for this case the following attorneys are enrolled to receive notice and a copy
through the ECF system.
                                    MATTHEW M. GRAVES
                                    United States Attorney
                                    D.C. Bar No. 481052

                                    SAMANTHA R. MILLER
                                    Assistant United States Attorney
                                    New York Bar No. 5342175

United States Attorney's Office
601 D Street, NW
Washington, DC 20530
**Samantha.Miller@usdoj.gov**

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
**Sean.McCauley@usdoj.gov**

_____/s/Roger Roots_____
Roger Root, Esq.