```
 1                  IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      ) Criminal Action
                                    ) No.: 21-cr-0679
 4             Plaintiff,           )
          vs.                       ) Washington, D.C.
 5                                  ) January 13th, 2023
     ROBERT WAYNE DENNIS            )
 6                                  ) 10:09 a.m.
               Defendant.           )
 7   _____)

 8
                     Transcript of Bench Trial - Day 4
 9              Before the Honorable James E. Boasberg
                     United States District Judge
10

11   For the Government:   Jason Manning
                           DOJ-CRM
12                         1400 New York Avenue, NW
                           Washington, D.C. 20005
13
                           Nialah Ferrer
14                         USAO-DC
                           601 D Street, NW, SUite 6-1301
15                         Washington, D.C. 20530

16   For the Defendant:    Allen Orenberg
                           The Orenberg Law Firm
17                         12505 Park Potomac Ave, 6th Floor
                           Potomac, MD 20854
18

19

20
     Court Reporter:       Christine T. Asif, RPR, FCRR
21                         Official Court Reporter
                           U.S. District & Bankruptcy Courts
22                         333 Constitution Avenue, NW
                           Room 6507
23                         Washington, D.C. 20001

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Good morning, everyone.
 3            THE CLERK:  Good morning, everyone.  We're here
 4   today for a verdict reading in 21-679, United States of
 5   America versus Robert Wayne Dennis.
 6            THE COURT:  Okay.  Welcome everybody.  Thank you for
 7   being back.  So I just want to ask a few more questions on a
 8   couple of the counts, Mr. Manning.  So I think we talked about
 9   it briefly, but you know, on Counts 6 and 8 -- well, what's
10   really more concerned on 6.  So the element is that the
11   defendant engaged in disorderly or disruptive conduct, and I
12   understand that element, but with the intent to impede or
13   disrupt the orderly conduct of government business or official
14   functions.  And so my question is, are the orderly conduct of
15   government business and official functions the certification
16   of the vote or are you're arguing that it's broader than that?
17            MR. MANNING:  Glad to address that, Your Honor.
18   We're arguing that it's broader than that in that it doesn't
19   have the same degree of specificity as the obstruction of an
20   official proceeding that could be charged under 1512(c)(2).
21   That said, we're not arguing, for the purposes of this case at
22   least, that it's so broad to encompass, you know, any activity
23   of any police officer.  That in this case we believe the
24   evidence shows, and will rise or fall on whether the evidence
25   shows, that the defendant intended to disrupt what was
```

1    happening in Congress that day.  He was at the Capitol for a

2    reason.  He approached that police line for a reason.  The

3    reason was his anger at what he knew to be happening in the

4    Capitol that day, where he went following the speech he heard

5    on the Ellipse.

6              THE COURT:  I think this is an interesting issue and

7    I appreciate the fact that you're taking a, what I think is a

8    more defensible position, as opposed to saying, well,

9    government business and official functions can include any

10   actions by the police, which I just -- I think that's probably

11   a stretch.  And I just wanted to -- so you would then agree

12   that there's no daylight between Count 6 and Count 8 here,

13   that he's either guilty of both or guilty of neither, but

14   there's not, given the way you're defining government

15   business, there's no real distinction then between those two

16   counts; fair?

17             MR. MANNING:  I think that's right.  I mean, the

18   only distinction is one is the restricted area and one is the

19   Capitol building or grounds and the two happen to be the

20   same -- they were coterminous on that day for the same

21   reasons.

22             THE COURT:  All right.  Thank you very much.

23             All right.  Again, I appreciate everyone's advocacy

24   here, your civility and your vigorous and effective work as

25   counsel here.  And Mr. Dennis, I've known Mr. Orenberg for a

1    long time.  In fact, he'll probably remember, I think I had

2    cases against him when I was a prosecutor over 20 years ago.

3    I know he appeared in front of me in superior court for many

4    times.  And you're fortunate to have such a good advocate on

5    you behalf.  I've seen a lot of lawyers and I can tell you

6    you're lucky to have him next to you.

7         So the facts that I find here that the defendant

8    came up from Texas to attend the stop the steal rally.  He was

9    coming because former president Trump called patriots to be

10   there, and he believed he was a patriot and should be there.

11   Now he never mentioned why he was coming beyond that the

12   president asked patriots to come, aside for a vague mention

13   about the election in response to my question.  And he never

14   said that he always does whatever a president wants him to do.

15        But in this case there was effectively no

16   cross-examination of the defendant, which again is a tactical

17   decision the government made.  I'm not sure why.  But there

18   was no cross of him as to his motives or his intent either

19   before or after.  And here there were no social media posts or

20   other statements about overturning the election or about

21   Congress or about taking his country back.  And so I don't --

22   given the government's decision not to cross, I don't really

23   have any evidence that he was coming to D.C. to impede the

24   vote, as opposed to coming to support president trump.

25        So after the speech he walked down to the Capitol

1  with others at the rally.  And his motive again, absent any

2  cross-examination, appeared to be to support the president and

3  be a part of the crowd.  There was no specific evidence beyond

4  that.  The Capitol grounds were closed to the public that day;

5  and barricades, fences, and signs so proclaimed.  Many of

6  these were down by the time the defendant arrived and he

7  proceeded after the Peace Circle up onto the Capitol grounds

8  and under the scaffolding for the inaugural stage.  There he

9  heard of tear gassing and a woman being shot, but he decided

10  to keep going forward to see what was going on.  There were

11  also people in ballistic gear with gas masks, helmets, et

12  cetera, which the defendant could see was hardly a peaceful

13  group of rally goers but rather plenty of people intent upon

14  confrontation and violent confrontation.

15       The defendant made his way up to the top of the

16  stage and he could see a police line forming at the top of the

17  steps on the lower west terrace.  The officers were yelling at

18  people to move back and the defendant could see them pushing

19  people off the higher terrace.  Police established a clear

20  line with batons and riot shields making clear that entry to

21  the area was barred, as was entry to the Capitol behind them.

22  People in the crowd were yelling that the officers were going

23  to die and that they were traitors.

24       Upset by what he believed was the striking of the

25  woman in red, the defendant came down from the stage, gestured

1    angrily to members of the crowd to rile them up.  And then

2    walked directly up the steps to where Officer =Weible was

3    standing.  The defendant had his hands in front of his face,

4    he said he was engaged by what had happened and felt compelled

5    to act.  He said he had tunnel vision and was looking at the

6    police line only.  He did not stop moving toward the police as

7    he approached them.

8            So a critical dispute in this case was who was the

9    first aggressor here.  And I find it was the defendant.  That

10   based -- I find this based mainly on the video evidence, which

11   again is undisputed evidence.  It is a video account of what

12   occurred.  I find that he first put his hands on Officer

13   Wyble's baton and made contact with Officer Wyble's right arm,

14   after which the officer to Officer Wyble's right, Officer

15   Pacheco, struck him in the neck area with her baton.

16   Mr. Dennis fell back from that impact and grabbed Pacheco's

17   baton.  Whether that was for support as he was falling or as

18   an aggressive act is not important, because he is no longer

19   charged with assaulting her.

20           In any event, after he was propped up and supported

21   by the man in the blue jean jacket, he then moved forward to

22   strike Officer Stadnik.  Once again I find he was the initial

23   aggressor there.  Stadnik then admittedly pulls him into a

24   bear hug and the two fall to the ground, after which the

25   defendant is restrained.  But based on the video, I find that

1    the defendant was the initial aggressor toward both Wyble and

2    Stadnik.  That he could have retreated after falling back down

3    the stairs, but instead continued forward toward Stadnik.  But

4    it is not the push by the man in the blue jean jacket that

5    propels the defendant toward Stadnik, but rather it's an

6    independent decision by the defendant to continue his

7    aggressive actions.

8            I find the defendant's account of the interactions

9    with the officers not credible, because the video undermines

10   it.  I do find the officer's accounts largely credible but,

11   again, my main reliance is on the video.  In addition, in his

12   July 21st interview the defendant admitted it was the dumbest

13   thing he had ever done, which again shows some recognition

14   that he was not merely a victim here.

15           So given those facts, we now look at the legal

16   issues and we dispense with a couple of defenses.  The first

17   is the public authority defense, which the defense has raised.

18   A number of courts in our district has explained why this is

19   not available in a case like this, and I agree.  For example,

20   Judge Bates in the case of United States versus Sheppard, No.

21   21-203, and Judge Howell in *United States versus Chrestman,*

22   C-h-r-e-s-t-m-a-n, 525 F.Supp.3d 14, in 2021.  They both talk

23   about the unavailability of the defense for two central

24   reasons.

25           First, the defendant must show that he relied on a

conclusion or statement of law by the relevant official, here
Mr. Trump.  But Trump never said to enter the restricted area
of the Capitol in his speech or to overcome police to enter
the Capitol or to impede the certification of the vote.  And
second, even if he implied this, he as the official must have
actual authority regarding the statement.  In other words, he
must have actual authority to instruct people to impede the
certification and to enter restricted areas in the Capitol.
And clearly he had no authority to instruct any impeding of
the electoral certification.  And so, therefore, the public
authority defense is not a valid defense here.

Further, I've already explained why the defense of
self-defense is not valid here, given that I find that the
defendant was the initial aggressor in relation to both Wyble
and Stadnik, the defendant in addition was the one who
provoked the incident by approaching the officers in the first
place.  And again, he's the one who initiated contact.  And
the defense itself has disclaimed any defense of others
defense.  So those defenses, I believe, are invalid.

So then moving to the specific counts, Count 1, I
find that the defendant did knowingly and intentionally commit
an act to interfere with Officer Stadnik, namely his assault
of that officer.  Stadnik was engaged in his official duties
which were incident to a civil disorder.  The civil disorder
did both affect commerce, we heard evidence about safeway

1    stores closing, and in addition it affected the performance of

2    a federally protected function, namely the Secret Service

3    protection of the vice president.  Again, we heard evidence

4    that the Secret Service had to move the vice president because

5    of disorder.  So I find the defendant guilty of Count 1.

6         Counts 2 and 4 relate to the assault and impeding of

7    officers.  And I explained in detail in my factual recitation

8    why the defendant did assault and interfere with both Wyble

9    and Stadnik.  He acted intentionally and voluntarily.  He made

10   contact with both of them intentionally and when he did so

11   they were assisting federal officers, namely the United States

12   Capitol police officers in their official duties, and I

13   therefore find him guilty of Counts 2 and 4, which are the

14   assault counts.

15        Count 5 is entering and remaining in a restricted

16   building or grounds.  I find the defendant knew when he was

17   under the scaffolding and heard of people being tear gassed

18   and shot that he wasn't allowed to be at that place on the

19   Capitol grounds, even if he reasonably believed that he could

20   be on the Capitol grounds between the Peace Circle and the

21   stage, which I don't need to find, but I find that he knew

22   that he wasn't allowed to be there under the inaugural stage.

23   And even if he was, at the very least he knew he could not go

24   to the top of the steps where the police line was.

25        Now, the defense at trial and in their brief, which

1  they submitted after the trial, argued that the police line

2  had low visibility and so the defendant did not necessarily

3  know that he could not proceed to the top of the steps there

4  on the lower west terrace, but I don't find that a credible

5  argument.  The defendant could see both from the stage and

6  from down the steps that the police had established a strong

7  and serious line.  The fact that one man with a cane was

8  behind the line, lying on the ground, doesn't diminish that.

9  And so the officers were telling people to move back.  They

10 had shoved people back.  And they established a clear line

11 with batons and riot shields.  Anyone would know they did not

12 have the authority to be there.  And yet the defendant,

13 knowing that, still walked up to the top of those steps.  In

14 addition, this was a restricted building because the vice

15 president was there, who is a person protected by the Secret

16 Service.  I therefore find the defendant guilty of Count 5.

17         Count 6, again, speaks of disorderly and disruptive

18 conduct in a restricted building or grounds.  And clearly this

19 was disorderly and disruptive conduct.  But again, the

20 question is was this an intent to impede or disrupt the

21 orderly conduct of government business or official functions,

22 or was his intent simply to assault the police.  In other

23 cases there's been some social media posting or other

24 statement by the defendant saying what his intent was, that it

25 was to in fact impede a vote.  Now, there's certainly an

1  argument that anybody at the Capitol that day was engaging --

2  that that was the conduct they were engaging in.  But again

3  here, I think it's a close call.  I must find beyond a

4  reasonable doubt the defendant so acted.  As I said, in the

5  absence of any government cross-examination of the defendant,

6  I cannot find that his -- beyond a reasonable doubt that he

7  was intending to impede or disrupt Congress as opposed to

8  simply being on the Capitol grounds to support President Trump

9  and to support other rally goers.  And given that the

10 government agrees, at least for purposes here, that police

11 functions are not necessarily government business or official

12 functions, I find -- I cannot find beyond a reasonable doubt

13 in this case that he was intending to impede or disrupt the

14 orderly conduct of government business or official function.

15 So I'll find him not guilty of Count 6.

16         Count 7, relates to engaging in physical violence in

17 a restricted building or grounds.  Again, he engaged in

18 physical violence because of the assault.  He engaged in so

19 knowingly and he was in a restricted building or grounds,

20 which he knew as I explained in relation to Count 5.  So I'll

21 find him guilty of Count 7.

22         Count 8 is disorderly conduct in a Capitol building.

23 And for the reasons he's not guilty of Count 6, he's not

24 guilty on Count 8, because there's no evidence of an intent to

25 disturb the orderly conduct of a session of Congress.  And

1    again, you know, it's not -- it's far from frivolous to argue

2    that everybody on the grounds that day had the intent to

3    disrupt, but I think here, beyond a reasonable doubt, I can't

4    find without any statements by the defense -- by the

5    defendant, I mean, before or during the incident that he was

6    there to do that as opposed to simply -- that he was simply

7    angry at the police.

8                 And then finally -- so not guilty of Count 8.

9    Finally, Count 9 is physical violence in a Capitol building or

10   grounds.  Again, he did engage in the act of physical violence

11   as I've explained it, and he did so in the grounds of the

12   Capitol, and he acted willfully and knowingly.  So I find him

13   guilty of Count 9.

14                So once again, guilty of Counts 1, 2, 4, 5, 7 and 9.

15                Any question as to the verdict, Mr. Manning?

16                MR. MANNING:  No, Your Honor.

17                THE COURT:  Mr. Orenberg?

18                MR. ORENBERG:  No, Your Honor.

19                THE COURT:  Okay.  So we need to set a date for

20   sentencing.

21                THE CLERK:  April 13th.

22                THE COURT:  What did you say?

23                THE CLERK:  90 days would be April 13th.

24                THE COURT:  And what day of the week is that?

25                THE CLERK:  That's a Thursday.

```
1              THE COURT:  Okay.

2              THE CLERK:  It does not look like we're in trial.

3              THE COURT:  Okay.  April 13th is a Thursday, 11:00

4    o'clock, Mr. Manning?

5              MR. MANNING:  That works for the Government, Your

6    Honor.

7              MR. ORENBERG:  What time, Your Honor?

8              THE COURT:  11:00 okay?

9              MR. ORENBERG:  That's fine.

10             THE COURT:  Again, that will be in person, Mr.

11   Orenberg, because it has to be.

12             MR. ORENBERG:  It has to be.  I understand.

13             THE COURT:  All right.  So Mr. Dennis, you will

14   be -- you're going to be interviewed by the probation

15   department in regard to a presentence report.  That means that

16   they're going to talk to you about your background, your

17   employment, education, family.  If you wanted Mr. Orenberg

18   present during that interview you may do so.  In addition, he

19   and the government may submit memoranda regarding a

20   sentencing.  Each of them will have a chance to talk at

21   sentencing.  You'll have a chance to talk at sentencing.  If

22   you want to submit letters on your own, behalf you may also do

23   that.  Do you understand all of that?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  And anything else then for the
```

1    Government today?

2              MR. MANNING:  Just the question under 18, U.S.C.,

3    3143, Your Honor, of the conditions.

4              THE COURT:  Okay.  And is there -- yes.

5              MR. MANNING:  Your Honor, the defendant has been on

6    release up till now.  Typically, under these charges of

7    conviction, the government would contend that detention is now

8    warranted under Section 3143.  However, the government and

9    defense counsel have been communicating about this.  And we do

10   believe that with some heightened conditions that we

11   understand that defense will propose and agree to, that under

12   those heightened conditions, and under the particular

13   circumstance of this case, that could satisfy ongoing

14   remainder under 1343.

15             THE COURT:  Thank you very much.

16             Mr. Orenberg.

17             MR. ORENBERG:  Good morning, Your Honor.  Appreciate

18   the government's recommendation.  We have been discussing, I

19   guess, a joint proposal to the Court.  He is currently under

20   conditions that include, obviously, no firearms in the home.

21   When he was initially arrested he was reporting once a week to

22   Pretrial Services in the Northern District of Texas.  I

23   understand that's been relaxed or modified to monthly.  So I

24   think what we'd jointly propose is that the Court, I guess in

25   the way that it can, instruct the Northern District of Texas

1    to ask him to report on a weekly basis.  Again, no --

2              THE COURT:  In person or phone reporting.

3              MR. ORENBERG:  No, by phone.  And no travel outside

4    the Northern District of Texas without permission by either

5    the Pretrial Services officer down there, or if necessary by

6    the Court.

7              THE COURT:  Okay.  That's fine with me.  I think

8    what the best thing, if you -- maybe the government and you

9    can just submit a proposed modification of conditions form.

10   Just coordinate with the courtroom deputy to just submit the

11   form that makes those changes in the conditions and I'll sign

12   that.

13             MR. ORENBERG:  Okay.

14             THE COURT:  Okay.

15             All right.  So Mr. Dennis, given the recommendation

16   by both sides, I will not detain you pending sentencing.  I

17   believe that given your compliance so far that that's

18   appropriate as a recommendation.  And it is what I expect I

19   would have done absent recommendation.  And so there are going

20   to be a couple of other restrictions; you need to report

21   weekly and you can't leave the Northern District of Texas

22   without consent of pretrial.  If you want to leave and they

23   don't consent, you can ask your lawyer to ask me if there's

24   some special occasion like a funeral or something you need to

25   go to, you can let me know.  All right?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you all.

3          MR. ORENBERG:  Thank you, Your Honor.

4          THE COURT:  We'll see you in April.

5          (The proceedings were concluded at 10:33 a.m.)

6

7          I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
record of proceedings in the above-entitled matter.

8
                    _____/s/_____
9                        Christine T. Asif
                     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25