# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 1:21-cr-00552 (DLF)** |
| **v.** | : | |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL UNDER RULE 33, AND/OR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT UNDER RULE 29

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Opposition to Defendant Kenneth Joseph Thomas's renewed motion for judgment of acquittal (originally stated orally at the close of the Government's case in chief) and motion for a new trial. ECF Nos. 193-94 ("Mot.").  The defendant asks this Court to set aside the jury's verdicts of guilty following a trial and presentation of evidence by both Government and defense, and to enter a judgment of acquittal or, in the alternative, grant a new trial.

Following trial, the jury convicted the Defendant on the following seven counts:

- Count One, Civil Disorder, 18 U.S.C. § 231(a)(3);
- Count Three, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Four, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Six, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Seven, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Eight, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); and
- Count Nine, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, § 1752(a)(2).

1

The Court should deny the Motion because, as the Court correctly found in many of its trial rulings, there was sufficient evidence to convict the Defendant of all counts beyond a reasonable doubt. *See, e.g.,* May 20, 2023 Minute Entry ("[A] trial, the government has produced more than sufficient evidence to permit a reasonable juror to find, beyond a reasonable doubt, that the defendant committed unlawful acts that support the charges in the indictment."). In addition, the Defendant fails to raise sufficient grounds for a new trial.

## THE EVIDENCE AT TRIAL

The evidence at trial showed that Thomas was acutely aware of the constitutional significance of January 6 and that he was intent on disrupting Congress' certification of the 2020 election by any means necessary, including by using force against law enforcement for many consecutive hours. (*E.g.,* Govt Admitted Trial Exs. (hereinafter "Govt Ex.") 402.1008 (Facebook post re "Midnight Riders Caravan" map; PiAnon "DC or Bust" meme), 402.3717 (Facebook post re 12th Amendment), 402.3788 (Facebook post re January 6 and VP Pence)), 300 series (BWC); Govt Exs. 504, 505 (Def. Rumble videos)). The evidence showed that Thomas began to act on this desire by not only traveling from Alabama to Washington, D.C. to attend the Stop the Steal rally on January 6, 2021, but by playing a unique leadership role both prior to and during the riot. (*Id.; see also* Govt Ex. 507 (Midnight Ride Caravan Richmond, CBS6 Interview)).

### *Prior to January 6*

Operating under the alias of "Pi Anon," Thomas personally organized and led a "MAGA caravan" of vehicles, which he referred to as the "Midnight Riders." (*E.g.,* Govt Exs. 402.1008, 402.5522 (Facebook post Midnight Ride Routes), 507). The evidence at trial showed that in the months and days leading up to January 6, he made countless social media posts regarding his understanding of the certification and his plans for the day, including posting the 12th Amendment

to the Constitution (covering the electoral college vote count) (Govt Ex. 402.3717), and memes

with violent imagery that showed bombs and lightning flying over and striking the United States

Capitol Building:

 

(Govt Exs. 402.3717, 402.8825).

In one of his Facebook posts, he specifically said the following about what was supposed

to be the peaceful transfer of power on January 6:



"Congressional vote on January 6 might be PLAN B . . . Plan A could be to just ignore the fraudulent electors . . . On January 6, VP Pence could throw out the fraudulent electors . . . Actually, he must throw out fraudulent electors."

3

Another Facebook post included an image of a figure in colonial attire on horseback, pointing a sword, which was captioned with what later became Thomas's mantra on January 6: "HOLD THE LINE."



(Govt Ex. 402.15465).

***On January 6, 2021***

Evidence presented at trial established that on January 6, 2021, the U.S. Capitol Building and its surrounding grounds were a restricted area because (1) the Vice President and his family would be visiting the Capitol for the election certification proceedings, and (2) of pre-existing COVID-19 precautions. (*E.g.*, Govt Exs. 201, 202, 204). The restricted grounds were demarcated by bike rack barricades and "AREA CLOSED" signs, demarcations that Thomas saw and filmed earlier throughout the day. (*E.g.*, Govt Exs. 504 (Def. Rumble video at 41:09), 511 (Def. YouTube video at 00:11)). But, these demarcations did not deter Thomas from entering and remaining on restricted Capitol Grounds for hours.

After attending the "Stop the Steal" rally at the Ellipse, Thomas, with his wife and child, marched down Pennsylvania Avenue towards the West Lawn of the U.S. Capitol.  (*E.g.*, Govt Exs. 510-517 (Def. YouTube videos)).  At one point on that march, Thomas is heard in his own video stating, "You hear that Congress?"  (Govt. Ex. 511 (approx. 04:45)).  As the crowd outside the Capitol, including Thomas, grew increasingly violent towards law enforcement, Thomas's wife and child decided to leave the scene, but Thomas did not; he chose to continue forging ahead to get closer to the Capitol Building:  "I don't know if [my wife] made a text or maybe a quick call or whatever, but she said like okay, we're going to go back to the buses because they're going to be leaving, there's something not right, and then she asked me, you know, please leave right now. And I said no . . . So they left. I made sure she got my daughter to safety. And then I went towards the Capitol." (Trial Tr. 207:12-18).

Thomas entered restricted Capitol Grounds around 2:28 p.m., when he videoed himself among thousands of other rioters stating, "Right now we got a whole list of patriots goin' and are gonna' storm the Capitol."  (Govt Ex. 511 (07:44)).  Notably, his choice to use the term "storm" is the only conduct for which Thomas feels remorse.  (Trial Tr. 222:11-15 ("Q. There's been some reference in this case and some of the testimony or documents about storming.  Do you recall that? A.  Yeah. So that is the one thing I regret saying in my videos.").

As Thomas marched up the stairs to the West Plaza and entered the staging area, he was not dissuaded by the presence of thousands of rioters battling hundreds of law enforcement officers there.  (*E.g.*, Govt Ex. 504 (approx. 18:00)).  Instead, for example, when he saw countless officers in the Upper West Terrace's grandstands preparing to line up to keep rioters back, he took video of them and began a "POLICE STAND DOWN" chant directed towards them, encouraging other rioters to join him as he said that phrase over and over again.



(*Id.*).

Shortly before 2:30 p.m., in response to the physical breach of the Capitol, the House and Senate suspended the Joint Session of Congress. U.S. Secret Service agents evacuated the Vice-President and his family from the Senate Chamber to a secure location within the Capitol grounds. (Govt Ex. 103). Simultaneously, U.S. Capitol Police (USCP) officers and congressional security staff worked to evacuate the Speaker of the House and senators, lock down the House Chamber, and protect the lawmakers and staff they could not immediately evacuate. (*Id.*; *see also* Govt Ex. 204).

At this time and for the next many hours, Thomas remained at the front of crowds on the Upper West Terrace, encouraging other rioters to push back against the lines of law enforcement that were attempting to protect the Capitol Building and to clear rioters from the Grounds. (*E.g.*, Govt Exs. 504, 505 (Def. Rumble videos)). The evidence showed that Thomas took cell phone

video of most of his day on January 6, including filming himself stating the following, often repeatedly, and in angrier and angrier tones:

- This is our house!  We're not backing down! (*E.g.*, Govt Ex. 309.1 (BWC))
- I just wanna' go knock on the door! (*Id.*)
- Let us in! (*Id.; see also* Govt Ex. 504 (29:43, 42:40))
- Police stand down! (*E.g.*, Govt Ex. 504 (18:44))
- WE behind YOU.  (*Id.* (41:27))
- Push! (Govt Ex. 305.1 (BWC))
- We want freedom, we want peace! (*E.g.*, Govt Ex. 308.1) (BWC))
- Traitors, traitors, traitors! (Govt Ex. 504 (36:36))
- You have woken a sleeping giant! (*E.g.*, Govt Ex. 303 (BWC))
- You see that you sons of bitches . . . fuck these assholes. HOLD THE LINE! (Govt Ex. 504 (53:23)).
- HOLD THE LINE!  HOLD THE FUCKING LINE! (*E.g.*, Govt Ex. 308.1 (BWC))

Thomas's intent was evidenced by his relentless efforts to get past, through, and around law enforcement:  he was attempting to get inside the building, "his house."  To that end, at approximately 3:15 p.m., Thomas was captured in officers' body-worn camera with a knife in his hand, just before he planned to cut zip-ties that were hindering his ability to exit out from under the Upper West Terrace's grandstands:



Notably, he deleted or otherwise edited out portions of his own video of this particular interaction with law enforcement, including the portion where an officer points at Thomas and orders him to put the knife away.  (*E.g.*, Govt Ex. 309.1 (BWC compared to Def. Rumble video)).

The evidence showed that approximately 15 minutes later, rather than heed officers' warnings to exit Capitol Grounds, Thomas instead proceeded to lead a barrage of assaults on law enforcement officers. At approximately 3:30 p.m., Thomas assaulted two MPD officers on the Senate side of the West Front of the Capitol by, twice, running up a short flight of stairs and throwing his body and hands into the officers' chests, all of which is captured on their body-worn camera:







(*E.g.*, Govt Ex. 307.1 (BWC)).  The jury convicted on both these charges, Counts Three and Four.

Approximately one hour later, around 4:30 p.m., Thomas again assaulted additional officers as they attempted to move rioters northward and off Capitol Grounds.  In both body-worn camera and in Thomas's own videos, officers are heard ordering rioters to "move" and telling them the plan was clear them off the Upper West Terrace.  (*E.g.*, Govt Ex. 308.1 (BWC), 712 (open-source video)).  But, the evidence showed at trial that, rather than comply, Thomas instead physically pushed back against the officers, chanting his mantra over and over again: "HOLD THE LINE."  (*Id.*).



(*E.g.*, Govt Ex. 305.1 (BWC)). Thomas was convicted of the assault depicted above, Count Six.

In the final charged assault on which the jury convicted, Count Seven, Thomas walked ahead of the rest of the rioters and body-checked a Metropolitan Police Department (MPD) officer directly in his shield, while again chanting, "HOLD THE LINE" repeatedly.  This officer testified that he still, today, struggles to be in crowds due to the trauma he endured on January 6.





(*E.g.*, Govt Ex. 308.1 (BWC)).

But Thomas did not stop there: late into the day, as the sky is visibly growing darker,

Thomas continued pushing back against law enforcement as they attempted to clear rioters off of

the Upper West Terrace.  For example, in another one of the videos Thomas took and posted to social media, he continued to push back against the moving law enforcement line while stating, "You see that you sons of bitches . . . fuck these assholes. HOLD THE LINE."  (Govt Ex. 504 (53:23)).

### Count One (18 U.S.C. § 231(a)(3))

The trial evidence showed that for many hours, Thomas contributed to the on-going unrest at the Capitol by, among other things, relentlessly attacking uniformed law enforcement officers, both verbally and physically.  In addition to the evidence described above, for example, Thomas joined a chant directed at a line of officers protecting the Capitol, where he yelled, "Traitors, traitors, traitors . . .!" (Govt Ex. 504 (36:36)).  Due the dangerous and violent conditions to which Thomas contributed, law enforcement agencies were unable to perform their proper functions, and the D.C. Mayor then issued an emergency order, instituting a 6pm curfew for all of D.C.  (*E.g.*, Govt Ex. 121).  The Government presented evidence that almost every D.C. location of the grocery store chain Safeway then went into the red, and the number of shipments of goods out of Safeway's Pennsylvania warehouse to Washington, D.C. plummeted.  (*See* Govt Exs. 116, 117).  On these bases, the jury found Thomas guilty of 18 U.S.C. § 231(a)(3).

### After January 6

Following January 6, Thomas boasted about his experience on social media platforms.  He posted on Facebook that although he did not "condone violence or destruction," he became "a little less restrained" as he saw "Capitol police fir[ing] tear gas on unarmed civilians . . .."  (Govt Ex. 402.14877).  Since January 6, Thomas has sought to become a well-known January 6 "activist." *See* Trial Tr. (requested but not yet available in full).  He is prolific on his various social media accounts, especially Telegram and Rumble, where he has accounts under the following usernames:

"Kekistani Rumblings" and "Sing4Freedom." (*E.g.*, Govt Ex. 500 series).  He has posted much

of the footage he captured on January 6 to those accounts, where it remains available today.  (*See*

*id.*).  He also has contributed to and posted countless podcasts on which he has appeared as a guest

since January 6.  (*See id.*).  In fact, at trial, he testified that he has gained corporate sponsors for

his social media activity, for example.  *See* Trial Tr. (requested but not yet available in full).

He also posted the following on Telegram late in 2022, and testified that he thought this

post was humorous:



(Govt Ex. 508).

<u>ARGUMENT</u>

Defendant's filing is plainly deficient under Rule 29 and Rule 33 of the Federal Rules of

Criminal Procedure.  His Motion should be denied.

**I.    Applicable Law**

A.  <u>Rule 29.</u>

Federal Rule of Criminal Procedure 29 permits the defendant to move for judgment of

acquittal at the close of the government's case in chief or at the close of all evidence on the grounds

that the evidence presented is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The

Court must affirm the verdict if, considering the evidence in the light most favorable to the

government, it determines that *any* rational trier of fact could have reached the same verdict." *E.g.,*

*United States v. Reffitt*, 602 F. Supp. 3d 85, 90 (D.D.C. 2022) (citing, e.g., *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002)).  "[A] judgment of acquittal is appropriate only when there is no evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *Reffitt,* 602 F. Supp. 3d at 90 (citing *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983). The Court "must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *Reffitt,* 602 F. Supp. 3d at 90 (citing *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983)).

A defendant's Rule 29 burden at the post-verdict stage is "very high," in part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015).  Indeed, the Court owes "tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). The defendant cannot surmount that demanding standard here.

B.  Rule 33.

Federal Rule of Criminal Procedure Rule 33 allows courts, at a defendant's request, to vacate a judgment and order a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a). "Motions under Rule 33 are disfavored, however, and 'viewed with great caution.'" *E.g., United States v. Hale-Cusanelli,* No. 1:21-CR-00037 (TNM), 2022 WL 4300000, at *3 (D.D.C. Sept. 19, 2022) (citing *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (cleaned up)). "Courts 'sparingly' exercise their authority to order a new trial, reserving it for 'extraordinary circumstances where the evidence preponderates heavily against the verdict' and when any error 'affects a defendant's substantial rights.'" *Id.* at 32 (cleaned up) (citation omitted).  "Granting a new trial 'is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred.'" *Reffitt,* 602 F. Supp. 3d at 90 (citing *United States v. Wheeler*, 753 F.3d

200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted)).  Indeed, application of

the rule "should be … limited to situations presenting a serious danger that  . . . an innocent person

has been convicted." *Borda*, 786 F. Supp. 2d at 32 (D.D.C. 2011) (internal quotations and citations

omitted).  The defendant bears the burden of "proving that the new trial is justified." *Reffitt,* 602

F. Supp. 3d 90 (citing *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

**II.    The Motion Should be Denied Under Both Rule 29 and Rule 33.**

In his Motion, the Defendant presses nearly identical arguments to those he advanced in

the many filings he submitted prior to trial, during trial, and during his first Rule 29 Motion, none

of which meet his "very high" burden under Rule 29 or the "extraordinary circumstances" standard

under Rule 33.   In fact, this Court has previously, and often repeatedly, rejected these very

arguments and found that "the government has produced more than sufficient evidence to permit

a reasonable juror to find, beyond a reasonable doubt, that the defendant committed unlawful acts

that support the charges in the indictment."  *See, e.g.,* May 20, 2023 Minute Entry; *see, e.g.,* ECF

Nos. 60, 61, 63, 64, 65 (collectively denied in Court's March 20, 2023 Minute Order); ECF Nos.

91, 114, 116, 118, 130, 136, 137, 148 (collectively either denied or deferred by Court during trial).

The jury in this case has now rendered a guilty verdict and, because the Defendant provides no

sound reason to reach a different result, the Court should deny his Motion.

### A.   The Court Previously Rejected Defendant's Missing Witness Argument.

Contrary to Defendant's argument (Mot. ¶ 1), the Court was well within its discretion to decline

to give a "missing witness" instruction here because Defendant could have called the witnesses,

and the witnesses' testimony would have been corroborative, if not cumulative, of the video

evidence.   Despite receiving the Government's final witness list on May 10, 2023, a list that

indicated the Government did not intend to call victim-Officers MN and KV, the Defendant chose

not to call the purported "missing witnesses," and waited until the final day of trial to request a missing witness jury instruction wherein he made the same arguments he makes in the instant Motion. *See* Mot. at 2; ECF No. 149 ("Thomas' proposed Missing Witness Jury Instruction"). The Court rejected this request, properly exercising the Court's "sound judicial discretion" on the issue. *See, e.g., United States v. Norris*, 873 F.2d 1519, 1522 (D.C. Cir. 1989). This ruling was proper: "an instruction or inference that the missing witness' testimony would be unfavorable to the government is generally permissible only when it is within the government's exclusive power to call the witness to testify." *Id.* For example, "no automatic inference of exclusive government control arises from the fact that witnesses are acting as government informants" because even if the government does not call that individual as a witness, the defendant is free to do so. *See id.* (citing *United States v. Tarantino*, 846 F.2d 1384, 1404 (D.C. Cir. 1988)); *see also United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir. 1994) (finding no error in refusal to give missing-witness instruction where defendant "has not shown that the missing agent was unavailable to him; indeed, he did not even inquire about the agent prior to trial"); *United States v. Nichols*, 912 F.2d 598, 602 (2d Cir. 1990) (notwithstanding the "close relationship between law enforcement agents and prosecutors," no need to give missing-witness instruction where defendant had the names of the agents and "[d]espite the availability of the agents, Mason made no effort to call them as witnesses. Under these circumstances, it appears that the agents' testimony was equally available to Mason and the government.").

"The logic underlying the missing witness rule is that where the party with peculiar or exclusive control of a witness fails to call that witness, there must be some reason for its failure." *Norris* 873 F.2d at 1522 (citing *Burgess v. United States*, 440 F.2d 226, 234 (D.C. Cir. 1970)). But, "[w]here there are other reasons why [s]he was not called, the failure of the party having the

peculiar power to control the presence of the witness to put her on the stand d[oes] not authorize an inference, supported by an instruction, that if [s]he testified [s]he would have done so unfavorably to the party." *Id.* (citations and quotations omitted). This is especially true where, as here, "[t]he government had well established the facts upon which it relied." *See id.*

Here, the Government was well within its rights to choose not to elicit testimony from every victim-witness, especially where, as here, the Government's evidence as to the assaults on those two officers was "well established" because it was clearly shown in officers' body-worn camera and other video evidence. Where the witness testimony is likely to be "cumulative or corroborative," the missing witness instruction is not justified. *Tarantino,* 846 F.2d at 1404 (citation omitted). The clarity of that evidence is established by the jury's convictions on the two counts in which the "missing" officers were victims: Counts Four and Six. Moreover, the Defendant was free to call Officers MN and KV, but he chose not to do so.

Therefore, on this point, the Defendant has failed to meet his burden under either Rule 29 or Rule 33.

### B. The Court Previously Rejected Nearly Identical Arguments Regarding Defendant's Misunderstanding of 18 U.S.C. § 111(a)(1).

Defendant also appears to argue that, despite Rule 29's deference to jury verdicts and Rule 33's extraordinary circumstances requirement, the officer-victims' physical stature, uniforms, riot readiness, memories, or mindsets on January 6—all facts the jury was fully capable of assessing—serve to fatally undermine the jury's convictions on Counts Three, Four, Six, and Seven, the 18 U.S.C. § 111(a)(1) counts. *See* Mot ¶¶ 2-3. He also again argues that Defendant's conduct did not and cannot rise to the level of "assault" as contemplated by the statute. *See id.* These arguments are recycled from a number of the Defendant's prior filings, especially his motion to dismiss the 111 charges, which this Court has repeatedly rejected. *See, e.g.,* ECF 63 (denied in

March 20, 2023 Minute Order).

In that motion, for example, the Defendant argued as follows:

> [M]ere harmless elbowing or pushing resistance, or mere brushing against a police shield during demonstration does not constitute aggravated felony assault on law enforcement, as contemplated by 18 U.S.C. §111 . . . Riot officers are specially equipped and trained officers. They don special crowd control gear in preparation, expectation and anticipation of making forceful contact with protestors in chaotic situations. [ ] Riot officers wearing "hard gear" then position themselves in aggressive advancement formations in order to push out crowds of demonstrators. They intend and expect to make physical contact.

ECF No. 163 at 2-3. This Court rejected those very arguments when it denied that motion. *See* March 20, 2023 Minute Order (denying motion (ECF No. 63)); *see also* ECF 103 (notice of expert on excessive use of force by law enforcement); May 12, 2023 Minute Order ("For the reasons stated at the May 12, 2023 pre-trial conference, the government's 87 Motion to Exclude the proposed expert testimony of Mr. Steve Hill and 106 Motion to Exclude the proposed expert testimony of Norbert J. Michel are GRANTED."); *see generally* Trial Tr. (requested but not yet available in full).

As the Court stated many times during trial, the officers' stature, readiness, memory, or mindsets are irrelevant to the Defendant's own *mens rea* because the Defendant, not the officers, was on trial; the sole inquiry was whether the Defendant acted "voluntarily and intentionally," and whether the jury found he "assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the United States, or any person assisting such an officer." *See* 18 U.S.C. § 111(a)(1) (emphasis added); ECF No. 190 at 28-30 (final jury instructions). Here, the jury's convictions on these counts shows it did, indeed, find the Defendant intended to assault, resist, impede, intimidate, or interfere with the four officer-victims in these counts.

Furthermore, as this Court found by denying the Defendant's motion to dismiss (ECF No. 63), there is no merit to the Defendant's argument that there is some sort of exception to

Section 111(a) for officers who are wearing protective gear or who know they are in a dangerous situation.[1]  *See* Mot. ¶ 3.  Officer R.A.'s testimony does not undermine the jury's verdict.[2]  First, nothing in the statute suggests that an assault is voided because an officer, over two years later, might not remember it.  Second, the officer's subjective assessment of defendant's intent—uninformed by evidence such as defendant's other statements—is not relevant.  Therefore, the Defendant failed to meet the standard under either Rule 29 or Rule 33.

      C.   The Court Previously Rejected Nearly Identical Arguments Regarding Defendant's Misunderstanding of 18 U.S.C. § 231(a)(3).

Here too, the Defendant recycles failed arguments to no avail.  *See* Mot. ¶ 4.  In the Motion, the Defendant argues that the Government "utterly, totally, and completely" failed to adequately prove Count 1, Civil Disorder, because it "put on no evidence of any city-wide, neighborhood-wide, or even regional negative economic impact due to Thomas' participation in events at the Capitol."  Mot. at 4-5.  But, the Court considered and rejected this very same argument at least once during trial.  *See generally* Trial Tr. (requested but not yet fully available, where the Court overruled the Defendant's Trial Brief objections on this issue); ECF No. 130 (Def. Reply to Govt Resp. to Trial Brief) ("Well, the Government is getting closer. But some attention to the actual laws applicable is still required. Starting with the clearest and shortest issues first for expediency . . . The statute 18 U.S.C. § 231(a)(3) . . . was passed specifically to address rioting that directly

---

[1] Defendant's claim that "mere simple assaults are treated as aggravated assaults" (¶ 3) is incorrect. Section 111(a) differentiates between simple assaults and acts that violate the statute and also include physical contact or the intent to commit another felony, providing different penalties for each.

[2] Moreover, Defendant's argument with respect to R.A. ignores all inculpatory testimony from him, such as, for example, his testimony that he recalled the group of rioters of which Defendant was a part making multiple runs at the police line in their attempts to get past officers and get closer to the U.S. Capitol Building.

harmed commerce like burning down businesses . . ..”); ECF No. 116 at 10 (Def. Trial Brief) (“The government’s claims in Count 1 fail due to lack of negative impact on commerce.”).

The Court’s ruling was, in essence, as follows:  first, the statute does not require the Government to prove “city-wide, neighborhood-wide, or even regional negative economic impact due to Thomas’ participation in events at the Capitol”; instead, as the jury instructions state, the Government need only prove that the civil disorder “in *any way or degree* obstructed, delayed, or adversely affected *either commerce* or the *movement of any article* . . ..”  *See* ECF No. 190 at 20 (emphasis added).  The Safeway records showed that Safeway stores in D.C. were impacted by the events of January 6, as were the shipments from Pennsylvania to D.C. Thus, the Court properly admitted these self-authenticating business records at trial after the Government provided a certificate of authenticity that complied with Federal Rule of Evidence 902(11).  Because business records are not testimonial, their introduction does not violate the Confrontation Clause. *See, e.g., United States v. Khatallah*, 278 F. Supp. 3d 1, 11 (D.D.C. 2017) (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)).  Nor would a rational jury be compelled to find that the curfew order, issued <u>because of the riot</u>, was an “independent and intervening force,” and that, consequently, the riot did not, “in any way or degree” affect commerce or the movement of any article in commerce. The defendant cannot meet his burden of demonstrating that “no rational jury” could have concluded that the riot had a deleterious effect on commerce or the movements of an article in the District of Columbia.

Moreover, as the Court repeatedly noted throughout trial, this charge can be proven in an entirely separate manner that has nothing at all to do with commerce: the jury could have found the Defendant guilty of Count 1 because the Government proved the *civil disorder* “obstructed, delayed, or adversely affected . . . the conduct or performance of *any federally protected function*.”

A federally protected function could have been any number of things, mainly, the U.S. Capitol Police's protection of the Capitol and its occupants and the U.S. Secret Service's protection of the Vice President.    Whether the Defendant, alone, interfered with a federally protected function is of no moment, given the Government is only required to prove that the defendant joined the *civil disorder*, which interfered with a federally protected function.  Thus, Defendant's argument that "[n]othing Thomas did on Jan. 6 could have interfered with officers' performance of a federal function" is irrelevant and misunderstands the statute (though the Government disagrees factually on this point).  Mot. ¶ 7.

For all these reasons, the Defendant has failed to meet his burden under either Rule 29 or Rule 33 on Count Two.

> D. <u>The Court Previously Rejected, Many Times, Nearly Identical Arguments Regarding the First Amendment and Defendant's Misunderstanding of 18 U.S.C. § 1752(a)(1)-(2).</u>

Here, the Defendant either (1) disregards the Court's rulings on the First Amendment, (2) misunderstands the elements of Counts Eight and Nine, or (3) refuses to accept what that statute provides.  *See* Mot. at 7-10.  The Motion makes the same arguments that the Defendant levied before trial, during trial, and during his first Rule 29 Motion, which the Court repeatedly rejected: that the Defendant did not commit crimes on January 6 because the Capitol Grounds, as a "public forum," were not permitted to be restricted due to "a long line of cases holding that people have a right to use the Capitol Grounds as a free speech and protest forum."[3]  *Id.*

Most explicitly, the Court rejected these arguments when it granted the Government's Motion *in limine* to Preclude the Use of Certain Improper Defenses, which carefully laid out why

---

[3] The Defendant has made these same arguments unsuccessfully numerous times elsewhere.  *See, e.g.,* ECF No. 64 at *passim* ("Furthermore, here in this case, the Government has spread the false implication, like an inkblot test, that the U.S. Capitol and its grounds are presumptively restricted areas . . . .") (citing, e.g., *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp 575

these very same arguments fail:  Capitol Grounds were lawfully restricted on January 6, 2021, and

the Defendant's First Amendment rights cannot insulate him from prosecution for is assaultive

conduct, among other things, within the Restricted Perimeter.[4]    This Court granted the

Government's Motion in its May 8, 2023 Minute Order, as well as when it refused to grant the

relief requested on this issue in Defendant's Trial Brief.[5]   *See generally* Trial Tr. (where Court

---

(D.D.C. 1972)); ECF No. 116 at *passim* (citing *Jeanette Rankin Brigade*: "The government relies
on an argument that the Secret Service gets to simply pronounce arbitrarily that a place is restricted
because a protectee may be "visiting. . . .."); ECF No. 130 at 10 ("However, as previously and
repeatedly briefed by the Defendant, *Jeanette Rankin Brigade* explicitly rejected the idea that the
Capitol Grounds require the atmosphere or quiet of a library and reject the regulation of noisy
protest. . .."); ECF No. 136 at *passim* (Motion for a Mistrial on First Amendment Grounds).

[4] The Government successfully argued against these arguments on numerous occasions as follows:

> The Court should preclude the Defendant from eliciting evidence, arguing, or
> asking questions that suggest that there was a First Amendment right to protest
> inside the restricted area around the Capitol on January 6. At trial, the government
> will show that the Capitol Grounds were restricted that day. There is no First
> Amendment right to protest in a restricted area. The government can—and on
> January 6, 2021—did restrict an area that is a traditional public forum for legitimate
> government ends. This Court has affirmed that the government may close a public
> forum in similar circumstances . . . That the Defendant's conduct early in the day
> on January 6 was protected by the First Amendment is of no moment in light of his
> breach of a restricted perimeter, assaults on law enforcement, and obstructive
> conduct against law enforcement when they attempted to clear the area around the
> Capitol: the moment he engaged in such conduct he crossed beyond the boundary
> of conduct protected by the First Amendment."

*See* ECF No. 82 at 2-8 (collecting cases); *see also, e.g.*, ECF No. 125 (Govt Resp. to Def. Trial
Brief) ("The Government notes that it has previously briefed the issue about whether the Capitol
Grounds may be temporarily closed to First Amendment activities. In response to the Defendant's
trial brief, the government adopts in full—again—the argument from its prior motion.  However,
the Government notes that many of the cases the Defendant cites to support his assertion that any
closure of the Capitol grounds at any time is unlawful do not stand for the propositions that he
contends . . ..") (citations omitted).

[5] Defendant made many of these arguments again in his Motion for a Mistrial on First Amendment
Grounds (ECF No. 136), which this Court also explicitly rejected. *See* May 20, 2023 Minute Order
("For all the reasons stated from the bench on May 19, 2023, the defendant's 136 Motion for
Mistrial on First Amendment Grounds is DENIED. As the Court stated repeatedly, the government
is permitted to introduce protected speech 'to establish the elements of a crime or to prove motive

addressed and rejected on a number of occasions Defendant's First Amendment-related arguments/objections regarding Restricted Grounds, including when referencing Defendant's trial brief); Pretrial Conference Trs. (same).

The Defendant also argues that "[a]t trial the government put on no evidence whatsoever that Thomas' actions could have disrupted or interfered with any Secret Service protectee[.]" Mot. at 7.  But, this misunderstands what the statute requires: the Government need not prove the Defendant's actions interfered with a protectee; instead, a protectee is only relevant as a part of the definition of what constitutes a restricted area.   The Government must only prove that the Defendant "knowingly entered or remained in" ((a)(1)), or "engaged in disorderly or disruptive conduct in" ((a)(2)), "any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is temporarily visiting." *See, e.g.,* ECF No. 190 at 31-33.  The government's evidence at trial established that at the relevant times there was a restricted area on Capitol Grounds and that there was such a person, the Vice President and his family.

The Defendant further argues that the Government submitted insufficient evidence for the jury to find that the Defendant knew the Capitol Grounds were restricted, referring, for example, to the Defendant's purported "innocent state of mind regarding the restrictedness or nonrestrictedness of the area." *See* Mot. at 9. Similarly, the Defendant argues that the Government failed to show "that Thomas could see or hear announcements or warnings that the area." *Id.* at 7. But, these self-serving conclusions are belied by the jury's verdict: as the Government stressed in closing, the Defendant, himself, took videos of physical signs stating that the area was restricted

---

or intent.' *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  And, at trial, the government has produced more than sufficient evidence to permit a reasonable juror to find, beyond a reasonable doubt, that the defendant committed unlawful acts that support the charges in the indictment.").

(*e.g.*, Govt Exs. 504 (41:09), 511 (00:11)), and the Government also showed the jury ample additional evidence from which it could find that the Defendant knew the area was restricted, including evidence of a number of other figurative "signs" denoting restriction, such as long lines of police officers in riot gear ordering rioters to "move" off the Upper West Terrace.  (*E.g.*, Govt Ex. 308.1 (BWC), 712 (open-source video)).   The fact that the Defendant responded to these commands as follows underscores such an understanding:  as he continued pushing back against the moving law enforcement line, he stated, "You see that you sons of bitches . . . fuck these assholes. HOLD THE LINE."  (Govt Ex. 504 (53:23)).

Thus, here, too, the Defendant has failed to meet his burden under either Rule 29 or Rule 33 on the 18 U.S.C. § 1752(a)(1)-(2) counts.

## CONCLUSION

For the reasons discussed herein, the defendant's Motion for judgment of acquittal and a new trial should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov
