**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-00552 (DLF)** |
| **v.** | : | |
| | : | |
| **KENNETH JOSEPH OWEN THOMAS,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Kenneth Joseph Owen Thomas to 109 months of incarceration, at the midpoint of the applicable range, 36 months of supervised release, restitution of $2,000, a fine of $77,607, and mandatory assessments totaling $525.

**I.     INTRODUCTION**

For nearly three hours on January 6, 2021, Kenneth Thomas participated in a violent assault on the United States Capitol, which forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05 That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Thomas understood the constitutional significance of January 6, and intended to disrupt Congress' certification of the 2020 election by any means necessary, including by repeatedly using force against police officers for hours. Thomas started planning well before January 6: in the weeks before, using the alias "Pi Anon," he made countless social media posts regarding his plans for the 6th, including memes with violent imagery that showed bombs and lighting flying over and striking the United States Capitol Building.

On the 6th, Thomas left the "Stop the Steal" rally and headed to the Capitol. But, as he neared restricted grounds, he sensed danger and smelled tear gas, instructing his wife and daughter to stay behind. Thomas nevertheless entered restricted Capitol grounds, and recorded himself proudly declaring that he and his fellow rioters were going to storm the Capitol.  For the next several hours, Thomas played a critical role in the attack on the Capitol, consistently appearing at the front of the violent mob on the Upper West Terrace, where he attacked lines of officers, both physically and verbally, attempted to get inside the Capitol building, and encouraged others to stand with him and "hold the line."

Since his January 6, 2021, arrest, Thomas has expressed no remorse for his crimes. Instead, he has sought fame and notoriety, and to profit financially from his criminal conduct. Even after a jury convicted him of seven charges, including five felonies, Thomas continues to spread misinformation, claiming that "January 6 was a setup" and that he and his fellow rioters "[were]

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

actually peaceful."

Due to his egregious criminal conduct on January 6, his refusal to accept responsibility, his false testimony, and the need to deter him and others from further wrongdoing, the government recommends that the Court sentence Thomas to 109 months, which is at the midpoint of the applicable range of 97 to 121 months.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol.

The government refers the Court to the Statement of Facts accompanying the complaint filed in this case, ECF No. 1, for a brief summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Kenneth Thomas' Role in the January 6, 2021 Attack on the Capitol.

#### *Pre-January 6 Conduct*

As January 6, 2021 approached, Thomas organized a group of individuals to travel to attend the rally and posted extensively on social media about the electoral college certification process, including posting the text of the 12th Amendment, which governs the electoral college vote. (*E.g.*, Govt Ex. 402.3717). Thomas also posted memes containing violent imagery such as bombs and lighting striking the United States Capitol Building:



*Figures 1 & 2: Examples of Thomas' Facebook Posts*
*(Figure 1 - Capitol with Lightning Bolt (Govt Ex. 402.8825),*
*Figure 2: Midnight Ride WW1WGA - 2nd American Revolution)*

In another of his Facebook posts, Thomas stated: "Congressional vote on January 6 might be PLAN B . . . Plan A could be to just ignore the fraudulent electors . . . On January 6, VP Pence could throw out the fraudulent electors . . . Actually, he must throw out fraudulent electors." (Govt Ex. 402.3788).

### January 6, 2021:
### Thomas' Approach to the Capitol

After attending the "Stop the Steal" rally at the Ellipse, Thomas, with his wife and child, marched down Pennsylvania Avenue towards the West Lawn of the U.S. Capitol. (*E.g.*, Govt Exs. 510-517). As they approached the Capitol, Thomas instructed his wife and daughter to leave the area to "get to safety" after he smelled "tear gas" and sensed "something not right." (5/19/23 Trial Tr. 207:3-20). Despite his awareness that this was no longer simply a peaceful protest, and despite that he observed the crowd outside the Capitol growing increasingly aggressive towards police, Thomas chose to continue forging ahead towards the violence in order to get closer to the Capitol Building. (*Id.*; Govt Ex. 504 (14:11)).

4

### *Thomas' Conduct on the Inaugural Staging Area*

As Thomas entered restricted Capitol Grounds around 2:28 p.m., he announced to what appeared to be his live stream audience, "Right now we got a whole list of patriots goin' and are gonna' storm the Capitol." (Govt Ex. 511 (07:44)).

As Thomas marched up the Northwest stairs and entered the inaugural stage, which was actively under construction, he was not dissuaded by the presence of thousands of rioters, some of whom were battling police officers, forcing them to retreat. (*E.g.*, Govt Ex. 504 (approx. 18:00)). Instead, when he saw officers standing on the Upper West Terrace's grandstands preparing to line up to keep rioters back, he kept getting closer to them and attempted to intimidate them by yelling repeatedly, "POLICE STAND DOWN" at them. (*Id.*).



*Figure 3: Screenshots from Thomas' Rumble Video of Officer Line, Top of Grandstands, Where Screen Began "POLICE STAND DOWN" Chant (Govt Ex. 504 (approx. 18:00))*

### *Thomas' Conduct under the Upper West Terrace Grandstand*

From the inaugural staging area, Thomas climbed under the grandstand, below where he had just seen officers lining up to keep rioters back. Although white tarps had been affixed with zip-ties to the underside of the grandstands in order to keep individuals from going underneath them, Thomas chose to ignore that and climbed through. Thus, at approximately 3:15 p.m., Thomas found himself stuck with a group of other rioters underneath the grandstands, surrounded by waist-high white tarp. (*E.g.*, Govt Ex. 309.1).

However, Thomas again made his way to the front of the crowd, leaning over the tarps, getting as close to officers as he could, while verbally harassing them by name. (*Id.*).  Thomas then opened what appeared to be a jackknife, and was about to cut the zip ties securing the tarp when Officer A.C. ran over, pointed at Thomas, and ordered him to stop, stating, "Don't do it. Back up, back up, back up!" (*Id.*). Thomas did not apologize; instead, he stood up, looked Officer A.C. in the eyes, and responded, "Let us in!" (*Id.*).

Officer A.C. then again ordered Thomas to back up, stating "put the knife away . . . that's a warning! . . . Do as I say!" (*Id.*).  Thomas appeared to put the knife away and then said: "I'm asking you . . . This is our house. This is our house. We're not backing down. You took an oath . . . I just wanna' go knock on the door!" (*Id.*).

*Remainder of Page Intentionally Left Blank*

\*       \*       \*

6



*Figure 4: Screenshot from BWC Video of Thomas Holding Jackknife
under Grandstands (Govt Ex. 309.1)*

### *Thomas' Conduct on the Upper West Terrace – 3:30 p.m. Timeframe*

Eventually, the rioters tore away enough of the white tarp to allow them to exit from under the grandstand (shown as location "A," in the 3-D rendering below (Govt Ex. 119 at 5)). Shortly after Thomas exited, he observed and recorded other rioters destroying property, including when one individual who used power tools from the construction site to continue pulling down physical barriers:



*Figure 5: Screenshot from Thomas' Rumble Video of Rioter Using Power Tool to Destroy
Grandstand Tarp (Govt Ex. 504 (31:23))*

As the mob of rioters on the Upper West Terrace continued growing, a defensive line of officers began to form at the top of a short set of steps, just to the left of the grandstands (shown as location "B" and the dotted red line in the 3-D rendering below (Govt Ex. 119 at 5)):



*Figure 6: 3-D Rendering Showing Thomas' Path on Upper West Terrace –*
*Thomas began (A) under the grandstand, then moved to face the*
*growing police line (B) and continued to resist and assault officers as the police line advanced*
*northward (C), (D), and (E).*

For the next ten to fifteen minutes, Thomas took video as he continued harassing police, repeating the same mantras as above: "Police stand down," "this is our house," "you took an oath," etc. Thomas joined a "back the blue" chant, but then also joined in when the crowd began yelling, "TRAITORS, TRAITORS, TRAITORS" at the same police line.  (Govt Ex. 504 (36:36)).

***Assault on Officer R.A. (Count Three)***

At approximately 3:30 p.m., after one rioter began a countdown from ten, Thomas joined the mob as it collectively charged the police line, which comprised of MPD officers in riot gear. Thomas charged up the steps towards the officers at full speed, pumping his arms as he ran, then raising his hands in front of him:



*Figure 7: Screenshot from BWC Video of Thomas, Circled in Red, Running Up Stairs to Assault Officer R.A. (Govt Ex.307)*

Using the combined momentum of his run and arm strength, Thomas then punched and/or violently pushed his fists directly into R.A.'s chest:

*Remainder of Page Intentionally Left Blank*

\*       \*       \*



*Figure 8: Screenshot from BWC Video of Thomas, Circled in Red,*
*Throwing Hands into Officer R.A.'s Chest (Govt Ex.307)*

Officer R.A. then reached out with both hands to force Thomas back down the steps. (*Id.*).
According to Officer R.A., this was one of two times he remembers the "angry" crowd succeeding
in breaking through the police line. (5/18/23 Trial Tr. 146:22, 149-150).

### *Assault on Officer M.N. (Count Four)*

Undeterred by having been repulsed once, Thomas again pumped his arms and charged
full speed up the steps a second time):

*Remainder of Page Intentionally Left Blank*

\*        \*        \*

10



*Figure 9: Screenshot from BWC Video of Thomas, Circled in Red,*
*Running Up Stairs to Assault Officer M.N. (Govt Ex.304)*

 As officers commanded the mob to "back up," Thomas continued his charge, again punching

and/or violently pushing his fists, this time into Officer M.N.'s chest:



*Figure 10: Screenshot from BWC Video of Thomas*
*Throwing Hands into Officer M.N.'s Chest (Govt Ex.304)*

Thomas's force was sufficiently violent that M.N. was forced to use his riot baton in order to regain control of the dangerous situation.(*Id.*). Just like Officer R.A.., Officer M.N. then reached out with both hands and forced Thomas back down the steps. (*Id.*). Both assaults were also captured in an open-source video from a different angle, which again shows Thomas deliberately taking aim, first at Officer R.A.:



Then, approximately three seconds later, at Officer M.N.:



*Figures 11 & 12: Screenshots from Open-Source Video of Thomas Throwing Hands into Officer R.A.'s Chest, then M.N.'s Chest – Assaults Circled in Red (Govt Ex. 707 (00:16-00:20))*

### *Continued Resistance on the Upper West Terrace*

Following the assaults on Officers R.A. and M.N., Thomas stood on the Upper West Terrace for approximately an hour and continued harassing officers. At one point during this period, Thomas stood in front of the line of officers, his reflection showing in their riot shields, and told them, "WE behind YOU." (Govt Ex. 504 (41:47)). Eventually, additional officers arrived and joined with the officers already on the Upper West Terrace; together, they began forming a new line, which would eventually move the mob northward and off the Terrace completely (shown as locations "C," "D," and, later, "E" Figure 6 (Govt Ex. 119 at 5)). Just after 4 p.m., Thomas sent a series of text messages: "It's a fight at the Capitol... No violence from us. The cops are tear gas. [sic] pepper balls/spray...Riot gear... [. . .] We're just trying to push through their line." When an induvial texted back, "You're pushing through to where?" Thomas responded, "Storming the Capitol." (*See* Att A).

Then, just before 4:30 p.m., Thomas again became violent. As the officers on the Upper West Terrace were attempting to move rioters northward and off Capitol Grounds, Thomas jumped a short wall to get into the action, where he proceeded to lead the charge in what became a battle to push back against the officers as they attempted to clear the Terrace.

*Remainder of Page Intentionally Left Blank*

\*        \*        \*

13



*Figure 13: Three Screenshots of Videos Showing Thomas Jumping Wall and Moving to Front of Violent Mob (Govt Exs. 306.1; 712 (1:04, 1:29))*

Then, Thomas again became physically assaultive. (*See, e.g.,* Govt Exs. 303, 303.1, 305,

305.1, 306, 306.1, 712). At the front of the now-violent mob, Thomas pushed against officers' and

their riot shields. (*Id.*). As he and his cohort became increasingly violent toward the police, onlookers could be heard crying out, "no, no no!!!" (Govt Ex. 712 (approx. 01:00 – 2:35)). Another onlooker noted that the police had begun using their batons, to which someone else responded, "they're only hittin' the people that hit back!" (*Id.*). Yet another individual repeated, "it's not safe, it's not safe!" (*Id.*). Police chanted at the rioters to "move back," and one officer announced their intention to clear rioters off the terrace entirely. (Govt Ex. 712).

Around the time that Thomas repeatedly pushed into Corporal S.A., who was a part of the police line facing Thomas, Corporal S.A. fell to the ground in the face of the crowd's pressure and was "frightened" and "scared" and thought he might be trampled by the crowd. (5/17/23 Trial Tr. 192:9-19). Thomas was again at the front of the mob yelling in the faces of the officers: "YOU HAVE WOKEN A SLEEPING GIANT!!!" (*E.g.,* Govt Ex. 303 at 3:22)).

### Assault on Officer K.V. (Count Six)

Approximately one minute later, Thomas repeatedly, and with increasingly angrier tones, screamed, "HOLD THE LINE!" (Govt Exs. 303, 303.1).



*Figure 14: Screenshot from BWC Video of Thomas, Circled in Red, Screaming and Preparing to Join with Other Rioters to Push with their Backs Against Defensive Police Line (Govt Ex. 303)*

15

Then, Thomas and other rioters turned their backs on officers, linked arms, and collectively pushed against the line of police, including Officer K.V. (*Id.*). While throwing his body weight against the police line, Thomas continued to scream, repeatedly, "HOLD THE LINE!" and, at one point, yelled, "PUSH!" (*E.g.,* Govt Ex. 305.1 (1:15)).

Officer D.P.L., who stood just next to Officer K.V. in this moment, remembered: "[T]here was a lot of yelling. I remember I was yelling at people to get back, get back. People were pushing against us. When we were trying to push, I remember just being pressed so hard it felt like my lungs caving in. It felt like they couldn't expand. I couldn't breathe." (5/18/23 Trial Tr. 15-20).

### *Assault on Officer R.N. (Count Seven)*

A few minutes later, after the police officers deployed chemical irritants to regain control, and after the mob had been pushed slightly farther northward on the Upper West Terrace, Thomas again became assaultive. As officers repeated "move," "move back," and "back up" as their line moved northward, Thomas stepped towards the line of officers, pulled the hood of his sweatshirt up over his head, and body-checked Officer R.N. in his riot shield, while again chanting, "HOLD THE LINE, HOLD THE FUCKING LINE" repeatedly. (*E.g.*, Govt Ex. 308.1). Then, Thomas grabbed the baton of the officer next to R.N., and then again body-checked Officer R.N. for a second time. (*Id.*). Officer R.N. was "[i]n fear" as the assault was occurring and, to this day, struggles to be in crowds due to the trauma he endured on January 6. (5/18/23 Trial Tr. 105:8-10).

### <u>*Thomas' Continued Resistance on January 6 and Afterwards*</u>

Thomas did not stop even after his fourth assault. After the police line had forced the mob around the corner to the northernmost part of the Upper West Terrace (shown as location "E" in Figure 6, above (Govt Ex. 119 at 5), Thomas continued to physically push back against the moving

16

police line with other rioters. Although officers continued ordering and gesturing at rioters to leave, Thomas ignored them. He then flipped his phone camera to selfie-style, and appeared to live stream himself physically pushing back against the line, while yelling the following, *inter alia*:

- You see that sons of bitches! (approx. 53:17).
- Hold the line, hold the line, fuck these assholes, hold the line! (approx. 53:53).
- Smile, the fucking world is watching! (approx. 56:28).
- Hold it, hooooooooooold it, hold the line, ahhhhhhhh! . . . Wow, you hit me again you son of a bitch! (57:03-57:39).

(Govt Ex. 504 (approx. 53:00-58:00)). At the end of this approximately five minute altercation, Thomas appears to have been again been pepper sprayed by police officers.

Despite this, Thomas remained on Capitol grounds, continuing to verbally harass officers by yelling, "HONOR YOUR OATH! HONOR YOUR OATH! You swore to follow all LAWFUL orders! THESE ARE NOT LAWFUL ORDERS!" (Govt Ex. 504 at approx. 4:00-6:00). Thomas also explained: "We all took the same oath, I'm a veteran, I took the same oath you took! . . . You know it was farmers that first stood up against tyranny. Three percent of society said 'we had enough!' We are today's Three Percent! But we're WAY bigger." (*Id.*).

On January 7, 2021, Thomas summed up his actions from the day before in a Facebook post: "This video is from the Capitol yesterday . . . After tear gas & multiple shots of irritants[,] I became a little less restrained. Judge all you want, but those that were there with the truest of intentions are heroes to our Republic . . . #captiolbuilding #wildprotest #StopTheSteal . . . #washingtondc #capitol." (*See* Govt Ex. 402.14877).

### III.    THE CHARGES AND CONVICTION AT TRIAL

On December 14, 2022, a federal grand jury returned a second superseding indictment

charging Kenneth Joseph Thomas with the following twelve counts:

- Count One, Civil Disorder, 18 U.S.C. § 231(a)(3);
- Count Two, Obstructing a Congressional proceeding, 18 U.S.C. § 1512(c)(2);
- Count Three, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Four, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Five, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Six, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Seven, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);
- Count Eight, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);
- Count Nine, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, § 1752(a)(2);
- Count Ten, Engaging in Physical Violence in a Restricted Building or Grounds, § 1752(a)(4); and
- Count Eleven, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);
- Count Twelve, Act of Physical Violence in a Capitol Building, 40 U.S.C. § 5104(e)(2)(F).

ECF No. 49. Thomas' four-day jury trial began on May 15, 2023. The jury returned its verdict on

June 1, 2023, convicting Thomas of Counts One, Three, Four, Six, Seven, Eight, and Nine. The

jury acquitted on Counts Two and Twelve, and hung on Counts Five and Eleven.

### IV.    STATUTORY PENALTIES

Thomas now faces sentencing on Counts One, Three, Four, Six, Seven, Eight, and Nine.

As acknowledged by the Presentence Report issued by the USPO, below are the potential penalties:

- Count One (Civil Disorder): five years of imprisonment, a term of supervised release of not more than three years, a term of probation of not more than five years, a fine up to $250,000, and a mandatory special assessment of $100.

- Counts Three, Four, Six, and Seven (Assaulting, Resisting or Impeding Certain Officers): eight years of imprisonment, a term of supervised release of not more than three years, a term of probation of not more than five years, a fine up to $250,000, and a mandatory special assessment of $100.

18

- Count Eight (Entering or Remaining in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Nine (Disorderly or Disruptive Conduct in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Applicable Sentencing Guidelines Range – Analysis for Each Count.

The government agrees with USPO's Guidelines analysis and submits the following analysis applies to Thomas' conduct and convictions:

<u>Count One:</u> **18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder (Obstructing, impeding, and interfering with Officers R.A., M.N., S.A., K.V., and R.N. on Upper West Terrace).**

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Adjustment | +3 | U.S.S.G. §2A2.4(b)(1) – offense involved physical contact. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not |

| | | |
|---|---|---|
| | | merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Thomas' conduct was aggravated assault because it included multiple assaults, each involving physical contact with Thomas' victims, and because all of those assaults were committed with the intent to commit another felony, namely, civil disorder, in violation of 18 U.S.C. § 231, and obstruction of an official proceeding in violation of 18 U.S.C. § 1512. |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>All officer-victims were clearly identifiable as police officers because they were announcing themselves as such, wearing full uniforms, riot gear, and were protecting the U.S. Capitol from the mob of rioters. Thomas admitted at trial that he knew the persons he attacked were police officers and acting in that capacity. His actions were motivated by their status as officers because he was trying to prevent them from performing their duty. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>As discussed above, Thomas provided materially false testimony under oath as detailed above. *See* U.S.S.G. §3C1.1 n.4(B). |
| **Total** | **22** | |

**Counts Three (Officer R.A.), Four (Officer M.N.), Six (Officer K.V.), and Seven (Officer R.N.): 18 USC § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers**

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2<br><br>See discussion with respect to Count One. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2: See discussion with respect to Count One. |
| Adjustment | +2 | U.S.S.G. §3C1.1: See the discussion with respect to Count One. |
| **Total** | **22** | |

**Count Eight: 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds**

| Base Offense Level | 4 | U.S.S.G. §2B2.3(a). |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | **\*See below** | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |

The cross-reference under U.S.S.G. § 2B2.3(c), which applies when the offense is committed with the intent to commit another felony, applies here. Despite his acquittal on Count Two, where proof beyond a reasonable doubt was required, this Court should find, by the

applicable preponderance standard,[2] that the evidence shows Thomas' conduct on January 6 was all intended to further his goal of obstructing Congress's certification of the election, conduct that constitutes a violation of 18 U.S.C. § 1512(c)(2). Indeed, this Court has already so found: in denying the defendant's motion for a mistrial, this Court stated that "the government has produced more than sufficient evidence to permit a reasonable juror to find, *beyond a reasonable doubt*, that the defendant committed unlawful acts that support the charges in the indictment." May 20, 2023 Minute Order (emphasis added). Count Two of the Indictment charged a violation of 18 U.S.C. 1512(c)(2), and thus, the Court's finding extended to a finding regarding the evidence supporting that charge. Logically, if there was sufficient evidence to establish Thomas' guilt beyond a reasonable doubt, there is sufficient evidence under the preponderance standard.[3]

As laid out in greater detail in the conduct section above, the evidence at trial established by at least a preponderance of the evidence that Thomas attempted to, and did, knowingly obstruct

---

[2] Despite considering a proposed amendment that would have prohibited the use of acquitted conduct in applying the Guidelines, this year, the Commission decided not to adopt that amendment; thus, acquitted conduct remains an appropriate consideration in applying the Guidelines. *See* U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines 211 (Feb. 2, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendlyamendments/20230201_RF-proposed.pdf; U.S. Sentencing Comm'n, Amendments to Sentencing Guidelines (Apr. 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

[3] The law is clear that acquitted conduct can be considered in connection with sentencing. *United States v. Jones*, 744 F.3d 1362, 1369 (D.C. Cir. 2014) (citing, *e.g.*, *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[B]inding precedent of this court establishes that" "sentencing based on acquitted conduct" and "enhancing a sentence within the statutory range based on facts found by the judge, as opposed to the jury, do[ ] not violate the Sixth Amendment.").

And, in applying the Guidelines, the Court must consider all "relevant conduct," without regard to whether the information would be admissible at trial. 18 U.S.C. § 3661. "Relevant conduct" is

an official proceeding: Thomas was fully aware that the Electoral College Vote was set to take place inside the U.S. Capitol on January 6, 2021; indeed, leading up to January 6, he had not only posted the text of the 12th Amendment to Facebook, but he had also stated the following: "Congressional vote on January 6 might be PLAN B . . . Plan A could be to just ignore the fraudulent electors . . . On January 6, VP Pence could throw out the fraudulent electors . . . Actually, he must throw out fraudulent electors."

Despite this knowledge, after leaving the "Stop the Steal" rally, Thomas joined the mob in corruptly storming the Capitol. He entered restricted Capitol grounds at approximately 2:30 p.m. on January 6, around the time both houses of Congress recessed. He and other violent rioters remained on restricted grounds until nightfall, physically and verbally pushing back against police officers as they attempted to clear rioters from the grounds and preventing Congress from resuming. Thus, Thomas knew the natural and probable consequences of his conduct would be to obstruct and delay the proceeding and he willfully engaged in that conduct.

All this shows, by at least a preponderance of the evidence, that Thomas knowingly committed the offense charged in Count 8 with intent to obstruct the certification proceeding on January 6, 2021.

Other judges in this district have applied the U.S.S.G. § 2B2.3(c) cross-reference based on similar conduct, even when the underlying 18 U.S.C. § 1752(a)(1) offense was a misdemeanor,

_____

"broadly defined." *United States v. Abu Khatallah*, 41 F.4th 608, 645 n.23 (D.C. Cir. 2022). Under Section 1B1.3(a)(1)(A), a defendant's "relevant conduct" encompasses both the defendant's own acts and those that the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. Finally, a defendant's "relevant conduct" under the Guidelines includes "all harm that resulted" from the defendant's acts or the acts of others engaged in the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(3).

although these were not cases in which a defendant was acquitted of a § 1512(c)(2) count. *See, e.g., United States v. Anthony Williams*, 21-cr-00377 (BAH), 9/16/2022 Sentencing Tr. at 49-51 (defendant also found guilty of § 1512(c)(2)); *United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-78 (defendant also found guilty of § 1512(c)(2)); *compare with United States v. Nicholas Rodean*, 21-cr-00057 (TNM), 10/26/2022 Sentencing Tr. at 5-11 (defendant not charged with § 1512(c)(2); court declined to apply the § 2B2.3(c) cross-reference to the § 1752(a)(1) misdemeanor conviction based on the case-specific facts—where in the court's assessment, the defendant did not intend to obstruct—but noted, "I think in many situations with many individuals the sum of the various pieces of evidence that the Government put forth at trial would certainly make out the guideline for obstruction of administration of justice [under the cross-reference]"). As succinctly explained by Chief Judge Howell in *Bledsoe*:

> The guideline at 2B2.3 applies to Count 2, charging: Entering and remaining in a restricted building or grounds, under 18 U.S.C. Section 1752(a)(1). This guideline provides a base offense level of 4 under the Guideline at Section 2B2.3(a). Two offense levels are added because the trespass occurred at a restricted building or grounds, under the Guideline at 2B2.3(b)(1)(A)(vii). It is then adjusted up to 25 offense levels pursuant to the guideline at 2B2.3(c)(1) and 2X1.1(a) because the offense was committed with the intent to commit the felony obstruction offense which adds up to 25 offense levels [pursuant to U.S.S.G. §2J1.2(a)] [. . .].

*United States v. Bledsoe*, 21-cr-00204 (BAH), 10/21/ 2022 Sentencing Tr. at 76-77 (defendant also found guilty of § 1512(c)(2)).

As in these other cases, § 2X1.1(a) applies, and so the base offense level is determined by application of § 2J1.2:

| Base Offense Level (adjusted) | 14 | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
|---|---|---|
| | | As discussed in more detail above, despite his acquittal on Count Two, the evidence shows by a preponderance of the evidence that Thomas entered the restricted area of the Capitol Grounds for the purpose of obstructing the official proceeding—that is, stopping or delaying Congress' work. |
| | | The substantive offense is thus a violation of 18 U.S.C. § 1512(c)(2), and the base offense level for a violation that offense should be applied: U.S.S.G. §2J1.2(a) – Obstruction of Justice. |
| Special offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which, in the Capitol riot cases, refers to a "proceeding before the Congress," as defined in § 1515(a)(1)(B). |
| | | There are multiple bases to apply this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses (a) the defendant's own acts or omissions and, (b) those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. § 1B1.3(a)(3). |
| | | As described in the conduct section above, Thomas's statements while he engaged in assaultive conduct, |

| | | |
|---|---|---|
| | | including encouraging others to stand with him and "hold the line" reveal that his intent in attacking the officers and the police line was related to his attempts to thwart the certification of the Electoral College vote. He threatened physical injury to many officers, including the four named assault victims in Counts Three, Four, Six, and Seven.<br><br>Finally, Thomas admitted at trial that he threatened property damage when he bent down to use a jackknife to cut the zip-ties that were holding the white tarp to the grandstands. Because this tarp was holding back the mob, and it's destruction would aid the mob's forward progress, this attempted property damage was in furtherance of his obstructive intent. |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for almost six hours while legislators were physically evacuated for their own safety.[4] |
| Obstruction | +2 | U.S.S.G. §3C1.1 – Obstructing or Impeding the Administration of Justice<br><br>See discussion in Count One (Civil Disorder). |
| **Total** | **27** | |

---

[4] *See, e.g., United States v. Calhoun*, 21-CR-116; *United States v, Reffit*, 21-cr-32.

**Count Nine:** 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base offense level | 10 | U.S.S.G. §2A2.4(a). |
| Special offense characteristic | +3 | U.S.S.G. §2A2.4(b)(1) – Offense involved physical contact.<br><br>Thomas repeatedly used his hands and body to push back against and assault lines of police on the Upper West Terrace – to "HOLD THE LINE." In doing so, Thomas made physical contact with a number of officers, including MPD Officers R.A., M.N., K.V., and R.N. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Thomas' conduct was aggravated assault because it was committed with the intent to commit another felony, namely, any of the four felony assault charges under 18 U.S.C. § 111(a) and the felony civil disorder charge under 18 U.S.C. § 231(a)(3). |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2. |
| Obstruction | +2 | U.S.S.G. §3C1.1 – Obstructing or Impeding the Administration of Justice.<br><br>See discussion in Count One (Civil Disorder). |
| **Total** | **16** | |

## Grouping

Pursuant to U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Therefore, the seven counts of conviction should be placed into five groups, based on their identified victims:

1) <u>Group One:</u> Counts One, Three, and Eight (impeding five officers and assaulting Officer-victim R.A., all conduct which forms the basis for the +8 enhancement for obstruction of the administration of justice).

2) <u>Group Two:</u> Count Four (assaulting Officer-victim M.N.).

3) <u>Group Three:</u> Count Six (assaulting Officer-victim K.V.).

4) <u>Group Four:</u> Count Seven (assaulting Officer-victim R.N.).

5) <u>Group Five:</u> Count Nine (entering and remaining in a restricted grounds; impeding government business; the victim is Congress).

The total offense level for Groups One is 27. The total offense level for Groups Two, Three, and Four is 22. The total offense level for Group Five is 16.

## Multiple Count Adjustment

Pursuant to U.S.S.G. § 3D1.4, one unit is assigned to Group One and one half unit is assigned for Groups Two, Three, Four, and Five, for a total of 3 units and an increase in the highest offense level (27) by 3 levels to 30. The USPO calculated Thomas' criminal history as category I, which is not disputed. (PSR ¶ 94). Accordingly, based on a total adjusted offense level of 30, Thomas' Guidelines imprisonment range is 97 to 121 months.

## Two-Level Upward Adjustment for Obstruction of Justice

Pursuant to U.S.S.G. § 3C1.1 (Obstructing or Impeding the Administration of Justice), the offense level should be increased by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," including by providing

"materially false testimony" during trial. U.S.S.G. § 3C1.1, n.4.[5] The government asserts that Thomas made multiple materially false statements to deny or minimize culpability, mischaracterize his criminal conduct as altruistic, and avoid responsibility, including the following:

- Thomas falsely testified that on his journey to the U.S. Capitol Building, and once he was on Capitol grounds, he did not encounter any police officer, fence, or warning indicating that the area was restricted, and, therefore, he did not have the requisite knowledge that he lacked lawful authority to enter or remain there. (*E.g.*, 5/19/23 Trial Tr. 213:4-15).

  Similarly, Thomas testified that he was unable to hear, understand, or decipher the verbal commands and hand gestures from officers commanding him to leave the Upper West Terrace. (*E.g.*, 5/19/23 Trial Tr. 214:17-215:3).

  He so stated despite the following:

  - Actively filming bicycle racks with "restricted area" signs (Govt Ex. 511 (00:11));
  - Actively filming discarded "area closed signs" (Govt Ex. 504 (41:09));
  - Actively filming himself as he began a "POLICE STAND DOWN" chant towards lines of police officers that were forming to keep rioters off the Upper West Terrace (*Id.* (18:00);
  - Actively filming repeated and clearly audible commands from officers to "move" and "back up" ((*e.g.*, Govt Ex. 308.1); and
  - Actively filming similarly clear physical hand gestures by police ordering the same (*e.g.*, Govt Ex. 504 (57:00-57:05)).

  The jury rejected Thomas' claim beyond a reasonable doubt when it convicted him of knowingly entering or remaining on restricted grounds and disorderly conduct in Capitol grounds (Counts Eight and Eleven).

- Thomas' testimony regarding the 3:30 p.m. assaults on Officers R.A and M.N. was patently false. Those officers' body-worn camera videos and open-source videos of the same clearly show that at the end of one rioter's countdown from ten, Thomas twice pumped his arms, ran up a short flight of stairs, and intentionally and forcefully threw his body and hands

---

[5] 4 Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

directly into the officers' chests in an effort to get through the police line and closer to the Capitol building.

Indeed, Thomas' texts just after 4 p.m. on January 6 confirmed this intent: "It's a fight at the Capitol . . . we're just trying to push through [the cops'] line." (Att. A). Thus, he was attempting to, and did, forcibly assault, resist, impede, oppose, intimidate, and/or interfere with officers to attempt to get through the police line and into the Capitol building.

Despite this evidence, Thomas perjured himself by telling an entirely different, non-credible story on the stand. That story involved his purported attempt to prevent one rioter, the "pipe guy," from trying to further "agitate the crowd to do things," and Thomas' purported attempt to assist two older rioters with canes. (5/19/23 Trial Tr. 250:1-24).

The video evidence does not support Thomas' theory. However, even if it did support the fact that he was attempting to assist the individuals with the canes initially, after Officer R.A. forced him down the stairs following the first assault, he still ran back up the steps a second time in an entirely different direction from the individuals with canes.

Thus, the jury rejected Thomas' claim beyond a reasonable doubt when it convicted him of assaulting Officers R.A. and M.N. (Counts Three and Four).

- Thomas also mischaracterized and minimized his conduct regarding his interactions with law enforcement in/around the knife-related incident under the grandstands, where he chided officers and attempted to destroy property by cutting zip-ties. Specifically, he stated that he was "sharing discourse" with the officers. (5/19/23 Trial Tr. 226:15-16).

  Moreover, despite conceding that he knew he was wrong when he attempted to cut zip-ties, he later explained away this conduct, calling it "a setup." (5/19/23 Trial Tr. 231:11, 232:12-16).

  The jury rejected Thomas' claim beyond a reasonable doubt when it convicted him of civil disorder (Count One).

- Thomas also excused his choices–to enter, remain, and commit crimes on Capitol grounds– based on his military training. For example, he testified that he did not retreat when his wife and child did, and when an injured rioter was carried past him near the Peace Circle, because he was not trained to move backwards and it was not something he was accustomed to doing. (5/19/23 Trial Tr. 207:17-20 (Thomas' wife said there was "something not right, and then she asked me, you know, please leave right now. And I said no, there's something wrong, I can go and help. So they left. I made sure she got my daughter to safety. And then I went towards the Capitol. That's what the military trains you to do, is you go towards the danger and provide any sort of aid that you can.")).

But, the video evidence introduced at trial made clear that no special training was required for Thomas, at any point in the day, to have walked back down the Capitol's steps and exited Capitol grounds.

Furthermore, as noted above, his texts just after 4 p.m. state that his intent was to break through the police line, not that his military training compelled his illegal conduct. (Att. A). Thomas also admitted repeatedly on direct and cross-examination that his intent always was to get closer to the Capitol and "have his voice heard." (*See, e.g.,* 5/19/23 Trial Tr. 212:15, 214:3-9, 215:17-22; 5/22/23 Trial Tr. 29:16-17).

The jury rejected Thomas' claim beyond a reasonable doubt when it convicted him of civil disorder (Count One), four counts of assault (Counts Three, Four, Six, and Seven), knowingly entering or remaining on restricted grounds (Count Eight), and disorderly conduct in Capitol grounds (Count Eleven).

- Thomas also repeatedly testified on direct and cross-examination that he made "no calls for violence" and was not promoting a violent revolution. (*See, e.g.,* 5/19/23 Trial Tr. 42:5-6) ("I made no calls for violence."). This was also false.

    First, as he pushed back against police, including late in the day on the northernmost part of the Upper West Terrace, he called out to other rioters, telling them to "hold the line" against the police, even before he, himself, started pushing. (*E.g.,* Govt Ex. 504 (approx. 53:00-58:00)). Then, as he began to physically push, he again re-started his belligerent rhetoric, calling officers "sons of bitches" and yelling "fuck these assholes" at them as his disobeyed their commands to exit the Upper West Terrace. (*Id.*). Encouraging other rioters to hold the line, then yelling profanities at police while pushing back against them is undoubtedly a call for violence.

    In addition, Thomas admitted to authoring, posting, or re-posting various memes on Facebook, many of which were introduced at trial. (*See generally,* 5/19/23 – 5/22/23 Trial Tr. (discussing Facebook memes throughout)). Those memes contained violent imagery showing bombs and lighting flying over and striking the United States Capitol Building. (*E.g.,* Govt Ex. 400 series).

As the foregoing amply illustrates, Thomas' trial testimony was untruthful with respect to several material matters, and he testified untruthfully about these material matters that were designed to substantially affect the outcome of the case. Accordingly, the Chapter 3 adjustment for obstruction of justice applies in the instant case. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (§ 3C1.1 enhancement is properly applied when a defendant testified falsely about a

material matter at trial).

## VI.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense.

As shown in Section II(B) of this memorandum, Thomas' felonious conduct on January 6, 2021 was part of a massive riot that delayed, and almost succeeded in preventing, the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and risking a constitutional crisis.

Thomas played a critical role in the attack on the Capitol, consistently appearing at the front line of the violent mobs on the Upper West Terrace, encouraging others to stand with him and "hold the line" as police officers attempted to organize themselves and clear the area. As he did this, he appeared to stream his criminal conduct, live, to viewers, attempting to frame their perception of the day. Despite Thomas' persistent efforts to minimize and, in fact to valorize, his conduct, he was a key figure in a violent riot and assaulted numerous police officers. His intentions were clear: he sought to storm the building and delay the Certification process.

The nature and circumstances of Thomas' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 109 months.

### B.  Thomas' History and Characteristics.

Thomas' crimes on January 6 were not isolated events in an otherwise law-abiding life, but rather the latest acts in a pattern of misconduct and violence that has persisted throughout his life. Thomas has demonstrated a willingness to allow his personal beliefs to override the rule of law,

including violating his pretrial conditions in this case. Furthermore, Thomas is a prolific and opportunistic liar, willing to utter falsehoods and half-truths when convenient or beneficial to himself, and especially when confronted with his own misconduct. In addition to the lies discussed above, Thomas actively misled the probation officer during his presentence interview, particularly regarding his dismissal from the Navy,[6] and has otherwise engaged in a misinformation campaign regarding the events of January 6, both on the stand and through his vast online social media presence.

       1.   <u>Thomas' Criminal History Category is Under-Representative.</u>

Although Thomas falls in Criminal History Category I and many of his convictions are not recent, his criminal history is extensive, and his past convictions are concerning because they stem from acts of violence.

In addition to amassing a number of offenses that resulted in his dismissal from the Navy in 2003, discussed further below, Thomas has accrued numerous criminal convictions throughout the course of his adult life. In 2004, less than one year after being dismissed from the Navy, Thomas was convicted of domestic battery in Chester, West Virginia, and served three days in jail. PSR ¶ 91. One year later, he was convicted a felony burglary in Lisbon, Ohio, and was sentenced to 180 days of incarceration and four years of probation. PSR ¶ 92. In 2014, he was charged with unlawfully possessing a firearm as a prohibited possessor, but ultimately was convicted of discharging a firearm within 500 feet of a dwelling, a misdemeanor, and sentenced to a year of

---

[6] As discussed further below, Thomas told USPO he had one "non-judicial punishment for an unspecified offense" while in the Navy. In reality, Thomas received three non-judicial punishments while serving in the Navy, and was ultimately dismissed in connection with his misconduct.

probation. PSR ¶ 93.

Thus, far from the storied war veteran and upstanding citizen that he claims to be, Thomas has, time and time again, demonstrated an unwillingness to follow the law. On January 6, he continued this pattern, including by commanding police officers to follow *his orders*, rather than obeying the orders they were giving him.

2.   Thomas Violated his Pre-trial Conditions.

During this Court's March 20, 2023 motions hearing, shortly after Thomas sought permission from the Court to appear remotely for his pretrial conference in order to conserve funds, the Court learned that Thomas had violated his pre-trial conditions when he failed to notify his Supervision Officer that he had traveled from his home in Ohio to the D.C. metro area in order to attend a conference along with other January 6 defendants. *See* March 24, 2023 Minute Entry.

Then, on July 6, 2023, following his trial conviction in this case, Thomas moved the Court to modify his conditions of release so that he could attend the "Truth and Light Freedom Festival," an event presented by "Jan6 Detainees." In his motion, Thomas falsely stated that he had "complied with all pretrial and posttrial conditions." *See* ECF No. 195. The government opposed, noting it appeared that Thomas was seeking to associate with other January 6 defendants, including a listed event "speaker," "Captain Gabriel" Garcia, whom Thomas had violated his pre-trial conditions to spend time with in March 2023, and who was, at the time of the "festival," on home detention. *See* ECF No. 196. The Court denied Thomas' motion. *See* July 5, 2023 Minute Order.

3. <u>Thomas Lied to USPO during his Presentence Interview.</u>

a. *Thomas' Military Service.*

The PSR notes that Thomas reported receiving "a non-judicial punishment for an unspecified offense" while serving in the United States Navy. PSR ¶ 128. This is false. Thomas received *three* non-judicial punishments while serving in the Navy, and was ultimately dismissed in connection with his misconduct:

- On September 30, 2001, the Defendant received a non-judicial punishment for making "provoking speech and gestures" to another sailor. For this first non-judicial punishment, the defendant was reduced in rank, placed on leave restrictions, reduced in pay, and given extra duty.

- On May 6, 2022, the Defendant received a second non-judicial punishment for absenting himself without leave from Naval Air Station Oceana in Virginia Beach, Virginia, and for failing to report for his assigned watch shift during his period of absence. For this second non-judicial punishment, the Defendant forfeited a portion of his pay and committed to and was placed in Navy correctional custody for thirty days.

- On July 30, 2003, the Defendant received a third non-judicial punishment again being absent without leave and for testing positive for methamphetamines and marijuana. In addition to his drug use, the Defendant was found to have demonstrated a "pattern of misconduct," to "not have the maturity or discipline necessary to succeed in the Navy," to not "exercise the Navy's core values of honor, service and commitment," and to "not [be] recommended for advancement or retention." For his misconduct, the Defendant received a general discharge from the Navy under honorable conditions on October 20, 2003.

Although Thomas served our nation in the military, which might ordinarily be a mitigating factor, but his three years of service were terminated in a general discharge due to a pattern of misconduct and drug use, facts that he has consistently misrepresented to others, including by painting himself as a "combat veteran."[7] Moreover, although he touts his veteran status and his respect for the oath

---

[7] Combat veterans are considered to be those that served in a combat zone, received a combat service medal, or received danger pay, facts that are not supported by Thomas' military records.

that he took, there a many examples of his conduct while enlisted, as a private citizen, and on January 6 that are not consistent with a commitment to honoring the law or our criminal justice system.

### b. Thomas' Other Failures to Report Pertinent Information to USPO.

The PSR also notes Thomas did not report having any social media. PSR ¶ 114. However, Thomas is prolific on social media, especially since his January 6 arrest, as discussed further below. In addition, the PSR notes that Thomas failed to provide USPO with the IRS consent form (PSR ¶ 134), which raises concerns about whether he how fulsome he was in disclosing his financial information, particularly given that he has used his January 6-related fame for profit, as discussed below.

### 4. Thomas Has Spread Significant Falsehoods and Misinformation about January 6.

Thomas is college-educated and able bodied, but he seems to have segued his arrest in this case and its related attention into a source of money[8] and fame.[9] As noted above, the volume of Thomas' online activity related to January 6, particularly his post-arrest and post-conviction activity, cannot be overstated.[10] Thomas has spent hundreds of hours online, explaining away his own conduct and the conduct of other rioters. On a typical day, he will appear on a live stream for four hours in the morning and four hours in the evening, primarily discussing the instant case and

---

[8] In addition to the over $77,607 in charitable contributions Thomas has received, he has secured corporate sponsorship for his social media postings and acknowledges spending $5,000 a month in "fundraising" in the PSR. PSR ¶ 136.

[9] In addition to establishing his own webpage and brand, supported by his frequent live streams, Thomas frequently appears on the podcasts and webcasts of a variety of online personalities and, during trial in the instant case, a music video was posted on YouTube that starred him.

[10] A rough list of Thomas' post-conviction media activity, for example, is attached hereto as Att. B.

January 6. He also makes additional media appearances, resulting in him producing more than 20 hours of January 6-related content each week. The primary message Thomas attempts to convey throughout all of his appearances is "Jan 6th was a Setup," words that are emblazoned front and center on the landing page for the website and "brand" he created after his arrest,   In an August 4, 2023 video he posted online, Thomas repeated that mantra, while also minimizing his own conduct and making countless misstatements about this Court, the judicial process, and January 6 sentences writ large:

> January 6 was a set up. The election was stolen. We went there to protest. Some people broke the law and they need to face justice. But it needs to be fair, true, and blind justice. Not somebody getting twenty years, ten years, thirty years in prison because they used their First Amendment right to protest took a selfie and left . . .

> But yet, we are actually peaceful. Emotions became heightened, officers were causing brutality, they were beating people unlawfully . . . so people became emotional . . . that's the human condition, it's understandable . . .

> Unfortunately, some people did break windows. Some people did attack the police instead of just defending themselves. And I am not justifying that one bit. Nope. But what is happening to even them in the courtroom is well above and beyond. It is just a loss of all due process. Cruel and unusual punishments . . .

> Whatever happened to "innocent until proven guilty?"[11]

In another media appearance, Thomas summed up the pretrial rulings in the instant case as, "basically, the judge was saying that if I wanted my First Amendment, I would have to sacrifice my Fifth Amendment." *The Tamara Scott Show With: Sarah McAbee , Tim Rivers , Joseph Thomas* (7/14/2023). Thomas' post-riot online activity shows that he continues to espouse the beliefs that he used to justify his criminal conduct on January 6 and before. It also demonstrates the same

---

[11] *See* https://rumble.com/v34id3r-sing4freedom.html?mref=nb1hk&mc=5w6ms.

hostility towards the rule of law that has pervaded his personal history. Finally, there is a pervasive lack of remorse. Not only does Thomas attempt to minimize and, in some cases, aggrandize, his conduct on January 6, he has belittled the experience of those he assaulted. For example, during the June 1, 2023 episode of Sing4Freedom, Thomas' own channel, in an apparent reference to mental anguish suffered by the officers who defended the Capitol Building, including one of his own victims who testified in this case, Thomas announced, "Let's give them PTSD by singing the National Anthem." While Thomas is free to express his beliefs, this Court can and should take his lies, misstatements, and lack of remorse into account when assessing his history and characteristics. [12]

As the above makes abundantly clear, Thomas' prior crimes, his prosecution for these crimes, and his convictions did not deter him from wrongdoing, and from spreading pervasive lies and misinformation. The only reliable method of protecting the community from Thomas in the

---

[12] Other misinformation Thomas has spread includes, for example, the following:

> . . . we showed our Patriotism and love for country . . . We are a pretty peaceful bunch, you know, folks in this movement . . . you stand up for the weak, you help protect the vulnerable, but you don't cause violence . . . Fair warning: I did not enter any buildings, I didn't destroy nothin', I didn't attack anybody. But, I believe that, you know, it's our right to have a peaceful expression, peaceful protest, and use our voice, to stand your ground with what you believe in.

(Govt Ex. 506 (approx. 00:00-3:00)).

> . . . I've had some issues. I can't point any fingers distinctively, but I think it's the Feds, or the government, or somebody who doesn't have my best interests in mind. But, they've been going through and deleting my data . . . the only entity that I can think of that would do something like that ["dox" me] is the DOJ . . . .

(Govt Ex. 504 (00:00-7:00)).

future is to remove him from the community for a significant period of time. His history counsels in favor of lengthy sentence.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Thomas' criminal conduct on January 6 was the epitome of disrespect for the law. Since his arrest, and especially since his trial, Thomas' continued public statements—that January 6 was "a setup" and that he and his fellow rioters, who assaulted law enforcement and challenged the peaceful transition of power, are the real "victims" of January 6—have trivialized and minimized the seriousness of what took place.

### D.   The Need for the Sentence to Afford Adequate Deterrence.

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Thomas has not expressed an iota of remorse or contrition since he dismounted the steps of the Upper West Terrace. To the contrary,

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Thomas is proud of his crimes: starting when he appeared to live-stream his crimes as he was committing them on January 6 and continuing until today, Thomas has trumpeted and celebrated his actions as patriotic, heroic, and honorable. He revels in his crimes and has used them to bring himself notoriety and fame among those who propound alternative, dishonest narratives about January 6. With that fame, he has sought to fundraise and enrich himself by capitalizing on his crimes, as discussed above and further below. Moreover, Thomas has acted as a one-man misinformation machine, putting forth hundreds of hours of recorded statements that minimize his criminal conduct and outright lie about the events of that day, labeling January 6 as "a setup" and celebrating his many counts of conviction as "a huge win."[14]

Thomas has also repeatedly slandered the officers who protected the Capitol on January 6. He has falsely stated that they were the ones responsible for the violence that day, thus casting blame upon their courage and bravery in guarding the Capitol and those inside it on January 6. In so doing, Thomas has promoted himself and his fellow rioters, and has attempted to paint himself as a hero and martyr.

---

[14] Since early December 2022, especially, Thomas has been releasing semi-weekly podcasts. In those podcasts, he has told outright lies about his own case and has provided many others with the opportunity to do the same. He has given a microphone to numerous other January 6 defendants, including Elmer Stewart Rhodes (convicted of seditious conspiracy, 21-cr-15-APM), Christopher Alberts (convicted of assault on law enforcement and carrying a firearm on Capitol grounds, 21-cr-26-CRC), Kirstyn Niemela (convicted of violations of 18 U.S.C. § 1752 and 40 U.S.C. § 5104, 21-cr-623-CRC), Shane Jenkins (convicted of obstruction of an official proceeding, civil disorder, and assaulting law enforcement officers, 21-cr-245-APM), Jacob Chansley (convicted of obstruction of an official proceeding, 21-cr-3-RCL), and many others. In addition to his podcast, he has made dozens of other media appearances in which he readily and eagerly sets forth baseless conspiracy theories, lies about his conduct on January 6, and misrepresents what happened in his criminal case, as discussed above.

Through its sentence, the Court must send an unambiguous message to Thomas that his assaults on MPD Officers were inexcusable and that his efforts to delay and obstruct the democratic process and the peaceful transition of power were not heroic.

### E.     The Importance of the Guidelines.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). "Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored." *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). Accordingly, courts must give "respectful consideration to the Guidelines." *Kimbrough*, 552 U.S. at 101.

### F.     Unwarranted Sentencing Disparities.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[16]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Webster*, 21-cr-208 (APM), the defendant, like Thomas, verbally and physically attacked officers on the West side of the Capitol. Like Thomas, Webster was a former member of the armed forces, who similarly agitated and encouraged other rioters

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

with his rhetoric and rage on January 6. Although Webster wore body armor and used a flagpole when he physically attacked a police officer on the Lower West Terrace, Webster only assaulted one officer, whereas Thomas assaulted many. Furthermore, Webster's assault was a single interaction, whereas Thomas assaulted officers by physically pushing back against police lines for many hours; then, even after the physical barrage ended, he continued verbally harassing officers on Capitol grounds into the evening on January 6. Thus, Thomas' conduct was far more pronounced, prolonged, and persistent, as opposed to Webster's brief assault in the opening minutes of the riot. Both Thomas and Webster took their cases to trial, gave false testimony, and neither expressed any remorse, even after their jury convictions. Judge Mehta sentenced Webster to 120 months of incarceration.

In *United States v. Vincent Gillespie*, 22-CR-60 (BAH), the defendant, like Thomas, engaged in pushing, shoving, yelling, and fighting with law enforcement officers. Similar to Thomas, Gillespie screamed "traitor" at the police, among other things, and, while still on Capitol grounds, stated the following during a video interview: "We were very close. We were almost overpowering them . . . That's what I would hope [we] would do. Take it over, take it over. Own it for a few days. I'm not an anarchist, but you can't let this stand what happened in this election." Although he was not charged with using a deadly or dangerous weapon, Gillespie gained control of police riot shields and used them against police. He also used his hands to grab an MPD Officer by the arm for several seconds. Different from Thomas, however, Gillespie was charged with only one count of assaulting, resisting, or impeding certain officers, for which he was convicted by jury. The jury also convicted Gillespie of civil disorder and two violence-related misdemeanor counts.

As with Thomas, though, the jury hung on a number of other charges, including obstruction of an official proceeding. Judge Howell sentenced Gillespie to 68 months of incarceration.

In *United States v. Patrick McCaughey*, 21-cr-40 (TNM), the defendant was convicted of obstructing an official proceeding and multiple assaults with a deadly or dangerous weapon on officers in the Lower West Tunnel. Although McCaughey was convicted of using a shield to assault officers, he was only 23 years old at the time of the offense and had no prior criminal history. Thomas, differently, was a fully formed adult on January 6, 2021, and had a criminal history that included violent crimes. Moreover, McCaughey never bragged about his actions and ultimately expressed remorse at his sentencing hearing, whereas Thomas has not expressed one iota of remorse. Judge McFadden sentenced defendant McCaughey to a total of 90 months of incarceration.

## VII.  RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair,* 699 F.3d at 512 (citation omitted). Because Alberts was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[17]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Thomas to pay $2,000 in restitution for his convictions on Counts One through Nine. This amount fairly reflects Thomas's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of

---

[17] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Thomas's convictions subject him to a statutory maximum fine of $1,450,000. PSR ¶¶ 164-65. In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994). The PSR has determined that Thomas can afford to pay a fine. PSR ¶ 138. The fine range for Thomas's offenses is from $30,000 to $250,000. PSR ¶ 168.

As mentioned above, Thomas has monetized January 6 by, among other things, taking sponsors and selling paraphernalia on his website and in his podcasts based on his status as a January 6 defendant, routinely referring to himself and others as "J6 [Prisoners of War]."

For example, on the day of opening statements during his trial, Thomas posted to his Telegram channel the "Chains Off Me" music video he inspired and is featured in. Then, post-trial, he created another video of himself, where he overlaid the song's audio with clips from his January 6 videos, including where he was screaming, "THEY WANNA' USE VIOLENCE ON AMERICANS? WE WANT FREEDOM. WE WANT PEACE" repeatedly. He also added a running banner along the bottom of that video, which provided links to his merchandise, as well as links to his various fundraising pages.

In addition, in early August 2023, Thomas even went to far as to orchestrate what he coined a "Sing4Freedom Prize Bonanza" raffle to raise funds for himself, where a "USA v THOMAS Trial Transcript, signed by the defendant and attorneys" is among the January-6-themed prizes to win.

As the PSR notes, Thomas has raised more than $77,607 in his various online forums, including in a website entitled, "Help Joseph Thomas Let Freedom Sing." PSR ¶ 137. It is difficult to determine the exact amounts that Thomas has made from his criminal conduct, but the $77,607 figure listed in the PSR likely underrepresents the real amount. Thomas should not be permitted to keep a single cent of this money because doing so would allow him to "capitalize" on his crime. *See, e,g, United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994) (In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public.").

Accordingly, the government requests a fine of, at a minimum, $77,607.

*Remainder of Page Intentionally Left Blank*

\*      \*      \*

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 109 months of incarceration, at the midpoint of the applicable range, 36 months of supervised release, restitution of $2,000, a fine of $77,607, and mandatory assessments totaling $525.

Respectfully submitted,

MATTHEW M. GRAVES

United States Attorney
DC Bar No. 481052

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

50

| Government's List of Figures & Attachments for Sentencing | |
|---|---|
| | |
| Figure No. / Attachment | Description | Admitted Govt Trial Ex. No. |
| 1 | Facebook Post - Capitol with Lightning Bolt | 402.8825 |
| 2 | Facebook Post - Midnight Ride WW1WGA - 2nd American Revolution | NA |
| 3 | Screenshots from Rumble Video of Officer Line, Top of Grandstands, Where Screen Began "POLICE STAND DOWN" Chant | 504 (approx. 18:00) |
| 4 | Screenshot from BWC Video of Thomas Holding Jackknife under Grandstands | 309.1 |
| 5 | Screenshot from Thomas' Rumble Video of Rioter Using Power Tool to Destroy Grandstand Tarp | 504 (31:23)) |
| 6 | 3-D Rendering Showing Thomas' Path on Upper West Terrace | 119 at 5 |
| 7 | Screenshot from BWC Video of Thomas, Circled in Red, Running Up Stairs to Assault Officer R.A. | 307 |
| 8 | Screenshot from BWC Video of Thomas,, Circled in Red, Throwing Hands into Officer R.A.'s Chest | 307 |
| 9 | Screenshot from BWC Video of Thomas, Circled in Red, Running Up Stairs to Assault Officer M.N. | 304 |
| 10 | Screenshot from BWC Video of Thomas Throwing Hands into Officer M.N.'s Chest | 304 |
| 11 | Screenshot from Open-Source Video of Thomas Throwing Hands into Officer R.A.'s Chest, Thomas and R.A. Circled in Red | 707 (00:16-17) |
| 12 | Screenshot from Open-Source Video of Thomas Throwing Hands into Officer M.N.'s Chest, Thomas and M.N. Circled in Red | 707 (00:16-20) |
| 13 | Three Screenshots of Videos Showing Thomas Jumping Wall and Moving to Front of Violent Mob | 306.1; 712 (1:04, 1:29) |
| 14 | Screenshot from BWC Video of Thomas, Circled in Red, Screaming and Preparing to Join with Other Rioters to Push with their Backs Against Defensive Police Line | 303 |
| A | Thomas Text Messages from January 6, 2021 | NA |
| B | Thomas Media Since June 1, 2023 Conviction | NA |

**Govt Att. A**

(owner)
To:

It's a fight at the Capitol... No violence from us. The cops are tear gass, pepper balls/spray... Riot gear... Beating people with night sticks. We're just trying to push through their line.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| | | | |

Status: Sent

1/6/2021 9:09:56 PM(UTC+0)

Source Info:
Universal_Android Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x129ADA (Table: sms; Size: 4317184 bytes)

From
(owner)

You're pushing through to where? Get into the Capitol? Or to get out of there?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Unknown | | | |

Status: Read
Delivered: 1/6/2021 9:11:21 PM(UTC+0)

1/6/2021 9:11:22 PM(UTC+0)

Source Info:
Universal_Android Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x129A2D (Table: sms; Size: 4317184 bytes)

(owner)
To:

Storming the Capitol

| Participant | Delivered | Read | Played |
|---|---|---|---|
| | | | |

Status: Sent

1/6/2021 9:14:45 PM(UTC+0)

Source Info:
Universal_Android
Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x1299BF
(Table: sms; Size: 4317184 bytes)

(owner)
To:

Been in once already

| Participant | Delivered | Read | Played |
|---|---|---|---|
| | | | |

Status: Sent

1/6/2021 9:14:54 PM(UTC+0)

Source Info:
Universal_Android
Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x129953
(Table: sms; Size: 4317184 bytes)

7



From:
(owner)

Kek, how is it in there? Get pics?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Unknown | | | |

Status: Read
Delivered: 1/6/2021 9:15:34 PM(UTC+0)

1/6/2021 9:15:34 PM(UTC+0)

Source Info:
Universal_Android
Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x1298D4
(Table: sms; Size: 4317184 bytes)



From:
(owner)

Also...
Why did you do that?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Unknown | | | |

Status: Read
Delivered: 1/6/2021 10:37:54 PM(UTC+0)

1/6/2021 10:44:45 PM(UTC+0)

Source Info:
Universal_Android
Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x1297F2
(Table: sms; Size: 4317184 bytes)



From:
(owner)

Also...
Why did you do that?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Unknown | | | |

Status: Read
Delivered: 1/6/2021 10:47:13 PM(UTC+0)

1/6/2021 10:47:14 PM(UTC+0)

Source Info:
Universal_Android
Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x129779
(Table: sms; Size: 4317184 bytes)

8

(owner)
To:

You'll see in my vids, no violence. Just trying to enter for the symbolism of entering the Capitol. There were agitators and provocateurs there. We were calling them out... Taking weapons from them.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| | | | |

Status: Sent

1/7/2021 2:38:55 PM(UTC+0)

Source Info:
Universal_Android Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x1294D6 (Table: sms; Size: 4317184 bytes)

(owner)
To:

I primarily documented it

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17702413587 Taio | | | |

Status: Sent

1/7/2021 2:39:30 PM(UTC+0)

Source Info:
Universal_Android Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x129463 (Table: sms; Size: 4317184 bytes)

## Instant Messages (6)

⚠ * These details are cross-referenced from this device's contacts

| # | Source | From | To | All timestamps | Content | Deleted | * |
|---|---|---|---|---|---|---|---|
| 1 | Native Messages | | | Timestamp: 12/16/2020 12:35:16 AM(UTC+0) | Direction: Outgoing Body: Jan 6th  Participants: Participant Delivered Read Played  Source file: Universal_Android Access.zip/data/user/0/com.android.providers.telephony/databases/mmssms.db : 0x405FCE (Table: sms; Size: 4317184 bytes) Status: Sent Message Type: SMS Folder: Sent | | 🏷 |

9

**Govt Att. B**

**Thomas Post-Conviction Media Activity**

| Title | Date | Duration | Link |
|---|---|---|---|
| Sing4Freedom 06-01-23 | 2023.06.01 | 00:02:21 | https://rumble.com/v2ri0uo-sing4freedom-06-01-23.html |
| Freedom Unchained Ep 31 \| Freedom Through Faith \| Jenna Ryan | 2023.06.05 | 01:05:17 | https://open.spotify.com/episode/2DjvDb5GAovEL54JBkHvoY?si=1XaXpD3jQGu7nnDeQXkzVg&nd=1 |
| Based Pilled Pod \| Pi with Patrick Reilly | 2023.06.08 | 00:19:08 | https://rumble.com/v2sxjf4-pi-with-patrick-reilly-based-pilled-pod.html |
| Freedom Unchained Ep 32 \| Freedom Through Faith \| Jenna Ryan | 2023.06.08 | 01:36:29 | https://rumble.com/v2tlpis-ep-32-unity-of-independence-q-anon-shaman.html |
| Exclusive! \| J6 \| A Victory Over the Government's Narrative \| Joseph Thomas \| Pi \| Day 878 | 2023.06.11 | 01:13:24 | https://rumble.com/v2rq6z6-j6-a-victory-over-the-governments-narrative-joseph-thomas-pi-day-878.html |
| Jenna Ryan interviews Joseph Thomas - J6 Defendant | 2023.06.20 | 01:13:24 | https://www.youtube.com/watch?v=b2kEc-aNE8Y |
| Freedom Unchained Ep 33 \| Seditious Government Tactics \| Stewart Rhodes | 2023.06.24 | 00:53:17 | https://rumble.com/v2v9mj4-ep-33-seditious-government-tactics-stewart-rhodes.html |
| The Remington Report Episode #10 | 2023.06.25 | 02:26:24 | https://rumble.com/v2wco72-the-remington-report-episode-10.html |
| INTBS w/JohnnyQ episode 40 Featuring Special Guest's PiAnon & Three Fallen1 | 2023.07.07 | 06:23:18 | https://rumble.com/v2sjm30-intbs-wjohnnyq-episode-40-featuring-special-guests-pianon-and-thee-fallen1.html |
| Trust in God \| Truth & Light Freedom Fest | 2023.07.12 | 00:27:17 | https://rumble.com/v2zhs7c-trust-in-god-truth-and-light-freedom-fest.html |
| The Tamara Scott Show With : Time Rivers, Joseph Thomas | 2023.07.14 | 00:24:41 | https://rumble.com/v302baq-the-tamara-scott-show-with-tim-rivers-joseph-thomas.html |
| Severe's Shipfaced Saloon Saturday - Open Zoom Panel - #SipForShips | 2023.07.29 | 05:01:48 | https://rumble.com/v337c24-severes-shipfaced-saloon-saturday-open-zoom-panel-sipsforships.html |

| Title | Date | Duration | Link |
|---|---|---|---|
| Freedom Unchained Ep 0 \| Slice of Pi | 2023.08.01 | 00:38:12 | https://rumble.com/v33q3u3-freedom-unchained.html |
| Freedom Unchained Ep 1 \| Slice of Pi | 2023.08.03 | 02:02:57 | https://rumble.com/v34hc0p-slice-of-pi.html |
| Team Awesome with "PiAnon" (Joseph Thomas)#Sing4Freedom | 2023.08.04 | 0:59:26 | https://rumble.com/v34j8kz-team-awesome-with-pianon-joseph-thomassing4freedom.html |
| Freedom Unchained Ep 2 \| Slice of Pi | 2023.08.06 | n/a | https://rumble.com/v351q04-ep-2-slice-of-pi.html |
| Freedom Unchained Ep 3 \| Slice of Pi | 2023.08.06 | 02:58:23 | https://rumble.com/v35jml4-ep-3-slice-of-pi.html |
| Freedom Unchained Ep 4 \| Slice of Pi | 2023.08.08 | 02:33:15 | https://rumble.com/v35zcxu-slice-of-pi.html |
| Freedom Unchained Ep 2 \| Coffe & Pi | 2023.08.11 | 02:19:24 | https://rumble.com/v36jrvv-coffee-and-pi.html |
| Freedom Unchained Ep 5 \| Slice of Pi | 2023.08.12 | 02:06:33 | https://rumble.com/v36nmg6-ep-5-slice-of-pi.html |
| Dynamite with James and Jim | 2023.08.10 | 01:04:24 | https://www.youtube.com/watch?v=G3xeexNzqIY |
| Freedom Unchained Ep 3 \| Coffee & Pi | 2023.08.12 | 15:01:37 | https://rumble.com/v36uydu-ep-3-coffee-and-pi.html |
| Freedom Unchained Ep 4 \| Coffee & Pi | 2023.08.14 | 04:21:49 | https://rumble.com/v37bf3s-coffee-and-pi.html |
| Freedom Unchained Ep 6 \| Slice of Pi | 2023.08.15 | 02:21:18 | https://rumble.com/v37nodi-slice-of-pi.html |
| Freedom Unchained Ep 5 \| Coffe & Pi (Redo) | 2023.08.16 | 02:58:15 | https://rumble.com/v386kgx-ep-5-coffee-and-pi-redo.html |
| Freedom Unchained Ep 7 \| Slice of Pi | 2023.08.17 | 02:00:30 | https://rumble.com/v38bvwb-ep-7-slice-of-pi.html |
| Freedom Unchained Ep 6 \| Coffee & Pi | 2023.08.18 | 03:55:24 | https://rumble.com/v38tb91-ep-6-coffee-and-pi.html |
| Freedom Unchained Ep 8 \| Slice of Pi | 2023.08.19 | 01:10:22 | https://rumble.com/v390haf-ep-8-slice-of-pi.html |
| Freedom Unchained Ep 7 \| Coffee & Pi | 2023.08.19 | 09:01:14 | https://rumble.com/v39agar-ep-7-coffee-and-pi.html |
| Freedom Unchained Ep 8 \| Coffee & Pi | 2023.08.21 | 04:15:49 | https://rumble.com/v3a1xp3-ep-8-coffee-and-pi.html |
| Freedom Unchained Ep 9 \| Slice of Pi | 2023.08.21 | 03:24:35 | https://rumble.com/v3a5ccj-ep-9-slice-of-pi.html |
| Freedom Unchained Ep 9 \| Coffee & Pi | 2023.08.23 | 02:48:16 | https://rumble.com/v3asvem-ep-9-coffee-and-pi.html |
| Freedom Unchained Ep 10 \| Coffee & Pi | 2023.08.23 | n/a | https://rumble.com/v3avrmw-ep-10-coffee-and-pi.html |
| **Total as of 8/23/2023 at 6pm** | | **87 Hours, 7 Minutes, 30 Seconds (Three days and fifteen hours of content)** | |